UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL FRANCISCO, *individually and on behalf of all others similarly situated*,

Plaintiff,

– *against* –

ABENGOA, S.A., SANTIAGO SEAGE, MANUEL SANCHEZ ORTEGA, BARBARA ZUBIRIA, and IGNACIO GARCIA ALVEAR,

Defendants.

**AMENDED
OPINION & ORDER**

15 Civ. 6279 (ER)

RAMOS, D.J.:

Lead Plaintiffs Jesse and Arlette Sherman and plaintiff PAMCAH-UA Local 675 Pension Fund (collectively, "Plaintiffs"), bring this federal securities class action against Abengoa S.A. ("Abengoa"); Manuel Sanchez Ortega, Abengoa's former Chief Executive Officer ("CEO"); Christopher Hansmeyer, the duly authorized representative for Abengoa in the United States; and HSBC Securities (USA) Inc., Banco Santander S.A., Canaccord Genuity Inc., Merrill Lynch International, and Société Générale, investment banks that served as underwriters for Abengoa's United States offering (together, the "Underwriter Defendants").  Plaintiffs seek to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), as well as under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.  Plaintiffs bring their Securities Act claims on behalf of purchasers of Abengoa ADSs pursuant or traceable to Abengoa's public offering on October 17, 2013.  They bring their Exchange Act claims on behalf of purchasers of Abengoa's American Depositary Shares ("ADSs") between October 17, 2003 and August 3, 2015 (the "Class Period").

Before the Court are three motions to dismiss Plaintiffs' Second Amended Complaint, filed by Abengoa, Doc. 115, Sanchez Ortega, Doc.113, and the Underwriter Defendants, Doc. 109.  Defendants also jointly request oral argument.  Doc. 136.  For the following reasons, the motions to dismiss are GRANTED, and the request for oral argument is dismissed as moot.

I.      **BACKGROUND**

   **A. Factual Background**

   Abengoa, founded in 1941, is an engineering and clean technology company headquartered in Spain.  Doc. 88 ¶¶ 20, 40–41.  Sanchez Ortega served as Abengoa's CEO from March 2010 until his resignation on May 19, 2015, and Hansmeyer was its duly authorized representative in the United States.  *Id.* ¶¶ 21–22.  This action relates to Abengoa's October 17, 2013 public offering on the NASDAQ Global Select Market (the "NASDAQ") for €517.5 million, which the Underwriter Defendants underwrote, and to the subsequent series of events culminating in the company's filing for insolvency and bankruptcy.  *Id.* ¶¶ 24, 227–38.  Lead Plaintiffs Jesse and Arlette Sherman and Plaintiff PAMCAH-UA Local 675 Pension Fund purchased Abengoa's ADSs during the Class Period.  *Id.* ¶ 19.  Specifically, the Shermans began trading Abengoa ADSs beginning November 18, 2014, Doc. 7, Ex. 1, and PAMCAH-UA Local 675 Pension Fund first purchased Abengoa ADSs on April 6, 2015, Doc. 12, Ex. 1.  The following facts are taken from Plaintiffs' Second Amended Complaint and are assumed to be true for purposes of the instant motions.

   *1.  The Offering*

   On October 4, 2013, in preparation for the offering, Abengoa filed a Registration Statement with the SEC on Form F-1, offering U.S. investors Class B shares in the form of ADSs, each of which represented the right to receive five Class B shares.  *Id.* ¶ 46.  The Underwriter Defendants helped to draft and disseminate the Registration Statement, and Sanchez Ortega and Hansmeyer signed it.  *Id.* ¶¶ 21–26.

   At the time of the offering, Abengoa was comprised of 532 subsidiaries, 17 associates, and 34 ventures, and was operating in over 70 countries.  *Id.* ¶ 41.  Because Abengoa engaged in large engineering and construction projects throughout the world, cash flow and liquidity were highly material to investors.  *Id.* ¶ 42.  Abengoa used two types of debt:  recourse debt and non-recourse debt.  *Id.* ¶ 43.  Recourse debt—also referred to as "corporate debt"—was guaranteed by Abengoa.  *Id.*  Non-recourse debt, which was used to finance specific projects, was guaranteed

by the assets and cash flows of the "project companies" formed to carry out those projects.  *Id.*
In other words, non-recourse debt was not secured by Abengoa in the event of a default.  *Id.*  The
company's recourse debt was subject to a debt ratio covenant with its lenders.  *Id.* ¶ 44.  As per
the covenant, Abengoa was required to maintain a "leverage" ratio of debt-to-earnings before
interest, taxes, depreciation and amortization ("EBITDA") below 3.0x until December 30, 2014,
and below 2.5x thereafter.  *Id.* ¶¶ 3, 44.

   As is relevant to the instant action, the Registration Statement made representations about
Abengoa's cash flow and liquidity, its debt usage and financing for long-term projects, and its
accounting policies.  *Id.* ¶¶ 52–58; 103–111.  According to the Registration Statement, as of June
30, 2013, Abengoa had recourse debt of €5,252 million, non-recourse debt of €5,297.6 million,
and €3,221.7 million in cash equivalents and short-term financial investments, resulting in a total
net debt (including other loans and borrowings) of €7,327.9 million.  *Id.* ¶ 103.  The Registration
Statement also contained the following language regarding its operations for financing
construction projects:

> **We have successfully grown our business while seeking to enforce strict
> financial discipline to maintain our strong liquidity position.  As of June
> 30, 2013, we had cash and cash equivalents and short-term financial
> investments of €3,222 million, which we believe are sufficient to satisfy
> our short-term liquidity needs.  This strong cash position also assists in
> bidding for large projects**. . . .
>
>                                   * * *
>
> While we generally seek to maintain a balance of non-recourse debt and
> corporate debt to encourage financial discipline, the majority of our capital
> expenditures are financed by non-recourse debt and funding, when applica-
> ble, from partners in a particular project.  **We incur corporate debt to fi-
> nance our investments, acquisitions and general purpose requirements.**
> Our corporate debt has the benefit of upstream guarantees from our operat-
> ing subsidiaries which are subject to debt/EBITDA ratios as discussed
> above.  The funding of our corporate capital expenditure is covered by ex-
> isting cash and corporate EBITDA generation.  We incur non-recourse debt
> on a project-by-project basis, and **we do not commit to any projects that
> we have been awarded prior to securing long-term financing.**

*Id.* ¶¶ 52, 105 (emphasis in the complaint).  It also contained the following statement regarding

Abengoa's "percentage-of-completion" accounting policy:

> Revenue from construction contracts is recognized using the percentage-of-completion method for contracts whose outcome can be reliably estimated and it is probable that they will be profitable.  When the outcome of a construction contract cannot be reliably estimated, revenue is recognized only to the extent it is probable that contract costs incurred will be recoverable.
>
> As described in Note 2.26.b) to our Annual Consolidated Financial Statements and our Interim Consolidated Financial Statements, the percentage of completion is determined at the date of every consolidated statement of financial position based on the actual costs incurred as a percentage of total estimated costs for the entire contract.
>
> Revenue recognition using the percentage-of-completion method involves the use of estimates of certain key elements of the construction contracts, such as total estimated contract costs, allowances or provisions related to the contract, period of execution of the contract and recoverability of the claims.  **We have established, over the years, a robust project management and control system, with periodic monitoring of each project.  This system is based on the long-track experience of the Group in constructing complex infrastructures and installations.  As far as practicable, we apply past experience in estimating the main elements of construction contracts and rely on objective data such as physical inspections or third parties [*sic*] confirmations.**  Nevertheless, given the highly tailored characteristics of the construction contracts, most of the estimates are unique to the specific facts and circumstances of each contract.

*Id.* ¶¶ 57, 110 (emphasis in complaint).

On October 16, 2013, Abengoa filed a Prospectus, which formed part of the Registration

Statement and increased the offering from 182,500,000 shares to 250,000,000, as well as set the

price of each ADS at $12.18.  *Id.* ¶ 47.  On October 17, 2013, the company went public in the

United States and began selling its ADSs on the NASDAQ exchange.  *Id.* ¶ 48.  Abengoa

realized €517.5 million in gross proceeds from the offering, or roughly $703.8 million.  *Id.* ¶ 49.

Abengoa represented that it intended to use the proceeds from the offering to repay €347 million

in corporate debt maturities due in 2013.  *Id.* ¶ 50.

    *2.  Positive Financial Reports*

After the offering, Abengoa made several reports of positive financial results.  On

November 11, 2013, Abengoa reported its financial results for the nine months ending September

30, 2013.  *Id.* ¶ 112.  It reported that its EBITDA had risen 29% year-over-year and that Abengoa was accelerating its deleverage targets.  *Id.*  At subsequent conference calls, Sanchez Ortega reiterated these results and remarked positively on the company's financial position, leverage, cash flow, and EBITDA.  *Id.* ¶¶ 113–117.  Abengoa's financial results for the full year ending December 31, 2013, which were announced on February 20, 2014, were similarly positive.  *Id.* ¶¶ 118–121.

On March 3, 2014, Abengoa announced that it intended to launch an initial public offering ("IPO") of Abengoa Yield plc ("Abengoa Yield"), a "yieldco."  *Id.* ¶ 122.  A yieldco is a separate business that owns and operates power plants and other energy-related assets to produce a steady flow of income.  *Id.* ¶ 122 n.2.  It enables "developer" parent companies to sell existing power plants to raise capital at a lower cost and is considered attractive to investors.  *Id.*

On March 19, 2014, Abengoa filed its annual report for the year ending December 31, 2013, signed by Sanchez Ortega, with the SEC.  *Id.* ¶ 124.  Abengoa again represented that it had sufficient capital and liquidity to fund existing operations and to finance expansions.  *Id.* ¶¶ 124–27.  In their presentations, Sanchez Ortega and Barbara Zubiria Furest, Abengoa's Co-Chief Financial Officer and Executive Vice President of Capital Markets and Investor Relations from January 2011 to January 19, 2015, reiterated this position at Abengoa's Eighth Annual Analyst and Investor Day on April 3, 2014 in New York.  *Id.* ¶¶ 28, 128–130.  Reports of Abengoa's favorable corporate leverage were reaffirmed by Abengoa's first quarter of 2014 and first half of 2014 results, as well as by continued confident statements from Sanchez Ortega and Zubiria Furest in subsequent presentations.  *Id.* ¶¶ 131–144.

On June 12, 2014, Abengoa launched the Abengoa Yield IPO, raising gross proceeds of $828.7 million.  *Id.* ¶ 122.[1]

---

[1] Although Abengoa was initially a 71.1% owner of Abengoa Yield, it slowly reduced its stake so as to raise hundreds of millions of euros of capital.  *Id.* ¶ 123.

