UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL FRANCISCO,
*individually and on behalf of all
others similarly situated*,

                          Plaintiff,

          – *against* –

ABENGOA, S.A., SANTIAGO SEAGE,
MANUEL SANCHEZ ORTEGA,
BARBARA ZUBIRIA, and IGNACIO
GARCIA ALVEAR,

                          Defendants.

---

**OPINION & ORDER**

15 Civ. 6279 (ER)

---

RAMOS, D.J.:

          Lead Plaintiffs Jesse and Arlette Sherman and Plaintiff PAMCAH-UA Local 675

Pension Fund ("Local 675 Pension Fund," and together with Lead Plaintiffs, "Plaintiffs"),

bring this federal securities class action against Abengoa S.A. ("Abengoa"); Manuel

Sanchez Ortega, Abengoa's former chief executive officer; Christopher Hansmeyer, the

duly authorized representative for Abengoa in the United States; and HSBC Securities

(USA) Inc., Banco Santander S.A. ("Banco Santander"), Canaccord Genuity Inc., Merrill

Lynch International, and Société Générale, investment banks that served as underwriters

for Abengoa's United States offering (collectively, the "Underwriter Defendants").  In

their Proposed Third Amended Complaint ("PTAC"), Plaintiffs seek to pursue remedies

under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), as well as

under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act") and Rule 10b-5, promulgated thereunder.  Plaintiffs bring their claims on behalf of

purchasers of Abengoa American Depositary Shares ("ADSs")[1] between October 17, 2013 and August 3, 2015 (the "Class Period").

Pending before the Court is Plaintiffs' motion for leave to file the PTAC.  Doc. 142.  For the following reasons, Plaintiffs' motion is GRANTED in part and DENIED in part.

## I.    BACKGROUND

### A. Factual Background

The Court assumes familiarity with the parties and its prior opinion in this matter, *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179 (S.D.N.Y. 2020).

Abengoa, founded in 1941, is an engineering and clean technology company headquartered in Spain.  Doc. 144-1 ¶ 24.  Sanchez Ortega served as Abengoa's CEO from March 2010 until his resignation on May 19, 2015, and Hansmeyer was its duly authorized representative in the United States.  *Id.* ¶¶ 25, 27.

This action relates to Abengoa's October 17, 2013 public offering on the NASDAQ Global Select Market (the "NASDAQ") for €517.5 million, which Underwriter Defendants underwrote, and to the subsequent series of events culminating in the company's filing for insolvency and bankruptcy.  *Id.* ¶¶ 28, 162–72.  Lead Plaintiffs Jesse and Arlette Sherman and Local 675 Pension Fund purchased Abengoa ADSs during the Class Period.  *Id.* ¶ 23.  Specifically, the Shermans began trading Abengoa ADSs beginning November 18, 2014, Doc. 7-1, and Local 675 Pension Fund first purchased Abengoa ADSs on April 6, 2015, Doc. 12-1.

The following facts are taken from the PTAC and are assumed to be true for purposes of the instant motion.

---

[1] For a foreign corporation to trade on the American stock exchange without listing its ordinary shares on the exchange, the foreign corporation must issue and deposit ADSs with an American financial institution. *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 464 (2d Cir. 2010).  The depositary institution then issues American Depositary Receipts to the beneficial owners of the ADSs, who are then free to sell the ADSs on American securities exchanges.  *Id.*

*1. The Offering*

On October 4, 2013, in preparation for the offering, Abengoa filed a Registration Statement with the Securities and Exchange Commission ("SEC") on Form F-1, offering U.S. investors Class B shares in the form of ADSs, each of which represented the right to receive five Class B shares.  Doc. 144-1 ¶ 123.  Underwriter Defendants helped to draft and disseminate the Registration Statement.  *Id.* ¶ 28.  Non-party Barbara Zubiría Furest—who served as Abengoa's co-chief financial officer and executive vice president of capital markets and investor relationships from January 2011 until her resignation, which was announced on January 19, 2015—signed the Registration Statement.  *Id.* ¶ 36.

At the time of the offering, Abengoa was comprised of 532 subsidiaries, 17 associates, and 34 joint ventures, and was operating in over 70 countries.  *Id.* ¶ 53.  Abengoa used two types of debt:  recourse debt and non-recourse debt.  *See id.* ¶¶ 274–76, 335–36; *see also Abengoa*, 481 F. Supp. 3d at 188.  Recourse debt—also referred to as "corporate debt"—was guaranteed by Abengoa.  Doc. 144-1 ¶¶ 246, 274–76; *see also Abengoa*, 481 F. Supp. 3d at 188.  Non-recourse debt, which was used to finance specific projects, was guaranteed by the assets and cash flows of companies formed to carry out those projects.  Doc. 144-1 ¶¶ 246, 274–76; *see also Abengoa*, 481 F. Supp. 3d at 188.  In other words, non-recourse debt was not secured by Abengoa in the event of a default.  *See* Doc. 144-1 ¶¶ 276, 353, 355; *see also Abengoa*, 481 F. Supp. 3d at 188.

Abengoa's recourse debt was subject to a debt ratio covenant with its lenders.  Doc. 144-1 ¶¶ 12, 143, 335–36, 353; *see also Abengoa*, 481 F. Supp. 3d at 188.  Under that covenant, Abengoa was required to maintain a "leverage" ratio of debt-to-earnings before interest, taxes, depreciation, and amortization ("EBITDA") below 3.0x until December 30, 2014, and below 2.5x thereafter.  Doc. 144-1 ¶¶ 59, 143, 227; *see also Abengoa*, 481 F. Supp. 3d at 188.

The Registration Statement made representations about Abengoa's cash flow and liquidity, its debt usage and financing for long-term projects, and its accounting policies.

Doc. 144-1 ¶¶ 196–203, 219–221, 226.  The Registration Statement contained the

following language regarding its operations for financing construction projects:

> We have successfully grown our business while seeking to enforce strict financial discipline to maintain our strong liquidity position.  As of June 20, 2013, we had cash and cash equivalents and short-term financial investments of €3,222 million, which we believe are sufficient to satisfy our short-term liquidity needs.  This strong cash position also assists in bidding for large projects.

*Id.* ¶ 130 (emphases omitted).  It also contained the following statement regarding

Abengoa's "percentage-of-completion" accounting policy:

> Revenue from construction contracts is recognized using the percentage-of-completion method for contracts whose outcome can be reliably estimated and it is probable that they will be profitable.  When the outcome of a construction contract cannot be reliably estimated, revenue is recognized only to the extent it is probable that contract costs incurred will be recoverable.
>
> As described in Note 2.26.b) to our Annual Consolidated Financial Statements and our Interim Consolidated Financial Statements, the percentage of completion is determined at the date of every consolidated statement of financial position based on the actual costs incurred as a percentage of total estimated costs for the entire contract.
>
> Revenue recognition using the percentage-of-completion method involves the use of estimates of certain key elements of the construction contracts, such as total estimate contract costs, allowances or provisions related to the contract, period of execution of the contract and recoverability of the claims. We have established, over the years, a robust project management and control system, with periodic monitoring of each project.  This system is based on the long-track experience of the Group in constructing complex infrastructures and installations.  As far as practicable, we apply past experience in estimating the main elements of construction contracts and rely on objective data such as physical inspections or third parties [sic] confirmations. Nevertheless, given the highly tailored characteristics of the construction contracts, most of the estimates are unique to the specific facts and circumstances of each contract.

> When the outcome of a construction contract can be reliably estimated and it is probable that it will be profitable, revenue from the contract is recognized over the term of the contract. When it is probable that the costs of the project will be greater than its revenue, expected loss is recognized immediately as an expense. To determine the appropriate amount of revenue to be recognized in any period, the percentage of completion method is applied. The percentage of completion method considers, at the date of the Statement of Financial Position, the actual costs incurred as a percentage of total estimated costs for the entire contract. Costs incurred in the period which relate to future project activities are not included when determining the percentage of completion. Prepayments and certain other assets are recognized as inventories, depending on their specific nature.

*Id.* ¶ 197 (emphases omitted).

On October 16, 2013, Abengoa filed a Prospectus with the SEC, which formed part of the Registration Statement. *Id.* ¶ 125. According to the Prospectus, Abengoa was offering to the public 250,000,000 Class B shares at €1.80 per share (or $12.18 per ADS). *Id.* On October 17, 2013, Abengoa went public in the United States and began selling its ADSs on the NASDAQ exchange. *See id.* ¶ 126. Abengoa realized €517.5 million in gross proceeds—or roughly $703.8 million—from the offering. *Id.* ¶ 127. In the Registration Statement, Abengoa represented that it intended to use those proceeds to repay €347 million in corporate debt maturities due in 2013 and 2014. *Id.* ¶ 128.

*2. Positive Financial Reports*

After the offering, Abengoa made several reports of positive financial results. On November 11, 2013, Abengoa reported its financial results for the nine months ending September 30, 2013. *Id.* ¶ 227. It reported that its EBITDA had risen 29% year-over-year and that Abengoa was accelerating its deleverage targets. *Id.* At a subsequent conference call, Sanchez Ortega reiterated these results and remarked positively on the company's financial position, leverage ratios, cash flow, and EBITDA. *See id.* ¶¶ 228–

29.  Abengoa's financial results for the full year ending December 31, 2013, which were announced on February 20, 2014, were similarly positive.  *See id.* ¶¶ 234–36.

On March 19, 2014, Abengoa filed its annual report for the year ending December 31, 2013, signed and certified by Sanchez Ortega, with the SEC pursuant to the Sarbanes-Oxley Act.  *Id.* ¶ 241.  Abengoa again represented that it had sufficient capital and liquidity to fund existing operations and to finance expansions.  *Id.* ¶¶ 241, 246.  Sanchez Ortega reiterated this position during his presentation at Abengoa's Eighth Annual Analyst and Investor Day on April 3, 2014 in New York.  *Id.* ¶ 248.  Reports of Abengoa's favorable corporate leverage were reaffirmed by Abengoa's first-quarter-of-2014 and first-half-of-2014 results, as well as by continued confident statements from Sanchez Ortega and Zubiría Furest in subsequent presentations.  *Id.* ¶¶ 251–69.

### 3. The Greenfield Bonds

During strategy-update presentations on September 3 and 4, 2014, Abengoa announced that the company was transitioning to an "asset-light" business model, aimed at generating cash throughout the life cycle of construction projects.  *Id.* ¶¶ 147–48.  This was due in part to investors' concerns about Abengoa's balance sheet.  *Id.* ¶ 147.  To achieve the "asset-light" model, Abengoa would create a subsidiary—Abengoa Greenfield, S.A. ("Abengoa Greenfield")—that would secure short-term "bridge" financing from Abengoa's external partners for the beginning stages of new projects.  *Id.*  According to the new model, completed projects would be sold to another Abengoa subsidiary—Abengoa Yield—and Abengoa would reinvest a portion of those proceeds in new projects via Abengoa Greenfield.  *Id.* ¶ 148.

On September 22, 2014, Abengoa announced that Abengoa Greenfield would issue €500 million in bonds (the "Greenfield Bonds").  *Id.* ¶ 149.  Abengoa represented that the company would guarantee the bonds, and that it intended to classify the bonds as corporate recourse debt upon issuance.  *Id.* ¶ 274.  Abengoa would use the proceeds from the offering to finance certain environmentally sustainable energy projects "until the long-

term funds associated with those project [were] obtained," while "optimizing financial costs." *Id.* ¶ 149 (quotation omitted). The bonds were offered in two tranches (one in euros and one in U.S. dollars), both set to mature in 2019. *Id.* The offering closed on September 30, 2014. *Id.*

   *4. The November 2014 Disclosures*

   In November 2014, Abengoa made a series of disclosures related to its debt characterization and other practices (the "November 2014 Disclosures").

