UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL FRANCISCO, *individually and on behalf of all others similarly situated*,

Plaintiff,

– against –

ABENGOA, S.A., MANUEL SANCHEZ ORTEGA, CHRISTOPHER HANSMEYER, HSBC SECURITIES (USA) INC., CANACCORD GENUITY INC., MERRILL LYNCH INTERNATIONAL, *and* SOCIÉTÉ GÉNÉRALE,

Defendants.

---

**OPINION & ORDER**

15 Civ. 6279 (ER)

---

RAMOS, D.J.:

Lead plaintiffs Jesse and Arlette Sherman bring this federal securities class action against Abengoa S.A.; Manual Sanchez Ortega, Abengoa's former Chief Executive Officer ("CEO"); Christopher Hansmeyer, the duly authorized representative for Abengoa in the United States; and HSBC Securities (USA) Inc., Canaccord Genuity Inc., Merrill Lynch International, and Société Générale, investment banks that served as underwriters for Abengoa's United States offering (together, the "Underwriter defendants"). The plaintiffs seek remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), as well as Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. They bring their Securities Act claims on behalf of purchasers of Abengoa's American Depositary Shares ("ADSs") traceable to the Registration Statement issued in connection with Abengoa's public offering on October 17, 2013. Doc. 165 ¶ 206. They bring their Exchange Act claims on behalf of purchasers of Abengoa's ADSs between October 17, 2013 and August 3, 2015 (the "Class Period"). *Id.* ¶ 1.

Before the Court are three motions to dismiss plaintiffs' Third Amended Complaint ("TAC"), filed by Abengoa, Doc. 176, Sanchez Ortega, Doc. 174, and the Underwriter defendants, Doc. 170.

For the reasons set forth below, the motions to dismiss are GRANTED.

## I.   BACKGROUND

### A.  Factual Background[1]

Abengoa, founded in 1941, is an engineering and construction company headquartered in Spain.  ¶¶ 2, 41.  Sanchez Ortega served as Abengoa's CEO from March 2010 until his resignation on May 19, 2015, and Hansmeyer was its duly authorized representative in the United States.  ¶¶ 25, 27.  This action relates to Abengoa's October 17, 2013 public offering on the NASDAQ Global Select Market (the "NASDAQ") for €517.5 million, which the Underwriter Defendants underwrote, and to the subsequent series of events culminating in the company's filing for insolvency and bankruptcy.  ¶¶ 28, 126.  Lead plaintiffs Jesse and Arlette Sherman purchased Abengoa's ADSs beginning November 18, 2014, during the Class Period.  ¶ 23; Doc. 7-1 at 4.  The following facts are based on the allegations in the TAC, which the Court accepts as true for purposes of the instant motion.  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

#### 1.  *Abengoa Structure*

At all relevant times, Abengoa was comprised of 532 subsidiaries, 17 associates, and 34 joint ventures, and was operating in over 70 countries.  ¶ 53.  Abengoa organized its business in three areas:  (1) Engineering and Construction, (2) Infrastructure Concessions, and (3) Industrial Production.  ¶ 54.  Abeinsa Ingeniería y Construcción Industrial S.A. ("Abeinsa") is Abengoa's

---

[1] Unless otherwise noted, all references to ¶ __ refer to the Third Amended Complaint, Doc. 165.

U.S. subsidiary that served as the head of the Engineering and Construction group.  ¶¶ 3, 54. Abeinsa directly or indirectly controlled all of Abengoa's operations in the United States, Mexico, Argentina, Uruguay, Chile, and Brazil between 2013 and 2015.  ¶ 57.  Abeinsa also controlled Abeinsa EPC and Abeinsa BD,  two additional subsidiaries of Abengoa focused on largescale clean energy projects such as solar plants, desalination plants, and bioethanol plants. *Id.*  Lastly, Abeinsa controlled Nicsa and Comercial Abengoa, two other companies responsible for manufacturing and selling metallic structures.  *Id.*  Instalaciones Inabensa S.A. ("Inabensa") lead Abeinsa's "Installations" division within the Engineering and Construction group, concentrating on engineering, construction, maintenance of electrical and mechanical infrastructure, and instrumentation for the energy, industry, transport, and services sectors.  ¶ 55. Together, Abeinsa and Inabensa's activities accounted for more than 60% of Abengoa's overall consolidated annual sales.  ¶ 56.  The plaintiffs thus allege that Abeinsa and Inabensa were the primary focus of Abengoa's executive management and senior leadership, as they were integral to the company's overall success.  *Id.*

### 2.  *Allegations from Former Employees*

Abengoa's income depended primarily on its overall sales and operating costs.  ¶ 59.  It calculated its gross operating margin by subtracting its sales and operating costs to determine its earnings before interest, taxes, depreciation, and amortization ("EBITDA").  *Id.*  Because Abengoa carried out numerous projects simultaneously throughout the world, it had to track the progress and costs of each project to properly account for earnings in accordance with International Accounting Standards ("IAS") for construction contracts, which are global accounting standards governing how transactions and events should be reported in financial statements.  ¶ 60.  IAS 11 states that contract revenues and expenses should be recognized by

reference to the stage of completion of the contract when the outcome of the contract can be estimated reliably, or otherwise should be recognized only to the extent of recoverable contract costs incurred.   ¶ 61.  This rule is referred to as the "percentage of completion" method for recognizing revenue.  *Id.*

A confidential whistleblower referred to as FE7[2] in the TAC submitted a letter describing widespread accounting fraud at Abengoa to the Office of the Prosecutor of the National Court in Madrid, Spain on April 10, 2017, after this lawsuit was initially filed.  ¶ 45.  Based on the details in the letter, plaintiffs allege that FE7 worked within Inabensa' Controller Department from at least 2013 through 2015 and was responsible for overseeing Inabensa's financial accounting and reporting.  ¶ 46.  A translated copy of FE7's letter is attached to the complaint.  *See* Doc. 165-1.

According to FE7, Abengoa used SAP[3] software to maintain its official accounting records, including vendor orders, expenses, invoices, cash flows, and other information related to project management.  ¶ 63.  Each project also contained an estimated profit margin based on the original bid for that project, which was commonly inflated because it did not account for the entire costs of the project.  ¶ 64.  The inflated margins generally were not revised by project managers in SAP, due in part to Abengoa's rigid internal procedures called Mandatory Compliance Standards ("MCSs"), which required several lawyers of upper management approval including group directors, area directors, project management departments, and internal auditors before a project manager could even request a lower margin.  ¶ 65.  Because project managers rarely went through this process, Abengoa recognized revenue prematurely over the course of its projects.  *Id.*

---

[2] FE refers to Former Employee.

[3] SAP AG is a software corporation best known for its business management software.  ¶ 63 n.1.

Further, separate from SAP, project managers maintained their own project records on Excel spreadsheets, which recorded the same categories of information in SAP without the restrictions of Abengoa's MCSs, allowing the managers to input the actual costs, expenses, and margins. ¶ 66. The plaintiffs allege that this dual bookkeeping was commonplace and widely known within Abengoa. ¶ 67. Indeed, when project managers were asked for their margin estimates, they would have to specify whether the official SAP margin or the more accurate Excel margin was being requested. *Id.* According to plaintiffs, this dual system was intentional, serving two key purposes: (1) it allowed Abengoa to portray a more profitable and liquid appearance to the public through the SAP records; and (2) it allowed Abengoa management to meet bonus objectives by increasing project earnings in the SAP Records. ¶ 68.

FE7 also alleges in the whistleblower letter that SAP margins were occasionally "hyper-inflated" to rapidly accelerate project revenue. ¶ 69. As an example, in December 2014, Inabensa increased the project margin to 86% for the "DGEN" project, an electrical line project in India, allowing Inabensa to recognize a profit of €2,947,000 in 2014. ¶ 69. This profit was the total estimated profit for the entire project, despite the fact that the project had "hardly even started." *Id.*

FE7 also alleges in the whistleblower letter that Abengoa falsified costs through the use of "cost provisions," which are accounting entries used to denote a cost or expense that has not yet been registered for an account. ¶ 70. This occurs, for example, when a cost is incurred but an invoice has not yet been received—a cost provision serves as a placeholder until the paperwork is received, at which point the provision is cancelled and the actual costs are entered. *Id.* Inabensa allegedly abused this process by regularly fabricating project costs, allowing it to recognize revenue prematurely. *Id.* Specifically, it entered costs provisions for materials that

had not yet been ordered, purchased, or that were not even needed for a particular project.  ¶ 71.

For example, Inabensa's total cost provisions increased dramatically in November 2013 from €5

million to €25 million, in part due to an electric transmission project in Kenya in which a cost

provision was entered for €11 million in materials, even though the actual expenses were not

incurred until 2014.  *Id.*

Inabensa's cost provisions decreased to €24 million by August 2014 but again increased

dramatically to nearly €58 million in November 2014 due in part to costs provision increases of

€14 million, €9 million, and €4 million in an electric transmission project in Ukraine, a second

project in Kenya, and a high-speed railway project called the AVE Mecca Medina project

between Mecca and Medina in Saudi Arabia, respectively.  ¶¶ 6, 71–72.  Further, Inabensa did

not enter the €58 million into SAP, but instead recorded only €33 million in cost provisions for

December 2014.  ¶ 72.  Accordingly, Inabensa benefitted by prematurely recognizing revenues

due to the inflated costs but then reduced those costs at year end to maintain favorable project

margins.  *Id.*  The cycle allegedly continued in 2015 when Inabensa added €5 million in cost

provisions for their manufacturing department between April and June.  ¶ 73.

While FE7 presumably only worked for Inabensa, FE7 stated that they were "certain"

that the fraud occurred in other Abeinsa subsidiaries as well.  ¶ 74; Doc. 165-1 at 19–21.  FE7's

statement is allegedly corroborated by six additional former employees of Abeinsa as described

below.

a.  *FE1*

FE1 was the former Director of Human Resources at Abeinsa's U.S. subsidiary, Abeinsa

EPC, from August 2010 to March 2013, when FE1 resigned due to stress caused by knowing

about accounting irregularities.  ¶¶ 39, 76.  FE1 repeatedly heard from employees in Abeinsa's

accounting department that there were two sets of books, one for external auditors and one for

internal purposes. *Id.* FE1 learned this information through an exit interview with Abeinsa's

internal auditor, who tendered his letter of resignation to FE1 because he had been directed to

sign off on false financial reports that inflated the value of certain projects. ¶ 114. He claimed

that the reports contained false percentages-of-completion and failed to show that some projects

were over budget, all misstatements that had allegedly been included to present to banks to

obtain larger lines of credit. *Id.* The internal auditor also had expressed his concerns to

Abeinsa's Chief Financial Officer ("CFO") Santiago Duran, but Duran told him to "shut the fuck

up and just sign" the reports. ¶ 115. The internal auditor believed that it would be illegal for him

to sign off on the reports knowing they would be used to obtain credit, so he refused to sign and

resigned. *Id.* FE1 approached Duran to discuss the internal auditor's resignation after the exit

interview, but Duran said he was too busy to discuss it. ¶ 116. FE1 thus memorialized the exit

interview in an email to Duran, copying Abeinsa's Legal Director. *Id.* Duran then told FE1 that

the internal auditor could not report his concerns to anyone outside of Abeinsa because he had

signed a non-disclosure agreement. *Id.* FE1 learned during leadership meetings that, prior to the

resignation of the internal auditor, the reports he refused to sign had been provided to lenders

who approved large lines of credit for Abengoa. ¶ 117.

b. *FE2*

FE2 is a former Abengoa employee with broad oversight for accounting and financial

reporting at several U.S. subsidiaries. ¶ 40. FE2 confirmed that U.S. subsidiaries maintained a

set of books shown to external auditors and a separate set for internal use. ¶ 77. Further, FE2

confirmed that Abeinsa engaged in a pattern of falsifying information in the external books. *Id.*

7

FE2 also was aware of instances in which Abengoa knowingly inflated profits and used those inflated profits to obtain hundreds of millions of dollars in financing.  ¶ 78.

