UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL FRANCISCO,
*individually and on behalf of all others similarly situated*,

Plaintiff,

*– against –*

ABENGOA, S.A., MANUEL SANCHEZ ORTEGA, CHRISTOPHER HANSMEYER, HSBC SECURITIES (USA) INC., CANACCORD GENUITY INC., MERRILL LYNCH INTERNATIONAL, *and* SOCIÉTÉ GÉNÉRALE,

Defendants.

**OPINION & ORDER**

15 Civ. 6279 (ER)

RAMOS, D.J.:

Lead plaintiffs Jesse and Arlette Sherman bring this federal securities class action against Abengoa S.A.; Manual Sanchez Ortega, Abengoa's former Chief Executive Officer ("CEO"); Christopher Hansmeyer,[1] the duly authorized representative for Abengoa in the United States; and HSBC Securities (USA) Inc., Canaccord Genuity Inc., Merrill Lynch International, and Société Générale, investment banks that served as underwriters for Abengoa's United States offering (together, the "Underwriter defendants").

Remaining in the instant action are Plaintiffs' claims pursuant to Section 11 of the Securities Act of 1933 (the "Securities Act") against all defendants; claims pursuant to Section 15 of the Securities Act against Sanchez Ortega and Hansmeyer; claims pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated

[1] Though Hansmeyer was served on September 8, 2016, he has not appeared in this action. Doc. 79.

thereunder against Abengoa and Hansmeyer; and a claim pursuant to Section 20(a) of the Exchange Act against Hansmeyer.[2]

They bring their Securities Act claims on behalf of purchasers of Abengoa's American Depositary Shares ("ADSs") allegedly traceable to the registration statement issued in connection with Abengoa's public offering on October 17, 2013. Doc. 165 ¶ 206. They bring their Exchange Act claims on behalf of purchasers of Abengoa's ADSs between October 17, 2013, and August 3, 2015 (the "Class Period"). *Id.* ¶ 1.

After this Court dismissed all of Plaintiffs' claims in the Third Amended Complaint ("TAC") in August 30, 2022 (the "August 2022 Opinion"), the Second Circuit issued an opinion on October 6, 2025, affirming in part, reversing in part, and vacating in part that decision. Docs. 195, 199. Before the Court are three motions to dismiss plaintiffs' TAC filed by Abengoa, Sanchez Ortega, and the Underwriter Defendants. Docs. 211, 214, 217.

For the reasons set forth below, Abengoa's motion is GRANTED in part and DENIED in part, Sanchez Ortega's motion is GRANTED, and the Underwriter Defendants' motion is GRANTED. As discussed below, Plaintiffs' Security Act claims have been dismissed without prejudice, while Plaintiffs' Exchange Act claims have been partially dismissed with prejudice.

---

[2] Plaintiffs previously brought Exchange Act claims against Sanchez Ortega; however, this Court dismissed those claims with prejudice for failure to allege scienter. *See* Doc. 195 at n.8, 54–55. The Second Circuit affirmed this decision. Doc. 199 at 40–42.

## I. BACKGROUND

### A. Factual Background[3]

Abengoa, founded in 1941, is an engineering and construction company headquartered in Spain. ¶¶ 2, 41.[4] Sanchez Ortega served as Abengoa's CEO from March 2010 until his resignation on May 19, 2015, and Hansmeyer was its duly authorized representative in the United States. ¶¶ 25, 27. This action relates to Abengoa's October 17, 2013 public offering on the NASDAQ Global Select Market (the "NASDAQ") for €517.5 million, which the Underwriter Defendants underwrote, and to the subsequent series of events culminating in the company's filing for insolvency and bankruptcy. ¶¶ 28, 126. Lead plaintiffs Jesse and Arlette Sherman purchased Abengoa's ADSs beginning November 18, 2014, during the Class Period. ¶ 23; Doc. 7-1 at 4. The following facts are based on the allegations in the TAC, which the Court accepts as true for purposes of the instant motion, as well as documents of which the Court takes judicial notice.

#### *1. Abengoa Structure*

At all relevant times, Abengoa was comprised of 532 subsidiaries, 17 associates, and 34 joint ventures, and was operating in over 70 countries. ¶ 53. Abengoa organized its business in three areas: (1) Engineering and Construction, (2) Infrastructure Concessions, and (3) Industrial Production. ¶ 54. Abeinsa Ingeniería y Construcción Industrial S.A. ("Abeinsa") is Abengoa's U.S. subsidiary that served as the head of the Engineering and Construction group. ¶¶ 3, 54. Abeinsa directly or indirectly controlled all of Abengoa's operations in the United States,

---

[3] A majority of this section is reproduced from the Court's August 2022 Opinion, which recounted Plaintiffs' allegations in the TAC. *See* Doc. 195 at 2–26. Differences between the factual background in this opinion as compared to the August 2022 Opinion are largely based upon documents of which the Court takes judicial notice, as detailed in the discussion section below.

[4] Unless otherwise noted, all references to ¶ __ refer to the Third Amended Complaint, Doc. 165.

Mexico, Argentina, Uruguay, Chile, and Brazil between 2013 and 2015. ¶ 57. Abeinsa also controlled Abeinsa EPC and Abeinsa BD, two Abengoa subsidiaries focused on largescale clean energy projects such as solar plants, desalination plants, and bioethanol plants. *Id.* Lastly, Abeinsa controlled Nicsa and Comercial Abengoa, two other companies responsible for manufacturing and selling metallic structures. *Id.* Instalaciones Inabensa S.A. ("Inabensa") lead Abeinsa's "Installations" division within the Engineering and Construction group, concentrating on engineering, construction, maintenance of electrical and mechanical infrastructure, and instrumentation for the energy, industry, transport, and services sectors. ¶ 55. Together, Abeinsa and Inabensa's activities accounted for more than 60% of Abengoa's overall consolidated annual sales. ¶ 56. The plaintiffs thus allege that Abeinsa and Inabensa were the primary focus of Abengoa's executive management and senior leadership, as they were integral to the company's overall success. *Id.*

### 2. *Allegations from Former Employees*

Abengoa's income depended primarily on its overall sales and operating costs. ¶ 59. It calculated its gross operating margin by subtracting its sales and operating costs to determine its earnings before interest, taxes, depreciation, and amortization ("EBITDA"). *Id.* Because Abengoa carried out numerous projects simultaneously throughout the world, it had to track the progress and costs of each project to properly account for earnings in accordance with International Accounting Standards ("IAS") for construction contracts, which are global accounting standards governing how transactions and events should be reported in financial statements. ¶ 60. IAS 11 states that contract revenues and expenses should be recognized by reference to the stage of completion of the contract when the outcome of the contract can be estimated reliably or otherwise should be recognized only to the extent of recoverable contract

costs incurred. ¶ 61. This rule is referred to as the "percentage of completion" method for recognizing revenue. *Id.*

A confidential whistleblower referred to as FE7[5] in the TAC submitted a letter describing widespread accounting fraud at Abengoa to the Office of the Prosecutor of the National Court in Madrid, Spain on April 10, 2017, after this lawsuit was initially filed. ¶ 45. Based on the details in the letter, plaintiffs allege that FE7 worked within Inabensa' Controller Department from at least 2013 through 2015 and was responsible for overseeing Inabensa's financial accounting and reporting. ¶ 46. A translated copy of FE7's letter is attached to the complaint. *See* Doc. 165-1.

According to FE7, Abengoa used SAP[6] software to maintain its official accounting records, including vendor orders, expenses, invoices, cash flows, and other information related to project management. ¶ 63. Each project also contained an estimated profit margin based on the original bid for that project, which was commonly inflated because it did not account for the entire costs of the project. ¶ 64. The inflated margins generally were not revised by project managers in SAP, due in part to Abengoa's rigid internal procedures called Mandatory Compliance Standards ("MCSs"), which required several layers of upper management approval including group directors, area directors, project management departments, and internal auditors before a project manager could even request a lower margin. ¶ 65. Because project managers rarely went through this process, Abengoa recognized revenue prematurely over the course of its projects. *Id.*

Further, in addition to the SAP records, project managers maintained their own project records on Excel spreadsheets, which recorded the same categories of information in SAP

[5] "FE" refers to Former Employee.

[6] SAP AG is a software corporation known for its business management software. ¶ 63 n.1.

without the restrictions of Abengoa's MCSs, allowing the managers to input the actual costs, expenses, and margins. ¶ 66. The plaintiffs allege that this dual bookkeeping was commonplace and widely known within Abengoa. ¶ 67. Indeed, when project managers were asked for their margin estimates, they would have to specify whether the official SAP margin or the more accurate Excel margin was being requested. *Id.* According to plaintiffs, this dual system was intentional, serving two key purposes: (1) it allowed Abengoa to portray a more profitable and liquid appearance to the public through the SAP records; and (2) it allowed Abengoa management to meet bonus objectives by increasing project earnings in the SAP Records. ¶ 68.

FE7 also alleged that SAP margins were occasionally "hyper-inflated" to rapidly accelerate project revenue. ¶ 69. As an example, in December 2014, Inabensa increased the project margin to 86% for the "DGEN" project, an electrical line project in India, allowing Inabensa to recognize a profit of €2,947,000 in 2014. ¶ 69. This profit was the total estimated profit for the entire project, despite the fact that the project had "hardly even started." *Id.*

FE7 also alleged that Abengoa falsified costs through the use of "cost provisions," which are accounting entries used to denote a cost or expense that has not yet been registered for an account. ¶ 70. This occurs, for example, when a cost is incurred but an invoice has not yet been received—a cost provision serves as a placeholder until the paperwork is received, at which point the provision is cancelled and the actual costs are entered. *Id.* Inabensa allegedly abused this process by regularly fabricating project costs, allowing it to recognize revenue prematurely. *Id.* Specifically, it entered costs provisions for materials that had not yet been ordered, purchased, or that were not even needed for a particular project. ¶ 71. For example, Inabensa's total cost provisions increased dramatically in November 2013 from €5 million to €25 million,

due in part to an electric transmission project in Kenya in which a cost provision was entered for €11 million in materials, even though the actual expenses were not incurred until 2014. *Id.*

Inabensa's cost provisions decreased to €24 million by August 2014 but again increased dramatically to nearly €58 million in November 2014, due in part to costs provision increases of €14 million, €9 million, and €4 million in an electric transmission project in Ukraine, a second project in Kenya, and a high-speed railway project called the AVE Mecca Medina project between Mecca and Medina in Saudi Arabia, respectively. ¶¶ 6, 71–72. Further, Inabensa did not enter the €58 million into SAP, but instead recorded only €33 million in cost provisions for December 2014. ¶ 72. Accordingly, Inabensa benefitted by prematurely recognizing revenues due to the inflated costs but then reduced those costs at year end to maintain favorable project margins. *Id.* The cycle allegedly continued in 2015 when Inabensa added €5 million in cost provisions for their manufacturing department between April and June. ¶ 73.

While FE7 presumably only worked for Inabensa, FE7 stated that they were "certain" that the fraud occurred in other Abeinsa subsidiaries as well. ¶ 74; Doc. 165-1 at 19–21. FE7's statement is allegedly corroborated by six additional former employees of Abeinsa as described below.

*a. FE1*

FE1 was the former Director of Human Resources at Abeinsa's U.S. subsidiary, Abeinsa EPC, from August 2010 to March 2013, when FE1 resigned due to stress caused by knowing about accounting irregularities. ¶¶ 39, 76. FE1 repeatedly heard from employees in Abeinsa's accounting department that there were two sets of books, one for external auditors and one for internal purposes. *Id.* FE1 learned that Abengoa was inflating project values through an exit interview with Abeinsa's internal auditor, who tendered his letter of resignation to FE1 because

he had been directed to sign off on false financial reports that inflated the value of certain projects. ¶ 114. He claimed that the reports contained false percentages-of-completion and failed to show that some projects were over budget, all misstatements that had allegedly been included to present to banks to obtain larger lines of credit. *Id.* The internal auditor also had expressed his concerns to Abeinsa's Chief Financial Officer ("CFO") Santiago Duran, but Duran told him to "shut the fuck up and just sign" the reports. ¶ 115. The internal auditor believed that it would be illegal for him to sign off on the reports knowing they would be used to obtain credit, so he refused to sign and resigned. *Id.* FE1 approached Duran to discuss the internal auditor's resignation after the exit interview, but Duran said he was too busy to discuss it. ¶ 116. FE1 thus memorialized the exit interview in an email to Duran, copying Abeinsa's Legal Director. *Id.* Duran then told FE1 that the internal auditor could not report his concerns to anyone outside of Abeinsa because he had signed a non-disclosure agreement. *Id.* FE1 learned during leadership meetings that, prior to the resignation of the internal auditor, the reports he refused to sign had been provided to lenders who approved large lines of credit for Abengoa. ¶ 117.

*b. FE2*

FE2 is a former Abengoa employee with broad oversight for accounting and financial reporting at several U.S. subsidiaries. ¶ 40. FE2 confirmed that U.S. subsidiaries maintained a set of books shown to external auditors and a separate set for internal use. ¶ 77. Further, FE2 confirmed that Abeinsa engaged in a pattern of falsifying information in the external books. *Id.* FE2 also was aware of instances in which Abengoa knowingly inflated profits and used those inflated profits to obtain hundreds of millions of dollars in financing. ¶ 78.

*c. FE3*

FE3 was a Senior Staff Accountant at Abengoa's corporate office in Chesterfield, Missouri from June 2013 to July 2014, when FE3 resigned due to concerns about Abengoa's financial reporting. ¶ 41. FE3 was responsible for accounting functions at Abeinsa, including preparing weekly and monthly financial reports for Abengoa's headquarters in Spain and preparing and analyzing cash flow statements. *Id.* FE3 confirmed the use of both SAP software and separate accounting books. ¶ 79. FE3 noted that when the revenue numbers in the internal books were higher than the actual numbers in SAP, FE3 was required to move costs and expenses around in SAP to match the numbers management required. ¶ 81.

*d. FE4*

FE4 worked for Abengoa from 1989 until retirement in March 2016. ¶ 42. FE4 worked as Chief of Critical Projects Follow-Up for Inabensa between 2013 and 2014, and then worked in the Controller Department from 2015 until retirement. *Id.* In his role as Chief of Critical Projects Follow-Up, FE4 was referred issues from project managers and discovered significant accounting irregularities, including the double accounting system with large disparities between them, false expenses, and manipulated accounting entries. *Id.* FE4 discovered during this time that Inabensa's Administration Department was using projects containing inaccurate cost provision information to calculate income data. ¶ 84. FE4 "assumed" based on his experience that the SAP records were later used for external purposes such as audits and investor information. *Id.*

FE4 also confirmed that Inabensa was regularly recognizing expenses prematurely in new projects to inflate project revenues, a practice that FE4 claims he had "no doubts" were coming from Abengoa's senior management. ¶ 88. FE4 described some instances where as soon as a

project was awarded, and especially if the end of the financial year was near, cost provisions would be entered immediately even if purchase orders were not issued and sometimes even if the suppliers had not been identified. ¶ 89. FE4 also confirmed the cost provisions described in FE7's whistleblower letter, including in connection with the Ukraine and Kenya projects, as well as two others in Kuwait. ¶ 90. FE4 stated that these cost provisions were controlled by Inabensa through its Project Control Department and used to improperly increase revenues, which he believes was done intentionally to achieve targets for executive bonuses. ¶ 91.

FE4 also discovered that project managers were using unofficial Excel files to account for projects because Inabensa did not have appropriate software for project managers to control the project progress and forecast. ¶ 85. FE4 confirmed that project manager forecasts differed from the forecasts in SAP, especially in expected final project profit margins, because it was difficult to obtain authority to lower the preset margins. ¶ 86. FE4 alleges that this problem was known by Inabensa's management, who authorized the development and purchase of software in 2014 and 2015 to oversee project follow-up. ¶ 87.