3. *The Greenfield Bonds*

At a strategy update breakfast on September 3, 2014, Abengoa announced that the company was transitioning to an "asset-light" business model, aimed at generating cash throughout the lifecycle of construction projects. *Id.* ¶¶ 145–46. This was due in part to investors' concerns about Abengoa's balance sheet. *Id.* ¶ 145. To achieve the "asset-light" model, Abengoa would create a subsidiary—Abengoa Greenfield, S.A. ("Abengoa Greenfield"), which would then secure short-term "bridge" financing from Abengoa's external partners for the beginning stages of new projects. *Id.* ¶ 146. According to the new model, completed projects would be sold to Abengoa Yield, and Abengoa would reinvest a portion of those proceeds in new projects via Abengoa Greenfield. *Id.* ¶ 147. Analysts and investors were optimistic about the new model. *Id.* ¶ 148.

On September 22, 2014, Abengoa announced that Abengoa Greenfield would issue €500 million in bonds (the "Greenfield Bonds"). *Id.* ¶ 149. Abengoa represented that the company would secure the bonds, and that it "intended to classify" the bonds as corporate recourse debt "upon issuance." *Id.* ¶ 151. Abengoa would use the proceeds from the offering to finance certain projects "until the long-term funds associated with those projects are obtained," while "optimizing financial costs." *Id.* ¶ 149. The bonds were offered in two tranches (one in euros and one in U.S. dollars), both set to mature in 2019. *Id.* ¶ 150. The offering closed on September 30, 2014. *Id.*

4. *The November 2014 Disclosures*

In November 2014, Abengoa made a series of disclosures related to its debt characterization and other practices (the "November 2014 Disclosures"). On November 12, 2014, Abengoa announced its financial results for the nine months ending on September 30, 2014. *Id.*¶ 152. Abengoa reported that EBITDA had risen 24% year-over-year, and that its corporate leverage ratio was 2.1x, a .4x reduction from the previous quarter. *Id.* In a conference call with analysts later that day, Sanchez Ortega reiterated optimism about the company's cash flow and liquidity. *Id.* ¶¶ 152–156.

6

During the call, an HSBC analyst sought clarification with regards to the Greenfield Bonds, noting that they did not seem to be included in Abengoa's reported corporate leverage ratio.  *Id.* ¶ 157.  Zubiria Furest then revealed that Abengoa had classified the Greenfield Bond as non-recourse debt, under the category "nonrecourse financing in process," which was excluded from the corporate leverage ratio.  *Id.*  When a Barclays analyst made the same observation— noting that "obviously the greenfield bonds . . . are the same as the other debts guaranteed by Abengoa.  And yet, you're not including it in the corporate debt.  I just want to understand why."—Zubiria Furest stated that the bonds were "classified in a different bucket. . . . It is preoperational nonrecourse debt.  And that is accounted for as what we call nonrecourse debt . . . ."  *Id.* ¶ 158.  According to Plaintiffs, analysts and investors were "stunned" to learn that the Greenfield Bonds had been categorized this way, citing a Lucror Analytics report issued on November 13, 2014 and a Fitch Ratings report issued on November 14, 2014.  *Id.* ¶¶ 159–160.  The price of Abengoa ADSs fell nearly 50% over the next three trading days, from $17.59 per ADS to $8.83 per ADS.  *Id.* ¶ 161.

On Monday, November 17, 2014, Abengoa held another call in an effort to repair its credibility.  *Id.* ¶¶ 162–63.  The company revealed that Abengoa accounted for a total of €1.595 billion (including the €500 million Greenfield Bonds) as "non-recourse debt in process."  *Id.* ¶ 163.  After including "non-recourse debt in process," Abengoa's corporate leverage ratio was 3.9x.  *Id*. ¶ 164.  Zubiria Furest also disclosed that Abengoa did not characterize "approximately €1 billion of cash linked to supplier payments that is set aside on collateral accounts" as debt.  *Id.* Regardless, Sanchez Ortega and Zubiria Furest[2] continued to highlight Abengoa's sound liquidity position.  *Id.* ¶¶ 165–67.  Analysts and investors continued to criticize the company, including in a Santander analyst report issued on November 17, 2014 and in a November 18, 2014 *Reuters* article.  *Id.* ¶¶ 168–69.

---

[2] Zubiria Furest resigned from her position two months later, on January 19, 2015.  Doc. 88 ¶ 257.

### 5. *Subsequent Reports and Transactions*

Throughout 2015, Abengoa continued to report that it had a healthy level of liquidity and was poised to generate positive cash flow and described its 2014 operating performance as "strong." *Id.* ¶¶ 171–189. Despite these assurances, on May 8, 2015, Abengoa borrowed 95 million Class B shares from its majority shareholder, worth approximately €275 million. *Id.* ¶¶ 190–91. On the same day, Abengoa agreed to subscribe to 51% of a $670 million capital increase announced by Abengoa Yield, designed to fund the acquisition of four solar power assets owned by Abengoa. *Id*. ¶ 192. Analysts questioned the timing of these transactions, noting that it would be "surprising and worrying" if the shares were used to access the funding. *Id.* ¶ 193.

On May 14, 2015, Abengoa announced its financial results for the quarter ending March 31, 2015, stating that it had "completed a crucial transformation of Abengoa's business model," reporting a corporate leverage ratio of 2, and emphasizing its liquidity position. *Id.* ¶ 194–199.

On May 19, 2015, Sanchez Ortega resigned from his position as CEO, but continued as non-executive First Vice Chairman and joined Abengoa's International Advisory Board. *Id.* ¶ 244. Abengoa stated that his decision was for "strictly personal reasons." *Id.* A report issued by Canaccord Genuity that day noted that the timing of Sanchez Ortega's resignation as surprising, as the company had only recently implemented its new business model. *Id.* ¶ 245. In an interview with a Spanish newspaper the next day, Sanchez Ortega explained that he was leaving for personal and health reasons, citing his heart surgery in 2012. *Id.* ¶¶ 246–47. He was replaced by Santiago Seage. *Id.* ¶ 27.

On June 29, 2015, Abengoa's subsidiary, Abengoa Concessions Investment Limited ("Abengoa Concessions"), entered into a margin loan facility agreement pursuant to which it was permitted to borrow up to $200 million. *Id.* ¶ 200. It posted as collateral a 14% stake in Abengoa Yield, which was reportedly worth approximately $450 million. *Id.* ¶ 201.

On July 6, 2015, Sanchez Ortega joined BlackRock, Inc. ("BlackRock"), "one of the world's largest asset managers, as the Head of Strategic Development for the Latin American

Infrastructure Investment Group, but allegedly continued to have access to material non-public information regarding Abengoa. *Id.* ¶¶ 248, 250–251. Shortly thereafter, two BlackRock subsidiaries began acquiring large short positions against Abengoa. *Id.* ¶¶ 249, 252.

Only July 16, 2015, Abengoa announced that it had sold all of its Class B shares in treasury stock to raise €97.6 million. *Id.* ¶ 204. This further raised suspicions, as stated in a July 17, 2015 *Reuters* article and a BPI analyst report issued on the same day. *Id.* ¶¶ 205–207. However, on July 23, 2015, Abengoa held a conference call in which it reaffirmed that decreasing debt was a key priority and that its recent credit upgrade by S&P would help achieve this goal. *Id.* ¶ 208.

      *6. July 31, 2015 Disclosures*

On Friday, July 31, 2015, Abengoa issued a press release announcing its financial results for the six months ending on June 30, 2015. *Id.* ¶ 209. Once more, the company reported a "strong business performance." *Id.* Later that day, Abengoa held a conference call with analysts and investors to discuss these results. During that call, Plaintiffs allege that "defendants ***finally*** began to reveal the dire financial situation that the Company was facing, but continued to misrepresent the Company's plans to access the capital markets for additional financing." *Id.* ¶ 211. For example, the company announced that it was reducing its corporate free cash flow guidance from €1.4 billion to between €600 million and €800 million. *Id.* It also announced that it was planning to divest €400 million worth of assets. *Id.* ¶ 212.

However, company executives continued to represent that Abengoa was in an adequate position with respect to its liquidity. *Id.* ¶¶ 213–16. Analysts on the call asked specifically whether the company was adequately funded. *Id.* ¶ 217. Seage stated that Abengoa had "no plan . . . to tap the capital markets in any manner." *Id.* ¶¶ 217–18.

Yet, the very next business day, on Monday, August 3, 2015, Abengoa announced that it was doing just that, seeking shareholder approval of a capital increase with preemptive rights of €650 million and asset divestitures totaling €500 million. *Id.* ¶ 220. The company stated that these "significant actions" were necessary to "reduce corporate debt" and "reinforce [Abengoa's]

balance sheet." *Id.* Plaintiffs allege that analysts and investors were "stunned," citing to reports and articles by Canaccord Genuity, Citi, and *Bloomberg*. *Id.* ¶¶ 222–25. The price of Abengoa's ADSs fell nearly 30%, from a closing price of $11.06 per share on July 31, 2015 to $7.75 per share on August 3, 2015. *Id.* ¶ 226. The price fell an additional $1.75 per share the following trading day, resulting in losses of $8.1 billion in market capitalization and approximately $837 million in ADS market share. *Id.*

   *7. Post-Class Period Allegations*

   On November 8, 2015, Abengoa announced that Gonvarri Corporacion Financiera ("Gonvarri"), a Spanish investment firm, had agreed to invest €350 million in connection with Abengoa's planned capital increase. *Id.* ¶ 228. However, it announced that Gonvarri cancelled that agreement just a couple of weeks later, on November 25, 2015. *Id.* ¶ 229. On November 25, 2015, Abengoa announced that it was filing for preliminary creditor protection under the Spanish Insolvency Law, which allowed it four months to reach an agreement with its creditors. *Id.* ¶¶ 227, 229. Seage resigned from his position on November 27, 2015. *Id.* ¶ 231. Between February 24, 2016 and April 7, 2016, dozens of Abengoa's U.S.-based affiliates filed for Chapter 11 bankruptcy protection. *Id.* ¶ 237.

   In March 2016, Spanish prosecutors and investors filed a case against Sanchez Ortega and others for misrepresenting Abengoa's financial statements. *Id.* ¶ 254. That case remains ongoing. *Id.* At an unspecified time, Sanchez Ortega was also named as a defendant in a lawsuit filed by Abengoa bondholders alleging that he had committed insider trading in connection with BlackRock's short positions. *Id.* ¶ 253. The Second Amended Complaint is silent as to the outcome of that litigation. *Id.*

   On March 10, 2016, Abengoa announced that it had reached a preliminary debt-restructuring agreement with its creditors. *Id.* ¶ 233. On March 28, 2016, Abengoa filed for bankruptcy protection pursuant to Chapter 15 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. *Id.* ¶ 234. The Mercantile Court of Seville no. 2 (the "Spanish Bankruptcy Court") approved the agreement between Abengoa and its creditors,

allowing it seven months to restructure. *Id.* ¶ 235. The Bankruptcy Court in Delaware recognized this as the controlling proceeding pursuant to 11 U.S.C. § 1517, and temporarily stayed the case. *Id.* ¶ 236. Abengoa's ADSs and Class B shares were delisted from the NASDAQ the next day, on April 28, 2016. *Id.*

Both of Abengoa's bankruptcy proceedings concluded in mid-2019, and Abengoa now operates according to a court-approved reorganization plan. *Id.* ¶ 238.