   On November 12, 2014, Abengoa announced its financial results for the nine months ending on September 30, 2014. *Id.* ¶ 270. Abengoa reported that EBITDA had risen 24% year-over-year, and that its corporate leverage ratio was 2.1x, a .4x reduction from the previous quarter. *Id.* In a conference call with analysts later that day, Sanchez Ortega and Zubiría Furest reiterated optimism about the company's cash flow and liquidity. *Id.* ¶¶ 271–73.

   During the call, an HSBC analyst sought clarification regarding the Greenfield Bonds, noting that they did not seem to be included in Abengoa's reported corporate leverage ratio despite Abengoa's representations that it would guarantee those bonds. *Id.* ¶ 275. Zubiría Furest then revealed that Abengoa had reclassified the Greenfield Bonds as non-recourse debt—and more specifically, under the category "nonrecourse financing in process," which was excluded from the corporate leverage ratio. *Id.* (alterations omitted). When a Barclays analyst made the same observation—noting that "obviously the [G]reenfield [B]onds . . . are the same as the other debts guaranteed by Abengoa. And yet, you're not including it in the corporate debt. I just wanted to understand why"— Zubiría Furest stated that the bonds were "classified in a different bucket. . . . It is preoperational nonrecourse debt. And that is accounted for as what we call nonrecourse debt . . . ." *Id.* ¶ 276. In response to the revelation that Abengoa had reclassified the Greenfield Bonds, the price of Abengoa ADSs fell nearly 50% over the next three trading days, falling from a closing price of $17.59 per ADS to $8.83 per ADS. *Id.* ¶ 277.

On November 17, 2014, Abengoa held another call in an effort to repair its credibility. *Id.* ¶ 278. The company revealed that Abengoa accounted for a total of €1.595 billion as non-recourse debt in process—including the €500 million in Greenfield Bonds. *See id.* ¶ 279. As non-recourse debt in process, that amount had not been included in Abengoa's corporate leverage ratio. *See id.* After including non-recourse debt in process, Abengoa's corporate leverage ratio was 3.9x. *Id.* ¶ 280. Abengoa further revealed that its "total net debt" was over €9 billion and its "total net leverage" ratio was 5.6x. *Id.* Zubiría Furest also disclosed that Abengoa did not characterize "approximately €1 billion of cash linked to supplier payments that is set aside on collateral accounts" as debt. *Id.* (alterations omitted). Despite these disclosures, Sanchez Ortega and Zubiría Furest[2] continued to highlight Abengoa's purportedly sound liquidity position. *Id.* ¶ 281.

### 5. Subsequent Reports, Transactions, and Protocols

Throughout 2015, Abengoa continued to report that it had a healthy level of liquidity and was poised to generate positive cash flow and described its 2014 operating performance as "strong." *Id.* ¶¶ 285–309. And specifically, on February 23, 2015, Abengoa filed its annual report for the year ending December 31, 2014 with the SEC on Form 20-F, which Sanchez Ortega signed and certified pursuant to the Sarbanes-Oxley Act. *Id.* ¶ 294.

Despite these assurances and representations, on May 8, 2015, Abengoa borrowed 95 million Class B shares from its majority shareholder, equal to 10% of its total outstanding stock and worth approximately €275 million. *Id.* ¶¶ 150, 338. That same day, Abengoa agreed to subscribe to 51% of a $670 million capital increase that Abengoa Yield had announced, designed to fund the acquisition of four solar power assets owned by Abengoa. *Id.* ¶¶ 151, 338. Analysts questioned the timing of these transactions,

---

[2] Zubiría Furest resigned from her position two months later, on January 19, 2015.  Doc. 144-1 ¶ 36.

noting that it would be "surprising and worrying" if the shares were used to get access to funding. *Id.* ¶ 152.

On May 14, 2015, Abengoa announced its financial results for the quarter ending March 31, 2015, reporting a corporate leverage ratio of 2 and emphasizing its liquidity position. *Id.* ¶¶ 310–14.

On May 19, 2015, Sanchez Ortega resigned from his position as CEO but continued as non-executive First Vice Chairman and joined Abengoa's International Advisory Board. *Id.* ¶¶ 25, 339. He was replaced by Santiago Seage. *Id.* ¶ 35.

Additionally, in May 2015, Abengoa created a "Controller Department" to audit past projects. *Id.* ¶ 337. According to Plaintiffs, the margins of projects had stayed relatively consistent until dropping drastically upon their completion, and the newly created department would determine why. *Id.* During this time, Abengoa's IT subsidiary—Simosa IT—purchased a new project management system to address the account-entry protocols in place with another one of Abengoa's subsidiaries, Abeinsa Ingeniería y Construcción Industrial S.A. ("Abeinsa"), which served as the head of Abengoa's engineering and construction group—one of Abengoa's three main business groups. *Id.* ¶¶ 3, 54, 87, 337. According to Plaintiffs, activity from the engineering and construction group represented more than 60% of Abengoa's overall consolidated annual sales, rendering the group—and by extension, Abeinsa—the primary focus of Abengoa's executive management and senior leadership throughout the Class Period. *Id.* ¶¶ 56–58.

On June 29, 2015, another Abengoa subsidiary—Abengoa Concessions Investment Limited ("Abengoa Concessions")—entered into a margin loan facility agreement, pursuant to which Abengoa Concessions could borrow up to $200 million. *Id.* ¶ 153. As collateral for the loan, Abengoa posted a 14% stake in Abengoa Yield, worth approximately $450 million. *Id.* ¶ 154.

On July 16, 2015, Abengoa announced that it had sold all of its Class B shares in treasury stock to raise €97.6 million. *Id.* ¶ 157. This announcement further raised

suspicions, as stated in a July 17, 2015 *Reuters* article and a BPI analyst report issued on the same day.  *Id.* ¶¶ 158–59.

### 6. July 31, 2015 Disclosures

On Friday, July 31, 2015, Abengoa issued a press release announcing its financial results for the six months ending on June 30, 2015.  *Id.* ¶ 318.  Once more, the company reported "strong business performance."  *Id.* (alteration omitted).  Later that day, Abengoa held a conference call with analysts and investors to discuss these results.  *Id.* ¶ 319.  Plaintiffs allege that, during that call, Abengoa "had finally begun to reveal signs that its financial condition was worse than previously disclosed" but "continued to misrepresent both the severity of its liquidity problems and plans going forward."  *Id.* ¶ 357; *see also id.* ¶ 320.  For example, the company announced that it was reducing its corporate free cash flow guidance and that it planned to divest €400 million worth of assets.  *Id.* ¶ 357.  Nevertheless, Abengoa continued to represent that it was in an adequate position with respect to its liquidity.  *Id.* ¶¶ 319–21, 357.  Indeed, Seage specifically stated that Abengoa had "no plan . . . to tap the capital markets in any manner."  *Id.* ¶ 321.

But on the next business day, August 3, 2015, Abengoa announced that it was doing just that, seeking shareholder approval of a capital increase with preemptive rights of €650 million and asset divestitures totaling €500 million, plus additional divestitures of bioenergy assets.  *Id.* ¶¶ 342, 359.  The company stated that these "significant actions" were necessary to "reduce corporate debt" and "reinforce [Abengoa's] balance sheet."  *Id.* ¶ 359.  Plaintiffs allege that analysts and investors were "stunned," citing to reports and articles by Canaccord Genuity, Citi, and *Bloomberg*.  *Id.* ¶¶ 361–64.  The price of Abengoa's ADSs fell nearly 30%, from a closing price of $11.06 per share on July 31, 2015 to $7.75 per share on August 3, 2015.  *Id.* ¶ 365.  The price fell an additional $1.75 per share the following trading day, resulting in losses of $8.1 billion in market capitalization and approximately $837 million in ADS market share.  *Id.*

### 7. Liquidity Crisis and Bankruptcy

On November 8, 2015, Abengoa announced that Gonvarri Corparación Financiera ("Gonvarri"), a Spanish investment firm, had agreed to invest €350 million in connection with Abengoa's planned capital increase.  *Id.* ¶ 162.  However, on November 25, 2015, Abengoa announced that Gonvarri had cancelled that agreement.  *Id.* ¶ 163.

That same day, Abengoa announced that it was filing for preliminary creditor protection under the Spanish Insolvency Law, which allowed it four months to reach an agreement with its creditors.  *Id.*  Shortly thereafter on November 27, 2015, Seage resigned from his position at Abengoa.  *Id.* ¶ 165.  Between February 24, 2016 and April 7, 2016, dozens of Abengoa's U.S.-based affiliates filed for Chapter 11 bankruptcy protection.  *Id.* ¶ 171.

On March 10, 2016, Abengoa announced that it had reached a preliminary debt-restructuring agreement with its creditors.  *Id.* ¶ 167.  On March 28, 2016, Abengoa filed for bankruptcy protection pursuant to Chapter 15 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  *Id.* ¶ 168.  On April 6, 2016, the Mercantile Court of Seville no. 2 approved the agreement between Abengoa and its creditors, allowing it seven months to restructure.  *Id.* ¶ 169.  On April 27, 2016, the Bankruptcy Court in Delaware recognized this as the controlling proceeding pursuant to 11 U.S.C. § 1517, and temporarily stayed the case.  *Id.* ¶ 170.  The next day, Abengoa's ADSs and Class B shares were delisted from the NASDAQ.  *Id.*

Both of Abengoa's bankruptcy proceedings concluded in mid-2019, and Abengoa now operates according to a court-approved reorganization plan.  *Id.* ¶ 172.

### 8. Criminal Proceedings

In the PTAC, Plaintiffs assert that two Spanish criminal proceedings are relevant to the instant suit.

First, on March 22, 2016, Abengoa's investors filed a criminal complaint against Sanchez Ortega and Felipe Benjumea Llorente—the former executive chairman of

Abengoa—for allegedly misrepresenting Abengoa's financial statements; Spanish prosecutors are supporting the prosecution, which is in the "investigatory stage" pending in the National Court in Madrid. *Id.* ¶¶ 4, 5, 180.  Plaintiffs note that this is the first of three stages of prosecuting a criminal complaint in Spain. *Id.* ¶ 175.  Additionally, according to Plaintiffs, the National Court maintains jurisdiction for investigating and ruling on crimes that are particularly severe, such as fraud that causes or can cause serious repercussion in the confidence of mercantile transactions in the national economy. *Id.* ¶ 179.  On February 2, 2020, the National Court expanded the criminal complaint to include Abengoa and other individuals. *Id.* ¶¶ 184–85.  In that order, the National Court noted that "enough evidence has been gathered to establish at this stage of the trial, *and without prejudice to the court ruling otherwise*, a possible accounting alteration of the accounts corresponding, at least, to the 2014 to 2016 yearly financial statements of Abengoa, S.A. and certain subsidiaries . . . to the detriment of its partners, shareholders and/or third parties." *Id.* ¶ 186 (emphasis added).