### c.  *FE3*

FE3 was a Senior Staff Accountant at Abengoa's corporate office in Chesterfield, Missouri from June 2013 to July 2014, when FE3 resigned due to concerns about Abengoa's financial reporting.  ¶ 41.  FE3 was responsible for accounting functions at Abeinsa, including preparing weekly and monthly financial reports for Abengoa's headquarters in Spain and preparing and analyzing cash flow statements.  *Id.*  FE3 confirmed the use of both SAP software and separate accounting books.  ¶ 79.  FE3 noted that when the revenue numbers in the internal books were higher than the actual numbers in SAP, FE3 was required to move costs and expenses around in SAP to match the numbers management required.  ¶ 81.

### d.  *FE4*

FE4 worked for Abengoa from 1989 until retirement in March 2016.  ¶ 42.  FE4 worked as Chief of Critical Projects Follow-Up for Inabensa between 2013 and 2014, and then worked in the Controller Department from 2015 until retirement.  *Id.*  In his role as Chief of Critical Projects Follow-Up, FE4 was referred issues from project managers and discovered significant accounting irregularities, including a double accounting system with large disparities between them, false expenses, and manipulated accounting entries.  *Id.*  FE4 discovered during this time that Inabensa's Administration Department was using projects containing inaccurate cost provision information to calculate income data.  ¶ 84.  FE4 "assumed" based on his experience that the SAP records were later used for external purposes such as audits and investor information.  *Id.*

FE4 also confirmed that Inabensa was regularly recognizing expenses prematurely in new projects to inflate project revenues, a practice that FE4 claims he had "no doubts" were coming from Abengoa's senior management.  ¶ 88.  FE4 described some instances where as soon as a project was awarded, and especially if the end of the financial year was near, cost provisions would be entered immediately even if purchase orders were not issued and sometimes even if the suppliers had not been identified.  ¶ 89.  FE4 also confirmed the cost provisions described in FE7's whistleblower letter, including in connection with the Ukraine and Kenya projects as well as two others in Kuwait.  ¶ 90.  FE4 stated that these cost provisions were controlled by Inabensa through its Project Control Department and used to improperly increase revenues, which he believes was done intentionally to achieve targets for executive bonuses.  ¶ 91.

FE4 also discovered that project managers were using unofficial Excel files to account for projects because Inabensa did not have appropriate software for project managers to control the project progress and forecast.  ¶ 85.  FE4 confirmed that project manager forecasts differed from the forecasts in SAP, especially in expected final project profit margins, because it was difficult to obtain authority to lower the preset margins.  ¶ 86.  FE4 alleges that this problem was known by Inabensa's management, who authorized the development and purchase of software in 2014 and 2015 to oversee project follow-up.  ¶ 87.

In his role in the Controller Department, FE4 conducted technical audits of the projects and identified and helped resolve critical problems in particular projects.  ¶ 42.

e. *FE5*

FE5 was a communications engineer for Inabensa from 2007 to 2017.  ¶ 43.  FE5 was assigned to the Controller Department as a project control engineer in April 2015 for the AVE Mecca Medina project.  *Id.*  FE5 was one of the first employees in that position, which was

created to investigate why projects that routinely maintained strong profit margins during the life of their execution suddenly showed heavy losses once completed. *Id.* When starting work on this project, FE5 attempted to access the initial budget for AVE Mecca Medina, but was not able to access the accounting records. ¶ 110. He thus was unable to calculate the true project margin. *Id.* Therefore, two project managers, Juan Angel Sierra Figueroa and Hakan Gok, instructed him to use a project margin of 21% and to modify costs to arrive at that amount. *Id.* However, FE5 stated that a 21% project margin would be impossible. ¶ 111. The project involved varying prices over the course of several years, and it would require someone to correctly anticipate fluctuations of copper, gasoline, and currency prices for an extended period of time. *Id.* Thus, costs had to be manipulated. *Id.* FE5 ultimately alleges that Abengoa's directors inflated the project margin to overstate the project's viability and improve its percentage-of-completion, resulting in higher revenues and bonuses for directors. *Id.*

FE5 further corroborated FE7's report of widespread accounting fraud. ¶ 92. For example, while reviewing the AVE Mecca Medina project's financial records, he discovered that unrelated expenses had been charged to the project in its first three years totaling €22,265,328. *Id.* In fact, on the first day of the project, an amount of €11,465,328 was charged to the project despite the fact that it was nowhere in the budget and constituted 10% of the contract price. ¶ 112. He claims that transferring unrelated funds in this manner was a widespread practice at Abengoa because it was necessary to hide undeclared losses from prior projects, increase the percentage-of-completion of new projects, and recognize higher revenues. ¶ 93. Further, senior management was necessarily involved because transactions between two subsidiaries require senior management approval. ¶ 133.

This practice of attributing losses from prior projects to new projects created a cycle whereby losses had to continue to be passed on to future projects, until Abengoa stopped winning new projects and no longer had the option of passing losses, precipitating its collapse and leading to bankruptcy. *Id.* FE5 further alleges that this fraud was directed by senior management for their financial gain, since their bonuses were based on percentage-of-completion of contracts and project margins. ¶ 94. FE5 alleges that invoices were issued for bonus-related purposes because they were often issued towards the end of the year to maximize that year's bonus. *Id.* FE5 claims that director-level employees were involved in these efforts because only employees of that level could generate invoices from different Abengoa group companies. *Id.* FE5 was ultimately terminated in 2015. *Id.*

  f. *FE6*

FE6 has worked for Canalizaciones Ebro S.L. ("Cebro"), a construction company that contracts with Abengoa, from 2010 to the present as Cebro's managing partner and sole administrator. ¶ 44. FE6 was responsible for negotiating the terms of construction contracts and dealing with representatives of Abengoa. *Id.* Between December 2011 and November 27, 2012, FE6 worked directly with representatives of Abengoa's subsidiary Befesa in relation to a project called the Cunene Water Pipeline project in Angola. *Id.* FE6 was instructed by Abengoa representatives to order equipment and supplies for the project that were not necessary and to commence construction of the pipeline earlier than planned, meaning that the pipeline would eventually have to be reconstructed at a later date after the trenches, which were supposed to be dug first, were dug. ¶¶ 44, 95. FE6 also alleges that throughout the course of the project, Abengoa project managers requested letters confirming the purchase of materials and supplies for use on the pipeline even though those materials were not yet needed or were not needed at

all.  ¶ 96.  Ultimately, Abengoa did not pay Cebro for the work, resulting in Cebro filing civil

and criminal complaints against Abengoa for unpaid invoices totaling €1,034,915.  ¶ 44.  The

plaintiffs allege that Abengoa thus improperly recorded at least this amount in project expenses

to prematurely recognize revenue.  ¶ 97.

### 3.   Allegations from Forensic Analysis

After filing for bankruptcy in 2016, as discussed further below, Abengoa's new and

current president Gonzalo Urquijo commissioned the accounting firm Klynveld Peat Marwick

Goerdeler ("KPMG") to conduct a forensic analysis of Abengoa for the years 2012 through

2016.  ¶ 99.  KPMG reviewed Abengoa's internal emails and documents, including internal

emails from Abengoa's former Executive Chairman Felipe Benjumea Llorente ("Benjumea"),  a

member of Abengoa's founding family.  ¶¶ 4, 33, 100.  KPMG concluded that accounting fraud

had occurred at Abengoa at the direction of Benjumea.  ¶ 99.  Specifically, the KPMG report

identified emails between Benjumea and other executives showing Benjumea's role in a

widespread corporate scheme to artificially inflate project margins and percentages of

completion.  ¶ 100.

KPMG also found that Abeinsa manipulated the revenue in its financial statements by

altering project margins, fraudulently recording €15 million by inflating project margins from

21% to 35%, and by fraudulently advancing percentages of completion between 2012 and 2013.

¶ 101.  Further, KPMG found €6.1 million worth of invoices "without economic substance"

charged to the AVE Mecca Medina project.  ¶ 102.

Further, KPMG determined that Abengoa used a process called "invoice triangulation[4]"

to inflate Inabensa's earnings for 2012 to €50 million.  ¶ 103.  Specifically, on August 10, 2012,

---

[4] Plaintiffs do not provide a concise definition of "invoice triangulation," but they appear to allege that it involved
"intra-group invoices without economic substance" being charged against various projects.  ¶¶ 102–07.

Julio Artillo, Inabensa's former Administration Department Director, suggested that Abengoa

use Inabensa Turkey to record the purchase of certain supplies that year, even though the

shipment of those supplies would not occur until 2013.  ¶ 104.  He also suggested using

additional projects, including AVE Mecca Medina, the Brazil and Peru power line projects, and

three solar thermal power plant projects in the U.S. and Spain to record nonexistent costs.  *Id.*

Benjumea replied to Artillo's email on August 11, 2012 directing him to also book costs against

the Peru power line project.  ¶ 105.  Artillo later circulated, in an email with the subject line

"Triangulation Turkey," a final list of projects to be used in the triangulation plan on September

20, 2012, and stated that the proposed expenses would allow Inabensa to raise its margin for

2012 to €53 million.  ¶ 106.  The projects he proposed included AVE Mecca Medina, Inabensa

Turkey, a solar mirrors project in South Africa, the Zapotillo, Mexico aqueduct project, two

desalination plant projects in Algeria and Ghana, and a wind turbine project in Brazil.  *Id.*  The

email was sent to Benjumea as well as senior managers of Abeinsa and Teyma, Abengoa's

Uruguayan subsidiary.  ¶ 106.  Benjumea replied on September 21, 2012 with his authorization

to proceed.  ¶ 107.  In the email, he further stated that "Everyone that is copied here must comply

with my instructions."  *Id.*  He concluded the email by telling José Domínguez Abascal,

Abengoa's then-general secretary, that for triangulation, he needed Solar Frame, the Indian

engineering firm that was finalizing its proposal for the South Africa project, "to solve this

urgently."  *Id.*  It is unclear what "solve this" meant, but KPMG's report indicated that Abascal

was attempting to incorporate Solar Frame into the triangulation scheme.  *Id.*

        The plaintiffs argue that the above exchanges illustrate and corroborate the accounting

fraud described in FE7's letter by demonstrating that Abengoa senior leadership "instituted,

facilitated, and even required systemic accounting fraud throughout the organization" and that the fraud was used to artificially inflate Abengoa's revenue and project profit margins.  ¶ 108.

### 4.  Arbitration Against Spain

The plaintiffs allege that Abengoa hid an additional €840 million in losses from its solar plant operations that should have accrued in 2013 that were lost due to changes in Spain's clean energy reform laws.  ¶ 118.  Abengoa entered into private arbitration against Spain in June 2013 to recover these losses, but never disclosed them to the public.  ¶¶ 118–19.

### 5.  The Offering

On October 4, 2013, in preparation for Abengoa's public offering on the NASDAQ, Abengoa filed a Registration Statement with the SEC on Form F-1, offering U.S. investors Class B Shares in the form of ADSs, each of which represented the right to receive five Class B shares. ¶ 123.  The Underwriter Defendants helped to draft and disseminate the Registration Statement, and Sanchez Ortega and Hansmeyer signed it.  ¶¶ 28, 219.