*e. FE5*

FE5 was a communications engineer for Inabensa from 2007 to 2017. ¶ 43. FE5 was assigned to the Controller Department as a project control engineer in April 2015 for the AVE Mecca Medina project. *Id.* FE5 was one of the first employees in that position, which was created to investigate why projects that routinely maintained strong profit margins during the life of their execution suddenly showed heavy losses once completed. *Id.* When starting work on this project, FE5 attempted to access the initial budget for AVE Mecca Medina, but was not able to access the accounting records. ¶ 110. He thus was unable to calculate the true project margin. *Id.* Therefore, two project managers, Juan Angel Sierra Figueroa and Hakan Gok, instructed him

to use a project margin of 21% and to modify costs to arrive at that amount. *Id.* However, FE5 stated that a 21% project margin would be impossible. ¶ 111. The project involved varying prices over the course of several years, and it would require someone to correctly anticipate fluctuations of copper, gasoline, and currency prices for an extended period of time. *Id*. Thus, costs had to be manipulated. *Id.* FE5 ultimately alleges that Abengoa's directors inflated the project margin to overstate the project's viability and improve its percentage-of-completion, resulting in higher revenues and bonuses for directors. *Id*.

FE5 further corroborated FE7's report of widespread accounting fraud. ¶ 92. For example, while reviewing the AVE Mecca Medina project's financial records, he discovered that unrelated expenses had been charged to the project in its first three years totaling €22,265,328. *Id.* In fact, on the first day of the project, an amount of €11,465,328 was charged to the project despite the fact that it was nowhere in the budget and constituted 10% of the contract price. ¶ 112. He claims that transferring unrelated funds in this manner was a widespread practice at Abengoa because it was necessary to hide undeclared losses from prior projects, increase the percentage-of-completion of new projects, and recognize higher revenues. ¶ 93. Further, senior management was necessarily involved because transactions between two subsidiaries require senior management approval. ¶ 133.

This practice of attributing losses from prior projects to new projects created a cycle whereby losses had to continue to be passed on to future projects until Abengoa stopped winning new projects and no longer had the option of passing losses, precipitating its collapse and leading to bankruptcy. *Id.* FE5 further alleges that this fraud was directed by senior management for their financial gain, since their bonuses were based on percentage-of-completion of contracts and project margins. ¶ 94. FE5 alleges that invoices were issued for bonus-related purposes because

they were often issued towards the end of the year to maximize that year's bonus. *Id.* FE5 claims that director-level employees were involved in these efforts because only employees at that level could generate invoices from different Abengoa group companies. *Id*. FE5 was ultimately terminated in 2015. *Id.*

*f. FE6*

FE6 has worked for Canalizaciones Ebro S.L. ("Cebro"), a construction company that contracts with Abengoa, from 2010 to the present as Cebro's managing partner and sole administrator. ¶ 44. FE6 was responsible for negotiating the terms of construction contracts and dealing with representatives of Abengoa. *Id.* Between December 2011 and November 27, 2012, FE6 worked directly with representatives of Abengoa's subsidiary Befesa in relation to a project called the Cunene Water Pipeline project in Angola. *Id.* FE6 was instructed by Abengoa representatives to order equipment and supplies for the project that were not necessary and to commence construction of the pipeline earlier than planned, meaning that the pipeline would eventually have to be reconstructed at a later date after the trenches, which were supposed to be dug first, were dug. ¶¶ 44, 95. FE6 also alleges that throughout the course of the project, Abengoa project managers requested letters confirming the purchase of materials and supplies for use on the pipeline even though those materials were not yet needed or were not needed at all. ¶ 96. Ultimately, Abengoa did not pay Cebro for the work, resulting in Cebro filing civil and criminal complaints against Abengoa for unpaid invoices totaling €1,034,915. ¶ 44. The plaintiffs allege that Abengoa thus improperly recorded at least this amount in project expenses to prematurely recognize revenue. ¶ 97.

*3. Allegations from Forensic Analysis*

After filing for bankruptcy in 2016, as discussed further below, Abengoa's new and current president Gonzalo Urquijo commissioned the accounting firm Klynveld Peat Marwick Goerdeler ("KPMG") to conduct a forensic analysis of Abengoa for the years 2012 through 2016. ¶ 99. KPMG reviewed Abengoa's internal emails and documents, including internal emails from Abengoa's former Executive Chairman Felipe Benjumea Llorente ("Benjumea"), a member of Abengoa's founding family. ¶¶ 4, 33, 100. KPMG concluded that accounting fraud had occurred at Abengoa at the direction of Benjumea. ¶ 99. Specifically, the KPMG report identified emails between Benjumea and other executives showing Benjumea's role in a widespread corporate scheme to artificially inflate project margins and percentages of completion. ¶ 100.

KPMG also found that Abeinsa manipulated the revenue in its financial statements by altering project margins, fraudulently recording €15 million by inflating project margins from 21% to 35%, and by fraudulently advancing percentages of completion between 2012 and 2013. ¶ 101. Further, KPMG found €6.1 million worth of invoices "without economic substance" charged to the AVE Mecca Medina project. ¶ 102.

Further, KPMG determined that Abengoa used a process called "invoice triangulation"[7] to inflate Inabensa's earnings for 2012 to €50 million. ¶ 103. Specifically, on August 10, 2012, Julio Artillo, Inabensa's former Administration Department Director, suggested that Abengoa use Inabensa Turkey to record the purchase of certain supplies that year, even though the shipment of those supplies would not occur until 2013. ¶ 104. He also suggested using

[7] Invoice triangulation is a practice "whereby unrelated expenses were oftentimes transferred to new projects to 'hid[e] undeclared losses from prior projects, increas[e] the percentage-of-completion of new projects[,] and recogniz[e] higher revenues for Abengoa.'" Doc. 199 at 15 (internal citation omitted).

additional projects, including AVE Mecca Medina, the Brazil and Peru power line projects, and three solar thermal power plant projects in the U.S. and Spain to record nonexistent costs. *Id.* Benjumea replied to Artillo's email on August 11, 2012 directing him to also book costs against the Peru power line project. ¶ 105. Artillo later circulated, in an email with the subject line "Triangulation Turkey," a final list of projects to be used in the triangulation plan on September 20, 2012, and stated that the proposed expenses would allow Inabensa to raise its margin for 2012 to €53 million. ¶ 106. The projects he proposed included AVE Mecca Medina, Inabensa Turkey, a solar mirrors project in South Africa, the Zapotillo, Mexico aqueduct project, two desalination plant projects in Algeria and Ghana, and a wind turbine project in Brazil. *Id.* The email was sent to Benjumea as well as senior managers of Abeinsa and Teyma, Abengoa's Uruguayan subsidiary. ¶ 106. Benjumea replied on September 21, 2012 with his authorization to proceed. ¶ 107. In the email, he further stated that "Everyone that is copied here must comply with my instructions." *Id.* He concluded the email by telling José Domínguez Abascal, Abengoa's then-general secretary, that for triangulation, he needed Solar Frame, the Indian engineering firm that was finalizing its proposal for the South Africa project, "to solve this urgently." *Id.* It is unclear what "solve this" meant, but KPMG's report indicated that Abascal was attempting to incorporate Solar Frame into the triangulation scheme. *Id.*

The plaintiffs argue that the above exchanges illustrate and corroborate the accounting fraud described in FE7's letter by demonstrating that Abengoa senior leadership "instituted, facilitated, and even required systemic accounting fraud throughout the organization" and that the fraud was used to artificially inflate Abengoa's revenue and project profit margins. ¶ 108.

*4. Arbitration Against Spain*

The plaintiffs allege that Abengoa hid an additional €840 million in losses from its solar plant operations that should have accrued in 2013 that were lost due to changes in Spain's clean energy reform laws. ¶ 118. Abengoa entered into private arbitration against Spain in June 2013 to recover these losses but never disclosed the losses to the public. ¶¶ 118–19.

*5. The Offering*

On October 4, 2013, in preparation for Abengoa's public offering on the NASDAQ, Abengoa filed a registration statement with the SEC on Form F-1, including a preliminary prospectus. ¶ 123. The Underwriter Defendants helped draft and disseminate the forms, and Ortega and Hansmeyer signed them. ¶¶ 28, 219. On October 17, 2013, Abengoa filed a final prospectus (the "Prospectus") with the SEC. ¶ 125.[8] That same day, the company went public in the United States and began selling its ADSs on the NASDAQ exchange. ¶ 126.

Under the "Title of Each Class of Securities to be Registered," the Form F-1 lists one category of security: "Class B shares . . . ." Doc. 231-2 at 3.[9] On that same page, in a footnote, the Form F-1 states "American depositary shares evidenced by American depositary receipts issuable upon deposit of the Class B shares registered hereby are being registered pursuant to a separate registration statement on Form F-6 . . . Each American depositary share represents five Class B shares." *Id.*[10]

---

[8] Both the preliminary and final prospectuses are materially similar for purposes of the instant motion. *Compare* Doc. 231-2 (the preliminary prospectus) *with* 231-1 (the final prospectus). Accordingly, unless otherwise stated, this opinion cites the final prospectus.

[9] Though the Form F-1 was not attached to the complaint, it is incorporated by reference.

[10] On October 7, 2013, Abengoa filed a registration statement with the SEC on form F-6, which purported to register "American Depositary shares, each representing five (5) Class B Shares of Abengoa, S.A." Doc. 216-3. This document is not attached to the complaint nor incorporated by reference in the complaint; however the Underwriter Defendants attach it to their motion, and the Court can take judicial notice of SEC filings. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991).

The Prospectus provides explicit information, not only about the Class B shares, but also about the ADSs. Doc. 231-1. Plaintiffs state, and Defendants do not dispute, that the Form F-1 and Prospectus together mention ADSs "over 1000 times." *See* Doc. 230 at 25. For example, the first page of the Prospectus begins with the heading "250,000,000 Class B Shares (either in the form of shares or American Depositary Shares) €1.80 per Class B share and $12.18 per ADS." Doc. 231-1 at 2; *see also id.* at 30 ("We are offering 250,000,000 Class B shares in the form of shares or American Depositary Shares, or ADSs, as described below, in the offering"). Additionally, the Prospectus has a section which enumerates the "[r]isks related to ownership of the ADSs and Class B shares." *Id.* at 68.

Further, in the "Where You Can Find More Information" section, the Prospectus reads:

> We have filed with the SEC a registration statement on Form F-1, including relevant exhibits and schedules, under the Securities Act covering the Class B shares and ADSs to be sold in this offering. A related registration statement on Form F-6 has been filed to register the issuance of the ADSs. This prospectus, which constitutes a part of the registration statement on Form F-1, summarizes material provisions of contracts and other documents that we refer to in the prospectus. Since this prospectus does not contain all of the information contained in the registration statement, you should read the registration statement on Form F-1 and its exhibits and schedules for further information with respect to us and our Class B shares and ADSs.

*Id.* at 372.

As relevant to Plaintiffs' allegations of misstatements, the Prospectus contained the following language regarding its operations for financing construction projects:[11]

> **Revenue from construction contracts is recognized using the percentage-of-completion method for contracts whose outcome can be reliably estimated and it is probable that they will be profitable.** When the outcome of a construction contract cannot be reliably estimated, revenue is recognized only to the extent it is probable that contract costs incurred will be recoverable.

[11] The Prospectus also included language concerning Abengoa's "strict financial discipline," and "robust project management and control system"; however this Court found those alleged misstatements inactionable in the August 2022 Order, which the Second Circuit affirmed in its October 2025 decision. ¶ 197, Doc. 195 at 36–37, Doc. 199 at 25–26. Accordingly, that part of the Prospectus is excluded from this section.

> As described in Note 2.26.b) to our Annual Consolidated Financial Statements and our Interim Consolidated Financial Statements, **the percentage of completion is determined at the date of every consolidated statement of financial position based on the actual costs incurred as a percentage of total estimated costs for the entire contract.**
>
> Revenue recognition using the percentage-of-completion method involves the use of estimates of certain key elements of the construction contracts, such as total estimated contract costs, allowances or provisions related to the contract, period of execution of the contract and recoverability of the claims. . .
>
> Nevertheless, given the highly tailored characteristics of the construction contracts, most of the estimates are unique to the specific facts and circumstances of each contract.
>
> When the outcome of a construction contract can be reliably estimated and it is probable that it will be profitable, revenue from the contract is recognized over the term of the contract. When it is probable that the costs of the project will be greater than its revenue, expected loss is recognized immediately as an expense. To determine the appropriate amount of revenue to be recognized in any period, the percentage of completion method is applied. The percentage of completion method considers, at the date of the Statement of Financial Position, the actual costs incurred as a percentage of total estimated costs for the entire contract. **Costs incurred in the period which relate to future project activities are not included when determining the percentage of completion.**

¶ 197 (emphasis in TAC).

Abengoa realized €517.5 million in gross proceeds, or roughly $703.8 million at the time of the October 17, 2013 offering. ¶ 127. Abengoa represented that it intended to use the proceeds from the offering to repay €347 million in corporate debt maturities due in 2013 as well as to reinforce its liquidity position and strengthen its balance sheets. ¶ 128.

*6. Continued Fraud*

Several of the former employees allege that fraud continued after the offering. For example, according to FE5, in November 2013, Inabensa Turkey invoiced €3.8 million of copper wire to Inabensa Saudi for the AVE Mecca Medina project even though Turkey was not involved in the project and the wire was not needed until 2014. ¶ 132. When the wire was finally needed in December 2014, Inabensa Saudi cancelled the invoice, meaning Abengoa had recorded the

expense as incurred for two years even though they were not effectively purchased until 2014. *Id.* Further, FE5 discovered false invoices from Nicsa dated December 30 and 31, 2013 totaling €7 million even though Nicsa had not done any work or provided supplies on the project. ¶ 133. Employees regularly referred separately to "cash flow with Nicsa" and "cash flow without Nicsa" to separately calculate Inabensa's cash flow with and without the Nicsa invoices. ¶ 134.

FE5 also identified invoices that were accepted in 2014 but were altered to extend the payment deadlines for years. ¶ 135. He also alleges Abengoa manipulated cash flow by entering invoices for lower amounts or not entering some at all. *Id.* As one example, an invoice for over 9 million Saudi Riyals was entered for only one-to-two million in SAP. *Id.* This practice allowed Abengoa to report either an improved cash flow or to prevent a negative cash flow. *Id.*

FE1 alleges that fraud continued in the form of training managers to reject supplier invoices to intentionally delay payment and increase its cash position, since rejected invoices could not be resubmitted for 30 days. ¶ 136. Indeed, one employee at Abeinsa was nicknamed "The Rejecter." *Id.* FE6 similarly recalled this technique of rejecting invoices, in particular on a water pipeline project where invoices were rejected "without clear explanations" so that they had to be resubmitted. ¶ 139. FE1 and FE6 also allege that Abengoa routinely refused to pay contractors, forcing them to file liens and settle their claims in arbitration for "pennies on the dollar." ¶¶ 138–39. FE3 further alleges that Abengoa created an intentionally slow and cumbersome process for invoice approval which often took months to complete in order to artificially inflate its cash and preserve its cash flow. ¶ 137.

The plaintiffs also allege that Abengoa falsified its 2014 financial statement by artificially increasing its project margin for a cogeneration plant project in Mexico by 14.7%. ¶ 142. This increase resulted in Abengoa overreporting its operating profit in 2014 by €218 million. *Id.*

Further, Abengoa allegedly concealed €500 million in bond debt issued by Abengoa Greenfield on September 30, 2014, as well as €700 million in debt from a syndicated loan issued the same day. ¶ 143. Abengoa also cancelled a €500 million syndicated loan on December 31, 2014, only to renew it two days later on January 2, 2015. ¶ 144. The plaintiffs suggest that Abengoa hid these debts to avoid breaching a covenant with its lenders whereby the lenders could demand immediate repayment, throwing Abengoa into bankruptcy, should Abengoa exceed a certain leverage ratio. ¶ 143.