### B. Procedural History

Plaintiff Michael Francisco, individually and on behalf of all others similarly situated, first filed his complaint bringing Exchange Act claims against Abengoa, Seage, Sanchez Ortega, Zubiria Furest, and Ignacio Garcia Alvear (Zubiria Furest's successor, Doc. 88 ¶ 29), on August 10, 2015. Doc. 1. In a related case, Daniel LaMoureaux, individually and on behalf of all others similarly situated, filed suit against the same parties on September 3, 2015. No. 15 Civ. 6971, Doc. 1. On October 9, 2015, husband and wife Jesse and Arlette Sherman, moved to consolidate the actions and for appointment as lead plaintiffs. Doc. 5. PAMCAH-UA Local 675 Pension Fund similarly moved on October 9, 2015. Doc. 8. On May 24, 2016, the Court granted the motions to consolidate and the Sherman's motion for appointment as lead plaintiffs, and denied the pension fund's. Doc. 19. The Shermans, together with PAMCAH-UA Local 675 Pension Fund, filed a First Amended Complaint on August 2, 2016, seeking relief under both the Exchange Act and the Securities Act and naming as defendants Abengoa, twenty-one individuals, and, for the first time, the Underwriter Defendants. Doc. 31.

On September 10, 2019, Abengoa wrote to advise the Court that its Chapter 15 case had been closed on August 21, 2019. Doc. 83; *see In re Abengoa, S.A., et al.*, No. 16-10754 (LSS) (D. Del. Bankr.) (No. 217). In a joint status report, Plaintiffs advised the Court that they intended to submit an amended pleading and that they did not intend to serve or pursue claims against the individual defendants who had not yet been served. Doc. 87. As such, the only Defendants remaining in the case were Abengoa, the Underwriter Defendants, Sanchez Ortega, and Hansmeyer. *Id.*

Plaintiffs filed the Second Amended Complaint on October 28, 2019.  Doc. 88.  Before the Court are motions to dismiss this complaint brought by the Underwriter Defendants, Doc. 109, Sanchez Ortega, Doc. 113, and Abengoa, Doc. 115.  Though Hansmeyer was served on September 8, 2016, he has not appeared in this action.  Doc. 79.  At a teleconference on May 19, 2020, Plaintiffs indicated that they would seek leave to amend the complaint in the event that Defendants' motions were granted.

### C.  The Second Amended Complaint

Plaintiffs bifurcate their second amended complaint into two parts:  (1) Securities Act allegations; and (2) Exchange Act allegations.

#### 1.  Securities Act Allegations

In support of their Securities Act claims, Plaintiffs allege that two sets of statements in the Registration Statement were false and misleading.  The first set includes statements regarding the Company's approach to financing construction projects, specifically:  (1) "This strong cash position also assists in bidding for larger projects"; (2) "We incur corporate debt to finance our investments, acquisitions and general purpose requirements"; and (3) "[W]e do not commit to any projects that we have been awarded prior to securing long-term financing."  Doc. 88 ¶ 52. Plaintiffs allege that these were inaccurate and incomplete statements of material fact because Abengoa used "erroneous financial statements to strengthen the appearance of the Company's operations and finances," which, in turn, "enabled Abengoa to improperly secure funding for projects and bid successfully on contracts."  *Id.* ¶ 53.  Specifically, Plaintiffs allege that Abengoa provided its external auditors with materially inaccurate information through a system of "double books" including an "SAP"[3] software system and a separate online accounting system.  *Id.* ¶ 54. When these systems contained discrepancies—which they often did—employees manually changed the "SAP" entries, often resulting in inflated profits which were then used to obtain "hundreds of millions of dollars in financing."  *Id.*  Additionally, Plaintiffs allege that Abengoa

---

[3] SAP AG is a software corporation best known for its business management software.  Doc. 88 ¶ 80 n.1.

overstated its financial position and improperly secured lines of credit by recording false

percentages of completion on various projects, "which enabled Abengoa to recognize material

amounts of revenue prematurely."  *Id.* ¶ 55.  Plaintiffs allege that this behavior occurred prior to,

during, and after the offering and that Defendants were negligent in failing to disclose this.  *Id.*

¶ 56.

     The second set of allegedly false and misleading statements also concern Abengoa's

"percentage-of-completion" accounting policy.  Specifically, Plaintiffs allege that the following

statement was inaccurate:

> We have established over the years, a robust project management and con-
> trol system, with periodic monitoring of each project.  This system is based
> on the long-track experience of the Group in constructing complex infra-
> structures and installations.  As far as practicable, we apply past experience
> in estimating the main elements of construction contracts and rely on objec-
> tive data such as physical inspections or third parties [*sic*] confirmations.

*Id.* ¶ 57.  Plaintiffs again allege that Abengoa routinely recognized construction contract revenue

prematurely, and that, in addition to helping Abengoa secure lines of credit, this behavior also

violated its stated accounting policy.  *Id.*  Plaintiffs allege that this practice was ongoing at the

time of the offering.  *Id.*

     *2.  Exchange Act Allegations*

     In support of its Exchange Act claims, Plaintiffs claim the falsity of numerous statements.

First, they reiterate the falsity of the above Registration Statement and other statements based on

the same theories of Abengoa's misrepresentation of its financial statements and its divergence

from its "percentage-of-completion" accounting policy.  *Id.* ¶¶ 104–11, 117, 121, 130, 135, 140,

144, 156, 167, 176, 184, 189, 199, 210.  They also allege that the Registration Statement

contained a third category of false representations about its debt and liquidity.  *Id.* ¶ 104.

Plaintiffs maintain that these and several other statements made by Defendants during the class

period about Abengoa's leverage, cash flow and EBIDTA were materially false and misleading

because Abengoa misrepresented its liquidity by:

> (i) categorizing a portion of its recourse debt as "non-recourse" debt—even
> though such debt was guaranteed by Abengoa; and (ii) failing to

characterize as debt funds the Company owed to banks for supplier pay-
ments, in order to report more favorable leverage ratios that exceeded the
ratios required by the Company's debt covenants.

*See, e.g.*, *id.* ¶¶ 104, 117, 121, 127, 130, 135, 140, 144, 156.  Plaintiffs also allege that

Defendants misled the market about Abengoa's liquidity and cash flow by intentionally delaying

supplier payments, refusing to pay contractors, and "pocketing funds" that should have been paid

to legitimate subcontractors.  *Id.* ¶¶ 104, 117, 121, 130, 135, 140, 144, 156, 167, 176, 184, 189,

199, 210.  With respect to the latter claim, Plaintiffs allege that Abengoa created "shell" U.S.

subsidiaries, which it then hired as subcontractors because it was required to hire U.S.

subcontractors as a condition of receiving certain federal funds.  *Id.* ¶¶ 91–92.  In fact, however,

those subsidiaries hired other subcontractors to perform the work required at a lower cost.  *Id.*

¶ 91.  Specifically, Plaintiffs allege that Abengoa used this tactic at its "Mojave" solar project in

California, as well as at others.  *Id.* ¶ 92.  Plaintiffs further maintain that, after the July 2015

disclosures, Defendants were actively planning to raise capital, in spite of indications to the

contrary, *id.* ¶ 210, and that they continued to materially misrepresent their liquidity situation, *id.*

¶ 218.

### 3.  *Confidential Witnesses*

In support of their allegations, Plaintiffs rely on information obtained from three

confidential witnesses, all of whom were former Abengoa employees.  "FE1" was the Director of

Human Resources at Abiensa EPC ("Abiensa"), an Abengoa subsidiary in the United States,

from August 2010 through March 2013.  *Id.* ¶ 75.  FE1 maintains that she heard that Abengoa

maintained two sets of books from employees in the Abiensa accounting department.  *Id.* ¶ 79.

She also reports that Abengoa held training sessions during which managers were taught to reject

supplier invoices for the purpose of delaying payments, and that Abengoa routinely refused to

pay contractors, forcing them to file liens and ultimately settle their claims in arbitration for far

less that what was owed.  *Id.* ¶¶ 88, 90.  FE1 learned this information through exit interviews,

including an interview with one of Abiensa's internal auditors "who resigned because he had

been directed to sign-off on false financial reports."  *Id.* ¶ 55.  According to FE1, the internal

auditor told her that he had expressed concerns to Abiensa's CFO, Santiago Duran, but was instructed to "shut the f—k up and just sign" the reports. *Id.* ¶ 96.  FE1 approached Duran to discuss the issue, but was brushed off and ultimately had to send an email to memorialize the report. *Id.* ¶ 97.  FE1 also states that the allegedly false reports were presented to various lenders, which she learned during leadership meetings that she attended. *Id.* ¶ 98.  FE1 ultimately resigned due to stress caused by knowing about Abengoa's accounting irregularities. *Id.* ¶ 75.

"FE2" is "a former Abengoa employee who had broad oversight for accounting and financial reporting at several of Abengoa's U.S. subsidiaries." *Id.* ¶ 76.  He or she also claims that the subsidiaries he or she was responsible for maintained a set of books that were shown to external auditors and a separate set of books for internal use, and that the information presented to external auditors was regularly falsified. *Id.* ¶ 79.  Additionally, FE2 "was aware of instances in which Abengoa intentionally ignored accounting principles in order to knowingly inflate profits." *Id.* ¶ 85.  He or she believed that the executives at Abengoa's U.S. subsidiaries were aware of these irregularities but were acting at the direction of the leadership in Spain. *Id.* ¶ 87.  FE2 claims to have resigned when asked to sign off on false financial statements. *Id.* ¶ 76.

"FE3" was a Senior Staff Accountant at Abengoa's corporate office in Chesterfield, Missouri from June 2013 through July 2014, where she was responsible for accounting functions at Abiensa. *Id.* ¶ 77.  FE3 also reports that she "believed" that Abengoa maintained a second set of books. *Id.* ¶¶ 54, 80.  FE3 was responsible for making sure that the numbers in the SAP system and the corporate online system matched. *Id.* ¶ 81.  She reports that, on some occasions, the numbers in Abengoa's corporate online system were higher than the numbers in the SAP system. *Id.* ¶ 82.  When this happened, she would have to move costs and expenses around in the SAP system to match the corporate system. *Id.*  When FE3 brought up these discrepancies to her CFO, Juan Callesi, he "attempted to make excuses for the discrepancies, such as blaming them on exchange rates." *Id.* ¶ 84.  FE3 also reports that Abengoa had a "cumbersome" process

for approving invoices, and that this often resulted in delayed payments.  *Id*. ¶ 89.  FE3 maintains that she resigned due to concerns about Abengoa's financial reporting.  *Id.* ¶ 77.

## II.     LEGAL STANDARD

### A.  Rule 12(b)(6)

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  (citing *Twombly*, 550 U.S. at 556).  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

In determining the motion to dismiss, the Court may "consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken."  *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015) (summary order) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  The Court may "take judicial notice of public disclosure documents that must be filed with the [SEC] and documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'"  *Silsby*, 17 F. Supp. 3d at 354 (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991)).