Second, in the Criminal Investigation Court in Seville, investors filed a criminal action in June 2018 against two Abengoa subsidiaries—Abeinsa and Instalaciones Inabensa S.A. ("Inabensa")—along with various senior officers of Abengoa for accounting fraud and misrepresentation; the PTAC does not indicate whether any of the defendants in the instant suit are named in that proceeding. *Id.* ¶¶ 3, 188–89.  Inabensa led Abeinsa's "Installations" division within the engineering and construction group.[3] *Id.* ¶ 55.  On June 9, 2020, the investigating judge—*i.e.*, the judge presiding over the investigatory stage of the criminal proceeding—elevated the action as to Abeinsa and Inabensa to the National Court—*i.e.*, the same court overseeing the criminal claims

---

[3] The Installations division concentrated on engineering; construction; maintenance of electrical and mechanical infrastructure; and instrumentation for the energy, industry, transportation, and service sectors. Doc. 144-1 ¶ 55.

against Sanchez Ortega, Benjumea Llorente, and Abengoa.  *See id.* ¶¶ 176, 190.  On November 6, 2020, the Spanish National Court reversed that decision, transferring the matter back to the Criminal Investigation Court in Seville.  Docs. 161 and 161-1.[4]

The PTAC is silent as to whether either of these proceedings has progressed beyond the investigatory stage.

### B. Procedural History

Plaintiff Michael Francisco, individually and on behalf of all others similarly situated, first filed his complaint bringing Exchange Act claims against Abengoa, Seage, Sanchez Ortega, Zubiría Furest, and Ignacio Garcia Alvear (Zubiría's Furest's successor, Doc. 88 ¶ 29) on August 10, 2015.  Doc. 1.  In a related case, Daniel LaMoureaux, individually and on behalf of all others similarly situated, filed suit against the same parties on September 3, 2015.  *LaMoureaux v. Abengoa, S.A.*, No. 15 Civ. 6971 (S.D.N.Y.), Doc. 1.  On October 9, 2015, Jesse and Arlette Sherman moved to consolidate the actions and for appointment as lead plaintiffs.  Doc. 5.  Local 675 Pension Fund similarly moved on October 9, 2015.  Doc. 8.  On May 24, 2016, the Court granted the motions to consolidate and the Shermans' motion for appointment as lead plaintiffs, and denied the pension fund's.  Doc. 19.  The Shermans, together with Local 675 Pension Fund, filed a First Amended Complaint on August 2, 2016, seeking relief under both the Securities Act and Exchange Act and naming as defendants Abengoa, twenty-one individuals, and, for the first time, the Underwriter Defendants.  Doc. 31.

On September 10, 2019, Abengoa wrote to advise the Court that its Chapter 15 case had been closed on August 21, 2019.  Doc. 83.  In a joint status report, Plaintiffs advised the Court that they intended to submit an amended complaint and that they did

---

[4] The Court may take judicial notice of developments of the related criminal proceedings in the Spanish courts.  *See* Fed. R. Evid. 201(b)(2); *see also Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 88 n.2 (2d Cir. 2012).

not intend to pursue claims against the individual defendants who had not yet been served.  Doc. 87.  As such, the only defendants remaining in the case were Abengoa, the Underwriter Defendants, Sanchez Ortega, and Hansmeyer.[5]  *Id.*

On October 28, 2019, Plaintiffs filed their Second Amended Complaint, Doc. 88, which Underwriter Defendants, Sanchez Ortega, and Abengoa moved to dismiss, Docs. 109, 113, and 115.  On April 30, 2020, Plaintiffs requested a pre-motion conference for a contemplated motion for leave to amend their complaint, citing new information that had come to light in connection with the criminal proceedings in Spain.  Doc. 120.  At a teleconference on May 19, 2020, the Court denied that request in light of the pending motions to dismiss, and Plaintiffs indicated that they would seek leave to amend their complaint in the event that the Court granted Defendants' motions.

On August 20, 2020, the Court granted Defendants' motions to dismiss the Second Amended Complaint and granted Plaintiffs leave to move to amend their complaint; on August 21, 2020, the Court entered an amended order.  *Abengoa*, 481 F. Supp. 3d at 216.

On September 30, 2020, Plaintiffs filed the instant motion and PTAC.  Doc. 142.

**C. Claim-specific Allegations**

Plaintiffs bifurcate the PTAC into:  (1) Securities Act allegations and (2) Exchange Act allegations.  To support those allegations, Plaintiffs rely on the accounts of a number of confidential witnesses, as well as three reports conducted after the Class Period.

*1. Confidential Witnesses*

More specifically, Plaintiffs rely on information obtained from seven confidential witnesses, all of whom were former Abengoa employees.

---

[5] Although Hansmeyer was served on September 8, 2016, he has not appeared in this action.  Doc. 79.

a. FE7

Plaintiffs rely most heavily on information provided by "FE7."  FE7, who worked

for Inabensa, is a confidential whistleblower who on April 10, 2017 submitted a detailed

letter to the Office of the Prosecutor of the National Court in Spain, describing

widespread, systemic accounting fraud at Abengoa.  Doc. 144-1 ¶¶ 45, 74, 98.  Moreover,

as Plaintiffs note, that letter includes information regarding Abengoa's chain of reporting,

its internal management controls, screenshots of Abengoa's internal accounting files from

one of Inabensa's servers, and specific examples of falsified project margins; taken

together, these characteristics, according to Plaintiffs, indicate that FE7 worked within

Inabensa's Controller Department between at least 2013 and 2015, and was responsible

for overseeing the subsidiary's financial accounting and reporting.  *Id.* ¶ 46.

FE7 describes in detail the dual accounting system Plaintiffs allege Abengoa

implemented.  According to FE7, Abengoa used one system—SAP software[6]—to

maintain its "official" accounting records, vendor orders, expenses, invoices, cash flows,

and other information related to project management.  *Id.* ¶ 63.  When a project manager

was assigned to a project, the project came with an estimated margin that originated with

the individuals who prepared the bid for that project in the first instance; those estimated

margins, according to FE7, were commonly inflated because they did not account for the

entire costs of the project.  *Id.* ¶ 64.  FE7 further states that project managers would not

revise those inflated margins, in part due to Abengoa's rigid internal compliance

standards.  *Id.* ¶ 65.  According to FE7, those standards were designed to ensure that

senior levels of Abengoa management had control over the project margins, as those

standards required that project managers obtain approval from several layers of upper

management—including group directors, area directors, project management

departments, and internal auditors—before they could even enter a request to lower a

---

[6] SAP AG is a software corporation best known for its business management software.  Doc. 144-1 ¶ 63 n.1.

project margin.  *Id.*  As a result, project managers left the margins in SAP as initially stated, and Abengoa in turn was able to recognize revenue prematurely during a project. *Id.*

Separate from the SAP software, project managers maintained their own project management records on Excel spreadsheets, which recorded the same categories of information contained in the SAP records.  *Id.* ¶ 66.  However, the project managers did not have the same compliance standards for their Excel spreadsheets, and these spreadsheets reflected the actual costs, expenses, and margins of the projects.  *Id.*

According to FE7, this dual accounting system was commonplace and widely known within Abengoa.  *Id.* ¶ 67.  Indeed, FE7 notes that, when project managers were asked for a margin estimate, they would reply by asking whether the requester wanted the official SAP margin or the accurate margin in the Excel spreadsheet.  *Id.*  Moreover, FE7 avers that this dual accounting system was intentional, allowing Abengoa to rely on the SAP records to portray a more profitable and liquid appearance to the public, while allowing various members of Abengoa's management to increase projected earnings so that they could meet bonus objectives set by the company.  *Id.* ¶ 68.

Beyond broadly describing the dual accounting system, FE7 also specified instances in which the project margins were inflated to rapidly accelerate purported project revenue.  First, FE7 states that, in December 2014, Inabensa increased the margin for the DGEN project—an electrical line project in India—to 86%, allowing Inabensa to recognize a profit of €2.947 million in 2014.  *Id.* ¶ 69.  That figure represented the total estimated profit for the entire project, and Abengoa was able to recognize that profit even though the project "had hardly even started."  *Id.* (quotation omitted).

Second, FE7 notes a few instances in which Abengoa allegedly falsified costs to accelerate the recognition of revenue on projects.  Again, Abengoa's accounting standards allowed the company to recognize revenue on projects in proportion to the costs the company incurred on the project and that project's percentage of completion.

*See id.* ¶ 70.  These accounting standards permitted the use of cost provisions, which were accounting entries used to denote a cost or expense that had not yet been registered for an account.[7]  *Id.*  According to FE7, Inabensa routinely fabricated project costs as cost provisions, allowing Abengoa to recognize revenue prematurely.  *Id.*  More specifically, FE7 claims that Inabensa regularly entered cost provisions for materials that it had not yet ordered or even needed for a project.  *Id.* ¶ 71.  For example, in November 2013, Inabensa's cost provisions increased to €25 million, after remaining at approximately €5 million for the three prior months.  *Id.*  According to FE7, that increase was due to two electric transmission projects—one in Kenya and the other in Ukraine.  *Id.*  FE7 also notes that, in particular, cost provisions for the Kenya project were logged on November 30, 2013 and maintained through the end of the calendar year—even though the actual expenses for the project were not incurred until 2014.  *Id.*  Then in 2014, Inabensa's cost provisions declined to approximately €24 million but increased sharply towards the end of the year, reaching nearly €58 million in value in November 2014.  *Id.* ¶ 72.  According to FE7, at the end of the year, Inabensa falsely recorded only €33 million in provisions. *Id.*  Thus, according to Plaintiffs, Inabensa both benefited throughout the year because of its premature recognition of revenue, and then reduced those costs at the end of the year to maintain favorable project margins.  *Id.*  FE7 alleges that a similar trend also happened in 2015.  *Id.* ¶ 73.

According to Plaintiffs, the fact that the provisions increased in frequency and amount—and towards the end of the year—shows that Inabensa abused these cost provisions to inflate its revenues and margins for year-end audits and reports.  *Id.*  And more broadly, Plaintiffs note FE7's conclusion that, because these accounting practices "required coordination from other companies within Abeinsa and senior levels of

---

[7] For example, a cost provision may be entered for an item even when a vendor's invoice had not yet been issued, effectively serving as a placeholder in an account until the underlying paperwork is received.  Doc. 144-1 ¶ 70.  When the invoice was received, the cost provision would be cancelled, and the actual cost would be accounted for instead.  *Id.*

management," these practices had been done by all large project companies within Abengoa.  *Id.* ¶ 74.

### b. FE1

Plaintiffs allege that the accounts of the other six confidential witnesses corroborate the information in FE7's whistleblower letter.  *Id.* ¶ 75.  "FE1" was the Director of Human Resources at Abeinsa's U.S. subsidiary, Abeinsa EPC.  *Id.* ¶ 114.  FE1 maintains that she repeatedly heard from employees in Abeinsa's accounting department that Abeinsa maintained two sets of books—keeping one set for its external auditor while maintaining a separate set for internal purposes.  *Id.* ¶ 76.