As relevant to the instant action, the Registration Statement contained the following language regarding its operations for financing construction projects:

> **We have successfully grown our business while seeking to enforce strict financial discipline to maintain our strong liquidity position.**  As of June 30, 2013, we had cash and cash equivalents and short-term financial investments of €3,222 million, which we believe are sufficient to satisfy our short-term liquidity needs.  **This strong cash position also assists in bidding for large projects**. . . .
>
> **Revenue from construction contracts is recognized using the percentage-of-completion method for contracts whose outcome can be reliably estimated and it is probable that they will be profitable.**  When the outcome of a construction contract cannot be reliably estimated, revenue is recognized only to the extent it is probable that contract costs incurred will be recoverable.
>
> As described in Note 2.26.b) to our Annual Consolidated Financial Statements and our Interim Consolidated Financial Statements, **the percentage of completion is determined at the date of every consolidated statement of financial position based on the actual costs incurred as a percentage of total estimated costs for the entire contract.**

Revenue recognition using the percentage-of-completion method involves the use of estimates of certain key elements of the construction contracts, such as total estimated contract costs, allowances or provisions related to the contract, period of execution of the contract and recoverability of the claims. **We have established, over the years, a robust project management and control system, with periodic monitoring of each project. This system is based on the long-track experience of the Group in constructing complex infrastructures and installations. As far as practicable, we apply past experience in estimating the main elements of construction contracts and rely on objective data such as physical inspections or third party confirmations.** Nevertheless, given the highly tailored characteristics of the construction contracts, most of the estimates are unique to the specific facts and circumstances of each contract.

When the outcome of a construction contract can be reliably estimated and it is probably that it will be profitable, revenue from the contract is recognized over the term of the contract. When it is probable that the costs of the project will be greater than its revenue, expected loss is recognized immediately as an expense. To determine the appropriate amount of revenue to be recognized in any period, the percentage of completion method is applied. The percentage of completion method considers, at the date of the Statement of Financial Position, the actual costs incurred as a percentage of total estimated costs for the entire contract. **Costs incurred in the period which relate to future project activities are not included when determining the percentage of completion.**

¶ 197 (emphasis in TAC).

On October 17, 2013, Abengoa filed a Prospectus with the SEC, which formed part of the Registration Statement and offered to the public 250,000,000 Class B shares at $12.18 per ADS. ¶ 125. That same day, the company went public in the United States and began selling its ADSs on the NASDAQ exchange. ¶ 126. Abengoa realized €517.5 million in gross proceeds from the offering, or roughly $703.8 million at that time. ¶ 127. Abengoa represented that it intended to use the proceeds from the offering to repay €347 million in corporate debt maturities due in 2013 as well as to reinforce its liquidity position and strengthen its balance sheets. ¶ 128.

### 6.  Continued Fraud

Several of the former employees allege that fraud continued after the offering. For example, according to FE5, in November 2013, Inabensa Turkey invoiced €3.8 million of copper wire supplies to Inabensa Saudi for the AVE Mecca Medina project even though Turkey was not involved in the project and the wire was not needed until 2014. ¶ 132. When the wire was

finally needed in December 2014, Inabensa Saudi cancelled the invoice, meaning Abengoa had recorded the expense as incurred for two years even though they were not effectively purchased until 2014.  *Id.*  Further, FE5 discovered false invoices from Nicsa dated December 30 and 31, 2013 totaling €7 million even though Nicsa had not done any work or provided supplies on the project.  ¶ 133.  Employees regularly referred separately to "cash flow with Nicsa" and "cash flow without Nicsa" to separately calculate Inabensa's cash flow with and without the Nicsa invoices.  ¶ 134.

FE5 also identified invoices that were accepted in 2014 but were altered to extend the payment deadlines for years.  ¶ 135.  He also alleges Abengoa manipulated cash flow by entering invoices for lower amounts or not entering some at all.  *Id.*  As one example, an invoice for over 9 million Saudi Riyals was entered for only one-to-two million in SAP.  *Id.*  This practice allowed Abengoa to either report an improved cash flow or to prevent a negative cash flow.  *Id.*

FE1 alleges that fraud continued in the form of training managers to reject supplier invoices to intentionally delay payment and increase its cash position, since rejected invoices could not be resubmitted for 30 days.  ¶ 136.  Indeed, one employee at Abeinsa was nicknamed "The Rejecter."  *Id.*  FE6 similarly recalled this technique of rejecting invoices, in particular on a water pipeline project where invoices were rejected "without clear explanations" so that they had to be resubmitted.  ¶ 139.  FE6 and FE1 also allege that Abengoa routinely refused to pay contractors, forcing them to file liens and settle their claims in arbitration for "pennies on the dollar."  ¶¶ 138–39.  FE3 further alleges that Abengoa created an intentionally slow and cumbersome process for invoice approval which often took months to complete in order to artificially inflate its cash and preserve its cash flow.  ¶ 137.

The plaintiffs also allege that Abengoa falsified its 2014 financial statement by artificially increasing its project margin for a cogeneration plant project in Mexico by 14.7%.  ¶ 142.  This increase resulted in Abengoa overreporting its operating profit in 2014 by €218 million.  *Id.* Further, Abengoa allegedly concealed €500 million in bond debt issued by Abengoa Greenfield on September 30, 2014 as well as €700 million in debt from a syndicated loan issued the same day.  ¶ 143.  Abengoa also cancelled a €500 million syndicated loan on December 31, 2014, only to renew it two days later on January 2, 2015.  ¶ 144.  The plaintiffs suggest that Abengoa hid these debts to avoid breaching a covenant with its lenders whereby the lenders could demand immediate repayment, throwing Abengoa into bankruptcy, should Abengoa exceed a certain leverage ratio.  ¶ 143.

The plaintiffs further allege that an audit conducted by an outside audit firm, Silva & Asociados, revealed significant losses during the course of 2014 that were not disclosed, including in particular, losses from two subsidiaries, Abengoa Solar, S.A., and Abengoa Bioenergia, S.A, totaling €1,246,000.  ¶¶ 140–41.  The audit report stated that portfolio losses that were accounted for in 2015 and 2016 should have been recognized as early as 2014, and instead were deliberately hidden to misrepresent their financial status to investors.  *Id.*  The plaintiffs allege that these two subsidiaries thus improperly received equity loans from Abengoa totaling €951,000,000 in 2015 as an attempt to avoid legal dissolution and liquidation.  ¶ 141. Further, plaintiffs allege that because Abengoa Solar and Bioenergia were both impaired to zero Euros in 2015 (meaning that their market value was zero), the subsidiaries of those companies also should have been impaired to zero.  *Id.*  However, Abengoa's 2015 financial statement stated that the subsidiaries had a value of over €2.8 billion and reported loans granted to the subsidiaries totaling over €2.5 billion, which could not be fully repaid and should have been

impaired accordingly.  *Id.*  Instead, Abengoa did not impair the values and thus concealed the losses from the market.  *Id.*

### 7.  *The Greenfield Bonds*

At strategy update meetings on September 3 and 4, 2014, Abengoa announced that the company was transitioning to an "asset-light" business model called "Abengoa 3.0," aimed at generating cash throughout the lifecycle of construction projects.  ¶ 147.  This was due in part to investors' concerns about Abengoa's balance sheet.  *Id.*  To achieve the "asset-light" model, Abengoa would create a subsidiary—Abengoa Greenfield, S.A.—which would then secure short-term "bridge" financing from Abengoa's external partners for the beginning stages of new projects.  *Id.*  Completed projects would be sold to Abengoa Yield, a "yieldco" that is a separate business that owns and operates power plants and other energy-related assets to produce a steady flow of income.  ¶ 148; Doc. 88 ¶ 122 n.2.  Abengoa would then reinvest a portion of those proceeds in new projects via Abengoa Greenfield.  ¶ 148.  Analysts and investors were optimistic about the new model.  *Id.*

On September 22, 2014, Abengoa announced that Abengoa Greenfield would issue €500 million in bonds (the "Greenfield Bonds").  ¶ 149.  Abengoa represented that the company would secure the bonds, and that it intended to classify the bonds as corporate recourse debt[5] upon issuance.  ¶ 274.  Abengoa would use the proceeds from the offering to finance certain projects "until the long-term funds associated with those projects are obtained," while "optimizing

---

[5] Abengoa used two types of debt:  recourse debt and non-recourse debt.  Doc. 88 ¶ 43.  Recourse debt—also referred to as "corporate debt"—was guaranteed by Abengoa.  *Id.*  Non-recourse debt, which was used to finance specific projects, was guaranteed by the assets and cash flows of the "project companies" formed to carry out those projects.  *Id.*  In other words, non-recourse debt was not secured by Abengoa in the event of a default.  *Id.*  The company's recourse debt was subject to a debt ratio covenant with its lenders.  *Id.* ¶ 44.  As per the covenant, Abengoa was required to maintain a "leverage" ratio of debt-to-earnings before interest, taxes, depreciation and amortization ("EBITDA") below 3.0x until December 30, 2014, and below 2.5x thereafter.  *Id.* ¶¶ 3, 44.

financial costs." ¶ 335.  The bonds were offered in two tranches (one in euros and one in U.S. dollars), both set to mature in 2019.  ¶ 149.  The offering closed on September 30, 2014.  *Id.*

### 8.   *2014 Disclosures*

Throughout 2014, Abengoa made a series of disclosures related to its debt characterization and other practices.  On November 12, 2014, Abengoa announced its financial results for the nine months ending on September 30, 2014.  ¶ 270.  Abengoa reported that its EBITDA had risen 24% year-over-year, and that its corporate leverage ratio was 2.1x, a .4x reduction from the previous quarter.  *Id.*  In a conference call with analysts later that day, Sanchez Ortega reiterated optimism about the company's cash flow and liquidity.  ¶¶ 270, 272.

During the call, an HSBC analyst sought clarification with regards to the Greenfield Bonds, noting that they did not seem to be included in Abengoa's reported corporate leverage ratio.  ¶ 275.  Bárbara Zubiría Furest ("Zubiría"), Abengoa's Co-Chief Financial Officer ("CFO") and Executive Vice President of Capital Markets and Investor Relations since January 2011, ¶ 36, then revealed that Abengoa had classified the Greenfield Bonds as non-recourse debt, under the category "nonrecourse financing in process," which was excluded from the corporate leverage ratio.  ¶ 275.  Analysts and investors criticized the categorization decision, and the price of Abengoa ADSs fell nearly 50% over the next three trading days.  ¶¶ 352–53.

Abengoa held another call on Monday, November 17, 2014 in which it revealed that it accounted a total of €1.595 billion (including the €500 million Greenfield Bonds) as "non-recourse debt in process," excluding it from the corporate leverage ratio even though it was guaranteed by Abengoa.  ¶ 279.  After including this category of debt, Abengoa's corporate leverage ratio was 3.9x.  ¶ 280.  Zubiría also disclosed that Abengoa did not include as debt €1 billion of cash linked to supplier payments that was set aside on collateral accounts.  *Id.*

However, Sanchez Ortega and Zubiría[6] continued to highlight Abengoa's sound liquidity position.  ¶ 281.

9.  *Subsequent Reports and Transactions*

On February 23, 2015, Abengoa issued a press release announcing its financial results for the full year of 2014 and also filed its annual report with the SEC on Form 20-F.  ¶¶ 293–94. The 20-F was signed and certified pursuant to the Sarbanes-Oxley Act by Sanchez Ortega and stated in relevant part:

I, Manuel Sánchez Ortega . . . certify that:

1. I have reviewed this annual report on Form 20-F of the Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the Company . . .; and

5. The Company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of Company's board of directors (or persons performing the equivalent function):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

---

[6] Zubiría resigned from her position two months later, on January 19, 2015.  ¶ 36.