The plaintiffs further allege that an audit conducted by an outside audit firm, Silva & Asociados, revealed significant losses during the course of 2014 that were not disclosed, including in particular, losses from two subsidiaries, Abengoa Solar, S.A., and Abengoa Bioenergia, S.A, totaling €1,246,000. ¶¶ 140–41. The audit report stated that portfolio losses that were accounted for in 2015 and 2016 should have been recognized as early as 2014, and instead were deliberately hidden to misrepresent their financial status to investors. *Id.* The plaintiffs allege that these two subsidiaries thus improperly received equity loans from Abengoa totaling €951,000,000 in 2015 as an attempt to avoid legal dissolution and liquidation. ¶ 141. Further, plaintiffs allege that because Abengoa Solar and Bioenergia were both impaired to "zero Euros" in 2015 (meaning that their market value was zero), the subsidiaries of those companies also should have been impaired to zero. *Id.* However, Abengoa's 2015 financial statement stated that the subsidiaries had a value of over €2.8 billion and reported loans granted to the subsidiaries totaling over €2.5 billion, which could not be fully repaid and should have been impaired accordingly. *Id.* Instead, Abengoa did not impair the values and thus concealed the losses from the market. *Id.*

*7. The Greenfield Bonds*

At strategy update meetings on September 3 and 4, 2014, Abengoa announced that the company was transitioning to an "asset-light" business model called "Abengoa 3.0," aimed at generating cash throughout the lifecycle of construction projects. ¶ 147. This was due in part to investors' concerns about Abengoa's balance sheet. *Id.* To achieve the "asset-light" model, Abengoa would create a subsidiary—Abengoa Greenfield, S.A.—which would then secure short-term "bridge" financing from Abengoa's external partners for the beginning stages of new projects. *Id.* Completed projects would be sold to Abengoa Yield, a "yieldco" that is a separate business that owns and operates power plants and other energy-related assets to produce a steady flow of income. ¶ 148; Doc. 88 ¶ 122 n.2. Abengoa would then reinvest a portion of those proceeds in new projects via Abengoa Greenfield. ¶ 148. Analysts and investors were optimistic about the new model. *Id.*

On September 22, 2014, Abengoa announced that Abengoa Greenfield would issue €500 million in bonds (the "Greenfield Bonds"). ¶ 149. Abengoa represented that the company would secure the bonds, and that it intended to classify the bonds as corporate recourse debt[12] upon issuance. ¶ 274. Abengoa would use the proceeds from the offering to finance certain projects "until the long-term funds associated with those projects are obtained," while "optimizing financial costs." ¶ 335. The bonds were offered in two tranches (one in euros and one in U.S. dollars), both set to mature in 2019. ¶ 149. The offering closed on September 30, 2014. *Id.*

---

[12] Abengoa used two types of debt: recourse debt and non-recourse debt. Doc. 88 ¶ 43. Recourse debt—also referred to as "corporate debt"—was guaranteed by Abengoa. *Id*. Non-recourse debt, which was used to finance specific projects, was guaranteed by the assets and cash flows of the "project companies" formed to carry out those projects. *Id.* In other words, non-recourse debt was not secured by Abengoa in the event of a default. *Id.* The company's recourse debt was subject to a debt ratio covenant with its lenders. *Id.* ¶ 44. Pursuant to the covenant, Abengoa was required to maintain a "leverage" ratio of debt-to-earnings before interest, taxes, depreciation and amortization below 3.0x until December 30, 2014, and below 2.5x thereafter. *Id.* ¶¶ 3, 44.

*8. 2014 Disclosures*

Throughout 2014, Abengoa made a series of disclosures related to its debt characterization and other practices. On November 12, 2014, Abengoa announced its financial results for the nine months ending on September 30, 2014. ¶ 270. Abengoa reported that its EBITDA had risen 24% year-over-year, and that its corporate leverage ratio was 2.1x, a .4x reduction from the previous quarter. *Id.* In a conference call with analysts later that day, Sanchez Ortega reiterated optimism about the company's cash flow and liquidity. ¶¶ 270, 272.

During the call, an HSBC analyst sought clarification with regards to the Greenfield Bonds, noting that they did not seem to be included in Abengoa's reported corporate leverage ratio. ¶ 275. Bárbara Zubiría Furest ("Zubiría"), Abengoa's Co-Chief Financial Officer ("CFO") and Executive Vice President of Capital Markets and Investor Relations since January 2011, ¶ 36, then revealed that Abengoa had classified the Greenfield Bonds as non-recourse debt, under the category "nonrecourse financing in process," which was excluded from the corporate leverage ratio. ¶ 275. Analysts and investors criticized the categorization decision, and the price of Abengoa ADSs fell nearly 50% over the next three trading days. ¶¶ 352–53.

Abengoa held another call on Monday, November 17, 2014 in which it revealed that it accounted a total of €1.595 billion (including the €500 million Greenfield Bonds) as "non-recourse debt in process," excluding it from the corporate leverage ratio even though it was guaranteed by Abengoa. ¶ 279. After including this category of debt, Abengoa's corporate leverage ratio was 3.9x. ¶ 280. Zubiría also disclosed that Abengoa did not include as debt €1 billion of cash linked to supplier payments that was set aside on collateral accounts. *Id.* However, Sanchez Ortega and Zubiría continued to highlight Abengoa's sound liquidity position. ¶ 281. Zubiría resigned from her position two months later, on January 19, 2015. ¶ 36.

*9. Subsequent Reports and Transactions*

On February 23, 2015, Abengoa issued a press release announcing its financial results for the full year of 2014 and also filed its annual report with the SEC on Form 20-F. ¶¶ 293–94. The 20-F was signed and certified pursuant to the Sarbanes-Oxley Act by Sanchez Ortega and stated in relevant part:

> I, Manuel Sánchez Ortega . . . certify that:
>
> 1. I have reviewed this annual report on Form 20-F of the Company;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;
>
> 4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the Company . . .; and
>
> 5. The Company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of Company's board of directors (or persons performing the equivalent function):
>
> > (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and
> >
> > (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

¶ 294. At a subsequent conference call on the same day, representatives spoke favorably of Abengoa's cash flow and liquidity. ¶ 300 ("That leaves us in an excellent position to face our operational and financial needs."); *see also* ¶ 299 (the 20-F, stating "[b]ased on our current level

of operations, we believe our cash flow from operations, available cash and available borrowings under our credit facilities will be adequate to meet our future liquidity needs for at least twelve months.”).

Throughout the beginning of 2015, Abengoa continued to report healthy levels of liquidity and positive cash flow. ¶¶ 285–88, 304–05, 310–13. Despite these assurances, on May 8, 2015, Abengoa borrowed 95 million Class B shares from its majority shareholder, worth approximately €275 million. ¶ 338. That same day, Abengoa agreed to subscribe to 51% of a $670 million capital increase announced by Abengoa Yield to fund the acquisition of four solar power assets. *Id.* On May 14, 2015, Abengoa announced its financial results for the quarter ending March 31, 2015, reporting a corporate leverage ratio of 1.5x and emphasizing its liquidity position and cash flow. ¶¶ 310–14

Sanchez Ortega resigned from his position as CEO shortly after on May 19, 2015. ¶ 339. Sanchez Ortega remained in his role as non-executive First Vice Chairman of the Board of Directors and a member of Abengoa’s International Advisory Board. ¶ 25. Santiago Seage replaced Sanchez Ortega as CEO of Abengoa. ¶ 35.

On June 29, 2015, Abengoa entered into a margin loan facility agreement with a financial institution whereby an Abengoa subsidiary could borrow up to $200 million. ¶ 340. Abengoa posted a 14% stake in Abengoa Yield as collateral. *Id.* On July 16, 2015, Abengoa announced that it had sold all of its Class B shares in treasury stock to raise €97.6 million. ¶ 341.

For the first time on July 31, 2015, Abengoa hinted at financial troubles during a conference call following a press release that announced guidance concerning a reduction in corporate free cash flow and plans to divest €400 million worth of assets. ¶ 357. However, company executives continued to represent that Abengoa was in an adequate liquidity position.

¶¶ 357–58. Seage stated on the call that it had "no plan . . . to tap the capital markets in any manner." ¶ 358.

Yet, the very next business day, on Monday, August 3, 2015, Abengoa announced that it was doing just that, seeking shareholder approval of a capital increase with preemptive rights of €650 million and asset divestitures totaling €500 million. ¶ 160. The company stated that these "significant actions" were necessary to "reduce corporate debt" and "reinforce [Abengoa's] balance sheet." ¶ 359. The plaintiffs allege that analysts and investors were "stunned," citing to reports and articles by Canaccord Genuity, Citi, and Bloomberg. ¶¶ 361–64. The price of Abengoa's ADSs fell nearly 30%, from a closing price of $11.06 per share on July 31, 2015 to $7.75 per share on August 3, 2015. ¶ 365. The price fell an additional $1.75 per share the following trading day, resulting in losses of $8.1 billion in market capitalization and approximately $837 million in ADS market share. *Id.*

*10. Bankruptcy*

On November 8, 2015, Abengoa announced that Gonvarri Corporación Financiera, a Spanish investment firm, had agreed to invest €350 million in connection with Abengoa's planned capital increase. ¶ 162. However, just a couple of weeks later, on November 25, 2015, it announced that Gonvarri cancelled that agreement. ¶ 163. That same day, Abengoa announced that it was filing for preliminary creditor protection under the Spanish Insolvency Law, which allowed it four months to reach an agreement with its creditors. *Id.* Seage resigned from his position as CEO of Abengoa on November 27, 2015. ¶ 165. Between February 24, 2016 and April 7, 2016, dozens of Abengoa's U.S.-based affiliates filed for Chapter 11 bankruptcy protection. ¶ 171.

On March 10, 2016, Abengoa announced that it had reached a preliminary debt-restructuring agreement with its creditors. ¶ 167. On March 28, 2016, Abengoa filed for bankruptcy protection pursuant to Chapter 15 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. ¶ 168. The Mercantile Court of Seville no. 2 (the "Spanish Bankruptcy Court") approved the agreement between Abengoa and its creditors on April 6, 2016, allowing it seven months to restructure. ¶ 169. The Delaware Bankruptcy Court recognized the Spanish Bankruptcy Court's decision as the controlling proceeding pursuant to 11 U.S.C. § 1517, and gave effect in the U.S. to the seven-month standstill agreement. ¶ 170. Abengoa's ADSs and Class B shares were delisted from the NASDAQ on April 28, 2016. *Id.* The bankruptcy proceedings in Spain and the U.S. ultimately concluded on August 22, 2019, and Abengoa now operates in accordance with its approved plan of reorganization. ¶ 172.

*11. Charges Filed Against Senior Leadership*

Following Abengoa's filing for bankruptcy, investors filed civil and criminal charges against Abengoa and certain officers, directors, and subsidiaries in Spain. ¶ 173. Two of the actions focus on the accounting fraud alleged in the TAC (together, the "Spanish Criminal Proceedings"). *Id.*

Investors filed a criminal complaint in Spain against Sanchez Ortega and Benjumea on March 22, 2016 for corporate crime and misrepresentation in capital investment of stock markets. ¶ 180. The Public Prosecutor's Office supported the prosecution, which was before the National Court in Madrid, a court with jurisdiction over "particularly severe crimes." *Id*. The court granted a motion to add the following parties as defendants on February 2, 2020: Abengoa, two members of its Audit Committee (Mercedes Gracia Diez and Alicia Velarde Valiente), Abengoa's auditor Deloitte S.L., and Don Manual Arranz Alonso, the Deloitte partner

responsible for the audit. ¶¶ 182, 185. In granting the motion, the National Court held that there was sufficient evidence to show that the additional defendants had committed "some type of criminal offense," and, in particular, a report filed by two financial consulting firms showed that there was evidence of "systematic concealment of substantial losses of . . . assets, as well as the inclusion of insufficiently accredited certifications that indicate a visible misrepresentation of the reality of the entity's economic and financial situation." ¶ 186. The report noted losses accounted for in 2015 and 2016 that should have been recorded since at least 2014. *Id.*

Investors filed a separate action against Abeinsa and Inabensa in Seville in June 2018, alleging crimes of accounting fraud and misrepresentation. ¶ 188. The investigating judge reviewed FE7's letter, testimony from FE4 and FE5, internal emails, and a forensic report from KPMG, among other things, all of which described systematic falsification of business records in Abeinsa and Inabensa. ¶ 189. In June 2020, the case was elevated to the National Court, the same court in Madrid overseeing the criminal claims against Abengoa. ¶ 190. In November 2020, the National Court declined the Seville Court's request to elevate the case and sent the action back to Seville in early 2021. *See* Doc. 213-5 at 3.

*12. Sanctions Against Deloitte*

While the Spanish Criminal Proceedings were ongoing, on February 28, 2018, Spain's top corporate financial accounting regulator, the Institute of Accounting and Auditing of Accounts ("ICAC"), sanctioned Deloitte S.L., Abengoa's independent auditor, in connection with its audit of Abengoa's 2014 financial statements. ¶ 192. ICAC found that Deloitte did not verify the accuracy of Abengoa's engineering and construction income in 2014, did not verify the accuracy of Abengoa's project margin estimates or costs, certified Abengoa's 2014 financial statements even though it knew they contained material inaccuracies, and "reprehensibl[y]"

approved Abengoa's decision to classify €1.2 billion of debt as non-recourse debt. ¶¶ 193–94. The plaintiffs allege that these sanctions further demonstrate that Abengoa was "rife with fraud," particularly by senior management who acted with impunity and without fear of repercussions due to the lack of oversight from their auditor, Deloitte. ¶ 195.

*13. Dismissals of the Spanish Criminal Proceedings*

More than five years after the initial complaint was filed, on July 26, 2023, the Seville Court dismissed the criminal action finding insufficient evidence to establish criminal liability for the alleged fraud in connection with the AVE Mecca Medina project. *See* Doc. 213-5 at 11 ("The Court has found, after a rigorous procedure of study and analysis of all the necessary information, that there are no indications of criminality."). In doing so, the Seville Court explicitly cast doubt upon the reliability of the KPMG report and instead credited a separate expert report. *Id.* at 5–6 (finding that the KPMG report was made "without the necessary documentation, cannot be considered to yield serious and rigorous conclusions . . ."); *id.* at 7 (finding a separate expert report "much more serious and rigorous" than the KPMG report); *id.* at 9 (crediting the separate expert report which found that "[t]here is no evidence of criminality that justifies the indictment . . .").

More than nine years after the initial complaint was filed, on July 31, 2025, the National Court dismissed the criminal action because the plaintiffs had not produced evidence to demonstrate criminal wrongdoing. Doc. 213-2 at 26 ("[I]t is evident that the commission of the crimes under investigation in the present proceedings is not duly justified, since the facts under investigation, which have given rise to the formation of the case, do not meet the necessary requirements, demanded by the Criminal Code").

In reaching its decision, the National Court ultimately adopted the Public Prosecutor's Office report which credited court-appointed experts who, *inter alia*, found no evidence that Abengoa's Board of Directors knew about a lack of liquidity prior to July 2015 and cast doubt upon the reliability of certain evidence presented by plaintiffs, including the ICAC report. *See e.g.* Doc. 213-2 at 23–24 (adopting the Public Prosecutor's report, which stated "[s]everal issues are raised by the plaintiffs to support this claim of falsification, which we believe have been resolved in the negative by the court experts: . . . Regarding the overvaluation of solar thermal power plants in Spain. In the opinion of the court-appointed expert, no such thing existed . . . The revenues recognized by Abengoa corresponding to the Engineering and Construction activity are based on a reasonable criterion as referred to in international standards . . . [T]he Prosecutor considers that there is insufficient evidence to conclude that this relevant information has been falsified, presenting a distorted image of the financial product, which could deceive the investor and induce them to make decisions they would not have made had they possessed reliable information"); *id.* at 19 (expert finding that "[n]o evidence has been found that the Board of Directors had information on the exact amount of the adjustments or that it was aware of the lack of liquidity that threatened the company before July [2015]"); *id.* at 20 (expert finding that "[n]o evidence has been found in the financial statements and other accounting documents of statements that overemphasized the profitability of renewable projects.")

On October 28, 2025, the National Court dismissed two separate appeals, and in doing so affirmed the reasoning of the July 31, 2025 dismissal. Docs. 213-3, 213-4; *see e.g.* Doc. 213-3 at 35 ("Furthermore, with the first expert mentioned, we must agree that Abengoa's accounting records were carried out in accordance with applicable regulations, reflecting a true and fair view of the company; and with the second expert, we agree that the ICAC's sanctioning resolution

does not question whether Abengoa's consolidated annual accounts cease to express a true and fair view of the entity."); *id.* ("Indeed, the determination shown by the judicial experts means that we cannot conceive, even indicatively, any supposedly criminal aspects in the conduct of the defendants."); Doc. 213-4 at 53 ("After this review of the appeal brief, comparing it with the reports of the two court experts and the arguments expressed by the Examining Judge and the Public Prosecutor's Office, the conclusion we draw is to reject the incriminating argument of the appellant and the parties adhering to it, given the conclusive opinions of those experts regarding the fact that Abengoa's accounts accurately reflected the true and fair view of the company, without any evidence of falsification of the accounts.").

**B. Procedural Background**

The Court assumes familiarity with the procedural background detailed in the August 21, 2020 Opinion dismissing the Second Amended Complaint ("SAC"), the September 10, 2020 Opinion granting leave to file the TAC, and the August 2022 Opinion dismissing the TAC. Docs. 139, 164, 195.