### B.  Rule 9(b)

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") by stating the circumstances constituting fraud with particularity.  *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320–21 (2007)).  These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim.  *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'" (quoting Fed. R. Civ. P. 9(b))).

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify:  (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent.  *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170).  Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however.  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)).  Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also, e.g.*, *Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed."  *In re*

*Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (citing *ECA*, 553 F.3d at 196).

## III.   DISCUSSION

Before the Court are motions to dismiss the Second Amended Complaint in its entirety. The Underwriter Defendants and Sanchez Ortega move to dismiss claims brought against them pursuant to Sections 11 and 15 of the Securities Act; and Abengoa and Sanchez Ortega move to dismiss claims brought against them pursuant to Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All defendants join and incorporate the others' motions to the extent applicable.  Defendants also urge that any dismissal should be with prejudice.  For the following reasons, these motions are GRANTED in part, and Plaintiffs' Second Amended Complaint is dismissed without prejudice.

### A.  Securities Act Claims

In their Second Amended Complaint, Plaintiffs bring claims against the Underwriter Defendants, Sanchez Ortega, and Hansmeyer pursuant to Section 11 of the Securities Act; and against Sanchez Ortega and Hansmeyer pursuant to Section 15 of the Securities Act.  Doc. 88 ¶¶ 26, 59–72.  "Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC."  *In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010).  "Section 15 . . . creates liability for individuals or entities that 'control[] any person liable' under section 11 or 12."  *Id.* (citation omitted). Plaintiffs allege that certain statements in the Registration Statement were false because:  (1) Abengoa used erroneous financial statements to improperly secure funding for projects and to bid successfully on contracts; and (2) Abengoa did not actually adhere to its stated "percentage of completion accounting policy."  Doc. 88 ¶¶ 51–58.  In particular, Plaintiffs focus on allegations that Abengoa maintained a system of "double books," and that when these two books contained discrepancies, employees were instructed to manipulate one of the books, resulting in inflated profits.  *Id.* ¶ 54.  Abengoa also allegedly recorded false percentages of completion on various projects, resulting in material amounts of revenue being recognized prematurely.  *Id.*

¶ 55.  Both Sanchez Ortega and Hansmeyer signed the Registration Statement and were allegedly "control persons" by virtue of their positions at Abengoa.  *Id.* ¶¶ 71–72.

Both the Underwriter Defendants and Sanchez Ortega argue that these allegations should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).[4]  The Underwriter Defendants argue that Plaintiffs' claims against them are both time-barred and conclusory.  Sanchez Ortega additionally argues that the claims against him must be dismissed because Plaintiffs have failed to establish a primary violation and that, in any event, Plaintiffs have failed to properly allege scienter as required for Section 11 claims.  The Court addresses each of these arguments in turn.

*1.  Timeliness*

Claims brought under Section 11 of the 1933 Act are subject to a one-year statute of limitations, which begins to run upon "the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  Notice of the untrue statements or omissions may be actual or constructive, *i.e.* inquiry notice.  *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993).  For both actual and inquiry notice, "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint."  *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011).  Plaintiffs are charged with knowledge of any fact that "a reasonably diligent plaintiff would have discovered."  *Id.* at 174. "In determining when a reasonable investor would have discovered the fraud, courts may take judicial notice of 'the *fact* that press coverage contained certain information, without regard to the truth of [its] contents.'"  *Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 348 (S.D.N.Y. 2014) (quoting *Rivas v. Fischer*, 687 F.3d 514, 520 n.4 (2d Cir. 2012)).

It is undisputed that the relevant date for evaluating the timeliness of the Securities Act claims is August 2, 2016, when these claims and the Underwriter Defendants were added to the

---

[4] Merrill Lynch International also moves to dismiss or lack of proper service pursuant to Federal Rule of Civil Procedure 12(b)(5).  Doc. 109.  Because the Court dismisses all claims against all of the Underwriter Defendants pursuant to Rule 12(b)(6), it does not reach the issue of whether service was properly effectuated on Merrill Lynch International.

litigation for the first time.  Doc. 31.  The Underwriter Defendants argue that the one-year statute of limitations on Plaintiffs' Section 11 claims began to run in November 2014, when Plaintiffs allege that Abengoa made a series of disclosures related to its debt characterization and financing practices.  Because Plaintiffs failed to bring the relevant claims before November 2015, then, the Underwriter Defendants argue that these claims are time-barred.  Plaintiffs, on the other hand, maintain that they were not put on notice of their claims until August 3, 2015, when Abengoa "abruptly announced a dire need for capital" and investors were able to "piece together enough information to deduce that Defendants violated the Securities Act by concealing a severe liquidity and debt crisis."  Doc. 122 at 17.  The Court agrees with the Underwriter Defendants.

In their complaint, Plaintiffs identify three statements in the Registration Statement that were allegedly false for purposes of their Securities Act claims:  (1) "[Abengoa's] strong cash position . . . assists in bidding for large projects"; (2) "[A]bengoa incur[s] corporate debt to finance [its] investments, acquisitions and general purpose requirements"; and (3) "[Abengoa] do[es] not commit to any projects that [it] has been awarded prior to securing long-term financing."  Doc. 88 ¶ 52.  The Underwriter Defendants posit that the November 2014 disclosures put Plaintiffs on notice that they could pursue a Securities Act claim based on at least two theories.  First, the disclosures put Plaintiffs on notice that Abengoa "had guaranteed a series of bonds used to finance ongoing construction projects, and categorized those debt instruments as 'non-recourse finance in process.'"  Doc. 110 at 10.  In other words, the disclosures allegedly put Plaintiffs on notice that Abengoa had misclassified a portion of its debt.  Second, the disclosures put Plaintiffs on notice that the statement that Abengoa does "not commit to any projects that we have been awarded prior to securing long-term financing" was inaccurate.  *Id.* at 10–11.

### a.  Misclassification of Debt

With respect to the Underwriter Defendants' first argument, there can be no doubt that the November 2014 disclosures clearly put Plaintiffs on notice of Abengoa's alleged mischaracterization of debt, nor do Plaintiffs seriously dispute this.  For example, during a November 12, 2014 conference call, an analyst asked why "the green[field] bond[s]" did not

seem to be included in the reported corporate leverage ratio.  Doc. 88 ¶ 157.  Zubiria Furest responded that Abengoa had reclassified the Greenfield Bond as non-recourse debt.  *Id.* According to the Second Amended Complaint, "[a]nalysts and investors were stunned to learn that Abengoa had reclassified the Greenfield Bonds as non-recourse debt on September 30, 2014 . . . in order to report a lower corporate leverage ratio in the Company's third quarter financial statements, and questioned the Company's reporting of its debt and leverage figures."  *Id.* ¶ 159. The complaint goes on to note that this revelation was the subject of several analyst reports and that "the price of Abengoa ADSs fell nearly *50%* over the next three days, on heavy trading volume, as the market digested the adverse announcements."  *Id.* ¶¶ 159–161 (emphasis in complaint).

But as Plaintiffs correctly note, their Securities Act claims are not based on Abengoa's misclassification of debt.  Doc. 88 ¶¶ 46–58.  "In order for the statute of limitations to begin running, disclosures do not have to 'perfectly match the allegations that a plaintiff chooses to include in its complaint.'"  *Emerson v. Mut. Fund Series Trust*, 393 F. Supp. 3d 220, 240 (E.D.N.Y. 2019) (quoting *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 302 (S.D.N.Y. 2014)).  Yet, "the disclosures still must 'relate [] directly to the misrepresentations and omissions' that are alleged.'"  *Id.* (quoting *Staehr v. Hartford Fin. Serv. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008)).  Though Plaintiffs' First Amended Complaint included a Securities Act claim based on allegations of debt mischaracterization, *see* Doc. 31 ¶¶ 47–49, Plaintiffs have now opted to pursue other theories,[5] omitting any mention of Abengoa's debt practices from their Securities Act claims and allegations.  The Underwriter Defendants have not identified any alleged misstatements or omissions in Plaintiffs' Second Amended Complaint that relate either directly or indirectly to Abengoa's debt practices.  As such, the November 2014 disclosures about these debt practices did not trigger the beginning of the statute of limitations for Plaintiffs' current Securities Act claims.

---

[5] Namely, that Abengoa used erroneous financial statements to improperly secure funding and that it failed to abide by its stated accounting policy.

b. *Commitment to Projects*

Plaintiffs did, however, choose to pursue a Securities Act claim alleging the falsity of the statement, "[Abengoa] do[es] not commit to any projects that [it] has been awarded prior to securing long-term financing." Doc. 88 ¶¶ 52–53. According to Plaintiffs' own pleadings and arguments, the November 2014 disclosures squarely put Plaintiffs on notice of this alleged misstatement. On the November 12 Conference Call, Zubiria Furest, explained that because the Greenfield Bonds were "project related and cannot be used for any other purpose other than to bridge a nonrecourse project," they were "categorized under nonrecourse financing." Doc. 111, Ex. 2 at 17. Zubiria Furest further explained that

> [W]hat we have done here is replaced the need to be closing bridge loans every six, nine months on a project-by-project basis, and . . . waiting for sometimes even a year to be able to start working on a project because we're waiting to close bridge financing . . . [s]o, for that reason and because the only purpose, the only use of proceeds for the green bond can be to finance eligible green projects, it cannot be touched for anything else. It could not be taken to the corporate for general corporate purposes. The accounting for that is different than on . . . a regular bond . . . It is, for accounting purposes, classified in a different bucket. In a way, it's like preoperational debt. It is preoperational nonrecourse debt.

*Id.* at 27. On the November 17 Conference Call, Sanchez Ortega explained that the Greenfield Bonds were "guaranteed by Abengoa even if [their] designation was 'non-recourse in process.'" Doc. 122 at 13. According to Plaintiffs, "Ortega also reiterated that all bridge loans Abengoa ever used had been quickly and successfully converted to long term non-recourse financing." *Id.* at 14. Plaintiffs state that "Ortega also indicated that the non-recourse in process debt was used as a type of revolving facility bridge loan, until long-term financing was in place for a project, then it moved on to finance another project." *Id.* at 14 n.9. In other words, the "non-recourse debt in process" was inherently short-term and was being used specifically to finance projects so that Abengoa would not need to "clos[e] bridge loans every six, nine months on a project-by-project basis, and . . . wait[] for sometimes even a year to be able to start working on a project because [it was] waiting to close bridge financing." Doc. 111, Ex. 2 at 27. These statements squarely disclosed the very falsity that Plaintiffs now allege in their complaint.