According to FE1, shortly before the offering, Abeinsa's internal auditor tendered his letter of resignation to FE1, and FE1 subsequently conducted an exit interview with him.  *Id.* ¶ 114.  FE1 claims that, during that interview, the internal auditor stated that he was resigning because he had been directed to sign off on financial reports that falsely inflated the value of certain projects, explaining that the reports showed false percentages of completion on some projects and failed to show that some projects were, in fact, over budget.  *Id.*  According to FE1, the internal auditor stated that those financial reports had been prepared to present to banks in order to obtain larger lines of credit.  *Id.*  FE1 also claimed that the internal auditor stated he raised his concerns with Santiago Duran, the chief financial officer of Abeinsa, but Duran told him to "shut the f--k up and just sign" the reports.  *Id.* ¶ 115.  After the exit interview, FE1 approached Duran to discuss what the internal auditor had reported; unable to speak to Duran, she memorialized the internal auditor's account in an email to Duran.  *Id.* ¶ 116.  According to FE1, after receiving the email, Duran approached FE1 to state that the internal auditor could not report his concerns to anyone outside of Abeinsa because he had signed a non-disclosure agreement.  *Id.*  During leadership meetings, FE1 also learned that, prior to the internal auditor's resignation, the financial reports were presented to various lenders who subsequently provided Abengoa with large lines of credit.  *Id.* ¶ 117.

FE1 also emphasized that cash flow was a critical financial metric for Abengoa and described various tactics the company engaged in to artificially increase the amount of cash on its books.  *Id.* ¶ 136.  As an example, FE1 notes that Abengoa held a training class during which managers were taught to reject supplier invoices, so that payment would be delayed, thereby increasing the company's reported cash position.  *Id.*  More specifically, according to FE1, because Abeinsa's contracts provided that rejected invoices could not be resubmitted for thirty days, this practice of rejecting invoices helped to preserve Abeinsa's cash on hand, increasing its reported cash flow.  *Id.*  FE1 also claimed that Abengoa routinely refused to pay contractors on its projects, instead forcing them to file liens against the company to ultimately settle their claims in arbitration for "pennies on the dollar."  *Id.* ¶ 138.

c. FE2

"FE2" is a former Abengoa employee who Plaintiffs allege had broad oversight over accounting and financial reporting at several of Abengoa's U.S. subsidiaries.  *Id.* ¶¶ 40, 77.  FE2 confirmed that Abengoa U.S. subsidiaries maintained two sets of accounting reports:  one for external auditors and the other for internal use.  *Id.* ¶ 77.  According to Plaintiffs, FE2 also states that Abeinsa engaged in a pattern of falsifying information in the reports presented to the company's external auditor, and that Abengoa intentionally ignored accounting principles to inflate profits in order to obtain hundreds of millions of dollars of financing, although the PTAC does not detail any specific instances recounted by FE2.  *See id.* ¶¶ 77–78.  FE2 resigned rather than sign off on false financial statements created to obtain capital for Abengoa.  *Id.* ¶ 40.

d. FE3

"FE3" worked as a senior staff accountant at Abengoa's corporate office in Missouri from June 2013 through July 2014.  *Id.* ¶ 41.  In that position, FE3 was responsible for accounting functions at Abeinsa, including with the preparation of weekly and monthly financial reports for Abengoa's corporate headquarters in Spain and

preparing and analyzing cash flow statements.  *Id.*  FE3 also confirmed the dual

accounting system in place throughout Abengoa.  *Id.* ¶ 79.  In their role, FE3 received

costs and revenues from Abeinsa's various projects and entered those numbers into the

SAP system; on a monthly basis, FE3 was required to ensure that the numbers in the SAP

system precisely matched the numbers Abengoa's executives had specified for ongoing

projects.  *Id.* ¶ 80.  According to FE3, on some occasions, the revenue numbers in

Abengoa's internal accounting system were higher than the actual numbers booked in the

external-facing SAP system.  *Id.* ¶ 81.  When that happened, FE3 was required to move

costs and expenses in the SAP to match the numbers mandated by Abengoa's senior

management.  *Id.* ¶¶ 81, 84.  FE3 believed that the numbers in both accounting systems

came from the same projects.  *Id.* ¶ 82.

Like FE1, FE3 also claims that Abengoa maintained a purposely slow and

cumbersome process for invoice approval, often stretching the problem for months at a

time in order to preserve its cash flow.  *Id.* ¶ 137.  According to FE3, Abengoa required a

process of up to six steps before an invoice could be forwarded to the department within

the company responsible for approval.  *Id.*  If the invoice was rejected at any step, it was

sent back to the vendor for resubmission, and the process started all over.  *Id.*  FE3 also

states that Abengoa held on to approved invoices and would forward them to banks in a

single package once a month, further delaying payment.  *Id.*

Ultimately, in July 2014, FE3 resigned due to concerns about Abengoa's financial

reporting.  *Id.* ¶ 41.

e. FE4

"FE4" worked for Abengoa entities from 1989 until retiring in March 2016,

working specifically as the Chief of Critical Projects Follow-up for Inabensa between

2013 and 2014, and in the Controller Department from 2015 until his retirement.  *Id.*

¶ 42.  FE4 claims that, in his role in the Critical Projects Follow-up Department, project

managers referred different issues to him.  *Id.*  In that role, FE4 discovered projects in the

SAP records that contained inaccurate cost-provision information, which was used to calculate project profits on a monthly basis, thereby projecting inaccurate income data. *Id.* ¶ 84.  FE4 also explains that, separate from the SAP records, project managers used Excel files to manage projects, so that they could have their own figures on cost forecast, expected margin, and other data.  *Id.* ¶ 85.  According to FE4, some forecasts in Excel differed from those in SAP, especially for the expected final profit margin for a given project.  *Id.* ¶ 86.  That was so, according to FE4, because Inabensa would open each project in SAP with a specified profit margin, but it was difficult to obtain authority to lower the present project margins during the execution of the project.  *Id.*  As such, the external-facing project margin in SAP was reduced only at the end of the project, resulting in a need for regular follow-up on project records.  *Id.*  In response to these issues, in 2014, Inabensa's management authorized the development of software to properly follow up on projects, and in 2015, Simosa IT—again, Abengoa's IT subsidiary—purchased commercial software to oversee project follow-up for Abeinsa. *Id.* ¶ 87.

FE4 also claims that Abeinsa was able to recognize revenues prematurely through its accounting notes in SAP.  *Id.* ¶ 89.  Particularly when a project was awarded near the end of a financial year, the cost provisions for the project were entered immediately, despite the fact that purchase orders had not been issued and, in some cases, suppliers had not even been identified.  *Id.*  Specifically, FE4 corroborated FE7's account that, in 2013, two transmission line projects—one in Ukraine and the other in Kenya—had false cost provisions.  *Id.* ¶ 90.  Additionally, FE4 recalled two other projects with false cost provisions, noting one in Kuwait with more than €10 million in provisions.  *Id.*  FE4 claims that this abuse of cost provisions continued in 2015, but he does not know what happened after pre-bankruptcy was declared in November 2015.  *Id.*  According to FE4, Inabensa controlled these cost provisions through its Projects Control Department.  *Id.* ¶ 91.

f. FE5

"FE5" worked as a communications engineer from 2007 to 2017 for Inabensa.  *Id.*
¶ 43.  In April 2015, FE5 was assigned to the Controller Department at Inabensa as a
project control engineer for the AVE Mecca Medina project—a high-speed railway
installation—in Saudi Arabia.  *Id.* ¶¶ 43, 109.  According to FE5, the Controller
Department was created to control the correlation between the initial budget of a project
and the subsequent costs that arose during the execution of that project.  *Id.* ¶ 43.  FE5
states that he was one of the first project control engineers at Abengoa, as the position had
been created to investigate why the company's projects routinely maintained strong profit
margins through the life of the project, but suddenly showed heavy losses once
completed.  *Id.*  In this role, FE5 oversaw the budget of a project; to accomplish that task,
FE5 compared the initial budget of a project to subsequent costs (incurred, committed,
and pending) in order to evaluate the project's margins.  *Id.* ¶¶ 43, 109.

During the course of his work on the AVE Mecca Medina project, FE5 discovered
that expenses unrelated to the project—*i.e.*, expenses from prior projects—had been
charged to the project in 2012, 2013, and 2014, totaling approximately €22.2 million.  *Id.*
¶¶ 92–93, 109, 112.  For example, on December 31, 2012—the first day of the project—
approximately €11.5 million was charged against it, despite the fact that the project had
not yet incurred any expenses and did not have any outstanding orders or invoices.  *Id.* ¶
112.  After further investigation, FE5 determined that these costs were in fact losses from
other, unrelated projects involving Huawei, Vodafone, and Nokia.  *Id.*

In November 2013, Inabensa Turkey, another Abengoa subsidiary, invoiced
approximately €3.8 million of copper wire supplies to another Abengoa subsidiary,
Inabensa Saudi, through the AVE Mecca Medina project; however, according to FE5,
Inabensa Turkey was not involved with the project, and Inabensa Saudi did not need
copper until 2014.  *Id.* ¶ 132.  In December 2014, when Inabensa Saudi finally needed the
copper wire, it cancelled the invoice from Inabensa Turkey.  *Id.*  Additionally, FE5

discovered falsified invoices charged to the project on December 30 and 31, 2013. *Id.*
¶ 133. These invoices totaled approximately €7 million and were from Nicsa, an
Abengoa subsidiary, for consulting, engineering, and supply services. *Id.* However,
according to FE5, Nicsa had no role in the project, and another company had performed
the engineering for the project. *Id.*

According to FE5, the practice of transferring unrelated expenses to new projects
was widespread at Abengoa, as it was necessary to hide undeclared losses from prior
projects, which in turn increased the percentage-of-completion of new projects and
allowed Abengoa to recognize higher revenues. *Id.* ¶ 93. FE5 further explains that, if a
new project was assigned losses from prior projects, the new project was ultimately
unable to allocate its true expenses; consequently, these inherited costs would have to be
attributed to another, newer project, essentially passing the buck on to future projects. *Id.*
According to FE5, when Abengoa stopped winning new projects, it lost the ability to pass
on losses from old to new projects, eventually leading to the collapse of the company. *Id.*

FE5 also states that senior management at Abengoa directed these transfers of
unrelated project expenses, alleging that executives within Abengoa were incentivized to
do so in order to earn bonuses. *Id.* ¶ 94. According to FE5, Abengoa based its executive
bonuses on the percentage-of-completion of contracts and project margins, so the
company's executives were incentivized to inflate those figures to increase the bonuses
they could receive. *Id.* FE5 also notes that executive bonuses were determined at the end
of a calendar year, aligning with the timing of when these transfers occurred. *Id.*
Moreover, FE5 surmises that director-level employees were involved in the practice of
transferring unrelated expenses because only employees with that level of seniority could
generate invoices from different Abengoa companies. *Id.* As an example, FE5 notes that
the Nicsa invoices charged to the AVE Mecca Medina project required approval by
Abengoa's senior management, as these transactions occurred between two Abengoa

subsidiaries; accordingly, Inabensa's directors lacked the authority to approve these transactions.  *Id.* ¶ 133.