¶ 294.  The 20-F and subsequent conference call on the same day spoke favorably of Abengoa's cash flow and liquidity.  ¶ 299 ("Based on our current level of operations, we believe our cash flow from operations, available cash and available borrowings under our credit facilities will be adequate to meet our future liquidity needs for at least twelve months."); ¶ 300.

Throughout the beginning of 2015, Abengoa continued to report healthy levels of liquidity and positive cash flow.  ¶¶ 285–88, 304–05, 310–13.  Despite these assurances, on May 8, 2015, Abengoa borrowed 95 million Class B shares from its majority shareholder, worth approximately €275 million.  ¶ 338.  That same day, Abengoa agreed to subscribe to 51% of a $670 million capital increase announced by Abengoa Yield to fund the acquisition of four solar power assets.  *Id.*  On May 14, 2015, Abengoa announced its financial results for the quarter ending March 31, 2015, reporting a corporate leverage ratio of 2 and emphasizing its liquidity position and cash flow.  ¶¶ 310–14

Sanchez Ortega resigned from his position as CEO shortly after on May 19, 2015.  ¶ 339.  Sanchez Ortega remained in his role as non-executive First Vice Chairman of the Board of Directors and a member of Abengoa's International Advisory Board.  ¶ 25.  The plaintiffs allege that Sanchez Ortega's resignation supports an inference of scienter because it occurred shortly after fallout regarding the Greenfield Bonds as well as:  the creation of the Controller Department and the implementation of new software to manage cost provisions, two control mechanisms that presented a risk that his fraud would be exposed.  ¶ 337.  Santiago Seage replaced Sanchez Ortega as CEO of Abengoa.  ¶ 35.

On June 29, 2015, Abengoa entered into a margin loan facility agreement with a financial institution whereby an Abengoa subsidiary could borrow up to $200 million.  ¶ 340.  Abengoa posted a 14% stake in Abengoa Yield as collateral.  *Id.*  On July 16, 2015, Abengoa announced

that it had sold all of its Class B shares in treasury stock to raise €97.6 million.  ¶ 341.  For the

first time on July 31, 2015, Abengoa hinted at financial troubles during a conference call

following a press release wherein it announced guidance concerning a reduction in corporate free

cash flow and plans to divest €400 million worth of assets. ¶ 357.  However, company executives

continued to represent that Abengoa was in an adequate liquidity position.  ¶¶ 357–58.  Seage

stated on the call that it had "no plan . . . to tap the capital markets in any manner."  ¶ 358.

Yet, the very next business day, on Monday, August 3, 2015, Abengoa announced that it

was doing just that, seeking shareholder approval of a capital increase with preemptive rights of

€650 million and asset divestitures totaling €500 million.  ¶ 160.  The company stated that these

"significant actions" were necessary to "reduce corporate debt" and "reinforce [Abengoa's]

balance sheet."  ¶ 359.  The plaintiffs allege that analysts and investors were "stunned," citing to

reports and articles by Canaccord Genuity, Citi, and Bloomberg.  ¶¶ 361–64.  The price of

Abengoa's ADSs fell nearly 30%, from a closing price of $11.06 per share on July 31, 2015 to

$7.75 per share on August 3, 2015.  ¶ 365.  The price fell an additional $1.75 per share the

following trading day, resulting in losses of $8.1 billion in market capitalization and

approximately $837 million in ADS market share.  *Id.*

### 10. Bankruptcy

On November 8, 2015, Abengoa announced that Gonvarri Corporación Financiera, a

Spanish investment firm,  had agreed to invest €350 million in connection with Abengoa's

planned capital increase.  ¶ 162.  However, just a couple of weeks later on November 25, 2015, it

announced that Gonvarri cancelled that agreement.  ¶ 163.  That same day, Abengoa announced

that it was filing for preliminary creditor protection under the Spanish Insolvency Law, which

allowed it four months to reach an agreement with its creditors.  *Id.*  Seage resigned from his

position as CEO of Abengoa on November 27, 2015.  ¶ 165.  Between February 24, 2016 and

April 7, 2016, dozens of Abengoa's U.S.-based affiliates filed for Chapter 11 bankruptcy

protection.  ¶ 171.

On March 10, 2016, Abengoa announced that it had reached a preliminary debt-

restructuring agreement with its creditors.  ¶ 167.  On March 28, 2016, Abengoa filed for

bankruptcy protection pursuant to Chapter 15 of the U.S. Bankruptcy Code in the United States

Bankruptcy Court for the District of Delaware.  ¶ 168.  The Mercantile Court of Seville no. 2

(the "Spanish Bankruptcy Court") approved the agreement between Abengoa and its creditors on

April 6, 2016, allowing it seven months to restructure.  ¶ 169.  The Delaware Bankruptcy Court

recognized this as the controlling proceeding pursuant to 11 U.S.C. § 1517, and gave effect in the

U.S. to the seven-month standstill agreement.  ¶ 170.  Abengoa's ADSs and Class B shares were

delisted from the NASDAQ on April 28, 2016.  *Id.*  The bankruptcy proceedings in Spain and the

U.S. ultimately concluded on August 22, 2019, and Abengoa now operates in accordance with its

approved plan of reorganization.  ¶ 172.

### 11. Charges Against Senior Leadership

Following Abengoa's filing for bankruptcy, investors filed civil and criminal charges

against Abengoa and certain officers, directors, and subsidiaries in Spain.  ¶ 173.  Two of the

complaints focus on the accounting fraud alleged in the TAC.  *Id.*

Investors filed a criminal complaint in Spain against Sanchez Ortega and Benjumea on

March 22, 2016 for corporate crime and misrepresentation in capital investment of stock

markets.  ¶ 180.  The Public Prosecutor's Office is supporting the prosecution, which is currently

before the National Court in Madrid, a court with jurisdiction over "particularly severe crimes."

*Id*.  The court granted a motion to add the following parties as defendants on February 2, 2020:

Abengoa, two members of its Audit Committee (Mercedes Gracia Diez and Alicia Velarde Valiente), Abengoa's auditor Deloitte S.L., and Don Manual Arranz Alonso, the Deloitte partner responsible for the audit.  ¶¶ 182, 185.  In granting the motion, the Spanish court held that there was sufficient evidence to show that the additional defendants had committed "some type of criminal offense," and, in particular, a report filed by two financial consulting firms showed that there was evidence of "systematic concealment of substantial losses of . . . assets, as well as the inclusion of insufficiently accredited certifications that indicate a visible misrepresentation of the reality of the entity's economic and financial situation."  ¶ 186.  The report noted losses accounted for in 2015 and 2016 that should have been recorded at least since 2014.  *Id.*

Investors filed a separate action against Abeinsa and Inabensa in Seville in June 2018, alleging crimes of accounting fraud and misrepresentation.  ¶ 188.  The investigating judge reviewed FE7's letter, testimony from FE4 and FE5, internal emails, and a forensic report from KPMG, among other things, all of which described systematic falsification of business records in Abeinsa and Inabensa.  ¶ 189.  In June 2020, the case was elevated to the National Court, the same court in Madrid overseeing the criminal claims against Abengoa.  ¶ 190.

### 12. Sanctions Against Deloitte

During these criminal proceedings, Spain's top corporate financial accounting regulator, the Institute of Accounting and Auditing of Accounts ("ICAC"), sanctioned Deloitte S.L., Abengoa's independent auditor, in connection with its audit of Abengoa's 2014 financial statements.  ¶ 192.  ICAC found that Deloitte did not verify the accuracy of Abengoa's engineering and construction income in financial year 2014, did not verify the accuracy of Abengoa's project margin estimates or costs, certified Abengoa's 2014 financial statements even though it knew they contained material inaccuracies, and "reprehensibl[y]" approved Abengoa's

decision to classify €1.2 billion of debt as non-recourse debt.  ¶¶ 193–94.  The plaintiffs allege that these sanctions further demonstrate that Abengoa was "rife with fraud," particularly by senior management who acted with impunity without fear of repercussions due to the lack of oversight from their auditor, Deloitte.  ¶ 195.

### 13. Summary of Allegations

Overall, the plaintiffs allege that defendants' statements related to the ADS offering and Abengoa's disclosures, SEC filings, and conference calls in 2014 and 2015 were materially false and misleading because they concealed rampant accounting fraud including artificially increased project margins, improperly recorded cost provisions, and active concealment of losses to artificially inflate earnings, with the result of preventing the market and investors from accurately assessing Abengoa's profitability and cash flow.  ¶¶ 237–40; 242–244; 249–50; 254–57; 261–64; 267–69; 282–84; 289–92; 295–303; 307–09; 315–17; 322–24.

As for corporate scienter, the plaintiffs allege that Abengoa's senior leadership facilitated and required accounting fraud as described above regarding Benjumea's inflation of project expenses and "triangulation" scheme, the sanctions against Deloitte, the transferring of expenses between projects, inflated project margins, and corporate bonus incentives.  ¶¶ 326–32.  The plaintiffs allege that the intent of employees is imputed to Abengoa under the doctrine of *respondeat superior* and common law agency principles.  ¶ 333.  The plaintiffs further allege that the timing of Sanchez Ortega's resignation bolsters an inference of scienter.  ¶¶ 334–46.

### B.  Procedural Background

The Court assumes familiarity with the August 21, 2020 Opinion and Order dismissing the SAC and the September 10, 2021 Opinion and Order granting leave to file a TAC, which detail the procedural history of this case up until that time.  Docs. 139; 164.  Following the

issuance of the September 10, 2021 Opinion, the plaintiffs filed a TAC on September 17, 2021.

Doc. 165.  Before the Court are motions to dismiss the TAC brought by Abengoa, Doc. 176,

Sanchez Ortega, Doc. 174, and the Underwriter defendants, Doc. 170.

## II.   LEGAL STANDARD

### A.  Rule 12(b)(6)

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all

factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's

favor.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  However, the Court is not

required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a

cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a

motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief

that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially

plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S.

at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer

possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [his]

claims across the line from conceivable to plausible, [the] complaint must be dismissed."

*Twombly*, 550 U.S. at 570.

### B.  Rule 9(b)

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff

must meet to survive a motion to dismiss."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d

87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23

(2007).  A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") by stating the circumstances constituting fraud with particularity.  *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs*, 551 U.S. at 320–21).  These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim. *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004) (quoting Fed. R. Civ. P. 9(b)) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'").

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify:  (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent.  *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170). Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however.  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)).  Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010).  Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so."  *Rombach*, 355 F.3d at 174.

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (citing *ECA*, 553 F.3d at 196).

## III.   DISCUSSION

Before the Court are motions to dismiss the TAC in its entirety.  Abengoa, Sanchez Ortega, and the Underwriter defendants move to dismiss claims brought against them pursuant to Section 11 of the Securities Act; Abengoa moves to dismiss claims brought against it pursuant to Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5; and Sanchez Ortega moves to dismiss claims brought against him pursuant to Section 15 of the Securities Act.[7]  All defendants join and incorporate the others' motions to the extent applicable.  The defendants also urge that any dismissal should be with prejudice.