In the August 2022 Opinion, the Court dismissed all claims in the TAC with prejudice. With respect to Plaintiffs' Securities Act Section 11 claims against Abengoa, Sanchez Ortega, the Underwriter Defendants, and Hansmeyer, the Court found the claims untimely and found that they failed to state a claim. Doc. 195 at 29–46**.** In finding that the Plaintiffs failed to state a Section 11 claim, the Court found that, of the alleged misstatements made in the registration statement, only Defendants' statements about the percentage-of-completion accounting method was actionable; that the testimony of the former employees, save FE3, would not be considered as their allegations were not sufficiently particular; and that overall Plaintiffs had failed to allege the falsity of the alleged "percentage of completion" misstatements. *Id.* at 36–46. The Court

dismissed Plaintiffs' Securities Act Section 15 claim against Sanchez Ortega and Hansmeyer because it depended on the success of Plaintiff's Section 11 claim. *Id.* at 46–47.

Finally, the Court dismissed Plaintiffs' Exchange Act claims against Abengoa and Sanchez Ortega. The Court found that Plaintiffs failed to allege any misstatements in their offering documents or subsequent statements, in part because the Court had already found that Plaintiffs failed to allege the existence of an accounting fraud scheme, and that Plaintiffs failed to allege scienter as both Abengoa and Sanchez Ortega. *Id.* at 47–55.[13] As the Court had already granted Plaintiffs leave to amend the SAC, the Court denied all Plaintiffs' TAC claims with prejudice. *Id.* at 55–56.

On September 29, 2022, Plaintiffs filed a notice of appeal of the August 2022 Opinion to the Second Circuit. Doc. 197. On October 6, 2025, the Second Circuit affirmed in part, reversed in part, and vacated in part (the "Second Circuit Decision").[14] Docs. 198, 199. First, the Second Circuit reversed the dismissal of Plaintiffs' Section 11 claims. Doc. 199 at 20–38. In doing so, the Second Circuit held that Plaintiffs filed the Section 11 claim within the relevant statute of limitations and had stated a Section 11 claim. *Id.* at 20–38. With respect to the latter, the Second Circuit agreed that the only actionable misstatement in Abengoa's offering materials concerned the percentage-of-completion method; however, it also found that this Court erred by not crediting the confidential witnesses and by not considering factual allegations based on proceedings in the Spanish Courts; and that Plaintiffs plausibly alleged falsity of its percentage-of-completion accounting statements. *Id.* at 24–38.

[13] The Court declined to address arguments concerning loss causation because "the plaintiffs' failure to adequately plead either scienter or a misstatement or omission is dispositive." Doc 195 at 55.

[14] The Second Circuit's mandate issued on October 29, 2025. Doc. 199.

The Second Circuit vacated the dismissal of Plaintiff's Section 15 claims against Sanchez Ortega, because the dismissal was premised on the dismissal of the Section 11 claims. *Id.* at 38.

The Second Circuit also vacated the dismissal of Plaintiffs' Exchange Act claims against Abengoa because it was premised on the dismissal of Plaintiffs' failure to allege an underlying fraud scheme and this Court did not consider the confidential witnesses and Spanish criminal proceedings. *Id.* at 38–40. Finally, the Second Circuit affirmed the denial of leave to amend the Exchange Act claims against Sanchez Ortega, as such amendments would be futile. *Id.* at 40–41.

After the Second Circuit mandate issued, the parties appeared before this Court for a conference on November 12, 2025, at which the defendants were granted leave to file motions to dismiss. Before the Court are three motions to dismiss the TAC, filed by Abengoa, Doc. 211, Sanchez Ortega, Doc. 217, and the Underwriter defendants, Doc. 214.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing

*Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

**B. Rule 9(b)**

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007). A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") by stating the circumstances constituting fraud with particularity. *See, e.g., ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs*, 551 U.S. at 320–21). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004) (quoting Fed. R. Civ. P. 9(b)) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'").

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g., Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170). Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)). The PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth

the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also Slayton v. American Express, Co*., 604 F.3d 758, 766 (2d Cir. 2010). Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174.

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Securities Litigation*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd,* 604 F. App'x 62 (2d Cir. 2015) (citing *ECA*, 553 F.3d at 196).

## III. DISCUSSION

### A. Section 11 of the Securities Act

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." *In re Morgan Stanley Information Fund Securities Litigation*, 592 F.3d 347, 358 (2d Cir. 2010). Defendants argue that Plaintiffs' Section 11 claims should be dismissed as to all defendants because: (1) the Spanish Criminal Proceedings were dismissed, their dismissal allows the Court to ignore allegations in the TAC premised upon those proceedings, and absent those allegations Plaintiffs fail to state a claim; (2) the ADSs that Plaintiffs purchased are not traceable to October 2013 offering nor to the registration statement with the alleged misstatements; (3) negative causation is apparent from the face of the complaint;

and (4) principles of comity suggest that dismissal is appropriate given the ongoing liquidation of Abengoa in the Seville Court. Further, Sanchez Ortega argues that the Section 11 claims against him should be dismissed because Section 11 requires a showing of scienter, which Plaintiffs cannot demonstrate.

*1. Conclusion of the Spanish Criminal Proceedings*

Defendants argue that the Second Circuit found that Plaintiffs successfully stated a Section 11 claim because it credited allegations based upon then in-progress Spanish Criminal Proceedings; and given that those same proceedings have since been dismissed, this Court should re-evaluate whether Plaintiffs state a Section 11 claim. Doc. 212 at 11–24. Specifically, Defendants argue that the dismissals explicitly cast doubt on evidence relied on in the TAC, and that "absent the imprimatur of reliability" from the Spanish Criminal Proceedings, the KPMG report, the ICAC resolution, and the confidential witness statements "should not be accorded undue weight." *Id.* at 21. Accordingly, they argue that Plaintiffs fail to demonstrate any of Abengoa's statements were false or misleading. *Id.* at 22.

Meanwhile, Plaintiffs argue that Defendants cannot relitigate what is already law-of-the-case after the Second Circuit decision; that the Spanish Criminal Proceedings were evaluated pursuant to the criminal beyond reasonable doubt standard, rather than the preponderance of evidence standard that would govern this civil case at trial; that even without the support of the Spanish Criminal Proceedings, the TAC states a Section 11 claim; and that the dismissal of the Spanish Criminal Proceedings creates a factual issue not appropriate to address at a motion to dismiss. Doc. 226 at 16–22.

The Court first addresses two preliminary matters: external materials and law of the case. In support of their arguments, Defendants attach certified English translations of the Seville

Court's July 26, 2023 order dismissing the Seville criminal action; the National Court's January 14, 2025 decision accepting two expert reports; the National Court's July 31, 2025 order dismissing the National Court criminal action; and the two National Court orders issued on October 28, 2025 dismissing appeals of the July 31, 2025 order. *See* Docs. 213-2, 213-3, 213-4, 213-5, 213-6. "A court may properly take judicial notice of a foreign court decision, including to establish the facts of the litigation and the opinions stated therein, without assuming their truth." *MCGM*, *GmbH v. OPTA Group. LLC*, No. 22-CV-5851 (PKC), 2024 WL 1250629, at *3 (S.D.N.Y. Mar. 21, 2024), *aff'd*, No. 24-1061-CV, 2025 WL 262589 (2d Cir. Jan. 22, 2025) (citing *Ermini v. Vittori*, 758 F.3d 153, 156 n.2 (2d Cir. 2014)); *see* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). The Court takes judicial notice of each of the attached decisions in the Spanish Criminal Proceedings, not for their truth, but to establish the outcome and opinions therein.

In support of their opposition to Abengoa's motion to dismiss, Plaintiffs attach the "Legal Opinion" of José Ángel Torres Lana and Ana Isabel Serrano Esteban entitled "Analysis of Spanish Civil and Criminal Legal Standards in the Context of the Abengoa Proceedings." Docs. 227–28. The report explains the interplay between criminal and civil proceedings in Spain; states that provisional dismissals, as in the Spanish Criminal Proceedings, are done without *res judicata* effect; and analyzes the dismissals' effect on Abengoa's potential civil liability under Spanish law. *See* Docs. 227 ¶ 4; 228 ¶ 5.

Generally, "plaintiffs' reliance on an expert declaration at the motion to dismiss stage is improper." *Boyette v. Montefiore Medical Center.,* No. 22-CV-5280 (JGK), 2023 WL 7612391, at *7 (S.D.N.Y. Nov. 13, 2023); *see Pyatt v. Raymond*, 462 F. App'x 22, 24 (2d Cir. 2012), *as*

*amended* (Feb. 9, 2012) (affirming the district court's decision to not to examine materials attached to a plaintiff's opposition to defendants' motion to dismiss because, "[t]hese documents (lyric sheets and expert reports regarding subsequently registered works) were not attached to or integrated into the complaint, or incorporated therein").

However, "[d]etermination of a foreign country's law is an issue of law." *Owen v. Elastos Foundation*, 343 F.R.D. 268, 282–83 (S.D.N.Y. 2023) (quoting *Itar-Tass Russian News Agency v. Russian Kurier, Inc*., 153 F.3d 82, 92 (2d Cir. 1998)). "In determining a question of foreign law, 'the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.'" *IKB Deutsche Industriebank AG v. McGraw Hill Finance, Inc*., No. 14-CV-3443 JSR, 2015 WL 1516631, at *3 n.1 (S.D.N.Y. Mar. 26, 2015), *aff'd*, 634 F. App'x 19 (2d Cir. 2015) (citing Fed. R. Civ. P. 44.1). Further, the Court may "reject the opinion of an expert on foreign law or give it whatever probative value the court believes it deserves." *Id.* (internal citation omitted). Though the Court is not explicitly deciding an issue of foreign law, background information about the Spanish legal system is relevant to its decision making. Accordingly, the Court will examine Plaintiffs' expert report insofar as it describes the Spanish legal system.

With respect to law of the case, Plaintiffs argue that the Second Circuit has already found the TAC to adequately allege material misrepresentations regarding Abengoa's percentage-of-completion accounting practices, and therefore the law of the case forecloses relitigation of that issue. Doc. 226 at 17. Defendants argue that the law of the case doctrine is inapplicable here because they are asking the Court to consider information that was not available to the Court of Appeals; namely the dismissal of those criminal proceedings Doc. 233 at 14.

"The law of the case doctrine 'ordinarily forecloses relitigation of issues expressly or impliedly decided by the appellate court.'" *Carroll v. Trump*, 151 F.4th 50, 66 (2d Cir. 2025) (quoting *United States v. Frias*, 521 F.3d 229, 234 (2d Cir. 2008)). "[T]he mandate rule, a branch of the law-of-the-case doctrine, . . . rigidly binds the district court, barring it from considering issues explicitly or implicitly decided on appeal." *Federal Treasury Enterprise Sojuzplodoimport v. Spirits International B.V.*, No. 14-CV-712 (SHS), 2026 WL 1075422, at *3 (S.D.N.Y. Apr. 21, 2026) (citing *United States v. Aquart*, 92 F.4th 77, 87 (2d Cir. 2024)). "The rule is subject to only 'narrow exception' for 'compelling circumstances, consisting principally of (1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice.'" *Aquart*, 92 F.4th at 87 (citing *United States v. Valente*, 915 F.3d 916, 924 (2d Cir. 2019)).

First, even assuming the dismissals of the Spanish Criminal Proceedings are "new evidence" that was unavailable to the Second Circuit, the dismissals do not change the relevant legal analysis. With respect to the question of whether Plaintiffs could incorporate allegations from the Spanish Criminal Proceedings, the Second Circuit held:

> [A] complaint may rely on factual allegations or reports incorporated in complaints from other proceedings, subject, of course, to the limitations of Federal Rule of Civil Procedure 11. In other words, the attorney signing the complaint must still be able to "certif[y] that to the best of [the attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[,] . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b). While this is inherently a case-dependent inquiry that will turn on the nature of the allegations contained in the other proceeding, we note that the allegations relied on by Plaintiffs in the TAC here were detailed, independently corroborated, and the product of an independent investigation. . . . These features distinguish the TAC from our prior precedents in which we rejected pleadings that merely relied on conclusory allegations asserted in other proceedings.
>
> For example, the Spanish National Court ruling [to expand the criminal complaint to include Abengoa] did not merely consist of conclusory assertions but rather was based on

> an auditing firm's expert report, ICAC's resolution of its investigation, and a forensic report from two financial-consulting firms, each of which "the [complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony." Similarly, the statements made by FE4, FE5, and FE7 in the Seville criminal proceeding were not merely conclusory allegations but rather consisted of detailed observations regarding the accounting-fraud scheme at Abengoa. Moreover, the allegations of all three confidential witnesses were independently corroborated by the allegations of other confidential witnesses, the aforementioned reports, and the KPMG investigation. And while it is true that plaintiffs ultimately may not be able to prove those allegations at a later stage of the proceedings, it is not for the district court to presume as much on a motion to dismiss.

Doc. 199 at 30–32 (alterations in original) (internal citations omitted). After considering the allegations in the TAC, including those incorporated from the Spanish Criminal Proceedings, the Second Circuit found that the TAC adequately alleged falsity with respect to Abengoa's percentage-of-completion representations. *Id.* at 31–38.

Defendants argue that because "the Court of Appeals has directed this Court to consider the allegations from the Spanish [C]riminal [P]roceedings in light of the Spanish courts' acceptance of the allegations . . . , it follows that the Court should also consider those allegations in light of the Spanish courts' ultimate conclusion that the evidence was insufficient to prove any misrepresentation or criminal fraud." Doc. 212 at 12. Specifically, Defendants argue that the dismissals cast doubt on the reliability of FE4, FE5, and FE7's testimony, whose testimony was examined in the Spanish Criminal Proceedings; on allegations concerning Abengoa's allegedly fraudulent behavior to increase profits; on Abengoa's alleged "invoice triangulation" scheme; on the reliability of the KPMG report; and on the reliability of the ICAC resolution. *Id*. at 19–21. "[A]bsent the imprimatur of reliability" from the Spanish Criminal Proceedings, Defendants argue that the allegations premised upon the KPMG report, the ICAC resolution, and the confidential witness statements "should not be accorded undue weight." *Id*. at 21.

However, the Court does not read the Second Circuit's opinion to require such consideration. Rather, as quoted above, the Second Circuit decision states that a plaintiff's ability to rely on allegations in another proceeding's complaint is only limited by Rule 11(b). *See* Doc. 199 at 30–31 (citing Fed. R. Civ. P. 11(b)). Generally, Courts evaluate a party's compliance with Rule 11(b) based on the time of filing. *See e.g. Doe v. Trustees of Columbia University in the City of New York*, No. 25-CV-01108 (ER), 2026 WL 878960, at *4 (S.D.N.Y. Mar. 31, 2026) ("In determining whether there has been a Rule 11 violation, courts apply 'an objective standard of reasonableness.' The focus of the inquiry is whether there is 'reasonable belief at the time of filing, not at some later time when facts are further revealed.'") (internal citations omitted); *Vinuela v. S.S. Britanis*, 647 F. Supp. 1139, 1148 (S.D.N.Y. 1986) ("The focus of [a Rule 11 sanctions] inquiry is the attorney's and/or party's reasonable belief at the time of filing, not at some later time when developments during discovery or trial reveal no basis for the belief."). Defendants cite no case law requiring that, in the instant case, the Court deviate from this rule. *But see In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 74 F. Supp. 3d 581, 588-89 & n.4, 592 (S.D.N.Y. 2015) (taking judicial notice of outcome of SEC investigations to evaluate credibility of allegations). The Second Circuit has already evaluated the sufficiency of the TAC, as viewed at the time the complaint was filed. *See* Doc. 199. Accordingly, the Court need not revisit the Second Circuit's decision to credit Plaintiffs' allegations in light of the dismissals in the Spanish Criminal Proceedings.

The Court is further disinclined to disturb the Second Circuit's holding, because the initial National Court and the Seville Court dismissals were issued prior to Second Circuit decision in the instant action. The Seville Court issued its dismissal on July 26, 2023; the National Court issued its dismissal on July 31, 2025; and the Second Circuit issued its opinion in

this case on October 6, 2025. *See* Docs. 213-5, 213-2, 198. While the dismissal of the National Court appeals did not occur until October 28, 2025, *see* Docs. 213-3, 213-4, the initial dismissal from the Seville Court occurred two years prior to the Second Circuit's opinion, and the National Court's dismissal occurred two months prior. While Defendants argue that the "information . . . was not available to the Court of Appeals" it does not indicate why they did not present these dismissals for the Second Circuit's consideration. *See* Doc. 233 at 14.