Plaintiffs' argument that the November 2014 disclosures relate exclusively to the Greenfield Bonds, which were not issued until September 2014, is unavailing. The November 2014 disclosures establish that Abengoa had been using non-recourse debt to provide bridge loans for at least twelve years. Doc. 111, Ex. 3 at 5. They also disclose that at the time of the offering, Abengoa had €591 million of guaranteed debt classified as non-recourse debt in process. Doc. 111, Ex. 4 at 9–10. Plaintiffs themselves include statements by Abengoa in their briefing indicating that "the rationale for the 'non-recourse in progress' category 'has been explained in our annual financial statements since 2002.'" Doc. 122 at 14 (citation omitted). Moreover, in other briefing, Plaintiffs argue that in the November 2014 disclosures "in addition to the . . . Greenfield Bonds, Abengoa admitted to misclassifying more than €1 billion of additional recourse debt it had guaranteed." Doc. 121 at 8–9 (citation omitted). In that same brief, Plaintiffs assert that during the Class Period, which dates back to before the offering, "Abengoa misrepresented its overall solvency by misclassifying recourse debt as non-recourse debt and artificially inflating its revenues. *Id.* at 31 (citation omitted). Plaintiffs' complaint supports this proposition, with allegations that the November 2014 disclosures "revealed that Abengoa accounted for a total of €1.595 billion (including the €500 million Greenfield Bonds) as so-called 'non-recourse debt in process' – thereby excluding such debt from the Company's corporate leverage ratio – even though the debt was guaranteed by Abengoa." Doc. 88 ¶ 163. Plaintiffs' own arguments and allegations clearly establish that the November 2014 disclosures related to debt that predated the Greenfield Bonds and that existed at the time of the offering.

Plaintiffs also suggest that the November 2014 disclosures were insufficient to put them on notice of their claim because "the commentary at the time was inconclusive and did not outweigh Abengoa's steadfast assurances." Doc. 122 at 15 (citation omitted). Although Abengoa's purported reassuring statements may have (though unlikely) alleviated some investors' concerns regarding its debt practices, Plaintiffs do not argue, nor could they, that these statements disavowed Abengoa's short-term recourse financing for projects.

Because the November 2014 Disclosures were sufficient to put Plaintiffs on notice of their allegations that the Registration Statement was false, their Section 11 claims are barred by the one-year statute of limitations. *See, e.g.*, *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138 (2d Cir. 2013) (finding that corrective disclosures provided "precisely the information Barclays should have disclosed earlier such that Lead Plaintiffs should have *discovered* their alleged claims on the dates of those disclosures" (internal quotation marks and citation omitted)); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 365 (S.D.N.Y. 2012) (finding that plaintiffs "need not have notice of all the misconduct it alleges in the Complaint to trigger" the limitations period).

### 2. Failure to State a Claim

In any event, the Second Amended Complaint also fails to state a Securities Act claim. "Although limited in scope, Section 11 places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1982).

> So long as a plaintiff establishes one of the three bases for liability under [the Securities Act]—(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading—then, in a Section 11 case, "the general rule [is] that an issuer's liability . . . is absolute."

*Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011) (internal citations omitted). "[Section 11] was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean*, 459 U.S. at 381–82. A misstatement or omission is material if "a reasonable investor would have considered [it] significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161–62 (2d Cir. 2000) (citations omitted). "[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

*Id.* (internal quotation marks omitted) (quoting *Godlman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

Here, Plaintiffs allege that Defendants violated the Securities Act because they used false financial statements, including a system of "double books" and a pattern of inflating the value of certain projects, to secure funding and to successfully bid on contracts, and because Abengoa failed to adhere to its "percentage of completion" accounting policy.

Again, as with regard to their first theory, Plaintiffs allege that three statements in the Registration Statement were materially false:  (1) "[Abengoa's] strong cash position . . . assists in bidding for large projects"; (2) "[A]bengoa incur[s] corporate debt to finance [its] investments, acquisitions and general purpose requirements"; and (3) "[Abengoa] do[es] not commit to any projects that [it] has been awarded prior to securing long-term financing."  Doc. 88 ¶ 52. Plaintiffs allege that these statements were false because Abengoa maintained a system of "double books" and because Abengoa inflated the value of certain projects.  It bases these allegations primarily on the statements of two confidential witnesses—FE1 and FE3. According to FE1, Abengoa's Director of Human Resources at Abiensa from August 2010 through March 2013, "[Abengoa's] financial statements recorded false percentages of completion on various construction projects, which enabled Abengoa to recognize material amounts of revenue prematurely."  *Id.* ¶ 55.  According to FE3, a Senior Staff Accountant who worked at the company's corporate office in Chesterfield, Missouri from June 2013 through July 2014, Abengoa's two accounting systems often had discrepancies, which required manual manipulations to reconcile.  "The result of these manipulations often resulted in inflated profits which, in turn, were used by Abengoa to obtain hundreds of millions of dollars in financing."  *Id.* ¶ 54.

These alleged misstatements or omissions have nothing to do with Abengoa's acquisition of corporate debt, or to Abengoa's commitment to projects prior to securing long-term financing—nor do Plaintiffs argue as much.  As to Abengoa's "strong cash position," Plaintiffs argue that these facts show that Abengoa's Registration Statement "failed to disclose a liquidity

crisis at Abengoa."  Doc. 122 at 8.  However, Plaintiffs have wholly failed to identify *any* false

financial statement.  Nor have they described how or why such statements were untrue.

Similarly, FE1's statements that "Abengoa overstated its financial position by inflating the value

of certain projects," fails to specify an example of any such project—and, moreover, is based

purely on second-hand knowledge.  Doc. 88 ¶ 55.

      Neither *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014), nor *In re Vivendi,*

*S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016)—to which Plaintiffs point to support—help their

cause.  In *Meyer*, Plaintiffs were able to point to a report submitted to Chinese regulators that

showed that certain prospectus statements were false.  761 F.3d at 251.  *Vivendi* is even further

afield.  In that case, the Second Circuit considered the adequacy of a jury verdict finding that

upwards of fifty statements supported a Securities Act violation.  As the court found, [t]That

individual alleged misstatements may relate to different aspects of a larger problem does not

necessarily subvert a finding of fraud . . . ."  838 F.3d at 250.  Indeed, "the problem that Vivendi

sought to conceal from the public was so vast, and touched upon so many aspects of its business,

that a few scattered misstatements would not have sufficed to mask it."  *Id.*  However, in that

case, there were *many* material facts that called Vivendi's liquidity into question.  This does

nothing to help Plaintiffs' argument that their allegations are non-conclusory.

      Plaintiffs' second theory fails for similar reasons.  The Registration Statement represents

that Abengoa adhered to a "percentage-of-completion" policy, and had "established . . . a robust

project management and control system."  Doc. 88 ¶ 57.  According to Plaintiffs, this was not

true because Abengoa routinely recorded incorrect percentages of completion so as to

prematurely recognize revenue.  *Id.* ¶ 58.  However, the complaint fails to identify a single

project that was affected by Abengoa's failure to abide by its "percentage of completion"

accounting policy; nor does it state how such revenue was recognized prematurely, or how much revenue was recognized prematurely.  These omissions are fatal to Plaintiffs' claims.[6]

### 3.  Sanchez Ortega

Plaintiffs also bring claims pursuant to Section 15 of the Securities Act against Sanchez Ortega and Hansmeyer.  Because the Court finds that Plaintiffs have failed to adequately plead a Section 11 claim, it must dismiss Plaintiffs' Section 15 claims as well.  *See In re Morgan Stanley Info. Funds Secs. Litig.*, 592 F.3d at 358 ("Thus, the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12." (citation omitted)); *see also Jones v. Party City Holdco, Inc.*, 230 F. Supp. 3d 185, 192 (S.D.N.Y. 2017) (finding that failure "to plead a primary violation under Section 11 or 12(a)(2), [means] plaintiffs' Section 15 claims too must be dismissed").

### B.  Exchange Act Claims

Plaintiffs bring for claims for violations of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, against Abengoa, Sanchez Ortega, and Hansmeyer, as well as claims for violations of Section 20(a) against Sanchez Ortega and Hansmeyer.  Doc. 88 ¶¶ 23, 277–84.  Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b) (1934), while SEC Rule 10b-5, promulgated thereunder, creates liability for a person who makes "any untrue statement of a material fact or . . . omit[s] to state a material fact . . . in connection with the purchase or sale of any security."  *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5 (1951)).  Rule 10b-5, promulgated by the SEC to implement Section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance."  *Press v. Chemical Inv. Servs.*

---

[6] *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297 (2d Cir. 2015) and *City of Omaha Police & Fire Ret. Sys. v. Evoquoa Water Techs. Corp.*, 18 Civ. 10320 (AJN), 2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020) can be distinguished on this basis.  In *Blanford*, for example, plaintiffs were able to point to specific contracts and describe specific practices. 794 F.3d at 301–302.  Similarly, in *City of Omaha*, the plaintiffs identified specific contracts, methods, and amounts of improperly recognized revenue.  2020 WL 1529371, at *20.

*Corp.*, 166 F.3d 529, 534 (2d Cir. 1999).  Under Rule 10b-5, it is unlawful for any person,

directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any
> untrue statement of a material fact or to omit to state a material fact neces-
> sary in order to make the statements made, in the light of the circumstances
> under which they were made, not misleading, or (c) To engage in any act,
> practice, or course of business which operates or would operate as a fraud
> or deceit upon any person, in connection with the purchase or sale of any
> security.

17 C.F.R. § 240.10b-5.  Section 20(a) of the Exchange Act imposes liability on individuals who

control any person or entity that violates Section 10.  *See* 15 U.S.C. § 78t(a).  "To assert a *prima*

*facie* case under Section 20(a), a plaintiff 'must show a primary violation by the controlled

person and control of the primary violator by the targeted defendant, and show that the

controlling person was in some meaningful sense a culpable participant in the fraud perpetrated

by the controlled person.'"  *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel*

*OAO*, 811 F. Supp. 2d 853, 882 (S.D.N.Y. 2011) (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101

F.3d 1450, 1472 (2d Cir. 1996)), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d

Cir. 2012) (summary order).

 Plaintiffs allege that Defendants repeatedly lied to investors about Abengoa's debt, cash

flow, and overall ability to continue operating.  Doc. 121 at 13–18.  For example, Abengoa and

Sanchez Ortega represented that the company was in "sound financial health," and had a "strong

liquidity" position due to its "strict financial discipline."  Doc. 88 ¶¶ 105–106, 129, 142, 165,

174, 178.  Plaintiffs allege that these statements were false and/or misleading because they

"cannot be reconciled with the egregious, widespread accounting fraud that was occurring within

Abengoa at the time these statements were made."  Doc. 121 at 13 (citing Doc. 88 ¶¶ 74–101

("misclassifying debt, delaying payment of supplier invoices, prematurely recognizing revenue,

and maintaining false accounting records")).  Defendants argue that Plaintiffs lack standing to

pursue claims regarding Abengoa's alleged debt mischaracterization, that their allegations fail to

state a claim for a violation of the Exchange Act, and that Plaintiffs have failed to establish control person liability for Sanchez Ortega.  The Court considers each of these arguments in turn.