FE5 also points to other methods Abengoa employed to inflate project margins. FE5 notes that, when he first started on the AVE Mecca Medina project, he attempted to obtain its initial budget but was unsuccessful, and was denied access to Inabensa's SAP accounting records.  *Id.* ¶ 110.  According to FE5, without the initial budget and all of the subsequent project costs, he was unable to calculate the actual margins for the project. *Id.*  FE5 claims that, instead, two project managers instructed him to use a project margin of 21% and to modify costs in order to arrive at that calculation.  *Id.*  Additionally, the accounting records FE5 actually received uniformly contained a project margin of 21%. *Id.* ¶ 111.  According to FE5, that level of uniformity was impossible, as the project involved varying prices over its lifetime, and he notes for example that the value of copper, gasoline, and foreign currency fluctuate with the market.  *Id.*  FE5 claims that this practice accordingly inflated the project margins, and Abengoa's directors implemented this practice to overstate a project's viability and to improve its percentage of completion, which in turn represented higher revenues for the company.  *Id.*

According to FE5, Abengoa also delayed the input of invoices into SAP—and at times reduced the amount of or did not input invoices into that accounting system.  *See id.* ¶ 135.  For example, FE5 found invoices that had been accepted in 2014 but had been altered to extend the payment deadlines for years, such that they were still payable in 2016 without being overdue.  *Id.*  Additionally, FE5 found an invoice for approximately nine million Saudi Riyals that was owed to a supplier but that had been recorded in the SAP as only one-to-two million Saudi Riyals, thereby inflating the appearance of Abengoa's cash flow.  *Id.*

### g. FE6

"FE6" has worked for Canalizaciones Ebro S.L. ("Cebro") since 2010, and is currently the partner and sole administrator of the company.  *Id.* ¶ 44.  In that role, FE6

negotiated the terms of construction contracts that Cebro entered into, and dealt with representatives of Befesa—another subsidiary of Abengoa—in December 2011 and November 2012 in connection with Befesa's Cunene Water Pipeline project in Angola. *Id.*  Specifically, Cebro was to construct 100km of pipeline for a water treatment plant being built in Angola.  *Id.*  According to FE6, Abengoa representatives instructed him to order equipment and supplies for the project that were not necessary, and to commence construction of the pipeline out of order, such that the pipeline would have to be reconstructed at a later date.  *Id.* ¶¶ 44, 95.  FE6 also states that, throughout the project, Cebro received requests from Befesa project managers for letters confirming those purchases.  *Id.* ¶ 96.  Additionally, FE6, who also processed work orders and invoices related to the project, recalled that Abengoa repeatedly rejected Cebro's invoices and sent them back for minor corrections without clear explanations.  *Id.* ¶ 139.  As a result, according to FE6, it took two to nine months until Abengoa approved the final invoices, causing delays in payment similar to those described by FE1.  *Id.*

FE6 claims that Abengoa ultimately failed to pay Cebro for its work on the project, resulting in Cebro filing civil and criminal complaints against Abengoa for unpaid invoices totaling approximately €1 million.  *Id.* ¶¶ 44, 97, 113.  According to FE6, Abengoa recorded that amount in project expenses between December 2011 and November 2012 despite not paying it.  *Id.* ¶¶ 97, 113.

### 2. Other Investigations

Plaintiffs also rely on two reports and one Spanish regulatory decision in support of their allegations.

#### a. KPMG Report

Following Abengoa's bankruptcy, the new president of the company, Gonzalo Urquijo, commissioned KPMG to conduct a forensic analysis of the company for the

years 2012 through 2016 (the "KPMG Report").[8]  *Id.* ¶ 99.  To conduct the investigation, KPMG reviewed Abengoa's internal emails and other internal documents.  *Id.*

The KPMG Report found that Abeinsa fraudulently recorded an aggregated net amount of €15 million by artificially inflating project margins and by falsely advancing the percentages of completion of projects between 2012 and 2013.  *Id.* ¶ 101. Additionally, the KPMG Report identified "intra-group invoices without economic substance charged against the AVE Mecca Medina project worth 6.1 million euros."  *Id.* ¶ 102 (alterations omitted).  The report also found that Inabensa issued fake invoices in connection with two contracts awarded for that project for an amount of €153 million. *Id.*

Additionally, the KPMG Report included email exchanges in which Abengoa executives used one of its subsidiaries—Inabensa Turkey—to record costs that either had not yet occurred or would not occur.  *Id.* ¶ 104.  Those emails included Benjumea Llorente and Julio Artillo, Inabensa's former Administration Department Director.  *Id.* ¶¶ 104–05.  In one email, on August 10, 2012, Artillo suggested several other projects to record fake costs, and stated that he would speak with the individuals in charge of those projects to determine what costs they could take on.  *Id.* ¶ 104.  In a follow-up email on September 20, 2012, Artillo circulated a final list of projects that could be used in this scheme, stating that the proposed expenses would allow Inabensa to raise its profit margin for 2012 to €53 million; recipients of that email included Benjumea Llorente and senior managers of Abeinsa and Teyman, which was Abengoa's Uruguayan subsidiary. *Id.* ¶ 106.  On September 21, 2012, Benjumea Llorente replied, authorizing the scheme, emphasizing its importance, and stating that "Everyone that is copied here must comply

---

[8] More specifically, Urquijo commissioned the KPMG Report after one of the investigating judges in the ongoing criminal proceedings in Spain demanded that Abengoa provide information in response to the indictments.  Doc. 144-1 ¶ 99.

with my instructions."  *Id.* ¶ 107.  José Domínguez Abascal—the general secretary of Abengoa at the time—was also included in this email.  *Id.*

### b. Audit by Silva & Asociados

In connection with the criminal proceedings in Spain, Silva & Asociados, an auditing firm, prepared an expert report for the National Court of Spain.  *Id.* ¶ 185. According to that audit, in 2014, Abengoa engaged in systematic concealment of substantial losses, and consequently misrepresented the financial condition of the company.  *Id.* ¶¶ 140–41.  Specifically, those losses stemmed from two Abengoa subsidiaries:  Abengoa Solar, S.A. and Abengoa Bioenergia, S.A.  *Id.* ¶ 140.

### c. ICAC Sanctions

On February 20, 2018, the Instituto de Contabilidad y Auditoría de Cuentas (the "ICAC"), a Spanish regulatory agency, sanctioned Abengoa's independent auditor and its lead partner in connection with an audit of Abengoa's 2014 financial statements.  *Id.* ¶ 192.  According to the ICAC's decision, the auditors did not verify the accuracy and reliability of income recorded in Abengoa's accounts from the company's engineering and construction activity for the 2014 financial year, nor did it verify the accuracy or reliability of Abengoa's project margin estimates or costs.  *Id.* ¶¶ 193–94.  Further, the ICAC also found that the auditors certified Abengoa's 2014 financial statements despite knowing that the statements contained material inaccuracies.  *Id.* ¶ 194.  The ICAC ultimately fined the auditors approximately €1.5 million.  *Id.* ¶ 192.

### 3. Securities Act Claims

In support of their Securities Act claims, Plaintiffs allege that two sets of statements in the Registration Statement were false and misleading:  (1) that Abengoa "enforce[d] strict financial discipline" and (2) that Abengoa adhered to the "percentage of completion" method for revenue recognition.  *Id.* ¶¶ 197–98.  Regarding the first category, Plaintiffs point to the emphasized portions in the below excerpt of the Registration Statement:

> *We have successfully grown our business while seeking to*
> *enforce strict financial discipline to maintain our strong*
> *liquidity position.* As of June 30, 2013, we had cash and cash
> equivalents and short-term financial investments of €3,222
> million, which we believe are sufficient to satisfy our short-
> term liquidity needs. *This strong cash position also assists*
> *in bidding for large projects.*

*Id.* ¶ 197. Regarding the second category, Plaintiffs allege that the following statements

were false and misleading:

> Revenue from construction contracts is recognized using
> the percentage-of-completion method for contracts whose
> outcome can be reliably estimated and it is probable that
> they will be profitable.
>
> . . .
>
> [T]he percentage of completion is determined at the date of
> every consolidated statement of financial position based on
> the actual costs incurred as a percentage of total estimated
> costs for the entire contract.
>
> . . .
>
> We have established, over the years, a robust project
> management and control system, with periodic monitoring
> of each project. This system is based on the long-track
> experience of the Group in constructing complex
> infrastructures and installations. As far as practicable, we
> apply past experience in estimating the main elements of
> construction contracts and rely on objective data such as
> physical inspections or third party confirmations.
>
> . . .
>
> Costs incurred in the period which relate to future project
> activities are not included when determining the percentage
> of completion.

*Id.* ¶ 197 (emphases omitted).

Plaintiffs allege that these statements were inaccurate because prior to, during,

and after the offering, Abengoa systematically inflated its profit margins and concealed its

losses in violation of international accounting standards. *Id.* ¶ 198.  Plaintiffs point to a few allegations in support of this assertion.  First, Plaintiffs note that, between August 2012 and September 2012, Benjumea Llorente directed Abengoa's senior management to transfer expenses between unrelated projects in order to artificially inflate Inabensa's profit margin, to an amount equal to 10% of Abengoa's consolidated operating profit for 2012. *Id.* ¶¶ 99–108, 199.  Second, Plaintiffs emphasize that, prior to the offering, Abengoa recorded expenses on two projects—AVE Mecca Medina and Cunene Water Pipeline—that were either unrelated to those projects or incurred prematurely; and in either scenario, doing so violated the percentage-of-completion revenue recognition method pursuant to international accounting standards. *Id.* ¶¶ 109–22, 200.  Third, Plaintiffs note that Abengoa concealed project losses through its use of dual accounting records.  More specifically, according to Plaintiffs, Abengoa's SAP records maintained positive project margins that materially differed from the true project margins kept by project managers in Excel spreadsheets; and by inflating project margins in the former records, Abengoa falsely showed profitability on projects that did not actually exist to auditors and investors. *Id.* ¶¶ 59–74, 201.  Fourth, based on information that came out of a demand for arbitration filed in 2013 by Abengoa against Spain, Plaintiffs emphasize that Abengoa concealed €840 million in losses attributable to solar operations in Spain. *Id.* ¶¶ 118–22, 202.

### 4. Exchange Act Claims

In support of their Exchange Act claims, Plaintiffs assert the falsity of numerous statements.  As an initial matter, they reiterate the falsity of the Registration Statement based on the same theories of Abengoa's misrepresentations of its financial statements and its divergence from its "percentage-of-completion" accounting policy. *See id.* ¶¶ 219–26.  Additionally, Plaintiffs point to a number of subsequent press releases concerning financial results, SEC filings, and statements by Sanchez Ortega and other Abengoa's officers regarding the company's leverage, cash flow, and EBIDTA, likewise

alleging their falsity based on the same theories. *Id.* ¶¶ 234–36, 241, 246, 248, 251–53, 258–60, 265–66, 270–73, 281, 285–88, 293–94, 299–302, 304–06, 310–14, 318–21. According to Plaintiffs, these representations concealed Abengoa's true liquidity risk from investors and prevented the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt. *Id.* ¶¶ 226, 233, 240, 247, 250, 257, 264, 269, 284, 292, 303, 309, 317, 324.

## II.   LEGAL STANDARD

### A. Rule 15(a)(2)

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, "[a] court should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). This is a liberal standard, and "a motion to amend should be denied only if the moving party has unduly delayed or acted in bad faith, the opposing party will be unfairly prejudiced if leave is granted, or the proposed amendment is futile." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 452 (S.D.N.Y. 2016); *see also Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 369 (S.D.N.Y. 2020) ("The Second Circuit has stated that a court should allow leave to amend a pleading unless the non-moving party can establish prejudice or bad faith.").

### B. Rule 9(b)

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") by stating the circumstances constituting fraud with particularity. *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320–21 (2007)). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim. *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004).