The Court dismissed the SAC on August 21, 2020, Doc. 139.  In sum, the Court found that the SAC was deficient for the following reasons:  (1) the Section 11 claims were time-barred; (2) the SAC failed to state a Securities Act claim because the allegations did not identify any false financial statement, describe how or why such statements were untrue, identify affected projects, or provide allegations based on personal knowledge; (3) plaintiffs lacked standing to pursue the Exchange Act claims regarding debt mischaracterization due to the timing of their ADS purchases and lack of causation; and (4) the SAC failed to state a claim for Exchange Act violations regarding Abengoa's cash flow and liquidity due to lack of allegations based on

---

[7] The Underwriter Defendants also argue for dismissal of the Section 15 claims.  However, the Section 15 claims are brought against only Sanchez Ortega and Hansmeyer.  ¶¶ 32, 215.

personal knowledge, failure to meet the pleading standard for fraud, failure to plead falsity, protection of forward-looking statements and puffery, and failure to allege scienter.  Doc. 139.  On September 10, 2020, the Court granted leave to amend the complaint and file a TAC after finding there was no undue delay, bad faith, or undue prejudice.[8]  Doc. 164.  Plaintiffs filed the TAC on September 17, 2021.  Doc. 165.  In the TAC, Plaintiffs add allegations from four additional confidential witnesses (FE4, FE5, FE6, and FE7) who allege that Abengoa was participating in widespread accounting fraud across several projects and subsidiaries.  However, these additional allegations do not remedy the deficiencies the Court identified in the SAC.  For the following reasons, these motions are GRANTED, and plaintiffs' TAC is dismissed with prejudice.

### A.  Section 11 of the Securities Act

In the TAC, the plaintiffs bring claims against Abengoa, Sanchez Ortega, the Underwriter defendants, and Hansmeyer pursuant to Section 11 of the Securities Act.  "Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." *In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010).  The Underwriter defendants and Sanchez Ortega argue that the claims should be dismissed as time barred.  The Underwriter defendants further argue that the claims as to Merrill Lynch International should be dismissed for improper service.  Sanchez Ortega and Abengoa argue that the claims should be dismissed for failure to state a claim.  The Court addresses each of these arguments in turn.

#### 1.  Timeliness

---

[8] The Court did not permit Plaintiffs to amend their Section 10 and Rule 10b-5 and Section 20(a) Exchange Act claims against Sanchez Ortega.  Doc. 164 at 48.

Under the Securities Act, new claims must be asserted "[i]n no event . . . more than three years after the security was bona fide offered to the public."  15 U.S.C. § 77m.  The statute of repose is a "substantive right in those protected to be free from liability after a legislatively-determined period of time."  *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 106 (2d Cir. 2013) (internal citation, alteration and quotation marks omitted).  Unlike statutes of limitation, statutes of repose are not subject to equitable tolling, nor may they be circumvented by application of the "relation back" doctrine under Federal Rule 15(c).  *See Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 451–52 (S.D.N.Y. 2017) (holding that a claim, which was untimely under the Securities Act's statute of repose, could not relate back to an earlier filing under Rule 15(c)).

The Underwriter defendants, joined by Sanchez Ortega, argue that because the TAC asserts Securities Act claims arising out of the October 17, 2013 ADS offering, the three-year statute of repose bars these claims.  The plaintiffs first brought Securities Act claims against the Underwriter defendants in the First Amended Complaint ("FAC") on August 2, 2016, and again in the Second Amended Complaint ("SAC") in October 2019.  Docs. 31; 88.  The Court's August 21, 2020 Opinion & Order then dismissed the Section 11 claims in the SAC as time-barred by the one-year statute of limitations.  Doc. 139 at 24.  Thus, the Underwriters argue, the Section 11 claims in the TAC must be dismissed as time barred under the three-year statute of repose, as the claims in the FAC and SAC were barred by the statute of limitations and the claims in the TAC, brought more than three years after the alleged misstatements, are based on a new theory of liability that Abengoa inflated its profit margins and concealed its losses in violation of international accounting standards.  *See Fogel v. Wal-Mart de Mexico SAB de CV*, No. 13 Civ. 2282, 2017 WL 751155, at *9 (S.D.N.Y. Feb. 27, 2017) (holding that claims that

were untimely under a statute of repose in an original complaint are also untimely in later amended complaints).  Further, the Underwriter defendants argue that the claim was not filed within the one-year statute of limitations since the plaintiffs were on notice of the facts underlying their claim in November 2014.

In response, the plaintiffs argue that while the Court's prior opinion did find that the Section 11 claims related to Abengoa's financing of construction projects were time-barred under the statute of limitations, the Court did not address the timeliness of claims regarding Abengoa's percentage of completion accounting policy.  Those claims, they argue, were dismissed for failure to identify affected projects and revenue.  *See* Doc. 139 at 26–27.  It is those claims that plaintiffs now reallege with new detail in the TAC, not for the first time as the defendants allege.  Accordingly, they argue, the Section 11 claims regarding the accounting policies were properly brought within both the three-year statute of repose and the one-year statute of limitations in the FAC and SAC.  Specifically, the plaintiffs did not become aware of erroneous financial statements and faulty accounting policies until the August 3, 2015 disclosures, which revealed that Abengoa's previous statements regarding its "strict financial discipline" were false.  Thus, the filing of the FAC on August 2, 2016 fell within the time limits.

The Court's previous opinion dismissing the SAC specifically found that the November 2014 Disclosures put the plaintiffs on notice that the Registration Statement regarding Abengoa's long-term project financing was false, rendering those Securities Act claims time-barred under the one-year statute of limitations.  Doc. 139 at 22, 24.  The plaintiffs are correct that the opinion did not specifically address the timeliness of the Securities Act claims related to erroneous financial statements used to secure funding and failure to abide by accounting policies, *see* Doc. 139 at 21, and instead dismissed those claims for failure to state a claim.  Further, the Court

31

agrees with plaintiffs that the Section 11 claims regarding accounting policies are not new and were alleged, although sparingly, in both the FAC and SAC against the Underwriter defendants. *See* Doc. 31 ¶¶ 49–51; Doc. 88 ¶¶ 57–60.  Therefore, the claims are neither new nor time-barred per the Court's prior opinion, as the Court has not previously made an explicit ruling regarding their timeliness.

However, the claims are nonetheless barred by the one-year statute of limitations.  While the plaintiffs allege that they were not aware of these potential claims until the August 3, 2015 disclosures, the November 2014 disclosures were sufficient to put the plaintiffs on notice that the Registration Statement was false.  As the plaintiffs themselves state in the TAC, following the November 2014 disclosures, "[f]issures began to appear in Abengoa's public façade," "the market . . . largely believed that [Abengoa] had attempted an accounting slight-of-hand," and, as reported by Reuters on November 18, 2014, there were "myriad further questions about how various liabilities are treated on [Abengoa's] balance sheet."  ¶ 12.  A hedge fund analyst at the time stated in the Reuters article that "[t]he more they open the door on their financials, the more questions there are."  *Id.*  While these statements alone could have alerted the plaintiffs to the alleged misstatements , at the very least, they triggered a duty to inquire.  *See Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 120 (2d Cir. 2017) ("Information triggers the duty to inquire if it relates directly to the misrepresentations and omissions the plaintiff alleges in its action against the defendants, and is, in the totality of the circumstances, specific enough to provide an ordinary investor with indications of the *probability* (not just the *possibility*) of a violation.") (internal quotation marks, citations, and alterations omitted); *see also Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 365 (S.D.N.Y. 2012) (finding that the plaintiff "need not have notice of all the

misconduct it alleges in the Complaint to trigger" the limitations period).  Because the November

2014 disclosures "should have alerted any reasonable investor that something is seriously

wrong," the Section 11 claims against the Underwriter defendants are time-barred by the one-

year statute of limitations.  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 434 (2d Cir.

2008) (internal quotation marks and citation omitted); *see also Merck & Co. v. Reynolds*, 559

U.S. 633, 653 (2010) (holding that the statute of limitations begins to run "once the plaintiff did

discover or a reasonably diligent plaintiff would have discovered the facts constituting the

violation—whichever comes first") (internal quotation marks and citation omitted).

### 2.  *Failure to Serve Merrill Lynch International*

The Underwriter defendants further argue that the complaint should be dismissed with

prejudice as to Merrill Lynch International ("MLI") because it has never been properly served.

While the Court dismisses the claims against MLI as barred by the statute of limitations, the

Court will briefly examine this issue.  The plaintiffs purported to serve MLI on August 9, 2016,

but actually served a different entity, Merrill Lynch International, Incorporated ("MLI, Inc.") at 2

World Financial Center, 225 Liberty Street, 41st Floor, New York, NY 10281.  Doc. 80.  MLI,

Inc. is not a defendant in this action and did not serve as an underwriter as relevant to this action.

MLI, the defendant and underwriter in this action, is a United Kingdom-based financial

institution without a United States office.  Doc. 171 at 22.  MLI has not appointed an agent for

service of process in the United States.  *Id.*

Counsel for the Underwriter defendants advised counsel for plaintiff in May 2018 that the

wrong entity had been served.  *Id.*  The plaintiffs then attempted to serve the proper defendant in

June 2018 by sending a summons and complaint via international registered mail through

Federal Express ("FedEx").  *Id.*  However, MLI argues that service via FedEx does not comply with the Hague Convention's requirements for international service nor Fed. R. Civ. P. 4.

According to the Supreme Court, "in cases governed by the Hague Service Convention, service by mail is permissible if two conditions are met:  first, the receiving state has not objected to service by mail; and second, service by mail is authorized under otherwise-applicable law."  *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1513 (2017) (citation omitted).  While they concede that the United Kingdom is a signatory to the Hague Convention[9] and does not object to service by mail, *see SHLD, LLC v. Hall*, No. 15 Civ. 6225 (LLS), 2016 WL 659109, at *3 (S.D.N.Y. Feb. 17, 2016), the Underwriter defendants argue that service is nonetheless improper due to a failure to comply with Rules 4(f)(2)(c)(ii) and 4(f)(3).  These rules state that an individual[10] in a foreign country

> may be served at a place not within any judicial district of the United States:  . . . if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:  . . . unless prohibited by the foreign country's law, by:  . . . using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f)(2)(c)(ii)–(3).  The Underwriters argue that where the above procedure is not followed and district court approval is not sought, service by international mail is improper.

In response, the plaintiffs argue that the Underwriters ignore Rule 4(f)(1), which authorizes service "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention[.]"  Fed. R. Civ. P. 4(f)(1).  As

---

[9] Section 10(a) of the Hague Convention authorizes service by mail and reads:  "[p]rovided the State of destination does not object, the present Convention shall not interfere with the freedom to send judicial documents, by postal channels, directly to persons abroad[.]"  *See Ackermann v. Levine*, 788 F.2d 830, 839 (2d Cir. 1986).

[10] Rule 4(h)(2) of the Federal Rules of Civil Procedure requires that international service on a foreign corporation be made "in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)." Fed. R. Civ. P. 4(h).

the Second Circuit has stated, "[f]ederal courts construing the Hague Convention have . . . consistently upheld mail service thereunder to defendants in [countries that are] a signatory to the Convention and ha[ve] not objected to mail service under Article 10(a)."  *Ackermann v. Levine*, 788 F.2d 830, 839–40 (2d Cir. 1986).  However, the Underwriters point to *In re Coudert Bros. LLP*, No. 16 Civ. 8237 (KMK), 2017 WL 1944162, at *8 (S.D.N.Y. May 10, 2017), which distinguishes *Ackermann* from facts similar to those at hand and holds that service by mail on a Hague Convention signatory is not an "internationally agreed means of service" under Rule 4(f)(1).[11]  Accordingly, Rule 4(f)(1) is not satisfied.