Finally, even if the Court were to consider the dismissals of the Spanish Criminal Proceedings, the Court would likely find that Plaintiffs are entitled to rely on the allegations at issue.

On the one hand, with respect to the National Court proceeding, Defendants correctly point out that the National Court's 2025 dismissal credited expert reports finding insufficient evidence to show criminal wrongdoing. *See e.g.* Doc. 213-2 at 19–20, 23–24. Further, on appeal, the dismissals and reasoning of the National Court were affirmed. *See e.g.* Docs. 213-3 at 35, 213-4 at 53. Similarly, Defendants correctly identify (1) that after the Seville Court elevated the proceeding to the National Court, the National Court reversed that decision in November 2020, and (2) that the Seville Court's 2023 dismissal cast doubt upon the reliability of the KPMG report and found that there was insufficient evidence to establish criminal liability for alleged fraud in connection with the AVE Mecca Medina project. *See* Doc. 213-5 at 5–7, 9.

However, these dismissals would be insufficient to prevent the Court from considering Plaintiffs' allegations premised upon then in-progress Spanish Criminal Proceedings. While they do cast doubt as to the reliability of some of the evidence relied on by Plaintiffs, the Spanish Criminal Proceedings' dismissals are not outcome determinative on the issue. The Second Circuit stated that the decision concerning whether a plaintiff may incorporate allegations from

another proceeding is a "case-dependent inquiry" based on "the nature of the allegations contained in the other proceeding." Doc. 199 at 31. While the Second Circuit did highlight that the incorporated allegations in the TAC were "detailed, independently corroborated, and the product of an independent investigation," they did not indicate that such a showing was necessary for a Plaintiff to incorporate the allegations. *Id.* Here, even if the results of the initial independent investigation or independent corroboration are cast into doubt, there is no doubt that the incorporated allegations are factually detailed and not conclusory like those that the Second Circuit has rejected in other cases. *Id*.[15]

Also, both dismissals of the Spanish Criminal Proceedings concerned criminal liability, which involves a different standard of proof than civil liability at issue in the instant action. *See* Doc. 213-2 at 6 (National Court finding that, "[t]he present case concerns whether, in light of the actions carried out, the necessary requirements, elements, and circumstances exist to conclude whether the defendants may have incurred any of the crimes punished under articles . . . of the Penal Code"); Doc. 213-5 at 9. Plaintiffs assert, and Defendants do not contest, that like courts in the United States, there is a higher burden of proof in criminal cases, akin to beyond reasonable doubt standard, rather than the plausibility standard used on a motion to dismiss or the preponderance of evidence standard for ultimate adjudication of civil cases. Doc. 226 at 18–19; Doc. 228-1 at 17–22 ("Under the Spanish legal system, criminal and civil courts indeed apply different standards in determining criminal and civil liability, respectively . . . " and noting that criminal proceedings use "the principle of 'beyond a reasonable doubt'" and civil

[15] Further, while a Court may disregard allegations that are contradicted or inconsistent with documents it takes judicial notice of, *see e.g. Rothbein v. City of New York*, No. 18-CV-5106 (VEC), 2019 WL 977878, at *2 (S.D.N.Y. Feb. 28, 2019), the Court does not view the Spanish Criminal Proceedings' decisions as contradictions to allegations from the confidential witnesses, the KPMG report or the ICAC sanctions, but rather as questions to their credibility, which is more appropriate for adjudication at a later stage.

proceedings "by contrast, [use] the preponderance of the evidence" standard); *see also id.* at 16 ("Spanish legislation and case law allow, once the criminal proceedings have concluded, the exercise of civil actions claiming civil liability for the same facts.").

Accordingly, the Court declines to dismiss Plaintiffs' Section 11 claims due to the resolution of the Spanish Criminal Proceedings.

*2. Traceability*

Defendants argue that Plaintiffs' Section 11 claims fail because they cannot plausibly trace their shares to the October 2013 offering as is required by new Supreme Court caselaw,[16] and because Plaintiffs fail to allege misstatements in the registration statement which registered the ADSs they purchased.[17] Meanwhile Plaintiffs argue that they have sufficiently alleged traceability to the October 2013 offering for pleading purposes and that the ADSs they purchased were offered pursuant to the registration statement with the alleged misstatements.

*a. External Materials*

The parties provide external materials to support their arguments concerning whether Plaintiffs' purchases of the ADSs are traceable to Abengoa's initial offering. In their motion, the Underwriter Defendants request that the Court take judicial notice of publicly available data from the Center for Research in Security Prices ("CRSP")[18] for the limited purpose of showing that the U.S. ADS float—the amount of ADS available for trading in the public market—"moved up and down over time" which, the Defendants assert "confirms" that ADSs were created and

[16] As discussed below, the Supreme Court case Defendants refer to is *Slack Technologies, LLC v. Pirani*, 598 U.S. 759 (2023).

[17] Neither of these arguments was argued in the prior motions to dismiss the TAC; and accordingly, they were not discussed in the Second Circuit's decision.

[18] Defendants describe CRSP as "a widely relied-upon repository of exchange-reported facts" that is "cited repeatedly by the SEC in its releases." Doc. 215 at n.6.

cancelled prior to Plaintiffs' purchases. Doc. 215 at 11, n.6; *see* Doc. 216-4. Meanwhile, Plaintiffs provide the declaration of Dr. Joshua R. Mitts to cast doubt upon the reliability of the CRSP data and to support the contention that all Abengoa's ADSs available on the NASDAQ are traceable to their initial offering. *See* Docs. 230 at 8; 231-3 ("Mitts Decl."). The Court examines each in turn.

First, the Court declines to take judicial notice of the CRSP data concerning the Abengoa ADS float. Generally, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Unlike common scenarios in which courts take judicial notice, the CRSP data is not published by the government nor is it merely well-publicized price data. *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F.Supp.3d 156, 166 (S.D.N.Y. 2015) (taking judicial notice for data published on a government website); *Ganino v. Citizens Utilities Co*., 228 F.3d 154, n.8 (2d Cir. 2000) ("[T]he district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment.") (collecting cases). Instead, the Defendants ask that the Court take notice of tables that they generated pulling the publicly available CRSP data. *See* Docs. 216; 216-4. The Defendants cite no cases concerning judicial notice of float data nor data from CRSP. Further, in their opposition, Plaintiffs question the underlying accuracy of the CRSP data, as well as the Defendants' conclusions that this data confirms ADSs were created and cancelled after Abengoa's initial offering. *See* Doc. 230 at 19–21.

The Court also declines to consider the Mitts Declaration. Plaintiffs ask that the Court consider Mitts' four conclusions: (1) there is no evidence that ADSs were issued in exchange for

unregistered Class B shares; (2) the Underwriter Defendants' CRSP data does not establish that ADSs were newly issued after the Offering; (3) even if ADSs were issued after the Offering, the evidence indicates that those ADSs were exchanged for registered Class B shares, and therefore, traceable to the Registration Statement; and (4) regardless of whether new ADSs were later created, the Underwriter Defendants committed to resell those ADSs. Doc. 230 at 9. As detailed above, a "plaintiffs' reliance on an expert declaration at the motion to dismiss stage is improper." *Boyette*, 2023 WL 7612391 at *7; *see Pyatt*, 462 F. App'x 22 at 24 (affirming the district court's decision to not examine materials attached to a plaintiff's opposition to defendants' motion to dismiss because the documents were not attached to or integrated into the complaint, or incorporated therein). Further, in their opposition, Plaintiffs make no argument as to why the Court should consider Mitts' declaration at the motion to dismiss stage.

*b. Traceability to the Offering*

Defendants argue that the Supreme Court decision *Slack Technologies, LLC v. Pirani*, 598 U.S. 759 (2023), which was decided while the case was pending appeal at the Second Circuit, requires finding Plaintiffs' barebones allegations that they "purchased ADSs of Abengoa . . . traceable to the Offering . . ." fails to confer Section 11 standing. *See* Doc. 215 at 13–22; Doc. 165 ¶ 23. The Defendants further argue that Plaintiffs cannot plausibly trace their ADS purchases to the October 2013 Offering, because, at the time of Plaintiffs' first purchase in November 2014, the market contained an "indistinguishable mix" of ADS sold as a part of the October 2013 offering and ADSs created after the October 2013 offering. *Id.* at 17–22.[19] The

[19] The Underwriter Defendants argue that ADSs could have been created after the October 2013 Offering because, as identified in the Prospectus, a depository bank could create or cancel new ADSs by conversion to or from Class B shares. Doc. 215 at 17. Therefore, holders of the 450 million Class B shares trading on Spanish exchanges prior to the October 2013 Offering could have their shares converted into ADSs. *Id.* at 218. Similarly, any holders of the 85

Defendants argue that the CRSP data conclusively demonstrates that this intermingling of registered and unregistered ADSs occurred prior to the Plaintiffs' purchases of the ADSs. *Id.* Meanwhile Plaintiffs acknowledge that the TAC merely alleges that the ADS purchases were "traceable to the Offering," and they argue that such an allegation is sufficient to establish Section 11 standing at the pleading stage. Doc. 230 at 14–18. Further, with the supplementation of Mitts' declaration, Plaintiffs argue that as a factual matter the only ADSs in the market at the time of Plaintiffs' purchases were ADSs traceable to the October 2013 Offering. *Id.* at 8–9.

In *Slack*, the Supreme Court considered an appeal from the Ninth Circuit concerning what a public buyer must allege to state a claim under Section 11 of the Securities Act. 598 U.S. at 762. As background, Slack Technologies conducted a direct listing in 2019, and as a part of that process, they submitted an allegedly misleading registration statement. *Id.* at 764. However, because Slack Technologies engaged in a direct listing, both 118 million newly registered shares and 165 million pre-existing unregistered shares were available to the public for sale at the same time. *Id.* While Pirani, the plaintiff, alleged that he purchased 30,000 shares of Slack Technology on the day of the offering, he did not allege that he purchased registered shares traceable to the allegedly misleading registration statement. *Id.* at 764–65. The registered and unregistered shares sold at the offering were indistinguishable, but Pirani argued that Section 11 applied to all shares as both groups "bear some sort of minimal relationship" to the allegedly defective registration statement. *Id.* at 768.

The Supreme Court declined to adopt Pirani's theory and instead found that "[t]o bring a claim under § 11, the securities held by the plaintiff must be traceable to the particular

---

million Class A shares could convert their shares into Class B shares and subsequently into ADSs. *Id.* Defendants argue that these ADSs created after the offering are "identical in form and function" to the ADSs sold during the offering. *Id.*

registration statement alleged to be false or misleading." *Id.* at 768; *see also id.* at 770 ("[W]e think the better reading of the particular provision before us requires a plaintiff to plead and prove that he purchased shares traceable to the allegedly defective registration statement."). In doing so, the Supreme Court noted that the holding comported with the vast majority of circuit courts across the country. *Id.* at 768 ("Nor is anything we say here particularly novel . . . More than half a century ago Judge Friendly addressed the question in an opinion for the Second Circuit in *Barnes* and concluded that 'the narrower reading' we adopt today is the more 'natural one.' . . . Until [the Ninth Circuit's decision in *Pirani*], even the Ninth Circuit seemed to take the same view.") (internal citations omitted).

Though the Supreme Court required a Section 11 plaintiff to plead that their purchases were traceable to a defective registration statement, it did not offer guidance as to how specific a plaintiff's allegations of traceability must be. *See Slack*, 598 U.S. at 770; *see also Cupat v. Palantir Technologies, Inc.*, 2025 WL 1141534, at *15 (D. Colo. Apr. 4, 2025) (noting that while "the United States Supreme Court confirmed that . . . a Section 11 plaintiff [is required] 'to plead and prove that he purchased shares traceable to the allegedly defective registration statement.' . . . the Supreme Court did not opine on what this means exactly—it did not assess whether any specific allegations were sufficient to plead traceability, nor what evidence is sufficient to prove it." (citing *Slack* 598 U.S. at 770)).

Defendants argue that Plaintiffs' allegations that they purchased Abengoa ADSs "traceable to the Offering" are insufficient to state a Section 11 claim under *Slack*. Doc. 215 at 15–16 ("Plaintiffs identify no chain of title, no transactional facts tying their purchases to the Offering, and no other facts that would support a claim that the ADSs they acquired more than a year after the Offering are traceable to the challenged registration statement."). In support,

Defendants cite several out-of-circuit district courts which have noted that "bare allegations to the effect that Plaintiffs purchased securities traceable to" the defective registration statement are insufficient. *Cupat*, 2025 WL 1141534 at *15; *Rose v. Butterfly Network, Inc*., 2025 WL 501427, at *2 (D.N.J. Feb. 13, 2025) ("Here, the plaintiffs allege that they 'purchased or otherwise acquired the Defendants' stock pursuant or traceable to' a particular registration statement . . . But simply saying so is not enough."); *see also Holland v. 9F Inc*., 2024 WL 5086106, at *3 (D.N.J. Dec. 12, 2024); *Fanucchi v. Enviva Inc*., 2024 WL 3302564, at *18 (D. Md. July 3, 2024); *In re GWG Holdings, Inc. Securities Litigation*, 2024 WL 4582904, at *3–4 (N.D. Tex. Oct. 24, 2024).[20]

Plaintiffs meanwhile argue that, in the context of Section 11, such allegations are sufficient. They cite district courts in this Circuit which, post-*Slack*, continue to find that "[t]he pleading requirement for Section 11 standing is satisfied by general allegations that [a] plaintiff purchased [securities] pursuant to or traceable to a false registration statement." *Alta Partners, LLC v. Forge Global Holdings, Inc.,* No. 23-CV-2647 (JMF), 2024 WL 1116682, at *7 (S.D.N.Y. Mar. 13, 2024) (quoting *In re Wachovia Equity Securities Litigation,* 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011)) (finding that allegations that plaintiff "purchased Public Warrants issued pursuant to or traceable to" the misleading registration statement sufficient); *In re United States Oil Fund, LP Securities Litigation*, No. 20 CIV. 4740 (PGG), 2025 WL 2771445, at *49 (S.D.N.Y. Sept. 29, 2025) (finding allegations that a plaintiff purchased securities "pursuant and/or traceable to" the misleading registration statements sufficient); *see also Lozada v. TaskUs,*

[20] In a supplemental letter to the Court, Defendants also argue that the Second Circuit decision *Knapp v. Barclays PLC*, supports their argument, as there the Second Circuit found that plaintiffs "failed to plead any facts tracing their [securities] . . . to the [registration statement]." 171 F.4th 166, 174 (2d Cir. 2026). However, as described below, the Court finds that case distinguishable from the instant case, as the language of the registration statement at issue in *Knapp* repeatedly indicated that it did not cover the securities that the plaintiff bought.

*Inc.*, 710 F. Supp. 3d 283, n.21 (S.D.N.Y. 2024) (in a footnote, finding that the plaintiff could bring Section 11 claims, as "[t]he Amended Complaint allege[d] that [the plaintiff] purchased shares 'traceable' to the registration statements filed during the IPO.").[21]

The Court does not read *Slack* to impose additional requirements as to the specificity of Section 11 traceability allegations and Defendants identify no other decisions binding on this Court. In accordance with the other courts in this District, the Court concludes that the allegations that Plaintiffs purchased ADSs "traceable to the offering" are sufficiently specific.[22]

*c. The Applicable Registration Statement*

The Defendants next argue that Plaintiffs' Section 11 claim should be dismissed because the TAC alleges misstatements in the Form F-1, which registered Abengoa Class B shares; however, the ADSs which Plaintiffs purchased were registered pursuant to "an entirely separate registration statement," the Form F-6. Doc. 215 at 22–24. They argue this is an incurable defect, as Form F-6 does not contain any reference to the alleged "percentage of completion" misstatement, and therefore the claim should be denied with prejudice. *Id.* at 24. Procedurally, Plaintiffs argue that Defendants waived this argument, as it should have been raised in previous motions to dismiss. Doc. 230 at 22–24. Substantively, Plaintiffs acknowledge that the Form F-6 registered the ADSs at issue and that their complaint does not directly mention the Form F-6;

---

[21] Defendants argue that these cases should be discounted as they did not adequately consider *Slack*, either because they were fully briefed prior to the Supreme Court decision, rely in-part on pre-*Slack* cases, or only addressed the issue in a cursory fashion. *See* Doc. 234 at 5–6. However, the Court finds these arguments unpersuasive. As stated above, this Court does not read *Slack* to impose requirements on the specificity of a plaintiff's Section 11 allegations of traceability.