    *1.  Standing*

    "It is axiomatic that a putative class representative must be able to individually state a claim against defendants, even though he or she purports to act on behalf of a class."  *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003); *see also Ramos v. Patrician Equities Corp.*, 765 F. Supp. 1196, 1199 (S.D.N.Y. 1991) ("A plaintiff, including one who is seeking to act as class representative, must have individual standing to assert the claims in the complaint against each defendant being sued by him.") (citations omitted).  To establish standing, a plaintiff must establish "a personal injury that is fairly traceable to the defendant's conduct and likely to be redressed by the requested relief."  *Retirement Bd. of the Policemen's Annuity and Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 159 (2d Cir. 2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  It is also well-established that "[w]ith respect to class representative standing, . . . where . . . plaintiffs allege that their losses were the result of a sustained course of conduct that propped up defendant's stock price throughout the class period, the class may be represented by an individual who purchased his shares prior to the close of the class period.  *In re Vivendi Univeral, S.A. Sec. Litig.*, 242 F.R.D. 76, 87 (S.D.N.Y. 2007) (citations omitted).

    Abengoa argues that Plaintiffs lack standing to assert claims relating to Abengoa's debt categorization and leverage ratio calculations because they purchased their ADSs after a correction of the alleged misstatements, *i.e.* the November 2014 disclosures, which were made between November 12 and November 17, 2014.  In particular, Lead Plaintiffs Jesse and Arlette Sherman did not make their initial ADS purchases until November 18, 2014,[7] Doc. 7, Ex. 1, and Plaintiff PAMCAH-UA Local 675 Pension Fund did not purchase its ADSs until April 6, 2015, Doc. 12, Ex. 1.  Plaintiffs argue that this is incorrect for two reasons:  (1) because "the fraud that

---

[7] The purchases upon which Plaintiffs are suing were made later, between July 15 and July 22, 2015.  Doc. 7, Ex. 2.

served to artificially inflate the price of Abengoa securities when they purchased their ADSs was part and parcel of the same 'sustained course of conduct' that existed prior to and after their purchases," Doc. 121 at 30; and (2) because, while the November 2014 disclosures "raised suspicions about [Abengoa's] debt, analysts and investors continued to rely on Ortega's contemporaneous representations that Abengoa was in 'sound financial health' due to its 'strong liquidity' and that operations going forward would be 'business as usual,'" *id.* at 32.  The Court finds neither of these arguments convincing.

Plaintiffs' first argument is particularly unavailing.  Although Plaintiffs now attempt to cast the alleged debt mischaracterization as part and parcel of a larger scheme to conceal Abengoa's impending insolvency from the public, Doc. 121 at 31, this does not square with how Plaintiffs have otherwise characterized Abengoa's alleged debt mischaracterization and, in particular, the November 2014 disclosures.  For example, in their Securities Act briefing,[8] submitted simultaneously to the Court, Plaintiffs argue that the November 2014 disclosures "do not speak to Abengoa's accounting manipulations, misstatements, or, its failure to adhere to the 'percentage-of-completion' accounting policy," and were therefore insufficient "to place them on notice of these other issues."  Doc. 122 at 15.  According to Plaintiffs' very own arguments and allegations, then, Abengoa's alleged debt mischaracterization does not "implicate[] the 'same set of concerns' as" Abengoa's other alleged fraudulent conduct.  *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, No. 17 Civ. 558 (SRU), 2020 WL 1181366, at *13 (D. Conn. Mar. 10, 2020).  Indeed, they readily deny that these were "inter-related misstatements and omissions."  *Nicholas v. Poughkeepsie Sav. Bank/FSB*, No. 90 Civ. 1607 (RWS), 1990 WL 145154, at *5–6 (S.D.N.Y. Sept. 27, 1990) (citing (*Green v. Wolf Corp.*, 406 F.2d 291, 299–300 (2d Cir. 1968)).  Plaintiffs cannot have it both ways:  they cannot attempt to bifurcate their debt mischaracterization theory for purposes of avoiding the statute of limitations on their Securities

---

[8] Plaintiffs submitted two briefs in opposition to the motions against them, one addressing their Exchange Act claims, Doc. 121, and one addressing their Securities Act claims, Doc. 122.

Act claims, while simultaneously claiming that the debt mischaracterization was "part and parcel" of Abengoa's overall scheme to defraud investors.

Instead, this case is more akin to *City of Bristol Pension Fund v. Vertex Pharm Inc.*, 12 F. Supp. 3d 225, 234–35 (D. Mass. 2014).  In that case, the court declined to find standing where there was no sustained course of conduct and where a corrective disclosure had been issued the day before plaintiffs had bought their stock.  The court there held that "a plaintiff who purchased after a corrective disclosure was made would have no standing, because relying on the earlier misrepresentation would no longer be reasonable in light of the new information; furthermore, the market is assumed to have processed the correction, which would be reflected in the stock price." 12 F. Supp. 3d at 235.  Such is the case here.

Plaintiffs' second argument fails for similar reasons.  Plaintiffs characterize the November 2014 disclosures as "partial disclosures," and argue that while they "raised suspicions about [Abengoa's] debt, analysts and investors continued to rely on Ortega's contemporaneous representations that Abengoa was in 'sound financial health' due to its 'strong liquidity' and that operations going forward would be 'business as usual.'"  Doc. 121 at 32.  This flies in the face of Plaintiffs' own allegations.  According to Plaintiffs, the commentary generally reflected that analysts were "stunned" to learn of Abengoa's alleged mischaracterization of debt.  Doc. 88 ¶ 159.  As a result, "the price of Abengoa ADSs fell nearly *50%* over the next three trading days, on heavy trading volume, as the market digested the adverse announcements—falling from a closing price of $17.59 per ADS on November 11, 2014, to close at $8.83 per ADS on November 14, 2014." *Id.* ¶ 161.  This was not a case where a "careful and sophisticated analysis" was required before the disclosures could have been considered "reasonably available to shareholders." *In re Am. Realty Capital Props. Litigation*, 15 Civ. 307 (AKH), 15 Civ. 6043 (AKH), 2019 WL 2082508, at *2 (S.D.N.Y. May 10, 2019).  In spite of revelatory nature of the November 2014 disclosures, Plaintiffs chose to purchase Abengoa ADSs.  Their alleged injuries, then, cannot be readily traced to Abengoa's alleged debt mischaracterization.

Plaintiffs therefore lack standing to bring claims based on Abengoa's alleged mischaracterization of debt.

### 2. Failure to State a Claim

Defendants argue that Plaintiffs fail to state a claim for violation of the Exchange Act.  To state a private civil claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that:  (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss.  *Dura*, 544 U.S. at 341–42, 125; *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007). Defendants argue that Plaintiffs' allegations fail to plausibly allege any actionable misstatement or omission with the requisite particularity; that they have failed to allege scienter; and that they have failed to allege loss causation.  Because the Court has found that Plaintiffs lack standing to bring claims based on Abengoa's alleged debt mischaracterization, it does not reach the issue of whether these allegations adequately state a claim for an Exchange Act violation.  With respect to the remainder of the allegations in the complaint, which primarily concern Abengoa's cash flow and liquidity, the Court agrees with Defendants, though it does not reach the issue of loss causation.

### a. Actionable Misstatements or Omissions

In order to survive a motion to dismiss, Plaintiff must establish that Defendant "made a statement that was '*misleading* as to a *material* fact.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  "A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false *at the time it was made.*"  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571 (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812–13 (2d Cir. 1996)).  The Second Circuit has repeatedly indicated that plaintiffs cannot simply assert that a statement is false—"they must demonstrate with specificity why . . . that is so."  *Rombach*, 355 F.3d at 174.  Where the alleged violations of Section 10b and

Rule 10b-5 are based on allegations that the defendant "omitted to state a material fact necessary to make the statement . . . not misleading; the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  "[I]f an allegation regarding [a] statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.*

Defendants argue that Plaintiffs' allegations regarding its liquidity and cash position cannot survive a 12(b)(6) motion for five reasons.  First, they are based almost entirely on flawed confidential witness statements.  Second, they improperly rely on generalities and speculative inferences.  Third, Plaintiffs fail to allege the contemporaneous falsity of Abengoa's July 31, 2014 statement regarding potential capital raises.  Fourth, they argue that the PSLRA's safe harbor immunizes them from forward-looking statements and, finally, that, at most, Defendants' statements amount to corporate optimism and puffery.

### i. Confidential Witness Statements

Plaintiffs' Exchange Act allegations rely on information obtained from three purported former Abengoa employees.  The first, "FE1," was a Human Resources director at one of Abengoa's largest U.S. subsidiaries until March 2013.  The second, "FE2," was an accounting executive at an unnamed U.S. subsidiary.  The third, "FE3," was a senior staff accountant at an Abengoa office in Missouri until July 2014.

Defendants argue that FE1's statements should be disregarded because she left the company before the start of the class period, are otherwise undated or present a misleading time frame, and amount to "general, second-hand comments regarding corporate culture and alleged financial practices at uncertain times before the class period."  Doc. 116 at 17.  As to Defendants' first two arguments, FE1's statements are not so lacking in specificity as to time-period that they need be discounted, and the Second Circuit has found that "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015).  However, courts have rejected confidential

witness allegations where the confidential witnesses "left the company before the class period."
*Campo v. Sears Holding Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x
212 (2d Cir. 2010).  Even if this were not the case, Defendants' argument regarding the general
and second-hand nature of FE1's allegations is equally if not more persuasive.  According to
Plaintiffs, FE1 first obtained the information alleged through exit-interviews with unnamed
employees.  Though Plaintiffs claim that FE1 investigated these complaints, the paragraphs they
cite for this proposition reveal that the allegations were corroborated "during leadership meetings
FE1 attended."  Doc. 88 ¶¶ 97–98.  FE1 does not state who was at these leadership meetings, or
who provided her with this information.  "Such second-hand information, obtained only through
intermediaries, undermines 'the likelihood that he had personal knowledge of the allegations.'"
*Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2013 WL 1287326, at *8 (quoting
*Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011)).

Defendants further argue that FE2's statements should be discounted because the SAC
does not describe FE2's position with particularity and because FE2 "offers only generalized
expressions of awareness of 'instances' or 'believed' that certain things happened."  Doc. 116 at
18.  Both of these arguments are persuasive.  "A complaint may rely on information from
confidential witnesses if 'they are described in the complaint with sufficient particularity to
support the probability that a person in the position occupied by the source would possess the
information alleged."  *Blanford*, 794 F.3d at 305 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314
(2d Cir. 2000).  The Second Amended Complaint describes FE2 only as "a former Abengoa
employee who had broad oversight for accounting and financial reporting at several of
Abengoa's U.S. subsidiaries."  Doc. 88 ¶ 76.  It says nothing about when FE2 worked for
Abengoa or which entity he or she worked for.  It does not even provide FE2's title.  This does
not meet the particularity requirement set out in *Novak*.  *See* 216 F.3d at 314.  Additionally,
many—though not all—of FE2's contributions to the complaint are grounded in generalized
"instances" and his or her similarly general "beliefs" about Abengoa's accounting practices.
Doc. 88 ¶¶ 86–87.  "A plaintiff cannot base securities fraud claims on speculation and conclusory

allegations." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted). Therefore, FE2's statements will be discounted as well.