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify:  (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170).  Conditions of a person's mind—such as malice, intent, or knowledge—may be alleged generally, however.  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)).  Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)); *see also, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014) (citing *ECA*, 553 F.3d at 196), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

## III.   DISCUSSION

Abengoa, Sanchez Ortega, and the Underwriter Defendants each submit their own motion and incorporate by reference the arguments of the other movants.  Together, Defendants challenge the PTAC as unduly delayed, brought in bad faith, and unduly prejudicial; however, the Court notes that, while Sanchez Ortega fully briefs the issue of futility, Abengoa and the Underwriter Defendants only briefly discuss that issue, stating that instead they intend to fully address it in a motion to dismiss should the Court grant Plaintiffs leave to amend their complaint.  Docs. 148 at 5–6 and 150 at 3.  Because it is

the burden of the non-movant to establish futility, *Ithaca Cap.*, 450 F. Supp. 3d at 377, and Abengoa and the Underwriter Defendants have explicitly reserved that issue for a motion to dismiss, the Court analyzes futility as to only Sanchez Ortega.

The Court first turns to the issues fully addressed by all of the defendants—namely, undue delay and bad faith, and undue prejudice—before turning to the arguments that are specific to Sanchez Ortega.

### A. Undue Delay and Bad Faith

Defendants argue that Plaintiffs should be denied leave to amend because they have unduly delayed bringing the allegations they have added to the PTAC. Defendants assert that a party engages in undue delay where a proposed amended complaint rests on information that the party knew, or should have known, prior to moving to amend, and where the party has had multiple chances to assert their pleading. Defendants contend that the PTAC is based on years-old allegations that Plaintiffs could have brought earlier, and that Plaintiffs fail to explain their failure to do so. Specifically, Defendants assert that, prior to filing the Second Amended Complaint, Plaintiffs knew or reasonably could have known about information gathered from the following sources, as information was available through public records and news reports at that time: (1) Abengoa's 2013 arbitration against Spain, (2) the Spanish criminal proceedings, (3) and the audits and other reports referenced in the PTAC. And according to Defendants, despite the availability of that information, Plaintiffs fail to offer a satisfactory explanation for their failure to allege those facts sooner—especially given that this case was originally brought back in 2015.

In this Circuit, mere delay, "absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Contrera v. Langer*, 314 F. Supp. 3d 562, 566 (S.D.N.Y. 2018) (quoting *State Tchrs. Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)). Although the party seeking to amend its pleading must explain its delay, *Park B. Smith, Inc. v. CHF Indus. Inc.*, 811 F. Supp. 2d

766, 779 (S.D.N.Y. 2011), the party opposing the amendment carries the burden of showing undue prejudice or bad faith, *Contrera*, 314 F. Supp. 3d at 567.  In opposing a motion for leave to amend a complaint, "[s]imply alleging that the plaintiff could have moved to amend earlier than she did . . . is insufficient to demonstrate undue delay." *Agerbrink*, 155 F. Supp. 3d at 452; *see also Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (collecting cases where courts granted leave to amend after delays ranging from two to five years).  Relatedly, a court will not deny a motion to amend simply because a plaintiff now "alle[ges] facts that were previously within [its] knowledge." *Bodum Holding AG v. Starbucks Corp.*, No. 19 Civ. 4280 (ER), 2020 WL 6135714, at *9 (S.D.N.Y. Oct. 16, 2020) (quoting *Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 460 (S.D.N.Y. 2012)); *see also Agerbrink*, 155 F. Supp. 3d at 452–53. Indeed, courts in this District have noted that a party "need not prove that [it] uncovered new facts or law in order for [a court] to grant leave to amend." *Affiliated FM Ins. Co. v. Liberty Mech. Contractors, Inc.*, No. 12 Civ. 5160 (KPF), 2013 WL 4526246, at *5 (S.D.N.Y. Aug. 27, 2013) (collecting cases).

The Court concludes that the PTAC is neither unduly delayed nor brought in bad faith.  Plaintiffs dispute the extent to which they had previously known the allegations that they have added in the PTAC, noting that most of the new information upon which they rely was available only after the Spanish National Court issued an order on February 3, 2020 referencing that information.  But that dispute is immaterial.  Even if Plaintiffs had known—or at least, could have uncovered—the new allegations prior to filing their previous iteration of the complaint, the Court concludes that Plaintiffs have met their burden in providing a satisfactory explanation for their delay.

As Plaintiffs argue, the Court's August 21, 2020 Order was the first time they became aware of the deficiencies in their Second Amended Complaint, and under the principles outlined in *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160 (2d Cir. 2015), and its progeny, they are entitled to leave to amend.

As the Second Circuit emphasized in *Loreley*, "[w]ithout the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." *Id.* at 190.  Accordingly, "[t]he proper time for a plaintiff to move to amend the complaint is when the plaintiff learns from the District Court in what respect the complaint is deficient," as "[b]efore learning from the court what are its deficiencies, the plaintiff cannot know whether he is capable of amending the complaint efficaciously." *Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 25 (2d Cir. 2017) (summary order).  As such, courts in this District have ordinarily granted a plaintiff "leave to amend at least once after having the benefit of a court's reasoning in dismissing the complaint." *See Obra Pia Ltd. v. Seagrape Invs. LLC*, No. 19 Civ. 7840 (RA), 2021 WL 1978545, at *3 (S.D.N.Y. May 18, 2021); *see also Attestor Value Master Fund v. Republic of Argentina*, 940 F.3d 825, 833 (2d Cir. 2019).

Defendants push back that, here, their motions to dismiss put Plaintiffs on notice of the deficiencies in the Second Amended Complaint, and Plaintiffs therefore had ample opportunity to amend their complaint before the Court's resolution of their motions.  But as the Second Circuit has emphasized, "[i]t is the District Court's ruling, not the defendant's arguments in support of a motion to dismiss, that puts a plaintiff on notice of the complaint's deficiencies." *Cresci*, 693 F. App'x at 25.  Because under *Loreley* and its progeny, Plaintiffs lacked notice of the deficiencies in their Second Amended Complaint until the Court's August 21, 2020 Order, they were unable to efficaciously amend the complaint prior to that time.  Accordingly, the Court concludes that Plaintiffs have provided a satisfactory explanation for any delay.  *See Kairam v. W. Side GI, LLC*, 793 F. App'x. 23, 28 (2d Cir. 2019) (summary order) (holding that leave to amend should be granted where plaintiff had already amended complaint twice but had "not yet done so with the benefit of a ruling").

From there, Defendants bear the burden of showing that the delay occurred because of dilatory motive or bad faith.  *Contrera*, 314 F. Supp. 3d at 567.  But again,

Defendants assert merely that Plaintiffs could have uncovered information in the new allegations sooner and could have brought these allegations before the instant motion. Courts in this Circuit routinely reject either basis for a finding of bad faith, even when several years have passed since the complaint was originally filed. *See Bodum*, 2020 WL 6135714, at \*9; *see also Agerbrink*, 155 F. Supp. 3d at 452–54; *Dilworth*, 914 F. Supp. 2d at 460. Moreover, Plaintiffs filed the instant motion for leave to amend by the deadline the Court set in its August 21, 2020 Order, indicating that they did not seek to draw out their request once they were apprised of the deficiencies in their pleading. Accordingly, the Court concludes that Plaintiffs' PTAC is not unduly delayed nor brought in bad faith.

### B. Undue Prejudice

Defendants also argue that they will be unduly prejudiced by the PTAC, asserting that Plaintiffs predicate their claims on several factual allegations that have never appeared before in this case, effectively rendering the matter an entirely new lawsuit. Moreover, those allegations relate to projects and transactions that stretch back to at least 2012, and Defendants contend that their ability to assemble evidence will be severely hampered due to fading memories and relevant witnesses no longer being available. Relatedly, Defendants note that, since this suit began, Abengoa has undergone a complete management overhaul and is currently restructuring for the third time. As such, according to Defendants, the PTAC will require them to expend significantly more time and expenses to litigate claims that should have been asserted earlier.

Denying leave to amend a complaint requires not just prejudice but *undue* prejudice. *Agerbrink*, 155 F. Supp. 3d at 454. The defendant bears the burden of showing that undue prejudice would result from granting leave to amend. *Id.* To determine whether a defendant is unduly prejudiced by an amended complaint, a court must consider whether the proposed amendment "would '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing

a timely action in another jurisdiction.'" *Id.* (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000)).  Additionally, courts consider the procedural posture of the case in determining whether an amendment is prejudicial.  *Id.* at 454–55 (finding defendant was not unduly prejudiced where plaintiff sought leave to amend before close of discovery); *see also Bodum*, 2020 WL 6135714, at *9.  Notably, the prospect of spending more time, effort, or money on litigation—including through additional discovery and motion practice—does not render an amended complaint unduly prejudicial.  *Agerbrink*, 155 F. Supp. 3d at 455; *see also Block v. First Blood Assocs.*, 988 F.2d 344, 351 (2d Cir. 1993) (granting leave where defendants argued prejudice resulted "solely because of the time, effort and money they expended in litigating this matter").  That is especially so where the defendant has been on notice of the substance of and theories underlying the plaintiff's claims.  *See Bodum*, 2020 WL 6135714, at *10.

The Court concludes that Defendants are not unduly prejudiced by the amendment.  As an initial matter, the Court notes that Defendants seem to contradict their position regarding undue delay:  whereas Defendants assert that Plaintiffs have unduly delayed bringing allegations that had previously been known or were accessible to the public—and therefore, Defendants were on notice, too—they also argue that they will be unduly prejudiced because Plaintiffs allege a plethora of new allegations.  In any event, as Plaintiffs note, although now incorporating several new factual allegations to address the deficiencies identified by the Court's August 21, 2020 Order, the PTAC still asserts the same causes of action and relies on the same alleged misstatements, names the same Defendants, focuses on the same Class Period, and puts forth the same theory of scienter as the Second Amended Complaint did.  Thus, contrary to Defendants' assertion, Plaintiffs have not brought an entirely new lawsuit through the PTAC, but instead have responded to the Court's August 21, 2020 Order to support the claims they had already brought.  *See Agerbrink*, 155 F. Supp. 3d at 455–56; *Bodum*, 2020 WL 6135714, at *10; *see also Loreley*, 797 F.3d at 190.  Further, although Defendants are likely correct that

they will experience some hardship from the passage of time and the increased expenses related to discovery, those factors are not sufficient to constitute *undue* prejudice—especially where, as here, discovery has not even commenced. *See Agerbrink*, 155 F. Supp. 3d at 454; *Bodum*, 2020 WL 6135714, at *9–10. That is especially true where, as here, the PSLRA expressly required Defendants to preserve "all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in [their] custody or control . . . and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure." *See* 15 U.S.C. § 78u-4(b)(3)(C)(i).

Accordingly, the Court concludes that the PTAC does not unduly prejudice Defendants. Because Abengoa and the Underwriter Defendants do not otherwise contest the PTAC at this juncture, Plaintiffs' motion is granted as to those defendants, with the exception of any claims against Banco Santander.[9]

### C. Futility of Claims Against Sanchez Ortega

*1. Standard for Futility*

The Second Circuit has held that leave to amend may be denied based on futility when it is "beyond doubt that the plaintiff can prove no set of facts in support of [its] amended claims." *Pangburn v. Culbertson*, 200 F.3d 65, 71 (2d Cir. 1999) (quotation omitted). The non-moving party bears the burden of establishing the amendment's futility. *Ithaca Cap.*, 450 F. Supp. 3d at 377. To determine whether a proposed pleading is futile, courts analyze whether it would withstand a motion to dismiss pursuant to Rule 12(b)(6). *Agerbrink*, 155 F. Supp. 3d at 456.