The plaintiffs apparently concede that the additional service requirements of Rules 4(f)(2)(c)(ii) and 4(f)(3) are not met, but argue that service was properly effectuated under Rule Rule 4(f)(2)(a), which provides for service "as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction."  The Underwriter defendants here concede that the United Kingdom allows for service by mail in domestic proceedings, *see* Rule 6.3(1)(b) of the Civil Procedure Rules of the United Kingdom, *available at*: http://www.justice.gov.uk/courts/procedure-rules/civil/rules/part06#IDAROHCC, but nonetheless argue that it is actually the United Kingdom's rule for service of process issued by foreign courts that applies, requiring service through a "Senior Master."  *See* Civil Procedure Rule 6.48; 6.5.  The Court finds no reason to impose such a requirement that goes beyond the plain language of Rule 4(f)(2)(a) and thus finds that service is proper under Rule 4(f)(2)(a).  Accordingly, the

---

[11] While other courts in this district have held such service to be proper under Rule 4(f)(1), *see, e.g.*, *Treeline Inv. Partners, LP v. Koren*, No. 07 Civ. 1964, 2007 WL 1933860, at *5 (S.D.N.Y. July 3, 2007); *Bidonthecity.com LLC v. Halverston Holdings Ltd.*, No. 12 Civ. 9258, 2014 WL 1331046, at *7 (S.D.N.Y. Mar. 31, 2014), *In re Coudert Brothers* explains that these cases mistake lack of objection to service by mail for agreement to service by mail, the former of which fails to satisfy Rule 4(f)(1).  *See In re Coudert Bros. LLP*, No. 16 Civ. 8237 (KMK), 2017 WL 1944162, at *8 (S.D.N.Y. May 10, 2017).

Underwriter defendants' motion to dismiss as to MLI on the basis of improper service is denied.[12]

### 3. Failure to State a Claim

Abengoa, joined by Sanchez Ortega, argues that the Securities Act claims should be dismissed because (1) the statements at issue are nonactionable puffery; (2) the confidential witnesses should not be credited; and (3) the plaintiffs have not alleged falsity regarding statements describing the percentage of completion method. The Court addresses each argument in turn.

### a. Puffery

In the TAC, the plaintiffs allege that Abengoa's Registration Statement contained material misrepresentations and omissions. In particular, the plaintiffs point to Abengoa's statement that it has "successfully grown [the] business while seeking to enforce strict financial discipline" through a "robust project management and control system" and the statement that "[r]evenue from construction contracts is recognized using the percentage-of-completion method[.]" ¶ 197. The plaintiffs allege these statements are false because Abengoa neither enforced strict financial discipline nor adhered to the percentage of completion method. ¶ 198.

Abengoa argues that the statements regarding strict financial discipline and robust project management are nonactionable puffery because "[v]ague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices are too general to cause a reasonable investor to rely upon them and therefore are precisely the type of puffery that this and other circuits have consistently held to be inactionable." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021) (internal quotation marks and citation omitted).

---

[12] But as discussed above and below, it is dismissed as time-barred under the statute of limitations as well as for failure to state a claim.

Courts in this district have found non-actionable puffery for similar statements attesting to strict anti-counterfeiting measures, disciplined underwriting, and established procedures to comply with regulatory requirements. *See, e.g.*, *Asay v. Pinduoduo Inc.*, 2021 WL 3871269, at *3 (2d Cir. Aug. 31, 2021); *Synchrony*, 988 F.3d at 165, 171–72; *Singh v. Cigna Corp.*, 918 F.3d 57, 60, 63–64 (2d Cir. 2019).  This Court in its prior opinion dismissing the SAC also found statements using adjectives like comfortable, sound, strong, impressive, diligent, and prudent to be nonactionable puffery.  Doc. 139 at 39.  In that opinion, the Court included as nonactionable puffery the statement that Abengoa sought to enforce strict financial discipline.  This statement, along with the similar statements regarding robust project management and control system, are nonactionable as "expressions of corporate optimism and puffery too general to cause a reasonable investor to rely upon them."  *Hutchinson v. Perez*, No. 12 Civ. 1073 (HB), 2013 WL 1775374, at *2 (S.D.N.Y. Apr. 25, 2013) (internal quotation marks and citation omitted).  However, the statement regarding usage of the percentage of completion method remains actionable, but will be dismissed for failure to state a claim, as discussed further below.

### b. *Confidential Witness Statements*

Abengoa disputes the relevancy and importance of several of the confidential witnesses listed in the TAC.  First, Abengoa argues that FE1 and FE3 have not identified a particular project or entry that was wrongfully altered nor explained how Abengoa's financial statements were affected.  Abengoa further argues that FE1 and FE3's allegations are general and second-hand, facts that the Court noted for FE1 in its prior opinion in discounting his testimony.[13]  *See* Doc. 139 at 33–34.  In addition, Abengoa notes that FE1 stopped working at an Abengoa subsidiary seven months before the class period and should therefore not be considered.

---

[13] The Court did not discount FE3's testimony because the SAC included "at least some details" relevant to FE3's allegations.  Doc. 139 at 35.

In response, the plaintiffs point to the fact that the TAC adds allegations from other former employees, namely FE4 and FE5, who were employed during the class period, provide first-hand accounts of the allegedly improper accounting, and name specific affected projects, such as the AVE Mecca Medina project.  ¶¶ 84–94.  Further, FE6 provides specific fraud allegations regarding the Cunene Water Pipeline project in Angola.  ¶¶ 95–96.  FE7 provided specific detail as to how the accounting fraud took place, including describing the two separate accounting systems (SAP and Excel), ¶¶ 63–68, and the intentionality of the accounting fraud, including its impact on Abengoa's reported profits and liquidity.  ¶ 68.  However, Abengoa argues that FE4, FE5, and FE7's allegations do not support plaintiffs' company-wide theory, since they worked for Inabensa, only one of over 600 of Abengoa's subsidiaries, and there are no allegations that they interacted with Abengoa management.[14]  *See Steinberg v. Ericsson LM Tel. Co.*, No. 07 Civ. 9615 (RPP), 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (holding that testimony of confidential sources who were mid-level managers with no alleged contact with defendants or corporate headquarters was insufficient to establish scienter); *see also Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), *aff'd sub nom. Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 430 F. App'x 63 (2d Cir. 2011) (discounting testimony of confidential witnesses who were "rank-and-file" with no contact with the defendants or access to aggregate data).  Further, although the plaintiffs allege that Inabensa and Abeinsa led the Engineering and Construction work that represented 60% of Abengoa's annual sales, Abengoa argues that there is no alleged correlation between those sales and Abengoa's overall revenue.  Lastly, defendants argue that

---

[14] To this point, the plaintiffs point out that Inabensa led Abeinsa's Installations division, and the majority of Abengoa's 2015 losses (€900 million of 1.2 billion) were attributed to Abeinsa.  ¶ 166.  However, it is not clear how the Inabensa employees interacted with the larger Abeinsa group nor Abengoa as a whole.

FE6's testimony should be disregarded because he did not work for Abengoa and thus has no basis to claim that Abengoa improperly recorded expenses for the Angola project with Cebro.  ¶¶ 44, 113.

As examples of non-specific non-personal allegations, the TAC states that "[b]ased on his twenty-plus year tenure at Abengoa, FE4 assumed the [allegedly incorrect] SAP records were later used for external purposes, such as audits and investor information," and goes on to allege that the practice of improperly recording cost provisions "was most probably pervasive throughout all Abengoa."  ¶¶ 84, 91.  FE7 similarly alleges that "senior management" created rigid internal procedures to ensure control over project margins, but does not allege who constitutes senior management nor his relationship to those persons.  ¶ 65.  FE7 also described a dual SAP and Excel accounting system which he alleges was "commonplace and widely known within Abengoa," ¶ 67, but these allegations are pulled from FE7's anonymous letter to the Spanish court and there is no indication that counsel confirmed the accuracy of the statements.  *See Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 31 n.7 (S.D.N.Y. 2016) (noting that best practices for counsel relying on confidential sources include confirming the statements with the witness to assure the statements are presented in fair context and notifying the person that they will be designated as a confidential witness which runs the risk of eventual exposure); *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 804 (S.D.N.Y. 2020) (noting that allegations from confidential sources that are neither investigated nor corroborated "sit, at best, uneasily with the requirements of [Federal Rule of Civil Procedure] 11").  FE7's allegations regarding improperly recorded costs in Ukraine, Kenya, and AVE Mecca Medina also lack specificity, as the TAC does not explain how the alleged costs were incorrect or untimely.  *See* ¶ 72.  As for FE5, the plaintiffs note that his employment with the Controller Department was independent

from Abengoa's internal Audit Department, and he vaguely alleges that he "was instructed by his superiors to manipulate accounting entries" to meet the pre-determined project margins, without providing the names or roles of those "superiors" nor explaining why it would be impossible to estimate fluctuating costs to keep project margins steady. ¶¶ 43, 111.  Further, he vaguely states that "directors inflated the project margin" and that he "discovered expenses . . . that appeared to be costs from previous, unrelated projects" without explaining the basis for these allegations.  ¶ 112.  Further, while FE4 and FE5 identified some projects with improperly recorded cost provisions and accounting fraud, e.g. Ukraine, Kenya, and AVE Mecca Medina, ¶¶ 90, 92,  there are no specific allegations outside of Inabensa.  Lastly, FE6 actually is not a former employee but rather an employee from a separate company (Cebro) that worked with an Abengoa subsidiary on just one project, and there are no allegations that he interacted with management at any level.  These allegations from the confidential witnesses, Abengoa argues, do not constitute personal knowledge sufficient to support the previously discounted testimony of the original confidential witnesses.

The Court generally agrees.  As stated in the prior opinion dismissing the SAC, "[a] complaint may rely on information from confidential witnesses if 'they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).  As this Court previously ruled in granting leave to amend, the TAC does sufficiently allege job descriptions for FE2, FE3, FE4, FE5, and FE7.  Doc. 164 at 45 n.11.  However, the allegations summarized above do not meet the particularity requirement set out in *Novak*, *see* 216 F.3d at 314, and "[a] plaintiff cannot base securities fraud claims on speculation and conclusory

allegations." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted).[15]  Further,

the allegations as to accounting irregularities provide the financial impact regarding only a

handful of projects, so the generalized allegations regarding the company as a whole cannot

explain with specificity "what effect the alleged conduct had on the company's statements

regarding its financial health." *Davidoff v. Farina*, No. 04 Civ. 7617 (NRB), 2005 WL 2030501,

at *13 (S.D.N.Y. Aug. 22, 2005).  Lastly, while plaintiffs urge the Court to credit the fact that

FE4, FE5, and FE7's testimony was considered by the Spanish courts in their criminal

proceedings against Abeinsa and Inabensa, in which the investigating judge elevated the charges

to the National Court, ¶¶ 188–90, the plaintiffs cite no cases in support of the proposition that

consideration in a Spanish proceeding entitles the allegations to consideration in this Court.

Accordingly, the allegations from the confidential witnesses as a whole should largely be

disregarded absent other corroborating allegations under Rule 9(b).

c.  *Falsity of Percentage of Completion Statements*

Abengoa further argues that the plaintiffs have failed to allege the falsity of the

statements regarding strict financial discipline and adherence to percentage of completion

accounting methods.  Even if the statements regarding strict financial discipline were not

nonactionable puffery, the Court agrees that plaintiffs have failed to allege their falsity.