[22] Defendants also argue that Plaintiffs cannot plausibly allege that their purchases of ADSs were traceable to the offering because at the time of Plaintiffs' November 2014 purchase, the market already contained a mix of ADSs registered pursuant to the October 2013 Offering and ADSs created afterwards. Doc. 215 at 17–22. The Court does not consider this argument because the Court has already concluded that Plaintiffs' allegations are sufficient at the pleading stage.

however, they maintain that the TAC alleges defects in the Form F-1 and the Prospectus; that the Form F-1 and Form F-6 "combined to register the ADSs"; that the Form F-1 and the Prospectus explicitly provided information about both the Class B shares and ADSs; and that numerous courts in the Circuit have allowed Section 11 claims to continue when the alleged misstatements were present in a Form F-1 but the plaintiffs' ADSs were purchased pursuant to a Form F-6. *Id.* a 24–27.

As a preliminary matter, Plaintiffs' contention that Defendants have waived this argument is unpersuasive. Plaintiffs argue that pursuant to Fed. R. Civ. P. 12(g)(2) Defendants waived the argument that Plaintiffs allege misstatements in the wrong registration statement because "[d]espite numerous rounds of motion to dismiss briefing . . . [t]he Underwriter Defendants could have—but [did] not—raise the argument." Doc. 230 at 22–23. While "[s]ome courts in this district have interpreted [Rule 12(g)(2)] to bar successive 12(b)(6) motions raising arguments previously available to the defense . . . This approach, however, is far from uniform." *Renois v. WVMF Funding, LLC*, No. 20-CV-9281 (LTS) (VF), 2025 WL 1744902, at *3 (S.D.N.Y. June 24, 2025) (internal citations omitted). Indeed, "the greater weight of case law in this District suggests that failure-to-state-a-claim arguments are not waivable and may be brought in a successive Rule 12 motion." *Ballast v. Workforce7 Inc.,* No. 20-CV-3812-ER, 2024 WL 307966, at *5 (S.D.N.Y. Jan. 25, 2024), *reconsideration denied*, 2024 WL 1530654 (S.D.N.Y. Apr. 8, 2024) (collecting cases). In the instant case, "barring Defendants from making these arguments in this 12(b)(6) motion and instead requiring that Defendants 're-raise [] identical arguments as a 12(c) motion after answering the [complaint]' would undermine, not promote, the purpose of Rule 12(g) by creating inefficient and dilatory motion practice." *Renois*,

2025 WL 1744902, at *4 (citing *Ballast*, 2024 WL 307966, at *5). Accordingly, the Court finds that Defendants have not waived this argument.

With respect to the substance of the argument, the Court is ultimately persuaded by Plaintiffs arguments that the Form F-1, the attached Prospectus, and the Form F-6 combined to register the ADSs in the instant case.

Under the Securities Act, while ADSs and their corresponding deposited securities are separate entities, "in order for AD[S]s to be publicly traded, 'both the AD[S]s and the deposited securities must be registered.'" *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 470 (2d Cir. 2010) (citing *American Depositary Receipts*, Securities Act Release No. 6894, Exchange Act Release No. 29226, 56 Fed.Reg. 24420 (May 30, 1991)) ("[T]he SEC notes that 'listed ADRs are not the securities of the foreign issuer but rather of the legal entity created by the depositary.'"). Form F-1 "shall be used for registration . . . of securities of all foreign private issuers . . . for which no other form is authorized or prescribed." 17 C.F.R. §§ 239.31(a). Meanwhile, Form F-6 "may be used for the registration under the Securities Act . . . of Depositary shares evidenced by American Depositary Receipts issued by a depositary against the deposit of the securities of a foreign issuer . . . ." *Id.* at § 239.36.

Such is true in the instant case. Though Defendants correctly point out that the Form F-1 facially registers the underlying Abengoa Class B shares and states that Abengoa ADSs will be registered pursuant to a separate Form F-6, *see* Doc. 231-1 at 3 (listing "Class B shares" as the only "Title of Each Class of Securities to be Registered," and further stating that "American depositary shares . . . hereby are being registered pursuant to a separate registration on Form F-6."), by their own language, the Form F-1 and Prospectus provided the substantive information about the ADSs for their registration.

Illustrating the interrelated nature of the documents, Plaintiffs point out that both the Form F-1 and Form F-6 were necessary to the offering, that the Form F-1, via its attached Prospectus, states that it is "covering the Class B shares and ADSs to be sold in this offering," and overall that the Form F-1 and Prospectus continually advises investors about information concerning both the underlying Class B shares and ADSs. Doc. 230 at 24–26; *see e.g.* Doc. 230 at 25 (stating that the Form F-1 and Prospectus mention ADSs "over 1,000 times"); Doc. 231 at 3 (first page of the prospectus concerns "182,500,000 Class B shares (either in the form of shares or American Depositary Shares)"); *id.* at 352 (indicating that potential investors "should read the registration statement on Form F-1 and its exhibits and schedules for further information with respect to [Abengoa] and [Abengoa's] Class B shares and ADSs."); *id.* at 49 (a section titled "Risks related to Ownership of ADSs and Class B shares"); *id.* at 353 ("We have filed with the SEC a registration statement on Form F-1, including relevant exhibits and schedules, under the Securities Act covering the Class B shares and ADSs to be sold in this offering. A related registration statement on Form F-6 is being filed to register the issuance of ADSs."). Both parties acknowledge that the Form F-6 on its own provides little information about the Abengoa ADSs. *See* Docs. 230 at 25–26 (Plaintiffs arguing that form F-6 is merely a "cover" letter, and "omits almost all the information regarding the ADSs that is required in a registration statement of a security under section 7 of the Securities Act."); 215 at 23 (Defendants noting that the Form "F-6 merely describes the security being registered and attaches just two exhibits: (1) the Deposit Agreement between Abengoa and the depositary and (2) an opinion of counsel as to the legality of the ADSs. And the F-6's prospectus is separate from the one alleged to contain false statements or omissions—it solely 'consists of the proposed form of American Depositary Receipt' attached to the Deposit agreement.") (internal citations omitted).

Further, although they do it in a cursory fashion, myriad cases in this Circuit have considered misstatements and omissions in Form F-1s and prospectuses even where Plaintiffs were purchasers of ADSs formally registered under a Form F-6. *See e.g. Shetty v. Trivago N.V.*, 796 F. App'x 31, 33 n.4 (2d Cir. 2019) (noting in a footnote that "[a]s used here, the term 'Registration Statement' refers to a collection of documents [the defendant] filed with the SEC ahead of its [offering]. These are: a Form F-1 . . . ; a Form F-6 . . . ; and a prospectus . . . "); *Panther Partners Inc. v. Jianpu Technology Inc.*, 2020 WL 5757628, at *1–2 (S.D.N.Y. Sep. 27, 2020) ("On October 20, 2017, [the defendant] filed an SEC Form F-1 to register the IPO, which was soon followed by an SEC Form F-6. After amendments, the SEC declared these forms—collectively, the 'Registration Statement'"); *In re Micro Focus International Plc Securities Litigation*, No. 1:18-CV-06763-ALC, 2020 WL 5817275, at *1 (S.D.N.Y. Sept. 29, 2020) ("As pleaded by Plaintiff, the 'Offering Documents' include a Form F-4, a Form F-6, and a Form 10 which all provided information to ADS acquirers."); *In re MINISO Group Holding Limited Securities Litigation*, No. 22-CV-9864 (ER), 2024 WL 759246, at *1 (S.D.N.Y. Feb. 23, 2024) (evaluating misstatements in a Form F-1 when looking to a Section 11 claim brought by purchasers of defendant's ADSs); *see also In re Yunji Inc., Securities Litigation*, No. 19-cv-6403 (LDH) (SMG), 2021 WL 1439715, at *2 (E.D.N.Y. Mar. 31, 2021) ("The ADSs were registered and offered pursuant to: a registration statement on Form F-1 . . . a registration statement on Form F-6. . . a registration statement on Form 8-A . . . and a final prospectus. . . collectively, the 'Registration Statement'").

Defendants argue that this Court should instead follow *In re Vivendi Universal, S.A.*, a case from this District which more squarely addressed the issue. 381 F. Supp. 2d 158 (S.D.N.Y. 2003). In *Vivendi*, the court examined whether the named plaintiffs, who were purchasers of

Vivendi ADSs, could plausibly allege a Section 11 claim based on alleged false statements made in a Form F-4 which registered "approximately 461 million ordinary shares, i.e., foreign deposited securities, of Vivendi Universal," rather than in the Form F-6 which registered the ADSs. *Id.* at 172. While the *Vivendi* Court considered the interrelated nature of ADSs and their underlying securities, it ultimately held that purchasers who bought ADSs pursuant to the F-6 form cannot claim to have standing under [Section] 11" because "a claim under [Section] 11 may only be maintained by those who specifically received their shares pursuant to the defective registration statement," and "plaintiffs do not allege defects in the F-6 form." *Id.* at 172–73.

However, in light of the fact that Abengoa ADSs could only be registered if their underlying shares were registered by the F-1 and attached Prospectus; in light of the body of caselaw considering a Form F-1, prospectus, and Form F-6 as part of a singular registration statement for ADSs; and in light of the fact that the Prospectus clearly discusses both Abengoa ADSs and the underlying shares, this Court is persuaded by Plaintiffs' argument that the Form F-1, attached Prospectus, and Form F-6 should all be viewed as the registration statement for the Abengoa ADSs.

Defendants argue this conclusion is contrary to the Supreme Court's decision in *Slack* and to the Second Circuit's decision in *Knapp v. Barclays PLC*. The Court finds those arguments unpersuasive. With respect to *Slack*, the facts of that case are distinct from those of the instant case. In *Slack*, the Supreme Court rejected the plaintiff's interpretation of Section 11 which would extend liability for misstatements in a registration statement to unregistered shares offered alongside registered shares at an offering. *Slack*, 598 U.S. at 769 (2023). The material facts at issue here are distinct, where all the shares for sale at Abengoa's October 2013 offering were registered. While *Slack* does have language directing Courts to consider the applicable

registration statement at issue, *see id.* at 767 ("[W]hen it comes to 'such security,' [Section 11] speaks to a security registered under the particular registration statement alleged to contain a falsehood or misleading omission."), as described above, myriad cases in this Circuit have considered the Form F-1, Form F-6 and Prospectus together as the registration statement for purposes of evaluating a Section 11 claim brought by ADS purchasers. Further, the Court does not read *Slack* to abrogate that caselaw, as the Supreme Court stated that its holding comported with most circuit courts across the country. *Id.* at 768 ("Nor is anything we say here particularly novel . . . More than half a century ago Judge Friendly addressed the question in an opinion for the Second Circuit in *Barnes* and concluded that 'the narrower reading' we adopt today is the more 'natural one.' . . . Until [the Ninth Circuit's decision in *Pirani*], even the Ninth Circuit seemed to take the same view.") (internal citations omitted).

With respect to *Knapp v. Barclays PLC*, in that case, the Second Circuit stated that "[b]ecause [S]ection 11 focuses on securities issued under a 'particular registration statement,' plaintiffs must first plead that they acquired securities 'traceable to [that] allegedly defective . . . statement.'" 171 F.4th 166, 173 (2d Cir. 2026) (alteration in original) (citing *Slack*, 598 U.S. at 767, 770). The Second Circuit ultimately found that there was no Section 11 liability because the registration statement at issue repeatedly indicated that it did not cover the securities that plaintiffs bought. *See id.* at 173 (holding that the registration statement's "own terms show that it does *not* cover" the securities at issue.) (emphasis in original). First, as stated above, many courts in this circuit have construed an F-1, Prospectus, and F-6 as the registration statement necessary for ADSs. Further, as Plaintiffs correctly identify, by its own terms, the Prospectus, which is attached to the F-1, does cover the ADSs and explicitly provides information about them. *See e.g.* Doc. 231 at 3 (first page of the prospectus concerns "182,500,000 Class B shares

(either in the form of shares or American Depositary Shares)"); *id.* at 352 (indicating that potential investors "should read the registration statement on Form F-1 and its exhibits and schedules for further information with respect to [Abengoa] and [Abengoa's] Class B shares and ADSs."); *id.* at 49 (a section titled "Risks related to Ownership of ADSs and Class B shares"); *id.* at 353 ("We have filed with the SEC a registration statement on Form F-1, including relevant exhibits and schedules, under the Securities Act covering the Class B shares and ADSs to be sold in this offering. A related registration statement on Form F-6 is being filed to register the issuance of ADSs.").

Ultimately, while the Court agrees with Plaintiffs that the Form F1, the Prospectus, and the Form F-6 worked in conjunction to register the Abengoa ADSs, Defendants are correct, and Plaintiffs do not dispute, that the Form F-6 is not mentioned in the TAC.[23] *See* Doc. 230 at 26. For that reason, the Court finds that the TAC insufficiently supports Plaintiffs' argument at this juncture and will dismiss Plaintiff's Section 11 claims without prejudice. Plaintiffs are granted leave to amend their TAC for the limited purpose of identifying the Form F-6 as a part of their Section 11 claims.

*3. Negative Causation*

Defendants argue that Plaintiffs' Section 11 claim should also be dismissed because negative causation is apparent from the face of the complaint. Doc. 215 at 25–28. Meanwhile, Plaintiffs argue that this is an affirmative defense for which Defendants have not met their burden. Doc. 230 at 27–31.

---

[23] Plaintiffs argue that the TAC repeatedly references the Form F-1 and Prospectus, which in turn "plainly refers to the Form F-6 as 'a related registration statement.'" Doc. 230 at 26. However, as stated above, they do not contend that the TAC itself mentions the Form F-6.

"Section 11(e) of the Securities Act does provide for a 'negative causation' affirmative defense to claims that a registration statement was materially misleading: A plaintiff cannot recover damages for losses that the defendant proves did not result from the alleged omission or misrepresentation." *Boluka Garment Co., Ltd. v. Canaan Inc.*, 547 F. Supp. 3d 439, 447 (S.D.N.Y. 2021) (citing 15 U.S.C. § 77k(e)); *see also Sharma v. Rent the Runway, Inc.*, 799 F. Supp. 3d 129, 147–48 (E.D.N.Y. 2025) (internal citations and quotations omitted) ("To successfully make a negative causation defense, a party must prove not the mere possibility that some other factor caused the plaintiff's loss but rather that all or an identified portion of plaintiff's loss was caused by that other factor.") (internal quotations omitted).

Evaluating negative causation is usually a fact-intensive inquiry not done on a motion to dismiss. *In re Giant Interactive Group, Inc. Securities Litigation*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009) ("Because it is unnecessary to plead loss causation to maintain claims under Sections 11 and 12, the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion."); *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272–73 (S.D.N.Y. 2007) ("Because an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial."). However, "[w]here it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses, dismissal of the complaint pursuant to Fed.R.Civ.P. 12(b)(6) is proper." *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 272 F. Supp. 2d 243, 253 (S.D.N.Y. 2003). Several courts have "recognized that the negative loss causation affirmative defense in the Section 11 context and the loss causation element of Section 10(b) claims are 'mirror images.'" *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 561 (S.D.N.Y. 2021).

As detailed below when evaluating Plaintiffs' Exchange Act claims, the Plaintiffs have plausibly alleged that their loss is due to the alleged percentage-of-completion misrepresentations.

While Plaintiffs have sufficiently demonstrated that their Section 11 claims should not be dismissed to due to negative causation, as stated above, the Court dismisses their Section 11 claims without prejudice due to a failure to include the Form F-6 in the TAC.

*4. Comity*

Abengoa argues that all claims against it, including the Section 11 claim, should be dismissed based on principles of comity because the Seville Court has been overseeing Abengoa's liquidation since 2021. Doc. 212 at 30–31. Meanwhile Plaintiffs argue that Defendants do not meet their burden to demonstrate that comity requires dismissal. Doc. 226 at 30–31.