Finally, Defendants argue that FE3's statements should also be discounted because her "generalizations" are similarly insufficient to support the complaint's claims. Doc. 116 at 18. Unlike for FE2, plaintiffs have described FE3's position with sufficient particularity, identifying not only her title, but also when and where she worked, as well as her general responsibilities. Doc. 88 ¶ 77. According to the complaint, FE3 "believed that Abengoa maintained a system of double books." *Id.* ¶ 80. Unlike for FE2, however, the complaint provides at least some details as to how FE3 arrived at this belief, including a description of the two systems used, why she believed there should not be discrepancies between the two systems, and allegations that FE3 was regularly required to defer to one system over another. *Id.* ¶¶ 80–84. FE3 also provides details of Abengoa's alleged "slow and cumbersome process for invoice approval." *Id.* ¶ 89. The Court will therefore consider FE3's statements in support of the allegations in the complaint.

*ii. Reliance on Generalities*

FE3's statements, however, are ultimately not very helpful to Plaintiffs. Even if the Court assumes all of FE3's statements to be true for purposes of this motion, these allegations are insufficient to meet the pleading standard for fraud. There is nothing to suggest that having two systems was inherently fraudulent, or that the method for correcting any discrepancies was inherently improper. Furthermore, there are no allegations concerning the frequency of these discrepancies or their magnitude, and therefore no allegations as to "what effect the alleged conduct had on the company's statements." *Davidoff v. Farina*, No. 04 Civ. 7617 (NRB), 2005 WL 2030501, at *13 (S.D.N.Y. Aug. 22, 2005). Furthermore, the complaint maintains that when FE3 brought these complaints to CFO Juan Callesi, he advised her that the discrepancies were the result of "exchange rates." *Id.* ¶ 84. Although the complaint appears to readily dismiss this as an "excuse," it provides the Court with no reason to do so, as there is nothing to suggest that this response was nefarious or even incorrect. Similarly, the complaint provides no allegations that the multiple levels of approval required for invoices was out of the norm or otherwise

improper, or even of which contractors were impacted.  *Id.* ¶ 89.  Indeed, it concedes that many

of these invoices were rejected at some point.  *Id.*  Nor does it adequately describe the material

impact such a process would have had on the company.  *Id.*  "[P]laintiffs must provide at the very

least some level of detail about the improper accounting alleged to underlie misleading

statements."  *Gavish v. Revlon, Inc.*, No. 00 Civ. 7291 (SHS), 2004 WL 2210269, at *13

(S.D.N.Y. Sept. 30, 2004).  They have failed to do so here.

      The remainder of Plaintiffs' allegations regarding Abengoa's cash and liquidity

requirements similarly fall short.  For example, Plaintiffs' allegations regarding Abengoa's use of

shell subsidiaries fails to allege any specific projects where this scheme was employed and the

impact of this alleged practice on Abengoa.  Nor is there any corroborating information—from a

confidential witness or otherwise—to support these statements.  Plaintiffs' allegations that

Abengoa engaged in transactions "to obtain badly needed working capital in an effort to stave off

bankruptcy," are equally unspecific.  Doc. 88 ¶ 203.  Though Plaintiffs state that Abengoa

admitted in bankruptcy filings in Delaware Bankruptcy Court to planning to "optimize its

financial structure in order to strengthen its financial position and business," Plaintiffs fail to

allege the material impact this had on Abengoa's financial state at the time of the alleged false

statements or omissions.  In other words, the complaint does not provide information as to why

these activities necessarily belied Abengoa's statements that it was in sound financial health at

the time.  Neither do Plaintiffs allege why the Court should consider these actions fraudulent, in

and of themselves.  This conclusion is underscored by the fact that, according to the complaint,

all of these capital-raising activities were public.  *Id.* ¶¶ 200, 204.

      *iii.  The July 31, 2015 Statement*

      Next, Abengoa argues that Plaintiffs have failed to allege contemporaneous falsity

regarding the July 31, 2015 statement about potential capital raises.  Abengoa's argument is once

more persuasive.  Plaintiffs allege that on Friday, July 31, 2015, Abengoa issued a press release

reporting "strong business performance."  Doc. 88 ¶ 209.  On a conference call later that day, the

company "began to reveal the dire financial situation that [it] was facing, but continued to

misrepresent [its] plans to access the capital markets for additional financing." *Id.* ¶ 211.  In

particular, the company represented that "at this point in time, [it] ha[d] no plan . . . to tap the

capital markets in any manner." *Id.* ¶ 217.  The next business day, Monday August 3, 2015,

Abengoa then made a complete about-face, filing a Form 6-K with the SEC announcing a

shareholders meeting to seek approval of "(1) a massive capital increase with pre-emptive rights

of €650 million . . . ; and (2) asset divestitures totaling €500 million," claiming that these

"significant actions were necessary to reduce corporate debt and reinforce Abengoa's balance

sheet." *Id.* ¶ 220 (internal quotation marks omitted).  Although the timing of Abengoa's actions

is suggestive, Plaintiffs fail to plead any facts in support of the allegation that the company's

statements were false at the time they were made.  "The mere disclosure of adverse information

shortly after a positive statement does not support a finding that the prior statement was false at

the time it was made." *Elliott Assocs., L.P. v. Covance, Inc.*, No. 00 Civ. 4115 (SAS), 2000 WL

1752848 (S.D.N.Y. Nov. 28, 2000) (citation omitted).  Therefore, "Plaintiff[s] fail[] to allege facts

that particularize how and why *each* defendant actually knew, or was reckless in not knowing,

that the alleged statements and omissions were fraudulent at the time they were made." *Defer LP

v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009).

   *iv.   The PSLRA's Safe Harbor*

   The PSLRA's safe harbor provision provides that no liability attaches to certain forward-

looking statements that are identified as such and "accompanied by meaningful cautionary

language identifying important factors that could cause actual results to differ materially from

those in the forward looking statements." *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp.

2d 364, 400 (S.D.N.Y. 2006) (citing 15 U.S.C. § 78u–5(c)(1)(A)(i)).  Forward-looking language

need not be contained in a separate section or specifically labeled.  Instead, "the facts and

circumstances of the language used in a particular report will determine whether a statement is

adequately identified" as forward-looking.  *Slayton*, 604 F.3d at 769.  "To avail themselves

of safe harbor protection under the meaningful cautionary language prong, defendants must

demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Id.* at 772.

Defendants argue that many of the statements Plaintiffs identify as misleading are forward-looking and are therefore protected by the PSLRA's safe harbor provision.  For example, they note, Abengoa expressed that it "continue[d] to be committed to meeting all [its] financial targets"; that it would "continue on a positive path"; to "improve"; and that it would "continue to make progress." Doc. 116 at 24 (citations omitted).  Abengoa also stated that it was "poised" to achieve its business goals, and had "all the right levers to continue on the path of increasing free cash flow delivery." *Id.* (citations omitted).  Defendants further point to phrases like "we expect," "we believe," "I think or "we think" or "I don't think," and argue that these indicate "that their plans were wholly anticipatory projects about an unknowable future." *Id.* (citations omitted).  Plaintiffs, however, maintain that such statements were not forward-looking, and therefore do not qualify for the PSLRA's safe harbor provision.  Instead, they argue that these select quotes "refer to then-existing conditions."  Doc. 121 at 21.

The PSLRA defines a forward-looking statement as "a statement of the plans and objectives of management for future operations, including places or objectives relating to the products or services of the issuer."  15 U.S.C. § 78u–5(i)(1)(B); *see also In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 384–85 (S.D.N.Y. 2012) ("The PSLRA defines forward-looking statements to include, inter alia, . . . statements of the plans and objectives of management for future operations . . . and statements of future economic performance." (internal citations and quotations omitted)), *reconsideration granted in part*, 856 F. Supp. 2d 645 (S.D.N.Y. 2012). Plaintiffs are correct that statements representing that Abengoa "continued to be committed to meeting all [its] financial targets," and was "reducing the leverage of the Company," in order to meet these targets, Doc. 88 ¶ 113, necessarily refer to the Company's then-existing conditions. However, the vast majority of the statements identified by Abengoa are plainly forward-looking.

To the extent these statements refer to Abengoa's future plans and objectives, these are non-actionable under the PSLRA's safe harbor provision.[9]

     v.  *Corporate Optimism and Puffery*

     Finally, Defendants argue that the complaint contains several statements that are non-actionable because they are mere "puffery."  These include statements that:

- [R]ely on general corporate optimism and "rosy affirmations," such as Abengoa's "comfortable outlook for the future" ([Doc. 88] ¶ 174), "comfortable position" (*id.* at ¶¶ 7, 197, 214), "healthy growth" (*id.* at ¶ 209), and "excellent position" (*id.* at ¶¶ 7, 180);

- rely on vague characterizations to describe Abengoa's "[s]trong," "strict," and "reinforced" "financial discipline" (*id.* at ¶¶ 103, 105, 129, 141–42), "sound financial health" and "sound financial position" (*id.* at ¶ 165), "strong liquidity" (*id.* at ¶¶ 105, 129, 141–42, 165, 174, 178; *see id.* at ¶¶ 175, 183), "[s]trong business performance" (id. at ¶ 209), "strong operating performance" (*id.* at ¶ 177), "sound capital structure" (*id.* at ¶ 178); and

- rely on other empty generalizations regarding Abengoa's business operations that include "impressive" "business momentum" (*id.* at ¶ 115), "prudent" and "diligent" managers (*id.* at ¶¶ 154, 215), a "clear business plan to deliver" (*id.* at ¶ 118), a "proactive and successful financial policy" (*id.* at ¶ 119), a "sound and confirmed disciplined investment policy" (*id.* at ¶ 133), and a focus on "key priorit[ies]" (*id.* at ¶¶ 116, 208; *see id.* at ¶ 141).

Doc. 116 at 26.  The Court agrees that these are "expressions of corporate optimism and puffery too general to cause a reasonable investor to rely upon them."  *Hutchinson v. Perez*, No. 12 Civ. 1073 (HB), 2013 WL 1775374, at *2 (S.D.N.Y. Apr. 25, 2013) (internal quotation marks and citation omitted).  Plaintiffs' appeal to *In re Vivendi Universal, S.A. Securities Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) is unavailing.  Although the Court agrees "such conclusory terms in a commercial context [may be] reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading," Plaintiffs' complaint has not provided the requisite allegations to rest on this legal basis.  *Id.* at 182.  For example, in *Vivendi*,

---

[9] Plaintiffs do not contest that Abengoa included meaningful cautionary language with these statements.  That argument is therefore conceded.  *See In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (arguments not addressed in opposition are conceded).

plaintiffs "alleged sufficient facts to show defendants could not have reasonably believed the statements made to the public." *Id*. As has been described in further detail above, however, such is not the case here.