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a

---

[9] Plaintiffs have previously represented to the Court that they did not intend to pursue claims against Banco Santander, Doc. 87 at 2, and Defendants argue that Plaintiffs therefore should not be permitted to add Banco Santander at this juncture. Plaintiffs did not address the issue in their reply, and so the Court construes that omission as waiver. *See* Doc. 154.

claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (quotation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 368 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv,* 644 F.3d 122, 130 (2d Cir. 2011) (quotations omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint." *Doe v. N.Y. Univ.*, No. 20 Civ. 1343 (GHW), 2021 WL 1226384, at *14 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). "Judicial notice may be taken of documents that are 'integral to the complaint,' such that the complaint 'relies heavily upon [the documents'] terms and effect." *Hesse v. Godiva Chocolatier, Inc.*, 463

F. Supp. 3d 453, 462 (S.D.N.Y. 2020) (quoting *Palin v. N.Y. Times Co.*, 940 F.3d 804, 811

(2d Cir. 2019)).  Further, "[c]ourts have also taken judicial notice of materials in the

public record, such as federal copyright registrations, newspaper articles, and regulatory

filings—all for the limited purpose of noting what the documents state, rather than to

'prove the truth of their contents.'"  *Id.* (quoting *Ace Arts, LLC v. Sony/ATV Music Pub.,

LLC*, 56 F. Supp. 3d 436, 442 (S.D.N.Y. 2014)).

Accordingly, when considering a motion to amend a pleading, a "court must

accept as true all well-pleaded facts and draw all reasonable inferences in the moving

party's favor."  *Agerbrink*, 155 F. Supp. 3d at 456.

### 2. Exchange Act Claims

In the PTAC, Plaintiffs bring claims against Sanchez Ortega for violations of

Section 10(b) of the Exchange Act and SEC Rule 10b-5, as well as for violation of

Section 20(a) of the Act.

<u>a. Section 10(b) and SEC Rule 10b-5</u>

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or

employing, "in connection with the purchase or sale of any security . . . any manipulative

or deceptive device or contrivance," 15 U.S.C. § 78j(b), while Rule 10b-5 creates liability

for a person who makes "any untrue statement of a material fact or . . . omit[s] to state a

material fact . . . in connection with the purchase or sale of any security," *In re OSG Sec.

Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5).  Rule

10b-5, promulgated by the SEC to implement Section 10(b), "more specifically delineates

what constitutes a manipulative or deceptive device or contrivance."  *Press v. Chem. Inv.

Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999).  Under Rule 10b-5, it is unlawful for any

person, directly or indirectly, by use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b)
> To make any untrue statement of a material fact or to omit to
> state a material fact necessary in order to make the
> statements made, in the light of the circumstances under

> which they were made, not misleading, or (c) To engage in
> any act, practice, or course of business which operates or
> would operate as a fraud or deceit upon any person, in
> connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Sanchez Ortega argues that Plaintiffs fail to state a claim for a violation of the
Exchange Act.  To state a private civil claim under Section 10(b) and Rule 10b-5, a
plaintiff must plead that:  (1) the defendant made a material misrepresentation or
omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the
purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or
omission, thereby (5) causing economic loss.  *Dura*, 544 U.S. at 341–42; *see also*
*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007)

More specifically, Sanchez Ortega argues that Plaintiffs have failed to adequately
plead scienter.  A plaintiff may establish scienter by alleging facts that either (1) show that
the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2)
constitute "strong circumstantial evidence of conscious misbehavior or recklessness."
*ECA*, 553 F.3d at 198.  The relevant inquiry for the Court "is whether *all* of the facts
alleged, taken collectively, give rise to a strong inference of scienter, not whether any
individual allegation, scrutinized in isolation, meets the standard."  *In re Magnum Hunter
Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 291–92 (S.D.N.Y. 2014) (quoting *Tellabs*, 551
U.S. at 322–23); *see also ECA*, 553 F.3d at 198; *Medis Inv. Grp. v. Medis Techs., Ltd.*,
586 F. Supp. 2d 136, 141 (S.D.N.Y. 2008) ("In order to determine whether a complaint
has adequately pleaded scienter, a court should examine all of the facts alleged
collectively or 'holistically' (without parsing individual allegations), and take into
account any inference concerning scienter—supporting or opposing—which can be
drawn from the complaint."), *aff'd*, 328 F. App'x 754 (2d Cir. 2009) (summary order).
"According to the Supreme Court, the critical inquiry is:  '[W]hen the allegations are
accepted as true and taken collectively, would a reasonable person deem the inference of

scienter at least as strong as any opposing inference?'  If so, then scienter has been adequately pleaded.  If not, the case may be dismissed." *Medis*, 586 F. Supp. 2d at 141 (quoting *Tellabs*, 551 U.S. at 326).

First, Sanchez Ortega argues that the PTAC fails to allege that he acted with motive and opportunity.  "A complaint has sufficiently alleged 'motive and opportunity to commit fraud' if it pleads facts showing that the defendant 'benefited in some concrete and personal way from the purported fraud.'" *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000)).  While "[t]he opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer," *id.* (collecting cases), general motives common to most corporate officers do not constitute "motive" for the purpose of establishing scienter, *ECA*, 553 F.3d at 198.  Therefore, the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation do not suffice to establish a motive.  *See Abengoa*, 481 F. Supp. 3d at 213; *see also Van Dongen*, 951 F. Supp. 2d at 468 (citing *Kalnit*, 264 F.3d at 139).

More specifically, Sanchez Ortega argues that Plaintiffs have failed to cure any of the defects identified in the Court's August 21, 2020 Order.  In dismissing the Second Amended Complaint, the Court held that Plaintiffs failed to establish that Sanchez Ortega had the motive to commit fraud, emphasizing that Plaintiffs failed to allege that Sanchez Ortega himself received any concrete and personal benefit from his behavior and noting that Plaintiffs had not alleged that he had sold a single share of his own Abengoa stock or ADS.  *Abengoa*, 481 F. Supp. 3d at 213.  Sanchez Ortega notes that the PTAC still fails to allege that he sold any shares of his own Abengoa stock or ADS during the Class Period, and asserts that the only new allegation related to motive is that he potentially stood to gain bonuses due to the alleged fraud, as bonuses for management were tied to project profitability.  In their reply, Plaintiffs do not attempt to refute these arguments, and instead assert that they have sufficiently allege facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness.  *See* Doc. 154 at 15–18; *see also id.* at 17 n.6.  Accordingly, Plaintiffs' failure to address motive in their reply concedes Sanchez Ortega's arguments concerning the issue.  *See Altowaiti v. Wolf*, 18 Civ. 508 (ER), 2021 WL 2941753, at *4 (S.D.N.Y. July 12, 2021).[10]

Where, as here, a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's conscious misbehavior or recklessness "must be correspondingly greater."  *Kalnit*, 264 F.3d at 142 (quotation omitted); *see also Abengoa*, 481 F. Supp. 3d at 213.  In order to establish scienter under the conscious misbehavior or recklessness theory, Plaintiffs "must show conduct by defendants that is at the least highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 216 (S.D.N.Y. 2004) (internal quotation marks omitted) (quoting *Kalnit*, 264 F.3d at 142); *see also Abengoa*, 481 F. Supp. 3d at 213.  To the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must "specifically identify the reports or statements containing that information."  *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 659 (S.D.N.Y. 2012) (quotation omitted). "Recklessness in the scienter context[, however,] cannot be merely enhanced negligence."  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005); *Medis*, 586 F. Supp. 2d at 142 ("To properly allege recklessness, the plaintiff must plead a state of mind approximating actual intent, and not merely a heightened form of negligence." (quotation omitted)).  Moreover,

---

[10] Numerous courts in this District have held that a party's failure to address an issue in its response to a Rule 12(b)(6) motion "amounts to a concession or waiver of the argument."  *See Cole v. Blackwell Fuller Music Publ'g, LLC*, No. 16 Civ. 7014 (VSB), 2018 WL 4680989, at *7 (S.D.N.Y. Sept. 28, 2018) (collecting cases).  Because the same standard governs the issue of futility on a Rule 15(a)(2) motion to amend and a Rule 12(b)(6) motion, the same analysis for waiver applies to both motions.

> unlike statements about historical facts, in which the scienter
> inquiry focuses on whether the defendants "knew facts or
> had access to information suggesting that their public
> statements were not accurate" or "failed to check
> information they had a duty to monitor," the recklessness
> inquiry as to forward-looking projections focuses on
> whether the defendants knew at the time they made these
> projections that they were unrealistic or unlikely to come
> true.

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 301 (S.D.N.Y.

2013) (quoting *ECA*, 553 F.3d at 199).

Sanchez Ortega argues that Plaintiffs fail to sufficiently allege conscious misbehavior or recklessness. First, Sanchez Ortega emphasizes that, while Plaintiffs allege that Benjumea Llorente directed senior managers to comply with his instructions regarding recording false costs, Plaintiffs fail to allege that Sanchez Ortega received that specific email or was a part of the other alleged email chains. Second, to the extent that Plaintiffs rely on the Spanish criminal proceedings, Sanchez Ortega notes that those proceedings are still in the preliminary investigative stage, which Plaintiffs acknowledge in the PTAC. Accordingly, just as the Court declined to assume the truth of the allegations in those proceedings in its August 21, 2020 Order, it should again decline to conclude that the existence of a criminal proceeding is sufficient to give rise to a requisite cogent and compelling inference of scienter. *See Abengoa*, 481 F. Supp. 3d at 214. Moreover, to the extent that Plaintiffs suggest that orders in those proceedings— specifically, the National Court's February 2, 2020 order adding defendants to one proceeding in which Sanchez Ortega is a defendant, and a June 9, 2020 order by the Seville Criminal Investigation Court transferring the other proceeding to the National Court—constitute judicial factfinding upon which the Court can rely, Sanchez Ortega asserts that both are merely procedural orders that do not change that the proceedings themselves are still at a preliminary stage. Additionally, as Abengoa notes in its November 17, 2020 surreply, the Spanish National Court vacated the June 9, 2020 order.

Doc. 161.  Third, Sanchez Ortega contends that the seven confidential witnesses fail to provide a basis to find a strong inference of scienter.  Sanchez Ortega emphasizes that the allegations regarding FE1 to FE7 do not even mention him, and asserts that allegations attributed to confidential witnesses who have no contact with a corporate officer are insufficient to support scienter.  Sanchez Ortega further argues that, without tying the confidential witnesses to him, Plaintiffs cannot simply allege that the information the confidential witnesses knew about would have made "its way up the entire corporate hierarchy," simply because the engineering and construction activities led by Abeinsa and Inabensa are alleged to have represented at least 60% of Abengoa's overall consolidated annual sales.  *See Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019).  Building on that point, Sanchez Ortega contends that the documents Plaintiffs rely on for that 60% figure contradict the allegation, as they do not specifically reference either subsidiary.  Moreover, Sanchez Ortega asserts that Plaintiffs fail to identify the specific "Abeinsa," "Inabensa," or "Befesa" subsidiaries associated with the confidential witnesses, noting that several Abengoa subsidiaries have those words in their names.  Fourth, Sanchez Ortega contends that neither his abrupt resignation as CEO of Abengoa in May 2015, nor his Sarbanes-Oxley certifications of the internal controls and financial reporting of Abengoa, sufficiently support the requisite inference for scienter.