As explained above, the allegations from confidential witnesses should not be accorded

undue weight, but even in light of the allegations regarding double bookkeeping, and as stated in

the Court's previous opinion, the existence of two sets of accounting books does not necessarily

indicate that Abengoa did not have strict financial discipline in place.  *See* Doc. 139 at 35

---

[15] The Court does not discount the testimony of FE3, as the Court held in its motion dismissing the SAC that FE3's allegations were sufficiently specific.  Doc. 139 at 35.  However, as noted in that opinion, FE3's statements alone are insufficient to meet the pleading standard for fraud.  *Id.*

("There is nothing to suggest that having two systems was inherently fraudulent, or that the method for correcting any discrepancies was inherently improper.").  Further, as Abengoa points out, the TAC even suggests that the two separate bookkeeping systems were not hidden but rather readily available internally.  ¶ 67 ("This dual-system of accounting was commonplace and widely known within Abengoa.  When project managers were asked for their margin estimates . . . they would reply by asking for clarification as to which margin was actually being requested[.]").  The TAC also indicates that Abengoa made efforts to rectify accounting errors, by for example, creating the Controller Department in May 2015 to audit the profit margins of past projects and by purchasing a new project management system to address Abeinsa's cost provision accounting.  ¶ 337.  Lastly, the plaintiffs' allegations regarding the difficulty of changing project margins within SAP due to Abengoa requiring multiple levels of approval, ¶ 65, do not credibly demonstrate a lack of strict financial discipline, as FE7's testimony regarding this practice is not sufficiently specific as described above, and it is not clearly alleged why a multi-level approval system would necessarily lead specifically to inflated project margins.  *See* Doc. 139 at 35–36.[16]  There are thus no credible specific allegations concerning the absence of strict financial discipline.

The plaintiffs' further allegations regarding improperly recorded expenses on AVE Mecca Medina and the Cunene Water Pipeline projects, among others, similarly must be discounted, as the allegations are from the confidential witnesses the Court describes above.  *See* ¶¶ 109–13.  The only other allegations from non-confidential witnesses regarding improperly recorded expenses concern Abengoa's arbitration proceedings with Spain, in which Abengoa

---

[16] Although plaintiffs cite *In re EVCI Colleges Holding Corp. Sec. Litig.*, to argue that allegations from confidential witnesses do not need to be "as comprehensive as . . . closing argument after trial," plaintiffs have not otherwise "alleged sufficient facts to support their contention[s]" and, accordingly, have not met their burden at this stage. 469 F. Supp. 2d 88, 91, 97 (S.D.N.Y. 2006).

allegedly hid losses from solar plant operations, ¶¶ 118–21.  These allegations, Abengoa argues, do not sufficiently allege falsity because the arbitration proceedings were publicly reported as early as November 11, 2013, *see* Doc. 179-3, and in Abengoa's 20-F forms for both 2013 and 2014.  Docs. 179-4 and 179-5.  While the plaintiffs respond that Abengoa did not disclose the actual amount of the demand or the underlying losses to investors, ¶ 121, such allegations on their own do not sufficiently allege falsity regarding strict financial discipline, and Abengoa cites a regulation indicating that they had no obligation to disclose the amounts at issue because the claims did not exceed 10 percent of their assets at the time.  *See* 17 C.F.R. § 229.103(b)(2) ("No information need be given . . . for proceedings: . . . [t]hat involve primarily a claim for damages if the amount involved, exclusive of interest and costs, does not exceed 10 percent of the current assets of the registrant and its subsidiaries on a consolidated basis.").

Lastly, Abengoa argues that the plaintiffs have not sufficiently alleged the falsity of the statements regarding adherence to a percentage of completion accounting method.  Abengoa argues that the Registration Statement disclaimed strict reliance on its percentage of completion accounting policy by emphasizing that this method involved "estimates," "significant judgments," and "risks" that could not "be specifically quantified" due to "the highly tailored characteristics of the construction contracts" which results in estimates being "unique to the specific facts and circumstances of each contract."  ¶ 130; Doc. 179-2 at 104.  Accordingly, deviations from strict percentage of completion accounting, it argues, do not establish falsity.

The plaintiffs respond by pointing to their allegations of accounting manipulation at the direction of Benjumea, ¶¶ 104–07, 112–13, and arguing that Abengoa's cautionary language was insufficient.  In support, they cite *Meyer v. Jinkosolar Holdings Co.*, in which the Second Circuit stated that "[a] generic warning of a risk will not suffice when undisclosed facts . . . would

substantially affect a reasonable investor's calculations of probability."  761 F.3d 245, 251 (2d

Cir. 2014) (citing *Rombach*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future

risk cannot insulate from liability the failure to disclose that the risk has transpired.")).

       In *Jinkosolar*, the defendant manufacturer Jinkosolar informed investors in its prospectus

that compliance with environmental regulations was costly, but non-compliance could lead to

bad publicity, fines, and business suspension.  761 F.3d at 251.  With this in mind, it also

disclosed that it had pollution abatement equipment and a 24 hour environmental monitoring

team.  *Id.*  These disclosures gave comfort to investors that the defendant was complying with

environmental regulations.  *Id*.  However, the defendant then failed to disclose in the prospectus

certain pollution problems that had occurred.  *Id.*  The Second Circuit held that the warning

regarding the high costs of non-compliance could not shield the defendant from liability.

       By contrast, in *Rombach*, a defendant who owned golfing facilities included in its

financial statements information about earnings as well as cautionary language regarding the

underperformance and decreased revenue of newly acquired facilities, which the district court

and then the Second Court affirmed are statements protected by liability under the "bespeaks

caution" doctrine, by which "alleged misrepresentations in a stock offering are immaterial . . .

[if] it cannot be said that any reasonable investor could consider them important in light of

adequate cautionary language[.]"  335 F.3d at 173 (quoting *Halperin v. eBanker USA.com,*

*Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)).  The cautionary language in Abengoa's financial

statements falls somewhere between these two extremes—it was neither a generic warning of

risk as in *Jinkosolar* nor as specific of a disclosure of risk as the *Rombach* statements.

Therefore, the statements are not shielded under the bespeaks caution doctrine, nor should the

cautionary language be disregarded.  The Court instead will examine the allegations regarding Benjumea to determine whether the statements are false even in light of the warnings provided.

The TAC alleges, based on a report from KPMG, that "Benjumea directed Abengoa's senior management to transfer expenses between unrelated projects" between August and September of 2012 to artificially inflate Inabensa's profit margin.  ¶¶ 199, 222.  Abengoa argues that the emails the KPMG report and TAC rely on do not involve Abengoa nor demonstrate a "widespread corporate scheme" as alleged, ¶¶ 100–08, as the emails refer only to invoice triangulation at Inabensa Turkey more than a year prior to the class period and do not provide appropriate context for Inabensa Turkey's activities compared to Abengoa as a whole.  *See Peifa Xu v. Gridsum Holding Inc.*, No. 18 Civ. 3655 (ER), 2021 WL 773002, at *9 (S.D.N.Y. Feb. 23, 2021) (holding that for a statement to be material for purposes of a Section 11 claim, the alleged misstatement must be material in the context of the company's total operations).  Further, Abengoa notes that the TAC does not allege the extent to which the earnings were inflated as a result of the alleged triangulation scheme and even argues that transferring of expenses between unrelated projects would not have an effect on the financial statement, since intragroup assets and liabilities are eliminated in full when Abengoa's financial statements are consolidated.  *See* Doc. 179-2 at 3, 11.

The plaintiffs respond that because Benjumea was Abengoa's Executive Chairman and the triangulation allegations refer to seven projects in Abengoa's important Engineering and Construction segment, the allegations sufficiently implicate Abengoa as a whole.  Further, they argue that there is no need for further context and specificity at this stage, and the defendants' proffered explanations for the alleged wrongdoing are "entitled to little weight" at the pleading

stage when all reasonable inferences must be drawn in the plaintiffs' favor.  *Blanford*, 794 F.3d at 306–07.

The Court agrees with Abengoa.  As stated in the Court's prior opinion dismissing the SAC, "the Court declines to assume the truth of the allegations" in the Spanish proceedings, as those proceedings have not concluded.  Doc. 139 at 43 (citing *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012) ("because such allegations are taken directly from uncorroborated allegations embedded in a complaint in another action, the Court will not consider them").  Further, even were the Court to consider the allegations, it is not clearly alleged either in the TAC or briefing how the existence of the triangulation scheme makes false Abengoa's statements regarding its use of a percentage of completion accounting model, especially in light of the cautionary language described above, the lack of specific allegations concerning the impact of the alleged triangulation scheme on the financial statements as a whole, and the relatively small percentage of total assets involved.[17] *See, e.g.*, *Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) ("[a]n accounting classification decision that affects less than one-third of a percent of total assets does not suggest materiality").  Ultimately, the plaintiffs have still not sufficiently "set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading[.]" *Dura Pharm., Inc.*, 544 U.S. at 345.  Accordingly, the Section 11 claims are dismissed.

### B.  Section 15 of the Securities Act

In the TAC, the plaintiffs bring claims against Sanchez Ortega and Hansmeyer pursuant to Section 15 of the Securities Act.  "Section 15 . . . creates liability for individuals or entities

---

[17] While Abengoa argues that plaintiffs' allegations concern just 0.25% of Abengoa's total revenue of approximately €6.3 billion for 2012, Doc. 177 at 26, the plaintiffs argue that 10% of Abengoa's consolidated operating profit for the year is affected, Doc. 182 at 11.  Even assuming the plaintiffs' numbers to be correct, absent additional reliable allegations, as explained above, the allegations do not rise to the level of specificity required by Rule 9(b).

that 'control[] any person liable' under section 11 or 12." *In re Morgan Stanley*, 592 F.3d at 358 (citation omitted).  Sanchez Ortega argues that because plaintiffs' Section 11 claims fail, the Section 15 claims also fail.  As discussed above, the Section 11 claims are barred by the statute of limitations and dismissed for failure to state a claim.  Accordingly, the Section 15 claims are dismissed as well.

### C.  Section 10(b) and Rule 10b-5

#### 1.  *Legal Standard*

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," while SEC Rule 10b-5 creates liability for a person who makes "any untrue statement of a material fact or . . .  omit[s] to state a material fact . . . in connection with the purchase or sale of any security."  *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013).  A statement may give rise to liability under § 10(b) if it is "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading."  *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, No. 16 Civ. 3068 (AJN), 2017 WL 4082482, at *5 (S.D.N.Y. Aug. 24, 2017), *aff'd*, 735 F. App'x 11 (2d Cir. 2018)) (internal quotation marks and citation omitted).

Rule 10b–5, promulgated to implement Section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance."  *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999).  Under Rule 10b–5, it is unlawful for any person, directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue
> statement of a material fact or to omit to state a material fact necessary in order to make

the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must plead that: (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.* a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss. *In re Express Scripts Holding Co. Sec. Litig.*, No. 16 Civ. 3338 (ER), 2017 WL 3278930, at \*10 (S.D.N.Y. Aug. 1, 2017) (citations omitted); *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). Moreover, the plaintiff must meet the PSLRA requirements. *ECA*, 553 F.3d at 196. Therefore, while the Court normally draws reasonable inferences in favor of a non-movant on a motion to dismiss, the PSLRA "'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *Id.* (citing *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)). "Plaintiffs can establish the requisite 'strong inference of fraudulent intent' either (a) by demonstrating 'that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 560 (S.D.N.Y. 2004) (citing *Kalnit*, 264 F.3d at 138–39). To show motive and opportunity to commit fraud, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud" that is more than a generalized motive that any public for-profit company might have. *Kalnit*, 264 F.3d at 139–40. To show strong circumstantial evidence of conscious misbehavior or recklessness, a plaintiff must allege

"conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA*, 554 F.3d at 202–03 (quoting *Kalnit*, 264 F.3d at 142).  The standard is higher than enhanced negligence and has been described as "a state of mind *approximating actual intent*." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks and citation omitted). In general, there are

> [a]t least four circumstances [that] may give rise to a strong inference of the requisite scienter:  where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*ECA*, 553 F.3d at 199 (internal quotation marks and citations omitted).