"International comity has been described by the Supreme Court as 'the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.'" *Leopard Marine & Trading, Ltd. v. Easy Street Ltd.*, 896 F.3d 174, 189–90 (2d Cir. 2018) (internal citations omitted). "Comity will be granted to the decision or judgment of a foreign court if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated." *Cunard S.S. Co. v. Salen Reefer Services AB*, 773 F.2d 452, 457 (2d Cir. 1985). Comity is an affirmative defense that defendants bear the burden of demonstrating. *Drexel Burnham Lambert Group Inc. v. Galadari*, 777 F.2d 877, 880 (2d Cir.1985),

Abengoa argues that this Court is required to dismiss Plaintiffs' claims against it in deference to Abengoa's liquidation proceedings in a Seville Court. Doc. 212 at 30–31. As a general rule, the Second Circuit has "'recognized one discrete category of foreign litigation that generally requires the dismissal of parallel district court actions—foreign bankruptcy proceedings'—because '[a] foreign nation's interest in the equitable and orderly distribution of a debtor's property is an interest deserving of particular respect and deference.'" *Leopard Marine & Trading*, 896 F.3d at 190. However, even in the bankruptcy context, defendants still need to "carry their burden" of demonstrating that comity is appropriate. *See e.g. International Association of Machinists & Aerospace Workers, AFL-CIO v. Varig S.A.*, 302 F. App'x 10, 12 (2d Cir. 2008).

Defendants have not met their burden to demonstrate the affirmative defense of comity is applicable. *See* Doc. 226 at 31 (Plaintiffs arguing that, "[b]eyond a bare reference to a Spanish liquidation, Abengoa's brief ignores whether that proceeding affords procedural fairness or meaningful adjudication, let alone class wide relief or damages."). They do not substantively engage with whether Plaintiffs' claims are subject to the Spanish proceedings, nor do they substantively argue that comity is appropriate for some other reason. *See International Association of Machinists & Aerospace Workers*, 302 F. App'x at 12 ("Though the exercise of comity is often appropriate with respect to foreign bankruptcy proceedings, defendants have failed to carry their burden of demonstrating that the . . . employees' claims are subject to the Brazilian bankruptcy proceeding or that comity is appropriate for some other reason.") (internal citations omitted).[24]

---

[24] In their motion to dismiss, Abengoa cites *New Line International Releasing, Inc. v. Ivex Films, S.A.*, as an example of a court's deference to the Spanish bankruptcy proceedings; however, in that case, the parties "concede[d] that the

While Plaintiffs have sufficiently demonstrated that their Section 11 claims should not be dismissed due to principles of comity, as stated above, the Court dismisses their Section 11 claims without prejudice due to a failure to include the Form F-6 in the TAC.

*5. Scienter*

Finally, Sanchez Ortega argues that the Section 11 claim against him should be dismissed because Plaintiffs do not plead that he had the requisite scienter for liability. Doc. 218 at 4–9. Meanwhile, Plaintiffs argue that Sanchez Ortega has waived this argument; that there is no scienter requirement in a Section 11 claim; and that even if scienter were required, Plaintiffs have adequately alleged it. Doc. 229 at 9–19.

As a preliminary matter, Plaintiffs' contention that Sanchez Ortega has waived this argument is unpersuasive. As explained above, "the greater weight of case law in this District suggests that failure-to-state-a-claim arguments are not waivable and may be brought in a successive Rule 12 motion." *Ballast,* 2024 WL 307966 at *5.

Substantively, the Second Circuit has made it clear that Section 11 "imposes strict liability on issuers and signatories, and negligence liability on underwriters, for material misstatements or omissions in a registration statement." *Federal Housing Finance Agency for Federal National Mortgage Association v. Nomura Holding America Inc.*, 873 F.3d 85, 99 (2d Cir. 2017) (internal quotations and citations omitted); *Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64, 84 (2d Cir. 2021) ("Unlike claims brought under Section 10(b) [of the Exchange Act], a plaintiff bringing a claim under Section 11 [of the Securities Act] need not allege scienter, reliance, or loss causation.") (internal quotations and citations omitted).

---

Spanish tribunal is a court of competent jurisdiction, and that under Spanish law [the plaintiff] would normally assert its claim in the proceeding before that court." 140 B.R. 342, 344-46 (S.D.N.Y. 1992). Such a concession has not been made in this case.

Where a Section 11 claim sounds in fraud, the "heightened pleading standard" of Rule 9(b) applies. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004); *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (stating that where "the [Section 11 claims] sound in fraud . . . the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies, requiring that the circumstances of the alleged fraud be set forth in the complaint with particularity."). Rule 9(b) reads: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9. The Second Circuit has articulated that the heightened pleading standards of Rule 9(b) requires "a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach*, 355 F.3d at 171 (internal citations omitted).

The parties do not dispute that Plaintiffs' Section 11 claim against Sanchez Ortega sounds in fraud or that Rule 9(b) applies to the claim; however, they do dispute whether Rule 9(b) requires a pleading of scienter. Sanchez Ortega argues that even though Section 11 does not require an element of scienter, where the claim sounds in fraud, Rule 9(b) requires plaintiffs to plead scienter. *See* Doc. 235 at 8–10. Meanwhile, Plaintiffs argue that Rule 9(b)'s requires only that the elements of a Section 11 claim, which does not include scienter, be pleaded with particularity. *See* Doc. 229 at 10–15.

The Second Circuit has articulated that scienter is not an element of Section 11, even in cases where the claim sounds in fraud. *See Rombach*, 355 F.3d at n.4 (noting that that "[n]either Section 11 nor Section 12(a)(2) requires that plaintiffs allege the scienter or reliance elements of a fraud cause of action") (internal citations omitted); *Pontiac Policemen.* 752 F.3d at 182–83

("Plaintiffs need not allege scienter, reliance, or causation [for a Section 11 claim] . . . . Where, as here, the claims sound in fraud . . . the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies, requiring that the circumstances of the alleged fraud be set forth in the complaint with particularity."); *IAM National Pension Fund v. Farfetch Ltd*., 2023 WL 2879304, at *1 (2d Cir. 2023) (stating "although claims under Sections 11 and 12(a) of the Securities Act are ordinarily subject to the pleading standards of Federal Rule of Civil Procedure 8(a), allegations that sound in fraud are subject to the heightened pleading standard of Rule 9(b) even though scienter is not an element of the Securities Act claims."); *Panther Partners Inc. v. Ikanos Commcationns, Inc*., 681 F.3d 114, 120 (2d Cir. 2012) ("Neither scienter, reliance, nor loss causation is an element of § 11 or § 12(a)(2) claims which—unless they are premised on allegations of fraud—need not satisfy the heightened particularity requirements of Rule 9(b) . . ."). However, the Second Circuit has not explicitly addressed the argument that Rule 9(b)'s pleading standards introduce a requirement of scienter for Section 11.

Sanchez Ortega argues that the Court should follow several courts in this District and Circuit which have found that, where a Section 11 claim sounds in fraud, Rule 9(b) includes "the requirement to plead with particularity a strong inference of scienter." *Caiafa v. Sea Containers Ltd*., 2008 WL 11516813, at *5 (S.D.N.Y. May 15, 2008) (internal quotations omitted); *see e.g. In re JP Morgan Chase Securities Litigation*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) ("In contravention of Fed.R.Civ.P. 9(b) . . . plaintiffs have failed to plead with particularity a strong inference of scienter in connection with a material misrepresentation or omission. Plaintiffs' Section 11 claim is dismissed."); *In re Marsh & Mclennan Companies, Inc. Securities Litigation*, 501 F. Supp. 2d 452, 492 (S.D.N.Y. 2006) ("Because the heightened pleading requirements of Rule 9(b) apply, Plaintiffs must adequately plead that [the Section 11

defendants] were reckless . . ."); *see also In re Chembio Diagnostics, Inc. Securities Litigation*, 616 F. Supp. 3d 192, 201 (E.D.N.Y. 2022) ("*Rombach* [] instructs that Section 11 or 12(a)(2) claims that sound in fraud are 'subject to the test of Rule 9(b).' This test includes the requirement that a fraud claim plead the defendant's state of mind. Accordingly, courts in this circuit have consistently applied *Rombach* to dismiss Securities Act claims that sound in fraud but fail to plead scienter.") (internal citations omitted).

Meanwhile, Plaintiffs argue that those cases are based on misreadings of applicable Second Circuit precedent and instead argue that this Court should follow courts in this District which have found that Rule 9(b) does not require a pleading of scienter. *See e.g. In re Sanofi Securities Litigation*, 87 F. Supp. 3d 510, 529 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) ("Defendants argue that plaintiffs' other federal claims [including a Section 11 claim] 'sound in fraud' and therefore also require proof of scienter. That is wrong. Claims that sound in fraud must satisfy the heightened pleading requirements of Rule 9(b), but that Rule does not add substantive elements such as scienter to any claim.") (internal citations omitted); *see also McKenna v. Smart Technologies Inc.,* 2012 WL 1131935, at *21 (S.D.N.Y. Apr. 3, 2012) ("That the Amended Complaint sounds in fraud simply connotes the pleading standard that plaintiff must meet under procedural rules. It is axiomatic that procedural rules cannot eviscerate substantive law, imposed by statute or otherwise . . . The Securities Act is a strict liability statute, imposing liability for, at a minimum, negligence and does not . . . require allegations of scienter.").

The Court is ultimately persuaded by Plaintiffs' argument that the Rule 9(b) standard does not introduce an additional requirement to plead scienter. Accordingly, the Court declines

to dismiss Plaintiffs' Section 11 claim against Sanchez Ortega based on a lack of allegations of scienter.

While Plaintiffs have sufficiently demonstrated that their Section 11 claim against Sanchez Ortega should not be dismissed due to a failure to plead scienter, as stated above, the Court dismisses their Section 11 claims without prejudice due to a failure to include the Form F-6 in the TAC.

**B. Section 15 of the Securities Act**

Plaintiffs bring claims against Sanchez Ortega and Hansmeyer pursuant to Section 15 of the Securities Act. "Section 15 . . . creates liability for individuals or entities that 'control[] any person liable' under section 11 or 12. *In re Morgan Stanley*, 592 F.3d at 358 (citation omitted). Sanchez Ortega argues that because Plaintiffs' Section 11 claims fail, the Section 15 claims must also fail. Doc. 218 at 10. As discussed above, because Plaintiffs' Section 11 claims have been dismissed without prejudice, their Section 15 claims are also dismissed without prejudice.

**C. Section 10(b) of the Exchange Act and Rule 10b-5**

Section 10(b) of the Exchange Act prohibits using or employing "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," while SEC Rule 10b-5 creates liability for a person who makes "any untrue statement of a material fact or . . . omit[s] to state a material fact . . . in connection with the purchase or sale of any security." *In re OSG Securities Litigation*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013). A statement may give rise to liability under § 10(b) if it is "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Police & Fire Retirement System of the City of Detroit v. La Quinta Holdings Inc.*, No. 16 Civ. 3068

(AJN), 2017 WL 4082482, at *5 (S.D.N.Y. Aug. 24, 2017), *aff'd*, 735 F. App'x 11 (2d Cir. 2018) (internal quotation marks and citation omitted).

Rule 10b–5, promulgated to implement Section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Press v. Chemical Investment Services Corp*., 166 F.3d 529, 534 (2d Cir. 1999). Under Rule 10b–5, it is unlawful for any person, directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must plead that: (1) the defendant made a material misrepresentation or omission, (2) with scienter, i.e. a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss. *In re Express Scripts Holding Co. Securities Litigation*, No. 16 Civ. 3338 (ER), 2017 WL 3278930, at *10 (S.D.N.Y. Aug. 1, 2017) *see also Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014).

In addition to the percentage-of-completion misstatement in the offering materials, the TAC alleges Exchange Act claims regarding additional statements, including Abengoa's press releases, conference calls, and presentations announcing their financial results, including their EBITDA and corporate leverage ratios in 2013, as well as their goals for 2014, *see* ¶¶ 227–29, 234–37, 248–49, 265–67, Abengoa's press releases, conference calls, and presentations announcing their financial results for 2014 and goals for 2015, ¶¶ 270–73, 281–82, 285–89, 299–

303, and Abengoa's press releases, conference calls, and presentations announcing their financial results for 2015 and goals for 2016, ¶¶ 304–07, 312–15, 318–22. Abengoa argues these claims should be dismissed because: (1) the Spanish Criminal Proceedings were dismissed, allowing the Court to disregard allegations in the TAC corroborated upon those proceedings; (2) principles of comity; and (3) the plaintiffs fail to allege loss causation. The Court evaluates each argument in turn.

*1. Conclusion of the Spanish Criminal Proceedings*

Abengoa first argues that in light of the Spanish Criminal Proceedings' dismissals, the Exchange Acts claims should also be dismissed. Doc. 212 at 22. They argue that, when considering the Spanish Court dismissals, Plaintiffs fail to allege Abengoa acted with scienter; fraud in connection to Abengoa's statements about cash flow and liquidity; and falsity regarding the July 31, 2015 statements. *Id.* at 22–24. However, because the Court has already decided that it will credit the allegations premised on the Spanish Criminal Proceedings at this stage, the Court declines to dismiss Plaintiffs' Exchange Act claims on this basis.[25]

*2. Comity*

Abengoa also argues that the Exchange Act claims against it should be dismissed based on principles of comity, because Abengoa is currently ongoing liquidation proceedings in a Seville Court. Doc. 212 at 30–31. For the reasons stated above, Abengoa has not met its burden to demonstrate dismissal for comity is appropriate in the instant case, and therefore the Court declines to dismiss Plaintiff's Exchange Act claims on this basis.

---

[25] With respect to the statements concerning cash flow, liquidity, and the July 31, 2015, statements, Abengoa argues that the Court should follow its reasoning in its previous dismissal of these Exchange Act claims. Doc. 212 at 23–24. Because the Court's most recent dismissal of these allegations in the TAC was premised upon Plaintiffs' failure to allege an accounting fraud scheme, Doc. 195 at 50–51, and because the Second Circuit explicitly found that such a scheme was adequately alleged, Doc 199 at 40, reliance on that previous decision is misplaced.

*3. Loss Causation*

Abengoa argues that Plaintiffs' Exchange Act claims must be dismissed because Plaintiffs fail to allege loss causation. Docs. 212 at 24–30. Specifically, Abengoa argues that Plaintiffs have not alleged a corrective disclosure relating to the percentage-of-completion accounting statements or any of the other Exchange Act claims. *Id*. Plaintiffs meanwhile contend that they adequately allege loss causation for all Exchange Act claims via the November disclosures 2014 announcing the reclassification of Greenfield Bond debt and the August 2015 disclosures announcing a sudden need for raising capital. Doc. 226 at 22–30.

Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal citation omitted). "To establish loss causation, 'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* (internal citations omitted); *see also Huey v. Anavex Life Sciences Corp.*, No. 25-1752, 2026 WL 1838665, at *7 (2d Cir. June 26, 2026) ("[Loss causation] does, however, contain the requirements of causal link and proximity. That is clear from the Supreme Court's statement in *Dura* that the plaintiff must prove that the defendant's misrepresentation 'proximately caused' her harm. That is, there must be a causal link, and it must also be proximate.") (internal citations omitted).

However, at the pleading stage "[p]laintiffs' burden is not a heavy one. The complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misinterpretations." *Loreley Finance (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (internal citations omitted);

*see also id.* at 188 ("[I]t is not necessary for the plaintiff to plead loss causation in detail to render her fraud claim plausible at the motion-to-dismiss stage"); *Gimpel v. The Hain Celestial Group, Inc.*, 156 F.4th 121, 151 (2d Cir. 2025) (stating that for loss causation, "there is no heightened pleading standard").

Abengoa argues that Plaintiffs' Security Act claims must be dismissed because, as pleaded, neither the November 2014 disclosures nor the August 2015 disclosures adequately demonstrate loss causation. Doc. 212 at 24–30. The Court evaluates each in turn.

With respect to the November 2014 disclosures, Abengoa first argues that Plaintiffs lack standing to sue for any misstatements allegedly corrected by the disclosures, as they purchased their ADSs after the disclosures occurred. *Id.* at 25–26. Abengoa also argues that the claims specifically concerning the percentage-of-completion methodology and account fraud do not relate to the November 2014 disclosures, and more generally that the devaluation of Abengoa ADSs after the disclosure was inconsistent with Plaintiffs' loss causation theory. *Id.* at 26–29.