     *b. Scienter*

     Defendants further argue that Plaintiffs have failed to adequately plead scienter for either Sanchez Ortega or Abengoa. A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. The relevant inquiry for the Court "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *In re Magnum Hunter*, 26 F. Supp. 3d at 291–92 (citing *Tellabs*, 551 U.S. at 322–23); *see also ECA*, 553 F.3d at 198; *Medis Inv'r Grp. v. Medis Tech., Ltd.*, 586 F. Supp. 2d 136, 141 (S.D.N.Y. 2008) ("In order to determine whether a complaint has adequately pleaded scienter, a court should examine all of the facts alleged collectively or 'holistically' (without parsing individual allegations), and take into account any inference concerning scienter—supporting or opposing—which can be drawn from the complaint."), *aff'd*, 328 F. App'x 754 (2d Cir. 2009) (summary order). "According to the Supreme Court, the critical inquiry is: 'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?' If so, then scienter has been adequately pleaded. If not, the case may be dismissed." *Medis Inv'r Grp.*, 586 F. Supp. 2d at 141 (citing *Tellabs*, 551 U.S. at 326).

     *i. Sanchez Ortega*

     Defendants argue that the complaint fails to plead that Sanchez Ortega acted with either motive and opportunity or with conscious misbehavior or recklessness. The Court agrees.

     Plaintiffs maintain that their complaint adequately establishes that Sanchez Ortega was motivated to "conceal[] a worsening liquidity crisis by, *inter alia*, misclassifying debt to portray lower leverage ratios and artificially inflating the Company's cash flows to show stronger

financial statements." Doc. 121 at 25.  Their goal, Plaintiffs suggest, was to avoid breaching debt covenants with its lenders, for the purpose of raising capital to hide massive losses.  *Id.* at 26.  "A complaint has sufficiently alleged 'motive and opportunity to commit fraud' if it pleads facts showing that the defendant 'benefited in some concrete and personal way from the purported fraud.'"  *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307–308 (2d Cir. 2000)).  While "[t]he opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer," *id.* (collecting cases), general motives common to most corporate officers do not constitute "motive" for the purpose of establishing scienter.  *ECA*, 553 F.3d at 198.  Therefore, the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation do not suffice to establish a motive.  *Van Dongen*, 951 F. Supp. 2d at 468 (citing *Novak*, 216 F.3d at 307).  Here, Plaintiffs have failed to adequately allege that Sanchez Ortega himself received any concrete and personal benefit from this behavior.  Nor did Sanchez Ortega allegedly stand to receive any special benefit or reward if Abengoa maintained its covenants.  Indeed, Sanchez Ortega is not alleged to have sold a single share of his own Abengoa stock or ADS during the class period, and ultimately *lost* large sums of money.  *See, e.g.*, Doc. 114 at 17–18.  As such, Plaintiffs have failed to properly allege motive for Sanchez Ortega.

When, as here, a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's conscious misbehavior or recklessness "must be correspondingly greater."  *Kalnit*, 264 F.3d at 142 (internal quotation marks and citation omitted).  In order to establish scienter under the conscious misbehavior theory, Plaintiffs "must show conduct by defendants that is at the least highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 216 (S.D.N.Y.2004) (internal quotation marks omitted) (quoting *Kalnit*, 264 F.3d at 142).  To the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must "specifically identify the reports or

statements containing this information." *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d at 659

(citation omitted). "Recklessness in the scienter context[, however,] cannot be merely enhanced

negligence." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005);

*Medis Inv'r Grp.*, 586 F. Supp. 2d at 142 ("To properly allege recklessness, the plaintiff must

plead 'a state of mind approximating actual intent, and not merely a heightened form of

negligence.'"). Moreover,

> [U]nlike statements about historical facts, in which the scienter inquiry fo-
> cuses on whether the defendants "knew facts or had access to information
> suggesting that their public statements were not accurate" or "failed to
> check information they had a duty to monitor," the recklessness inquiry as
> to forward-looking projections focuses on whether the defendants knew at
> the time they made these projections that they were unrealistic or unlikely
> to come true.

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 301 (S.D.N.Y. 2013)

(citing *ECA*, 553 F.3d at 199; *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 153–54

(S.D.N.Y.2004)).

      As circumstantial evidence of scienter, Plaintiffs point to allegations that Sanchez Ortega

"abruptly resigned as Abengoa's CEO" in May of 2015. Doc. 121 at 26 (citing Doc. 88 ¶¶ 244–

45). They also note that two months later, Sanchez Ortega joined BlackRock, an asset

management firm, "which promptly began to amass a large short position against Abengoa." *Id.*

at 26–27 (citing Doc. 88 ¶¶ 249–52). Finally, they note that Sanchez Ortega has been named as a

defendant in several lawsuits in Spain in connection with his move to BlackRock, Doc. 88

¶¶ 253–54, and that he is currently facing criminal charges for misrepresenting Abengoa's

financial statements. *Id.* ¶ 254.

      This evidence, taken together, does not raise a strong inference of scienter. Resignations

accompanied by suspicious circumstances may bolster the inference of scienter. *See, e.g.*, *Van

Dongen*, 951 F. Supp. at 474 (S.D.N.Y. 2013) ("[T]he resignation and retirement of company

insiders alleged to have been involved in the scheme . . . all contribute to the inference of

scienter."). However, for this to be the case, plaintiffs must also allege "a factual basis to

conclude that the resignation was tied to participation in or knowledge of the fraud." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019) (citing *Glaser*, 772 F. Supp. 2d at 598 (collecting cases)). The complaint pleads no such facts. As to allegations of insider trading, there are no allegations connecting Sanchez Ortega to BlackRock's purchase of Abengoa stock, nor are there any allegations that Sanchez Ortega personally benefitted from this supposed scheme. Finally, as to the proceedings in Spain, the complaint contains no reference to the outcome of those proceedings or to their ultimate findings. As such, the Court declines to assume the truth of the allegations in those proceedings. *See, e.g.*, *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012). In any event, "the existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter." *Lipow v. Netl UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 164 (S.D.N.Y. 2015) (internal quotation marks and citation omitted).

The Court therefore finds that Plaintiffs have not adequately alleged that Sanchez Ortega acted with the requisite scienter.

### ii. Corporate Scienter

Plaintiffs also fail to plead motive on behalf of Abengoa. "When the defendant is a corporate entity . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). The "most straightforward way to raise such an inference for a corporate defendant" in most cases is "to plead it for an individual defendant," however, there may be some instances where a plaintiff may allege scienter as to a corporate defendant without also alleging scienter as to an individual defendant. *Id.*; *Vining v. Oppenheimer Holdings Inc.*, No. 08 Civ. 4435(LAP), 2010 WL 3825722, at *12 (S.D.N.Y. Sept. 29, 2010) ("[A] plaintiff can raise an inference of corporate scienter by establishing scienter on behalf of an employee who acted within the scope of his employment." (internal citation omitted)). "In exceedingly rare instances, a statement may be so

'dramatic' that collective corporate scienter may be inferred." *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (citation omitted).

Plaintiffs argue that Abengoa had much the same motivations as Sanchez Ortega, *i.e.* that it was motivated to show stronger financial statements so as to avoid covenant breaches and with the objective of raising capital to hide massive losses.  Doc. 121 at 25–26.  Not only does this smack of improper group pleading, *see C.D.T.S. v. UBS AG*, No. 12 Civ. 4924 (KBF), 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013), but these are exactly the kinds of motivations that courts in this circuit routinely reject, *see, e.g.*, *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009) (motive "to prevent the negative ramifications of a resultant drop of . . . stock price—even if such a drop would allegedly threaten the 'survival' of a company—is far too generalized" (internal citation omitted)).

Plaintiffs argue that allegations regarding the employees at two subsidiaries, Santiago Duran and Juan Callesi, establish that Abengoa possessed the requisite corporate scienter.  As an initial matter, the allegations regarding Duran and Callesi are based entirely on confidential witness statements, which, for the reasons stated above, the Court largely declines to credit. However, even if it were to credit these allegations, Plaintiffs have failed to allege a "connective tissue between" these employees and anything that was reported to Abengoa's senior management.  *Jackson*, 960 F.3d at 99.  The complaint contains no information as to how Callesi and Duran fit into the organizational structure at Abengoa, or as to how their supposed knowledge of certain facts would impute to senior management.  As such, these allegations are insufficient to establish corporate scienter.

### 3.  *Loss Causation*

Plaintiffs' failure to adequately plead either scienter or a misstatement or omission is dispositive.  Thus, the Court need not reach the issue of loss causation.  *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *22 ("Because the issue of scienter . . . proves fatal to Plaintiffs' Section 10(b) [claims]. . .  the Court need not reach the UBS Defendants' arguments regarding . . . loss causation[.]"); *Hutchinson v. Perez*, No. 12 Civ. 1073 (HB), 2012 WL 5451258, at *8

(S.D.N.Y. Nov. 8, 2012) *amended*, No. 12 Civ. 1073 (HB), 2013 WL 93171 (S.D.N.Y. Jan. 8, 2013) ("Since the Court must dismiss the Amended Complaint if Plaintiff fails to adequately plead scienter, I need not reach loss causation or misleading statements and omissions under the PSLRA."); *Footbridge Ltd. v. Countrywide Home Loans, Inc.,* No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *22 (S.D.N.Y. Sept. 28, 2010) ("I need not reach the issue of whether the SAC alleges loss causation because the SAC fails to allege a misstatement or that defendants acted with scienter.").

### 4.  Control Person Liability

Accordingly, the control person liability claims under Section 20(a) must be dismissed because Plaintiffs fails to allege a primary violation under Section 10(b).  *See Rombach*, 355 F.3d at 178 ("Because we have already determined that the district court properly dismissed the primary securities claims against the individual defendants, these secondary claims must also be dismissed.").

### C.  Leave to Amend

Defendants request that the Court deny Plaintiffs' Second Amended Complaint with prejudice.  Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to replead "when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).  The "usual practice" in this Circuit upon granting a motion to dismiss is to permit amendment of the complaint.  *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 446–47 (S.D.N.Y. 2014) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)).  Because it is possible that Plaintiffs can plead additional facts to remedy some of the deficiencies identified in this opinion without prejudice to Defendants, Plaintiffs are granted leave to move to amend their complaint.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189–90 (2d Cir. 2015) (finding the "district court exceeded the bounds of its discretion in denying Plaintiffs leave to amend their complaint" because an amended complaint "may cure the remaining defects" identified by the court).  Plaintiffs will not be given unlimited bites at the apple, however, as they are now on notice of the

deficiencies in their pleadings.  *See, e.g.*, *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 351 (S.D.N.Y. 1999) ("[W]here a plaintiff is on notice of deficiencies in an initial pleading and has had the opportunity to cure them by a first amendment, 'dismissal with prejudice is proper when a complaint previously has been amended.'").

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions are GRANTED.  Defendants' letter motion for oral argument is dismissed as moot.  Doc. 136.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 109, 113, 115, and 136.  Dismissal is without prejudice. Any motion for leave to amend must be filed by September 30, 2020.

Dated:    August 21, 2020
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.

46