The Court agrees with Sanchez Ortega.  As an initial matter, the Court notes that it does not rely on the *fact* that there are criminal proceedings in Spain to infer scienter.  Because Plaintiffs acknowledge that those proceedings are still in their investigatory stage, the Court declines to infer scienter from the existence of those proceedings—just as it did in its August 21, 2020 Order.  *Abengoa*, 481 F. Supp. 3d at 214; *see also Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 164 (S.D.N.Y. 2015).

Even assuming that the Court could rely on all of the confidential witness statements,[11] those accounts are not sufficient to support a strong inference of scienter. At bottom, despite no specific allegations tying Sanchez Ortega to the dual accounting system scheme, Plaintiffs urge the Court to infer scienter based on the following: the confidential witnesses worked at and with subsidiaries that represented approximately 60% of Abengoa's overall consolidated annual sales; the policies and decisions that helped perpetuate the fraud must have come from or been approved by department heads and directors at Abeinsa and Inabensa, as well as from Abengoa's senior management; and Sanchez Ortega was CEO when much of the accounting fraud alleged by the confidential witnesses took place. Taken together, according to Plaintiffs, Sanchez Ortega must have known—or at least should have known—about the alleged fraud, given his position at Abengoa.

In other words, Plaintiffs rely on the "core operations" doctrine. Under that doctrine, "if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004); *see also*

---

[11] "A complaint may rely on information from confidential witnesses if 'they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Emps' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Novak*, 216 F.3d at 314). Even if, as Sanchez Ortega contends, Plaintiffs have not specifically alleged which of the Abeinsa subsidiaries the confidential witnesses worked at, "[a] plaintiff need only plead the 'probability that [the confidential witness] know[s] what [he or she] is talking about.'" *See Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484 (S.D.N.Y. 2018) (quoting *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 97 (S.D.N.Y. 2006)). As the Court concluded in its August 21, 2020 Order, a complaint sufficiently describes a confidential witness's position when it identifies that employee's title, when and where she worked, and her general responsibilities. *Abengoa*, 481 F. Supp. 3d at 209. At the very least, the PTAC provides similar descriptions for FE2, FE3, FE4, FE5, and FE7, and alleges specific actions that each of these witnesses took in their respective roles, thereby providing sufficient information to infer that these witnesses possess the information they alleged. Thus, at a minimum, Plaintiffs would meet their burden regarding the positions of these confidential witnesses.

*Schwab v. E\*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 434 (S.D.N.Y. 2017).  "In other words, this doctrine allows courts to draw an inference of scienter where misrepresentations and omissions allegedly made by defendants were about their core operations."  *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 423 (S.D.N.Y. 2020).  The Second Circuit has not expressly determined if the "core operations" doctrine remains applicable to provide scienter after the enactment of the PSLRA.  *See Frederick v. Mechel OAO*, 475 F. App'x 353, 356 & n.5 (2d Cir. 2012) (summary order).  However, the Second Circuit has suggested that the doctrine can provide additional support for an inference of scienter, even if it cannot establish scienter on its own.  *See City of Omaha*, 450 F. Supp. 3d at 424.  The majority of courts in this Circuit—including this one—have adopted this approach.  *See id.* (collecting cases); *see also In re Kandi Techs. Grp., Inc. Sec. Litig*, No. 17 Civ. 1944 (ER), 2019 WL 4918649, at \*7–8 (S.D.N.Y. Oct. 4, 2019).  Moreover, in deciding whether to apply the core operations doctrine, courts in this District have required that the operation at issue make up nearly all of a company's business or be essential to its survival.  *See Kandi*, 2019 WL 4918649, at \*7.

Even assuming, *arguendo*, that approximately 60% of Abengoa's consolidated sales constitutes enough to invoke the core operations doctrine, *see id.* at \*8, the Court finds Plaintiffs' allegations insufficient, on the basis of the core operations doctrine alone, to establish scienter on behalf of Sanchez Ortega.  Although the importance of Abeinsa's and Inabensa's transactions should have strengthened Sanchez Ortega's awareness of any specific contradictory fact or information, they could not substitute specific factual allegations linking him to the alleged accounting fraud.  *See id.*; *see also Schwab*, 258 F. Supp. 3d at 434.  And even if Plaintiffs have sufficiently alleged that some of the decisions that perpetuated the accounting fraud could be made by only senior managers at Abengoa—thereby requiring that information about the fraud be shared with them—that is not enough to establish scienter.  *See Maloney v. Ollie's Bargain Outlet Holdings*, No.

19 Civ. 8647 (JPO), --- F. Supp. 3d ----, ----, 2021 WL 517934, at *6 (S.D.N.Y. Feb. 10, 2021); *City of N. Miami Beach Police Officers' and Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19 Civ. 10825 (JPO), 2021 WL 212337, at *10–11 (S.D.N.Y. Jan. 21, 2021).  Again, scienter requires that a defendant be specifically informed of contrary information.  *City of N. Miami*, --- F. Supp. 3d at ----, 2021 WL 212337, at *8, 10–11.

Of course, in determining whether Plaintiffs have adequately established scienter, "[t]he Court is mindful of its obligation to consider 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'"  *Id.* at *11 (quoting *Tellabs*, 551 U.S. at 323).  But Plaintiffs' allegations fall short both individually and collectively.

Regarding Sanchez Ortega's resignation, as the Court emphasized in its August 21, 2020 Order, although "[r]esignations accompanied by suspicious circumstances may bolster the inference of scienter, . . . plaintiffs must also allege 'a factual basis to conclude that the resignation was tied to participation in or knowledge of the fraud.'"  *Abengoa*, 481 F. Supp. 3d at 214 (quoting *Schiro*, 396 F. Supp. 3d at 303); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (collecting cases).  "Put differently, a resignation can establish scienter only if the plaintiff alleges independent evidence corroborating that the employee who resigned held a culpable state of mind.  Standing alone, however, an employee's resignation does not raise a strong inference of scienter."  *Schiro*, 396 F. Supp. 3d at 303 (citations omitted).  As with the Second Amended Complaint, the PTAC pleads no such facts, stating only that Sanchez Ortega abruptly resigned following the revelation of Abengoa's leverage ratios and amidst tightening internal financial controls.  *See Glaser*, 772 F. Supp. 2d at 598.

Nor do the Sarbanes-Oxley certifications establish scienter.  Of course, courts have determined that signing Sarbanes-Oxley certifications might be indicative of scienter.  *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018).  However, a plaintiff "cannot raise an inference of fraudulent intent based on the signing of a

certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements." *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) (collecting cases). And where, as here, the complaint does not adequately allege that the defendant had actual knowledge of the alleged fraud, it undermines the allegations that he knew that the certifications were false. *See Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017). Accordingly, the Sarbanes-Oxley certifications do not support an inference of scienter as to Sanchez Ortega.

Therefore, Plaintiffs' allegations, viewed collectively, do not support a strong inference of scienter for Sanchez Ortega. *Tellabs*, 551 U.S. at 314. Because failure to plead a strong inference of scienter alone is a sufficient basis for dismissal, the Court concludes that Plaintiffs' claim pursuant to Section 10 and Rule 10b-5 is futile. *See Kandi*, 2019 WL 4918649, at *8.

### b. Section 20(a)

Section 20(a) of the Exchange Act imposes liability on individuals who control any person or entity that violates section 10. *See* 15 U.S.C. 78t(a). "To assert a *prima facie* case under Section 20(a), a plaintiff 'must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.'" *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 882 (S.D.N.Y. 2011) (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) (summary order). "The majority of courts in this District hold that since 'culpable participation is an element of a Section 20(a) claim,' it 'must be pleaded with the same particularity as scienter.'" *In re Veon Ltd. Sec. Litig.*, No. 15 Civ. 8672 (ALC), 2018 WL 4168958, at *21 (S.D.N.Y. Aug. 30, 2018) (quoting *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA,*

*Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) (collecting cases)).  Accordingly, to assert a section 20(a) claim, a "plaintiff must meet the PSLRA's standard of alleging facts indicating 'that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct.'"  *Id.* (quoting *Special Situations*, 33 F. Supp. 3d at 439).

Even assuming that Plaintiffs have sufficiently alleged a section 10 claim against Abengoa and the Underwriter Defendants, Plaintiffs have failed to plead scienter as to Sanchez Ortega, as discussed above.  Accordingly, Plaintiffs have failed to state a claim that Sanchez Ortega was a culpable participant pursuant to section 20(a).

### 3. Securities Act Claims

In the PTAC, Plaintiffs bring claims pursuant to sections 11 and 15 of the Securities Act against Sanchez Ortega.

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010).  Section 11 "creates a right of action for 'any person' who acquired a security offered pursuant to a misleading registration statement."  *City of Omaha*, 450 F. Supp. 3d at 400 (quoting 15 U.S.C. § 77k(a)).  "To allege a claim under Section 11 of the Securities Act, a plaintiff need show that a registration statement:  (1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statement therein not misleading."  *Id.* (quotation omitted).  A section 11 claim does not require a showing of scienter, reliance, or loss causation.  *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016); *Morgan Stanley*, 592 F.3d at 359.

Section 15 of the Securities Act imposes joint and several liability on "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under" section 11.  *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) (citing 15 U.S.C. § 77o(a)).  To establish liability under section 15, a

plaintiff must show a primary violation of section 11 and control of the primary violator by the defendant.  *See id.*  "[W]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss."  *City of Omaha*, 450 F. Supp. 3d at 427 (quotation omitted).  Further, although "[c]ourts in this District are divided as to whether culpable participation, an element of a § 20 claim, is also required for liability under § 15," and the Second Circuit has not resolved the issue, the majority of courts in this District have concluded that culpable participation is not required to state a claim under section 15.  *Id.* at 427 n.4; *see also In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012) (collecting cases); *In re Refco, Inc. Sec Litig.*, 503 F. Supp. 2d 611, 660 & n.43 (S.D.N.Y. 2007).  The Court agrees that the majority approach should govern, meaning that Plaintiffs are not required to allege culpable participation—and accordingly, scienter—as part of their claim pursuant section 15.

Sanchez Ortega argues only that Plaintiffs' claims pursuant to the Securities Act should be dismissed because they fail to adequately allege scienter.  Doc. 147 at 15–16.  Because those claims do not require a showing of scienter, and Sanchez Ortega has not otherwise addressed futility, Plaintiffs' motion is granted as to their claims pursuant to the Securities Act.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion is GRANTED in part and DENIED in part.  Specifically, Plaintiffs' motion is granted as to all claims except their claims against Sanchez Ortega pursuant to (1) section 10 and Rule 10b-5 and (2) section 20(a), and all claims against Banco Santander.  Because further amendment of those claims would be futile, they are dismissed with prejudice.  *See 421-A Tenants Ass'n, Inc. v. 125 Ct. St. LLC*, 760 F. App'x 44, 51 (2d Cir. 2019) (summary order).  In light of Abengoa and the Underwriter Defendants' intention to move to dismiss the Third Amended Complaint, the Court directs those parties to file their motions in accordance with the

following schedule:  the motions to dismiss are due October 1, 2021, any opposition shall be filed by October 22, 2021, and the replies shall be filed by October 29, 2021.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 142, and the requests for oral argument are denied as moot, Docs. 142, 143, and 154.

It is SO ORDERED.

Dated:    September 10, 2021
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.