> 2.  *Discussion*

As explained above, the plaintiffs have not stated a claim as to the statements concerning strict financial discipline and percentage of completion accounting.  However, the TAC alleges Exchange Act claims regarding additional statements, including Abengoa's press releases, conference calls, and presentations announcing their financial results including their EBITDA and corporate leverage ratios in 2013 as well as their goals for 2014, *see* ¶¶ 227–29, 234–37, 248–49, 265–67, Abengoa's press releases, conference calls, and presentations announcing their financial results for 2014 and goals for 2015, ¶¶ 270–73, 281–82, 285–89, 299–303, and Abengoa's press releases, conference calls, and presentations announcing their financial results for 2015 and goals for 2016, ¶¶ 304–07, 312–15, 318–22.  Abengoa argues that these claims should be dismissed for several reasons.  The Court addresses each argument in turn.

> a.  *Safe Harbor Provision*

Abengoa first argues that many of the statements were already dismissed in the Court's prior opinion as non-actionable forward-looking statements under the PSLRA's safe harbor provision.  The plaintiffs have not responded to this argument.  The Court therefore reaffirms its prior holding:  "[t]o the extent these statements refer to Abengoa's future plans and objectives, these are non-actionable under the PSLRA's safe harbor provision."  Doc. 139 at 39.

b.  *Statements Concerning Cash Flow and Liquidity*

Abengoa next argues that plaintiffs have not shown that the statements concerning its cash flow and liquidity positions were fraudulent.  In response, the plaintiffs argue that their allegations are similar to those in *In re Vivendi, S.A. Sec. Litig.*, in which the Second Circuit found that there was sufficient evidence for a jury to find similar statements regarding liquidity materially false or misleading.  838 F.3d 223, 250 (2d Cir. 2016).  In *Vivendi*, the jury analyzed 56 statements related to the company's liquidity as well as evidence that the company had emphasized its EBITDA growth to the public because it was hard to track the impact of purchase accounting effects[18] within the EBITDA, creating a false sense that the company had high profitability and ample cash flow when in fact it only had strong purchase accounting effects.  *Id.* at 251.  Further, the jury had before it significant evidence that the company had no cash flow, despite its statements that it would have billions of euros in cash flow during the relevant period. *Id.* at 251–52.  However, unlike in *Vivendi*, as discussed above, plaintiffs have not sufficiently alleged the underlying accounting fraud.  Accordingly, the Exchange Act claims as to these statements are dismissed.

---

[18] Purchase accounting effects are "one-time paper adjustments that cannot readily translate into free cash flow[.]" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 251 (2d Cir. 2016).

### c. Falsity of the July 31, 2015 Statements

The Court's prior opinion dismissing the SAC held that the plaintiffs did not sufficiently plead falsity regarding the July 31, 2015 statements concerning Abengoa's plan to tap the markets.  Doc. 139 at 37.  Abengoa argues that the TAC has not added any additional allegations of falsity and the claim should again be dismissed.  The plaintiffs respond that their allegations of falsity are now supported by detailed factual allegations showing that the statement was part of the overarching accounting fraud scheme to hide Abengoa's liquidity risk.  However, again as explained above, the Court holds that the plaintiffs have not sufficiently alleged the existence of an accounting fraud scheme.  Accordingly, the claim is dismissed.

### d. Scienter

#### i. Motive

Even if there was an actionable misstatement, Abengoa argues that the plaintiffs have failed to allege motive.  To show motive and opportunity to commit fraud, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud" that is more than a generalized motive that any public for-profit company might have.  *Kalnit*, 264 F.3d at 139–40.  In the TAC, the plaintiffs allege that executives at Abengoa intentionally manipulated the accounting entries to earn executive bonuses, which were based on the percentage-of-completion of contracts and project margins.  ¶¶ 8, 68, 91, 94, 111, 332.  The plaintiffs argue that their allegations regarding motive are sufficient as they have alleged both a company-wide policy of accounting fraud as well as a personal profit motive.  *See, e.g.*, *In re: EZCorp, Inc. Sec. Litigations*, 181 F. Supp. 3d 197, 209 (S.D.N.Y. 2016) ("supporting a finding of scienter is the collective picture painted by the confidential witnesses:  a culture of unscrupulous lending practices and lax oversight that was . . . widespread").

The general rule in the Second Circuit is that "receipt of incentive compensation, including performance-based bonuses, does not, by itself, establish motive." *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 159 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (citing *Kalnit*, 264 F.3d at 139).  Further, the allegations regarding Abengoa's bonuses come from the confidential witnesses, the testimony of whom the Court has discounted.  Accordingly, the TAC has not sufficiently alleged motive.

ii.  *Conscious Misbehavior or Recklessness*

Abengoa next argues that conscious misbehavior or recklessness cannot be inferred.  The TAC alleges that the Exchange Act defendants

> knew and/or recklessly disregarded the falsity and misleading nature of the information . . . [because t]he fraudulent scheme described herein could not have been perpetrated . . . without the knowledge and complicity, or at least, the reckless disregard of the personnel at the highest levels of Abengoa, including each of the Exchange Act Defendants.  The Exchange Act Defendants, because of their positions with Abengoa, controlled the contents of its public statements during the Class Period.  They were provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, [they] knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to . . . the public and that the positive representations that were being made were false and misleading.

¶¶ 348–49.  Because the complaint fails to demonstrate motive, to show scienter through circumstantial evidence, "the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d at 142 (internal quotation marks and citation omitted).

Abengoa argues that the allegations regarding the triangulation scheme directed by Benjumea should not be relied on as the KPMG report describing the triangulation scheme is merely an allegation in a foreign proceeding.  As explained above, the Court agrees, so the allegations regarding Benjumea's scienter will not be considered.

The plaintiffs argue that they have alleged scienter as to Abengoa's audit committee, Deloitte, and Deloitte partner Alonso, as the TAC states that a judge evaluated evidence against them regarding criminal charges for knowingly certifying false financial information to the public. ¶¶ 182–87, 329. This is not quite the case. Rather, a judge in the Spanish National Court granted a motion to add these parties into the action after finding that the alleged facts and evidence before him "[met] the requirements of some type of criminal offense[.]" Doc. 165-2 at 24. It is not clear that a finding of scienter was ever made. Further, "the existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter[.]" *City of Brockton Ret. Sys. v. Avon Prod., Inc.*, No. 11 Civ. 4665 (PGG), 2014 WL 4832321, at *23 (S.D.N.Y. Sept. 29, 2014) (internal quotation marks and citation omitted). Lastly, the "connective tissue" between these employees and anything that was reported to Abengoa's senior manager is still lacking, so any alleged scienter cannot be imputed to Abengoa as a whole. Doc. 139 at 44 (citing *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020)).

The plaintiffs' remaining arguments as to corporate scienter fair no better. The TAC alleges that Abeinsa and Inabensa's department heads and directors were complicit in fraud because their approval was required to transfer expenses among subsidiaries. ¶¶ 74, 91, 94, 330. However, these allegations again come from the testimony of the confidential witnesses that the Court has discounted, and the allegations are not specific enough to suggest corporate scienter, much less impute it to Abengoa as a whole, particularly since it is not clear these executives played any role in creating the financial statements. *See Barrett v. PJT Partners Inc.*, No. 16 Civ. 2841 (VEC), 2017 WL 3995606, at *8 (S.D.N.Y. Sept. 8, 2017) (finding no scienter in part because the complaint did not allege that the employee at issue was involved in crafting internal controls or public disclosures); *see also In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d

261, 273 (S.D.N.Y. 2009) (finding no knowledge or recklessness leading to an inference of

scienter due to lack of particularized allegations); *In re Iconix Brand Grp., Inc.*, No. 15 Civ. 4860

(PGG), 2017 WL 4898228, at *18 (S.D.N.Y. Oct. 25, 2017) (same). Nor can the plaintiffs rest

on the TAC's allegations that senior leadership must have been involved because only they could

lower project margins in the SAP accounting system and they benefitted from bonuses achieved

as a result. ¶¶ 65–66. As explained, Abengoa's project margin adjustment processes do not

necessarily reflect fraudulent intent, and the allegations are not specific enough or they come

from the confidential witnesses whose testimony the Court has found insufficient.

Lastly, the plaintiffs argue that the TAC adequately pleads scienter as to Sanchez Ortega

individually, as it alleges that he was CEO at the company during the fraud and resigned under

suspicious circumstances. ¶¶ 334–46. "Courts in this Circuit have long held that accusations

founded on nothing more than a defendant's corporate position are entitled to no weight." *City*

*of Brockton*, 2014 WL 4832321, at *19; *see also Bd. of Trustees of City of Ft. Lauderdale Gen.*

*Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011), *aff'd sub*

*nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) (summary order). Therefore,

these allegations do not raise a strong inference of scienter. Further, a "resignation by itself is

insufficient to support an allegation of scienter because there are any number of reasons that an

executive might resign." *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y.

2012) (internal quotation marks and citations omitted) (finding that a suspiciously timed

resignation added to the inference of scienter). However, a suspiciously timed resignation can

add to "the overall pleading of circumstantial evidence of fraud." *In re Scot. Re Grp. Sec. Litig.*,

524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007). As there is no other circumstantial evidence of

fraud, even if the Court were to find Sanchez Ortega's resignation suspicious, it would not be enough to rescue plaintiffs' claims.

Even collectively, Plaintiffs' allegations do not come close to showing the required level of "highly unreasonable" conduct that is "an extreme departure from the standards of ordinary care." *ECA*, 554 F.3d at 202–03.  Therefore, the Exchange Act claims are dismissed.

### e.  Loss Causation

As the Court held in its prior opinion dismissing the SAC, the plaintiffs' failure to adequately plead either scienter or a misstatement or omission is dispositive.  Thus, the Court need not reach the issue of loss causation.  *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *22 ("Because the issue of scienter . . . proves fatal to Plaintiffs' Section 10(b) [claims] . . . the Court need not reach the UBS Defendants' arguments regarding . . . loss causation[.]"); *Hutchinson v. Perez*, No. 12 Civ. 1073 (HB), 2012 WL 5451258, at *8 (S.D.N.Y. Nov. 8, 2012). *amended*, No. 12 Civ. 1073 (HB), 2013 WL 93171 (S.D.N.Y. Jan. 8, 2013) ("Since the Court must dismiss the Amended Complaint if Plaintiff fails to adequately plead scienter, I need not reach loss causation or misleading statements and omissions under the PSLRA."); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *22 (S.D.N.Y. Sept. 28, 2010) ("I need not reach the issue of whether the SAC alleges loss causation because the SAC fails to allege a misstatement or that defendants acted with scienter.").

### D.  Leave to Amend

Federal Rule of Civil Procedure 15 instructs courts to "freely give leave [to amend a pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Second Circuit has instructed courts not to dismiss a complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Shabazz v.*

*Bezio*, 511 F. App'x 28, 31 (2d Cir. 2013) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)).  However, the plaintiffs have already had a chance to amend in response to the Court's opinion dismissing the SAC.  Accordingly, dismissal is with prejudice.

## IV.    CONCLUSION

For the foregoing reasons, the defendants' motions to dismiss are GRANTED.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 170, 174, and 176, and to close the case.

It is SO ORDERED.

Dated:    August 30, 2022
          New York, New York
                                        _____
                                              Edgardo Ramos, U.S.D.J.