Plaintiffs do not contest that they first purchased ADSs after the November 2014 disclosures. Instead, they argue that the November 2014 disclosures were a part of the larger accounting-fraud allegations; that the November 2014 disclosures were only partial disclosures that the market did not fully process immediately; that Courts have found that 10b-5 plaintiffs need not have continuous share ownership through each corrective disclosure to maintain standing; and that loss causation does not require a "perfect mirror image disclosure." Doc. 226 at 24–27.

With respect to standing, as this Court stated in a previous order, "it is axiomatic that a putative class representative must be able to individually state a claim against defendants, even though he or she purports to act on behalf of a class." *In re Merrill Lynch & Co. Research*

*Reports Securities Litigation*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003); *see also Ramos v. Patrician Equities Corp.*, 765 F. Supp. 1196, 1199 (S.D.N.Y. 1991) ("A plaintiff, including one who is seeking to act as class representative, must have individual standing to assert the claims in the complaint against each defendant being sued by him.") (citations omitted). To establish standing, a plaintiff must establish "a personal injury that is fairly traceable to the defendant's conduct and likely to be redressed by the requested relief." *Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 159 (2d Cir. 2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). It is also well-established that "[w]ith respect to class representative standing, . . . where . . . plaintiffs allege that their losses were the result of a sustained course of conduct that propped up defendant's stock price throughout the class period, the class may be represented by an individual who purchased his shares prior to the close of the class period." *In re Vivendi Universal, S.A. Securities Litigation*, 242 F.R.D. 76, 87 (S.D.N.Y. 2007).

As Abengoa correctly points out, the Court has previously examined these arguments concerning the November 2014 disclosures. When considering the SAC, this Court previously held that Lead Plaintiffs did not have standing to bring Exchange Act claims premised upon the November 2014 disclosures, because the Shermans purchased their ADSs after the alleged disclosures. Doc. 139 at 29–32. In doing so, the Court first rejected the argument that the November 2014 disclosures, which concerned debt misclassification, were part of a "sustained course of conduct" existing before and after those disclosures, because the disclosures were not sufficiently related to Plaintiffs broader allegations of accounting fraud which continued afterwards. *Id.* at 29–30 (comparing the instant case to *City of Bristol Pension Fund v. Vertex Pharm Inc.*, 12 F. Supp. 3d 225 (D. Mass. 2014)). For similar reasons, the Court also rejected

the argument that the November 2014 disclosures were partial disclosures that investors failed to fully process given Abengoa's subsequent representations about sustained cash flow and liquidity. *Id.* at 31. The Court found this argument inconsistent with other allegations in the SAC, which demonstrated that the November 2014 disclosures quickly resulted in a 50% decrease in stock price. *Id.*

With respect to this analysis, the facts in the TAC are materially similar to those in the SAC, such that this Court's analysis need not change. In a November 12, 2014, call, Abengoa communicated its optimism about the company's cash flow and liquidity, ¶¶ 270, 272, and disclosed that it classified Greenfield Bonds as non-recourse debt, excluded from the corporate leverage ratio, ¶¶ 275, 279. Analysts and investors criticized the debt classification decision, causing the price of Abengoa ADSs to fall by nearly 50% over three trading days. ¶¶ 352–53. Abengoa's call on November 17, 2014, reiterated its decision to classify the Greenfield Bonds as non-recourse debt and Abengoa's sound liquidity position. ¶¶ 279, 282. Lead plaintiffs, Jesse and Arlette Sherman, bought ADSs after these disclosures, with their initial ADS purchase coming on November 18, 2014.[26] Doc. 7-1.

In a footnote, Plaintiffs argue that this is distinguishable from the Court's previous order because in its previous order, "this Court found that the plaintiff did not have standing because the corrective disclosure issued a day before plaintiff purchased '***and*** there was no sustained course of conduct.' . . . Here the TAC alleges precisely such a course of conduct." Doc. 226 at n.6 (emphasis in original). While it is true that Abengoa's statements about liquidity, cash flow,

[26] In its motion to dismiss, Abengoa argues that July 2015 should be the relevant date for the Court's analysis here because the purchases upon which Plaintiffs are suing were made between July 15 and July 22, 2015. *See* Doc. 7-2. Plaintiffs do not counter this point directly; however, whether the Court uses the initial purchase date of November 18, 2014, or the July 2015 date, the Court's analysis remains unchanged.

and broader accounting continued beyond these November 2014 disclosures, the previous order found that specific disclosures concerning the classification of Greenfield Bonds are materially distinct from broader allegations of accounting fraud to not constitute a sustained course of conduct. Doc. 139 at 30–31. This conclusion is bolstered by the Second Circuit's reasoning, albeit in a different context, that the November 2014 disclosure did not "relate directly" to Plaintiffs' allegations concerning accounting practices. Doc. 199 at 21 (finding that, with respect to Plaintiffs' Section 11 claims, the 2014 disclosure did not trigger Plaintiffs' duty to inquire as to Abengoa's alleged fraud because "Abengoa's November 2014 disclosure—in which it acknowledged that it had misclassified its debt—did not 'relate directly' to Plaintiffs' allegations in the FAC and SAC that Abengoa made false statements in its Registration Statement regarding its accounting practices.").

Therefore, as it did in its order dismissing the SAC, the Court concludes that Plaintiffs lack standing to bring claims for alleged misrepresentations that were corrected by the November 2014 disclosures, namely alleged misstatements concerning Abengoa's debt.[27] Further, because

---

[27] In their opposition, Plaintiffs also argue that "[c]ourts consistently hold that plaintiffs asserting Rule 10b-5 claims do not need continuous share ownership through each corrective disclosure to maintain standing for class representation." Doc. 226 at 26. However, the cited cases do not stand for that exact proposition. *See In re Stillwater Capital Partners Inc. Litigation*, 853 F. Supp. 2d 441, 445, n.4 (S.D.N.Y. 2012) (denying defendants' arguments that some plaintiffs lacked standing to bring Exchange Act claims because there were factual issues concerning the securities' ownership that needed to be resolved as a part of the class certification motion); *Hom v. Vale,* S.A., 2016 WL 880201, at *7 (S.D.N.Y. Mar. 7, 2016) (denying the appointment of co-lead plaintiffs, even though one lead plaintiff may not be able to allege loss causation for a specific set of claims).

The Second Circuit has recognized that "[n]othing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action . . .'[I]t is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim.'" *Police & Fire Retirement System of City of Detroit v. IndyMac MBS*, Inc., 721 F.3d 95, 112 (2d Cir. 2013) (internal citations omitted). However, at the same time, "there must be a named plaintiff sufficient to establish jurisdiction over each claim advanced." *Id.* "In fact, the lead plaintiff in a securities class action has 'a responsibility to identify and include named plaintiffs who have standing to represent the various potential subclasses of plaintiffs who may be determined, at the class certification stage, to have distinct interests or claims.'" *Fishbury, Ltd. v. Connetics Corp*., No. 06 CIV. 11496 (SWK), 2006 WL 3711566, at *4 (S.D.N.Y. Dec. 14, 2006) (internal citations omitted). Plaintiffs do not argue that a different named plaintiff purchased Abengoa ADSs prior to the November 2014 disclosures.

the November 2014 disclosures were unrelated to Plaintiffs' broader allegations of accounting fraud, Plaintiffs cannot use them to demonstrate loss causation for Exchange Act claims about alleged misstatements concerning liquidity, cash flow, and the percentage-of-completion accounting method.

With respect to the August 2015 disclosure, Abengoa argues that the Exchange Act claims premised on the percentage-of-completion misstatements must be dismissed as the August 2015 disclosure "did not reveal anything about Abengoa's use of percentage-of-completion accounting," and more broadly that all Exchange Act claims premised on the August 2015 disclosure should be dismissed as Abengoa's plans to raise capital were already public.[28] Doc. 212 at 27–31.

To summarize the relevant facts, on July 31, 2015, Abengoa first hinted at financial troubles during a conference call following a press release wherein it announced guidance concerning a reduction in corporate free cash flow and plans to divest €400 million worth of assets. ¶ 357. However, company executives continued to represent that Abengoa was in an adequate liquidity position, and Seage stated that Abengoa had "no plan . . . to tap the capital markets in any manner." ¶¶ 357–58. However, on August 3, 2015, the next business day, Abengoa announced that it was seeking shareholder approval of a capital increase with preemptive rights of €650 million and asset divestitures totaling €500 million. ¶ 160. According

---

[28] Abengoa also argues that the TAC itself admits that the August 3, 2015 disclosure did not relate to the percentage-of-completion misstatements because it alleges that the disclosure was "'about its "strong liquidity position" and "strict financial discipline"' . . . statements [which] are no longer in this case." Doc. 212 at 27 (citing TAC ¶ 365). However, the Court does not read the TAC as limiting the allegations concerning the August 3, 2015 disclosure purely to those two statements, but rather as providing those two statements as examples of the types of misrepresentations revealed by the disclosure. *See* TAC ¶ 365 ("Abengoa's [August 3, 2015] about-face signaled to investors that its previous statements about its 'strong liquidity position' and 'strict financial discipline,' for example, were untrue. In fact, Abengoa was and had been on the brink of a liquidity crisis, a reality that had been successfully concealed since the Offering thanks to Defendants' false and materially misleading statements and accounting fraud scheme to inflate earnings and hide losses.").

to reports from Canaccord Genuity, Citi, and Bloomberg, analysts and investors were "stunned," and over the next two trading days, Abengoa stock price declined 45%. *Id.* ¶¶ 360–65.

The Court finds that the allegations concerning the August 2015 disclosure adequately allege loss causation at this stage. To successfully plead loss causation, a plaintiff may either allege: "(a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud' or (b) that 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232–33 (2d Cir. 2014) (citing *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501, 511, 513 (2d Cir.2010)) (internal quotations and citations omitted).

Abengoa argues that any Exchange Act claims based on alleged percentage-of-completion misstatements cannot attribute any loss to the August 2015 disclosure because the disclosure was not corrective as it "did not reveal anything about Abengoa's use of percentage-of-completion accounting." Doc. 212 at 26–27. "In order to plead corrective disclosure, plaintiffs must plausibly allege a disclosure of the fraud by which 'the available public information regarding the company's financial condition [was] corrected,' and that the market reacted negatively to the corrective disclosure." *Carpenters Pension Trust Fund of St. Louis*, 750 F.3d at 233 (internal citations omitted). Plaintiffs correctly observe that Courts in this Circuit have found that corrective disclosures need not be "mirror images" of the misstatement they are correcting. *See e.g. Freudenberg v. E*Trade Finance Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y 2010) (noting that "neither the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure to be a 'mirror image'"). However, Abengoa correctly points out that the corrective disclosures in Plaintiffs' cited cases more closely

relate to the alleged misstatements than those in the instant case. *See e.g. Zornberg v. NAPCO Security Technologies, Inc.*, 778 F. Supp. 3d 516, 524 (E.D.N.Y. 2025) (finding that a company's disclosure that several quarterly reports "should no longer be relied upon" was a corrective disclosure to alleged misstatements of inventory levels in the same quarterly reports).

Regardless, the Court finds that Plaintiffs sufficiently allege that Abengoa's August 2015 announcement that it sought a massive capital increase—despite stating the contrary the prior business day—was a materialization of a risk concealed by Abengoa's allegedly fraudulent misstatements concerning percentage-of-completion accounting, liquidity, and cash flow. *See* Doc. 226 at 28. Under the materialization of risk theory, "[a] misrepresentation is 'the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations.'" *In re Omnicom Group*, 597 F.3d at 513 (quoting *Lentell*, 396 F.3d at 173). Plaintiffs plausibly allege that Abengoa's misstatements concerning the percentage-of-completion accounting, cash flow, and liquidity, were all aimed at obfuscating a liquidity crisis. The Court is persuaded that such an unexpected announcement of a $650 million raise, despite assurances to the contrary the previous business day, is within the "zone of risk" of obfuscating the company's liquidity crisis. The subsequent drop in the Abengoa ADS price is therefore sufficient to establish loss causation at this stage. While the evidence may not ultimately demonstrate the required causal connection at summary judgment or trial, Plaintiffs meet their burden at this stage, which is "simply [to] give Defendants . . . a plausible causal link between th[e] loss and the alleged misrepresentations." *Loreley*, 797 F.3d 160.

Abengoa's arguments to the contrary are unpersuasive at this juncture. Abengoa argues that this case is like that of *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Finance Holdings Ltd.*, in which a court in this District found that press releases

concerning a SEC investigation into finite reinsurance contracts did not qualify as corrective disclosures for the plaintiff's general allegations of accounting fraud as "there is no logical connection between the press releases and Plaintiff's vague allegations of manipulations and improper accounting." 886 F. Supp. 2d 328, 338 (S.D.N.Y. 2012) ("Plaintiff is essentially arguing that the press releases made shareholders aware of the issues surrounding Fairfax's finite reinsurance contracts, which, by some unexplained connection, also disclosed to shareholders that Fairfax was an irresponsible company. While loss causation certainly need not be demonstrated explicitly, Plaintiff's purported relationship between the press releases and Fairfax's improper accounting mechanisms is far too tenuous to support a claim."). However, unlike the *Plumbers* court, in the instant case, the Court finds a sufficient logical connection between the disclosures and the alleged misstatements. As stated above, the alleged misrepresentations aimed to obfuscate issues of liquidity, and the materialization of that risk occurred when Abengoa unexpectedly announced a capital raise to address those hidden issues.

Next, Abengoa argues that the August 2015 disclosure is insufficient to demonstrate loss causation because Abengoa's capitalization needs were already public. Doc. 212 at 29–30. Abengoa correctly identifies that according to the TAC's allegations, in the months prior to August 2015, Abengoa raised money in various ways. Doc. 165 ¶ 150–51 (alleging that on May 8, 2015, Abengoa borrowed approximately €275 million of class B shares from its majority shareholder and agreed to "subscribe to 51% of a $670 million capital increase announced by [a subsidiary]"); *id.* ¶ 153 (alleging that on June 29, 2015, Abengoa filed a form with the SEC indicating that one of its subsidiaries had entered into a margin loan agreement allowing it to borrow up to $200 million); *id.* ¶ 157 (alleging that on July 16, 2015, Abengoa filed a Form 6-K announcing that it raised €97.6 million from the sale of all class B shares in its treasury stock);

*see also* Doc 213-10 at 103 (the registration statement, stating "[w]e believe our market capitalization is affected by our level of indebtedness, as our refinancing risk may be high relative to certain other borrowers . . ."). Further, it is true that where a disclosure provides new information to the public, that disclosure generally cannot be source of allegations of loss causation. *See e.g. In re Omnicom Group*, 597 F.3d at 511 (denying that a board member's resignation constituted materialization of the risk, as the facts giving rise to the resignation "were known a year before the resignation, and the resignation did not add to the public knowledge any new material fact about the [allegedly misleading] transaction"); *see also In re EHang Holdings Ltd. Securities Litigation*, 646 F. Supp. 3d 443, 465 (S.D.N.Y. 2022) (finding that a report could not serve as a corrective disclosure to demonstrate loss causation because the report "did not reveal 'some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint'") (internal citations omitted). However, the Court is persuaded that there is significance to the fact that, just the business day prior to announcing the raise, Abengoa had assured investors that Abengoa was in an adequate liquidity position and that it did not plan to raise capital through the market. Therefore, the August 3, 2015 announcement that Abengoa sought to raise $650 million did make public material information about Abengoa's liquidity position, which is what the alleged misstatements aimed to obscure.

Accordingly, the Court finds that Plaintiffs sufficiently allege loss causation based on Abengoa's August 3, 2015 disclosure. Therefore, Abengoa's motion to dismiss the Exchange Act claims concerning the alleged misstatements of the percentage-of-completion accounting, liquidity, and cash flow are denied.

## IV. CONCLUSION

For the reasons set forth above, Abengoa's motion is GRANTED in part and DENIED in part, Sanchez Ortega's motion is GRANTED, and the Underwriter Defendants' motion is GRANTED. As discussed above, Plaintiffs' Security Act claims have been dismissed without prejudice, while Plaintiffs' Exchange Act claims have been partially dismissed with prejudice.

With respect to the dismissal of the Security Act claims, Plaintiffs are granted leave to amend their complaint for the limited purpose of adding information about the Form F-6. With respect to Plaintiffs' Exchange Act claims, the claims premised on alleged misstatements of percentage-of-completion accounting, liquidity, and cash flow can continue.

Plaintiffs must file any fourth amended complaint by September 25, 2026.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 211, 214, 217, 220, 225.

It is SO ORDERED.

Dated: August 28, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.