UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL FRANCISCO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ABENGOA, S.A., SANTIAGO SEAGE, MANUEL SANCHEZ ORTEGA, BARBARA ZUBIRIA and IGNACIO GARCIA ALVEAR,<br><br>Defendants. | Case No. 1:15-cv-06279 (ER)<br><br>**FOURTH AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

# TABLE OF CONTENTS


NATURE OF THE ACTION ........ 1

JURISDICTION AND VENUE ........ 7

PARTIES ........ 7

Plaintiffs ........ 7

Abengoa ........ 8

Individual Defendants ........ 8

Underwriters ........ 8

RELEVANT NON-PARTIES ........ 9

Abengoa Senior Management ........ 9

Former Abengoa Employees ........ 10

CLASS ACTION ALLEGATIONS ........ 12

SUBSTANTIVE ALLEGATIONS ........ 14

Abengoa's Business and Organizational Structure ........ 14

Systemic Accounting Fraud at Abengoa ........ 15

Benjumea Artificially Inflates Abengoa's 2012 Revenues ........ 25

Abengoa Falsifies Project Expenses and Financial Statements prior to the Offering ........ 28

Investors Purchase Abengoa ADSs on False Information ........ 32

Abengoa Manipulates Project Costs and Hides Losses after the Offering ........ 34

The Need for Capital Increases as Project Losses Accumulate ........ 39

Abengoa's Liquidity Crisis Results in Bankruptcy ........ 41

Criminal Charges against Senior Leadership ........ 43

Sanctions against Abengoa's Independent Auditor ........ 51

SECURITIES ACT ALLEGATIONS ........ 52

The Registration Statement Contained Material Misrepresentations and Omissions ........ 52

Violation of Section 11 of the Securities Act Against the Securities Act Defendants ........ 55

Violation of Section 15 of the Securities Act Against the Individual Defendants ........ 56

EXCHANGE ACT ALLEGATIONS ........ 57

Materially False and Misleading Statements Made During the Class Period ........ 57

The Offering ........ 57

First Nine Months of 2013 Financial Results .......... 60
Full Year 2013 Financial Results .......... 61
The 2013 20-F .......... 63
Eighth Annual Analyst and Investor Day .......... 66
First Quarter of 2014 Financial Results .......... 67
First Half of 2014 Financial Results .......... 69
Strategy Update Breakfasts .......... 70
First Nine Months of 2014 Financial Results .......... 72
February 9, 2015 Announcements .......... 76
Full Year 2014 Financial Results and 2014 20-F .......... 79
First Quarter of 2015 Preliminary Financial Results and Ninth Annual Analyst and Investor Day .......... 83
First Quarter of 2015 Financial Results .......... 84
First Half of 2015 Financial Results .......... 87
Additional Scienter Allegations .......... 90
Corporate Scienter .......... 90
Ortega's Resignation Bolsters the Inference of Scienter .......... 92
Loss Causation/Economic Loss .......... 95
Applicability of Presumption of Reliance: Fraud on the Market Doctrine and *Affiliated Ute* Doctrine .......... 99
No Safe Harbor .......... 101
Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants .......... 101
Violation of Section 20(a) of the Exchange Act Against the Individual Defendants .......... 102
PRAYER FOR RELIEF .......... 103
JURY TRIAL DEMANDED .......... 104

Lead Plaintiffs Jesse and Arlette Sherman ("Lead Plaintiffs") and additional plaintiff PAMCAH-UA Local 675 Pension Fund (collectively, "Plaintiffs"), by their undersigned attorneys, make the allegations set forth herein based upon knowledge as to their own acts and upon the investigation conducted by Plaintiffs' counsel. That investigation included the examination and analysis of information obtained from public and proprietary sources – including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings by Abengoa, S.A. ("**Abengoa**"), regulatory filings and reports, securities analysts' reports and advisories, press releases and other public statements, media reports, and interviews with former employees of Abengoa and/or its subsidiaries. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of purchasers of: (i) the American Depositary Shares ("ADSs") of Abengoa between October 17, 2013 and August 3, 2015, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; and (ii) Abengoa ADSs pursuant and/or traceable to its public offering conducted on October 17, 2013 (the "Offering"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2. Abengoa was founded in 1941. At the time of the Offering, it was widely regarded as one of Europe's most preeminent and venerable engineering and construction companies. Unbeknownst to investors, it was rife with fraud. Even without the benefit of formal discovery, Plaintiffs have amassed blatant proof that Abengoa was systemically, on a company-wide scale, manipulating its financial records and statements to conceal a severe liquidity risk prior to, during, and after the Offering. Similar to "Ponzi" schemes, Abengoa's fraud came to an abrupt halt when it was no longer able to obtain new money to hide old losses. Abengoa filed for bankruptcy at that point, leaving its investors with pennies on the dollar.

3. Abengoa's accounting fraud was extensive. It involved multiple layers of management across dozens of subsidiaries and consumed entire segments within the organization. Plaintiffs' support for these accusations primarily consists of first-hand accounts from former employees within Abengoa's "Engineering and Construction" division subsidiaries Abeinsa Ingeniería y Construcción Industrial S.A. ("**Abeinsa**") and Instalaciones Inabensa S.A. ("**Inabensa**"), which historically accounted for approximately 60% of Abengoa's overall consolidated revenue. These former employees describe a systemic course of conduct whereby Abengoa artificially inflated profit margins for its various construction projects while simultaneously recording fake expenses. This was done in order to prematurely recognize revenue under international accounting standards, specifically International Accounting Standard 11 which provided the rules for the "percentage of completion" revenue recognition method.

4. Plaintiffs also rely on judicial fact findings from ongoing criminal proceedings against Abengoa in Spain. These criminal proceedings accuse Abengoa and its senior management, including former CEO Manuel Sanchez Ortega ("**Ortega**") and former Executive Chairman Felipe Benjumea Llorente ("**Benjumea**"), of "corporate crime as defined in article 290 of the Penal Code" and "the crime of misrepresentation in capital investment or misrepresentation in investment in stock markets in violation of, as defined in art 282 bis of the Penal Code." Importantly, these criminal proceedings, of which there are two, are well past the initial pleading stage. They have been "admitted" in their respective courts and then thoroughly and independently investigated by the investigating judges with the use of subpoenas, testimony, expert analyses, and evidentiary hearings. Although these proceedings remain mostly confidential, certain information has been made public and, as demonstrated below, provides chapter-and-verse support for Plaintiffs' allegations.

5. Plaintiffs' perhaps most damning piece of evidence features Abengoa's former Executive Chairman, Benjumea, front-and-center. Between August 2012 and September 2012, ***prior to the Offering***, Benjumea conspires in emails with multiple directors and department heads at a number of Abengoa's subsidiaries to inflate project expenses across at least seven different

projects on three different continents. The net result of Benjumea's directives—and, indeed, the text of his September 21, 2012 email explicitly qualifies it as a ***directive***—is to artificially double Inabensa's forecasted profit margin to €53 million for the 2012 fiscal year. For context, this amount represented 10% of Abengoa's consolidated operating profit for the entire year.

6. Another example of fraud ***prior to the Offering*** involves one of Abengoa's most prestigious construction contracts, the AVE Mecca Medina project. This project involved constructing a high-speed railway and supporting structures between Mecca and Medina in Saudi Arabia. The overall project was valued at more than €7 billion with Abengoa slated to receive more than €150 million. Abengoa formally commenced work on December 31, 2012. On that very same day, Abengoa charged €ll,465,328 in costs from previous, unrelated projects to AVE Mecca Medina's books. According to the former employee who investigated this matter within Abengoa, these expenses were nowhere in the budget, but instead represented losses from previous unrelated projects. By recording these expenses when it did, Abengoa fraudulently inflated its revenue for the year by prematurely recording additional revenue commensurate with the expenses under the "percentage of completion" revenue recognition rules.

7. Similarly, in yet another example of fraud ***prior to the Offering***, Abengoa concealed a significant impairment attributable to its subsidiary, CSP Equity Investment S.a.r.l., and the value of six different solar plants located in Spain. In June 2013, Abengoa commenced arbitration proceedings against the Kingdom of Spain claiming that the Government's energy reform laws had devalued its solar plants by €840 million. Yet Abengoa did not disclose these solar plant losses in its Registration Statement and Prospectus for the Offering.[1] Instead, Abengoa

[1] The Registration Statement and Prospectus for the Offering (collectively, the "Registration Statement") consisted of: (i) the registration statement on Form F-1 (File No. 333-191575) that Abengoa filed with the SEC on October 4, 2013, as amended on October 15 and 16, 2013 (the "Form F-1"); (ii) the registration statement on Form F-6 that Abengoa and Citibank, N.A., as depositary, filed with the SEC on October 7, 2013, registering the ADSs, each representing five Class B shares (the "Form F-6"); and (iii) the final prospectus (the "Prospectus") that Abengoa filed with the SEC on October 17, 2013, which forms part of the Form F-1. The SEC declared the

billed itself as a venerable institution with "strict financial discipline," a "strong cash position," and a "robust project management and control system" that fairly and strictly adhered to "[r]evenue recognition using the percentage-of-completion method" based on its "long-track experience . . . in constructing complex infrastructures and installations." Thus, when investors purchased Abengoa's ADSs, they did so based on false and materially misleading information.

8. These examples are not one-off transgressions committed by just a few rogue employees. They were part and parcel of an overarching systemic fraud that, as shown above, was known and enforced by Abengoa's most senior leadership. Indeed, according to a confidential "whistleblower," Abengoa's "Engineering and Construction" division subsidiaries (*i.e.*, Abeinsa and Inabensa) routinely inflated project profit margins and improperly recognized revenue in violation of the percentage of completion method. In fact, citing specific examples and using screenshots of Abengoa's internal accounting files, the "whistleblower" demonstrates how senior management used accounting entries referred to as "cost provisions" to inflate project expenses at the end of a fiscal year. This, in turn, allowed Abengoa to recognize additional amounts of revenue under the percentage of completion method. This benefited not just Abengoa as a whole, but the individual project managers and directors as well, in light of the fact that their bonuses were tied to the profitability of their respective projects.

9. The "whistleblower" account is corroborated by additional former employees as well as evidence leaked to the media in Spain. For example, in August 2018, Abengoa's current Executive Chairman, **Gonzalo Urquijo**, retained KPMG to conduct a forensic analysis of Abengoa's past financial statements. KPMG completed its investigation in October 2019. Its final report identified three types of accounting fraud that were endemic at Abengoa and its subsidiaries between 2012 and 2016, including the transferring of project expenses to inflate margins and hide

---

Form F-1 and the Form F-6 effective on October 16, 2013. Together, these documents registered the ADSs sold in the Offering.

losses (referring to it as invoice "triangulation"). KPMG cited the emails to and from Benjumea discussed above in its conclusions.

10. In addition, the "whistleblower" account is supported by Spain's top financial accounting regulator, the *Instituto de Contabilidad y Auditoria de Cuentas* (the "ICAC"), a regulatory agency similar to the Public Company Accounting Oversight Board in the U.S. On February 20, 2018, the ICAC sanctioned Abengoa's independent auditor for the 2014 fiscal year, **Deloitte S.L.**, and its lead audit partner, **Don Manuel Arranz Alonso,** in connection with its audit of Abengoa's 2014 financial statements. The ICAC resolution cites specific instances in which Deloitte knowingly certified incorrect and materially misleading financial statements, referring in some instances to Deloitte's actions as "reprehensible." The resolution also faults Deloitte for failing to object or even question Abengoa's inflated profit margins. These breaches of auditing standards led the ICAC to fine Deloitte and its audit partner €1.48 million and €8,700, respectively.

11. Abengoa and its top executives, including Ortega, concealed the existence of this massive accounting scheme and the severe liquidity risk that it was hiding. Instead, they represented that Abengoa's EBITDA was increasing year-over-year and that it had achieved its "liquidity reinforcement plans" thanks to their "strict financial discipline." These statements, and others like them, collectively concealed Abengoa's true liquidity risk and materially misled investors to believe that it was able to timely meet its financial obligations and fund its operations.

12. The problem that Abengoa sought to conceal though was so vast and touched upon so many aspects of its business that eventually the fraud was unable to keep it hidden. Fissures began to appear in Abengoa's public façade. In November 2014, following a bond issuance by one of Abengoa's subsidiaries, analysts inquired why Abengoa failed to include the bonds in its recourse debt leverage ratio. This ratio was critical to analysts because it was a metric for evaluating Abengoa's liquidity and, depending on the ratio, determined whether and how much additional financing it could obtain. Abengoa provided an excuse in response, but it was not received well by the market which largely believed that it had attempted an accounting slight-of-hand in hopes of showing lower leverage ratios. As *Reuters* reported, the revelation raised "myriad

further questions about how various liabilities are treated on its balance sheet" and quoted a hedge fund analyst as stating: "***The more they open the door on their financials, the more questions there are***." (Emphasis added.) The debacle hit Abengoa's credibility and ADS price, resulting in a steep decline of nearly 50% per ADS

13. Abengoa's cash crisis worsened over the next year. This necessitated a series of transactions designed to inject badly-needed capital into its balance sheet, including borrowing shares from majority shareholders, using subsidiaries to take out margin loans, and selling the ***entirety*** of its treasury stock. While this was happening, Ortega and Abengoa's CFO at the time, Bárbara Zubiría Furest ("Zubiría"), resigned amidst tightening internal controls over project margins and cost provisions.

14. On August 3, 2015, suspicions over Abengoa's accounting and true financial health peaked when, ***the day after announcing that it had "no need" and "ha[d] no plans" to raise additional capital***, Abengoa did just that by announcing a massive capital increase of ***€650 million*** and asset divestitures totaling ***€500 million***. Analysts sounded the alarms. *Bloomberg*, for example, said that the unexpected announcement had "***eroded trust in Abengoa's accounting methods and ability to generate sufficient cash to service its debt***." (Emphasis added.)

15. Analysts were correct to question Abengoa's solvency. On November 25, 2015, Abengoa announced that Gonvarri Corporación Financiera ("Gonvarri"), who had previously agreed to invest approximately €350 million in connection with Abengoa's planned €650 million capital increase, had canceled the deal and that, as a result, Abengoa was filing for preliminary creditor protection under the Spanish Insolvency Law. At the time of the filing, Abengoa reported gross financial debt of €8.9 billion. In addition, analysts estimated that Abengoa had approximately €2.1 billion in "confirming lines" (*i.e.*, funds owed to suppliers) and €5.9 billion of debt held by subsidiaries, bringing its total debt to ***€16.9 billion***.

16. On April 18, 2016, Abengoa's ADSs ceased trading on the NASDAQ, less than three years from when they were first listed. Plaintiffs and other similarly situated investors have been left with nothing. Meanwhile, in Spain, Abengoa, Ortega, Benjumea, and others face criminal

charges for accounting fraud. Plaintiffs bring this action to recover the damages they sustained as a result of Defendants' fraud under the federal securities laws.

## JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5] and Sections 11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o].

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 27 of the Exchange Act [15 U.S.C. §78aa] and Section 22 of the Securities Act [15 U.S.C. §77v].

19. Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act and 28 U.S.C. §1391(b) and (c). Many of the acts that constitute the alleged violations of law occurred in this District, and the Offering was marketed in this District.

20. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ, a national securities market located in this District.

21. This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

22. At the time of the Offering, more than 30% of Abengoa's revenues were generated in the United States. Furthermore, it received substantial "stimulus" funds from the federal government. During the Class Period, Abengoa's U.S. headquarters were located in St. Louis, Missouri.

## PARTIES

### Plaintiffs

23. Lead Plaintiffs and Plaintiff PAMCAH-UA Local 675 Pension Fund purchased the ADSs of Abengoa during the Class Period and traceable to the Offering, as set forth in the

certifications previously filed with the Court and incorporated herein by reference, and have been damaged thereby.

**Abengoa**

24. Defendant Abengoa was founded in 1941 as an engineering and construction company and subsequently expanded its operations into activities including renewable energy, power transmission lines and biofuels. During the Class Period, Abengoa maintained its principal corporate offices at Campus Palmas Altas, No. 1, Calle Energia Solar, Seville, 41014, Spain.

**Individual Defendants**

25. Ortega served as Abengoa's CEO from March 2010 until his resignation from that position on May 19, 2015. Ortega also served as First Vice-Chairman of the Board of Directors from January 20, 2015 through July 27, 2015, and was a member of Abengoa's International Advisory Board at all relevant times herein.

26. Following Ortega's resignation in May 2015, independent auditors retained by Abengoa's new management obtained evidence of accounting fraud implicating Ortega and other members of Abengoa's senior management. As detailed below, Ortega has been and remains a defendant in criminal proceedings in Spain, where he stands accused of violating Articles 282 bis and 290 of the Criminal Code of Spain for falsifying Abengoa's economic-financial information.

27. Defendant Christopher Hansmeyer ("Hansmeyer") was, at all relevant times, the duly authorized representative for Abengoa in the United States.

**Underwriters**

28. Defendants HSBC Securities (USA) Inc., Canaccord Genuity Inc., Merrill Lynch International and Société Générale (the "Underwriter Defendants") are investment banks that served as underwriters for the €517.5 million Offering (which at the time was equal to $703.8 million), helping to draft and disseminate the Registration Statement and sharing more than €18.5 million in underwriting fees.

29. The Underwriter Defendants failed to perform adequate due diligence in connection with their roles as underwriters for the Offering and were negligent in failing to ensure that the

Registration Statement for the Offering was prepared properly and accurately. The Underwriter Defendants' failure to conduct adequate due diligence was a substantial factor leading to the harm complained of herein.

* * *

30. The "Securities Act Defendants" refers to Abengoa, Ortega, Hansmeyer, and the Underwriter Defendants.

31. The "Exchange Act Defendants" refers to Abengoa and Hansmeyer.

32. The "Individual Defendants" refers to Ortega and Hansmeyer.

## RELEVANT NON-PARTIES

### Abengoa Senior Management

33. Benjumea is a member of Abengoa's founding family, the Benjumeas. He joined Abengoa in 1983 as a member of the Board of Directors, and in 1989 he was appointed Managing Director. He served as the Executive Chairman of the Board of Directors from 1991 until September 24, 2015, when he was demoted to "Honorary" Chairman of the Board of Directors.

34. As Executive Director, Benjumea was responsible for and oversaw executive functions at Abengoa. This included overseeing and orchestrating the alleged fraudulent conduct at Abengoa. As detailed below, following his demotion in September 2015, independent auditors implicated Benjumea as having been directly involved in and responsible for fraudulent accounting at Abengoa. He has been and remains a defendant in criminal proceedings in Spain, where he stands accused of violating Articles 282 bis and 290 of the Criminal Code of Spain for falsifying Abengoa's economic-financial information.

35. Santiago Seage ("Seage") served as CEO and First Vice-Chairman of Abengoa from May 2015, following the resignation of Ortega, until his resignation on November 27, 2015. Seage presently serves as CEO of Atlantica Yield plc (formerly known as Abengoa Yield plc) ("ABY" or "Abengoa Yield"), a position he held from its formation in December 2013 through May 2015, and reassumed in November 2015. Additionally, Seage held other senior management positions at Abengoa since joining in 2005.

36. Bárbara Zubiría Furest ("Zubiría") served as Abengoa's Co-Chief Financial Officer ("CFO") and Executive Vice President of Capital Markets and Investor Relations from January 2011 until her sudden resignation, announced on January 19, 2015. In addition, Zubiría signed the Registration Statement, as defined herein.

37. Ignacio Garcia Alvear ("Garcia Alvear") served as Abengoa's Co-CFO for Investor Relations and Capital Markets since February 1, 2015, when he assumed the responsibilities of Zubiría following her resignation. Garcia Alvear previously served as the CFO of Abengoa Bioenergy since January 2004.

**Former Abengoa Employees**

38. The allegations in this Complaint are supported by the knowledge of former high-ranking and mid-level Abengoa employees ("FEs"). As detailed below, these former employees each served in positions at Abengoa that provided them with access to the information they are alleged to possess.

39. FE1 was the Director of Human Resources at Abengoa's U.S. subsidiary Abeinsa EPC from August 2010 through March 2013, when FE1 resigned due to the stress caused by knowing about, among other things, accounting irregularities.

40. FE2 is a former Abengoa employee who had broad oversight for accounting and financial reporting at several of Abengoa's U.S. subsidiaries. FE2 resigned rather than sign off on false financial statements created to obtain capital for Abengoa.

41. FE3 worked as a Senior Staff Accountant at Abengoa's corporate office in Chesterfield, Missouri from June 2013 through July 2014, when FE3 resigned due to concerns about Abengoa's financial reporting. In that position, FE3 was responsible for accounting functions at Abengoa's U.S. subsidiary Abeinsa, including, among other things, preparing weekly and monthly financial reports for Abengoa's corporate headquarters in Spain and preparing and analyzing cash flow statements.

42. FE4 worked for the Abengoa group from 1989 until retiring in 2016. FE4 worked as the "Chief of Critical Projects Follow-up" for Inabensa between 2013 and 2014, and in 2015 in

the Controller Department until his retirement in March 2016. FE4's function was to technically audit the execution of the projects and to identify, follow up, and help to resolve critical project problems. In 2015, Raul Santiago Perez joined the department as its Manager and FE4's direct supervisor. In the course of his role in the "Critical Projects Follow-up" Department during 2013 and 2014, project managers referred different issues to FE4. FE4 discovered significant accounting irregularities in the course of his ordinary duties, including a double accounting system with large disparities, false expenses and manipulated accounting entries.

43. FE5 worked as a communications engineer from 2007 to 2017 for Inabensa. In April 2015, FE5 was assigned to the "Controller Department" as a "project control engineer" ("Ingeniero de Control de Proyecto" or "ICP") for the AVE Mecca Medina project in Saudi Arabia. FE5 was one of the first ICPs at Abengoa, which was a new position created to investigate why its projects routinely maintained strong profit margins during the life of their execution only to suddenly show heavy losses once completed. As an ICP, FE5 was tasked with overseeing the project's budget which required, among other things, comparing the initial budget to subsequent costs (incurred, committed, and pending) in order to evaluate project margins. This was the specific purpose of the "Controller Department," which was created specifically to control independently from Abengoa's internal Audit Department the correlation between the initial budget and the subsequent costs that arose during the execution of the project. FE5 remained in this position until Abengoa terminated his employment in 2017. FE5 was instructed by his superiors to manipulate accounting entries, as needed, in order to calculate a pre-determined margin throughout the project's lifespan.

44. FE6 has worked for Canalizaciones Ebro S.L. ("Cebro") from 2010 through the present date. He is Cebro's partner and sole administrator. In that capacity, he was responsible for negotiating the terms of construction contracts entered into by Cebro and dealing with his counterparts at other companies. FE6, on behalf of Cebro, dealt directly with representatives of Abengoa's subsidiary, Befesa, in relation to the Cunene Water Pipeline project in Angola between December 2011, when Cebro negotiated the project's contract terms with Abengoa, and November

27, 2012, when Cebro's work on the project ended. Cebro's role in the project was to construct 100km of pipeline for a water treatment plant being built in Angola. FE6 was instructed by Abengoa representatives to order equipment and supplies for the project that were not necessary and to commence construction of the pipeline out of order relative to the other work on the project, meaning that the pipeline would eventually have to be reconstructed at a later date. Abengoa did not pay Cebro for the work it performed on the project and, as a result, Cebro filed civil and criminal complaints against Abengoa for unpaid invoices in the amount of €1,034,915.16.

45. FE7 is a confidential "whistleblower" who submitted a detailed letter describing widespread, pervasive accounting fraud at Abengoa to the Office of the Prosecutor of the National Court in Madrid, Spain, on April 10, 2017. A copy of the complete "whistleblower" letter, followed by a certified English translation, is attached hereto as Exhibit A.

46. The intricate details contained within FE7's letter, including information about Abengoa's chain of reporting, internal management controls, screenshots of Abengoa's internal accounting files from Inabensa's "GRUPOS-C09" server, and specific examples of falsified project margins, indicate that the author of the letter worked within Inabensa's Controller Department from at least 2013 through 2015 and was responsible for overseeing Inabensa's financial accounting and reporting. FE7's letter was considered in the Spanish criminal proceedings against Abeinsa and Inabensa, discussed below, and used in the course of its independent investigation to compel witness testimony that corroborated it.

## CLASS ACTION ALLEGATIONS

47. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Abengoa ADSs between October 17, 2013 and August 2, 2015, inclusive, and were damaged thereby, seeking to pursue remedies under the Exchange Act, as well as on behalf of all those who purchased or otherwise acquired Abengoa ADSs pursuant and/or traceable to the Offering, and were damaged thereby, seeking to pursue remedies under the Securities Act (the "Class"). Excluded from the Class are Defendants, members of the immediate families of each

Defendant, Abengoa (including its subsidiaries) and its officers and directors at all relevant times, any entity in which any excluded party has or had a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, heirs, successors or assigns of any such excluded party.

48. The members of the Class are so numerous that joinder of all members is impracticable. Abengoa sold 287,500,000 Class B shares (in the form of ADSs) in the Offering and Abengoa ADSs were actively traded on the NASDAQ throughout the Class Period. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. In addition, the names and addresses of the Class members can be ascertained from records maintained by Abengoa or its transfer agent. Notice of the pendency of this action can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

49. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class have been similarly affected by Defendants' conduct in violation of federal law that is complained of herein. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

50. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

51. Common questions of law and fact apply equally to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether Defendants misrepresented and/or omitted material facts about Abengoa and its business;

c. whether the price of Abengoa ADSs was artificially inflated during the Class Period; and

d. to what extent the members of the Class have sustained damages and the appropriate measure of damages.

52. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## SUBSTANTIVE ALLEGATIONS

### Abengoa's Business and Organizational Structure

53. Abengoa was founded in 1941 in Seville, Spain and its stock began trading on the Madrid and Barcelona Stock Exchanges in 1996. Abengoa went public in the United States via the Offering which took place on October 17, 2013. At the time of the Offering, Abengoa had operations in more than 70 countries and was comprised of 532 subsidiaries, 17 associates and 34 joint ventures.

54. During the Class Period, Abengoa organized its business in three different activities: (1) Engineering and Construction, (2) Infrastructure Concessions, and (3) Industrial Production. Abeinsa served as the head of Abengoa's Engineering and Construction segment. As such, Abeinsa constituted one of Abengoa's main business groups.

55. Inabensa, in turn, led Abeinsa's "Installations" division within the Engineering and Construction group. According to Abengoa's annual financial reports, the "Installations" division concentrated on engineering, construction, maintenance of electrical and mechanical infrastructure, and instrumentation for the energy, industry, transport, and services sectors.

56. The Engineering and Construction activities led by Abeinsa and Inabensa consistently represented more than 60% of Abengoa's overall consolidated annual sales. As such,

Abengoa's Engineering and Construction segment was the primary focus of Abengoa's executive management and senior leadership and was integral to its overall success at all relevant times.

57. For context, between 2013 and 2015, Abeinsa controlled directly or indirectly all of Abengoa's operations in the United States, Mexico, Argentina, Uruguay, Chile, and Brazil, among locales. Abeinsa also controlled Abeinsa EPC and Abeinsa BD, two of Abengoa's subsidiaries dedicated to largescale clean energy projects, including solar plants, desalination plants, and bioethanol plants. In addition, Abeinsa controlled other companies responsible for manufacturing and selling metallic structures, such as Nicsa and Comercial Abengoa.

58. Based on the foregoing, Abeinsa and Inabensa were of extreme importance to Abengoa's overall operations.

**Systemic Accounting Fraud at Abengoa**

59. During the Class Period, Abengoa's income primarily depended upon its overall sales and operating costs. Abengoa calculated its gross operating margin by subtracting its sales and operating costs and, from there, would determine its EBITDA. EBITDA is widely used by analysts, investors, and the general public as a key metric to evaluate the financial condition of a business.

60. Abengoa carried out multiple projects simultaneously throughout the world. Consequently, Abengoa had to track the progress and costs of each project in order to properly account for earnings on a monthly, quarterly, and annual basis. This was supposed to be done in accordance with International Accounting Standards ("IAS") for construction contracts, which requires that income equal the costs incurred on the project plus a pro-rated amount of the profit or operating margin that will ultimately be recognized on the project.

61. IAS 11, in particular, provides the precise revenue recognition rule that applied to Abengoa's construction contracts. In pertinent part, it states that contract revenues and expenses are recognized by reference to the stage of completion of a contract when the outcome of the construction contract can be estimated reliably, otherwise revenue is recognized only to the extent

of recoverable contract costs incurred. Abengoa referred to this rule as the "percentage of completion" method for recognizing revenue.

62. Abengoa represented in filings with the SEC that it adhered to the percentage of completion method when recognizing revenue for ongoing construction projects. It also represented that it had established a "robust project management and control system" to ensure accurate financial reporting for its various construction projects. This was not true.

63. According to FE7, the "whistleblower," the accounting fraud at Abengoa was pervasive. Abengoa used SAP[2] software to maintain its "official" accounting records, vendor orders, expenses, invoices, cash flows and other information related to project management. At the end of each month, a closing for each project was prepared to update the financial records for that project.

64. When a project manager was assigned to a project, it came with an estimated margin that originated with the individuals that prepared the bid for the project in the first instance. This estimated margin, which is entered into SAP, was commonly inflated because it did not account for the entire costs of the project.

65. Project managers receiving inflated margins would not revise them in SAP to account for the costs, but instead would leave the margins as initially stated. This was due in part to the fact that Abengoa instituted rigid internal procedures referred to as Mandatory Compliance Standards (MCSs or, in Spanish, NOCs). These NOCs were designed to ensure that senior levels of Abengoa management had control over the project margins. These NOCs required project managers to obtain approval from several layers of upper management, including group directors, area directors, project management departments, and internal auditors, before a project manager could even enter a request to lower a project margin using Abengoa's "Bizagi" system. Consequently, project managers left the project margins in SAP as initially stated, despite being

[2] SAP AG is a German multinational software corporation whose best known product is its enterprise resource planning ("ERP") business management software. ERP is a suite of integrated applications that companies utilize to store and manage data from every stage of their businesses.

inflated. In turn, Abengoa was able to recognize revenue prematurely throughout the life of a project (*i.e.*, larger margins allowed for greater pro rata recognition of revenue at earlier points in the projects).

66. Separate and apart from SAP, project managers maintained their own project management records on Excel spreadsheets. These spreadsheets recorded the same categories of information contained in the SAP records, but without restriction and free from Abengoa's NOCs requirements. Thus, project managers relied on their spreadsheets instead of the SAP records because they reflected the actual costs, expenses, and margins of the projects for which they were responsible.

67. This dual-system of accounting was commonplace and widely known within Abengoa. When project managers were asked for their margin estimates (referred to as a FEMFO, which is an acronym for "Fecha de estimacion margen de fin de obra"), they would reply by asking for clarification as to which margin was actually being requested (*i.e.*, the official margin in SAP or the accurate margin from their own Excel spreadsheets).

68. Importantly, the dual-system of accounting was also intentional. It served two key purposes: first, it allowed Abengoa to rely on the SAP records for the purpose of portraying a more profitable and liquid appearance to the public; and, second, it allowed various members of Abengoa's management to meet bonus objectives by increasing project earnings.

69. In addition to routinely maintaining inflated project margins, FE7 also confirmed instances in which the margins were hyper-inflated to rapidly accelerate project revenue. For example, in December 2014, Inabensa increased the project margin to 86% for the "DGEN" project, an electrical line project in India (SAP code PC090300 9049). This allowed Inabensa to recognize a profit of €2,947,000 in 2014, which was the total estimated profit for the entire project when, in reality, the project had "hardly even started."

70. Abengoa also falsified costs to accelerate the recognition of revenue on certain projects. IAS 11 allowed Abengoa to recognize revenue on projects in proportion to the costs it incurred on the project and the project's percentage of completion, as described above. Cost

"provisions" are accounting entries use to denote a cost or expense that has not yet been registered for an account. For example, a provision may be recognized when a cost is incurred but the vendor's invoice has not yet been issued or received; it effectively serves as a placeholder in an account until the underlying paperwork is received, at which point the provision is cancelled and the actual costs are accounted for. Inabensa abused this "provision" rule by routinely fabricating project costs which, in turn, allowed Abengoa to recognize revenue prematurely in violation of IAS 11 at opportune times for itself and senior management.

71. According to FE7, Inabensa entered cost provisions for materials that had not yet been ordered, purchased or, in fact, even needed for a particular project. In August 2013, Inabensa's total cost provisions amounted to approximately €5 million, which more or less stayed the same until November 2013 when it increased to €25 million. The increase was due to two Electric Transmission projects, one in Kenya with a provision for materials worth more than €11 million (SAP code PC090300 8041-002) and another in Ukraine with a provision for more than €9 million (SAP code PC090300 5315-002).[3] Significantly, provisions for the Kenya project were logged on November 30, 2013 and maintained through year-end, even though the actual expenses were not incurred or recorded until 2014.

72. Inabensa's cost provisions decreased to approximately €24 million by August 2014, but increased steadily through the remainder of the year rising to €34 million in September 2014, €30 million in October 2014, and nearly €58 million in November 2014. The sudden and sharp increase in provisions comprised charges on the Ukraine project mentioned above (increasing from €9 million in November 2013 to €23 million in October 2014), a second project in Kenya (increasing from less than €1 million in August 2014 to more than €10 million in September 2014), the AVE Mecca Medina project in Saudi Arabia (€0 in September 2014 to almost €4 million in

[3] FE7 provides proof of these provisions in the "whistleblower" letter. The bottom screenshot on page "PLAINTIFFS_28" features an Excel spreadsheet showing the cost provisions for the Electric Transmission projects and, in particular, the provisions for the Kenya and Ukraine projects (Lower Spreadsheet, Cells C25 and C27, respectively).

October 2014). At year end, Inabensa did not enter the entire €58 million into SAP, but instead falsely recorded in SAP only €33 million in provisions for December 2014. Accordingly, Inabensa benefited throughout the year by prematurely recognizing revenues commensurate with inflated costs, but then reduced those costs at year end in time to maintain favorable (greater) project margins.

73. This cycle continued through August 2015, but with addition of provisions from Inabensa's manufacturing department (beginning with €4 million in April 2015 and ending with €9 million in June 2015). The fact that the provisions increased in frequency and amount towards the end of the year every year demonstrates that the practice was intentional and designed to inflate Inabensa's revenues and margins for year-end audits and reports.

74. Although FE7 only worked for Inabensa, FE7 was "certain" that the fraud described in the "whistleblower" letter occurred throughout Abeinsa. Moreover, given that the fraudulent accounting required coordination from other companies within Abeinsa and senior levels of management, FE7 was able to state "with little margin of error" that these practices had been done by all large project companies within Abengoa.

75. The information contained within FE7's letter to the Office of the Prosecutor is corroborated by ***six*** additional former employees of Abengoa and, specifically, former employees within Abeinsa (the parent company of Inabensa where, upon information and belief, FE7 worked).

76. FE1, the former Director of Human Resources at Abeinsa's U.S. subsidiary, Abeinsa EPC, repeatedly heard from employees in Abeinsa's accounting department that Abeinsa maintained two sets of books. Abeinsa would show one set of books to its external auditor, but maintained a separate set of books for internal purposes.

77. FE2, the former U.S.-based accounting executive, confirmed that U.S. subsidiaries maintained a set of books that were shown to the external auditor and a separate set of books that were for internal use. FE2 further stated that Abeinsa engaged in a pattern of falsifying the information in the books presented to its external auditor.

78. In addition, FE2 was aware of instances in which Abengoa intentionally ignored accounting principles in order to knowingly inflate profits, and then used those inflated profit numbers to obtain hundreds of millions of dollars of financing. FE2 believed that Abengoa intentionally misstated various accounting figures and frequently falsified information to make its financial condition appear more favorable than it actually was.

79. FE3, the former Senior Staff Accountant, likewise believed that Abengoa maintained a system of double books. According to FE3, Abengoa utilized a "SAP" software system for its accounting, but also maintained a separate accounting system used by project managers to keep track of its project data.

80. FE3 received numbers, including costs and revenues, from Abeinsa's various projects and entered those numbers into the SAP system. On a monthly basis, FE3 was required to make sure that the numbers reported in the SAP system precisely matched the numbers specified by Abengoa's executives for ongoing projects.

81. FE3 reported that on some occasions, the revenue numbers in Abengoa's internal record-keeping system were higher than the actual numbers booked in the SAP system. When this occurred, FE3 was required to move costs and expenses around in the SAP to match the numbers instructed by management. FE3 created journal entries, until the SAP system's numbers matched the other set of records.

82. FE3 believed that the numbers in Abengoa's separate accounting system came from the same projects reported in the SAP system, and thus, there was no apparent reason for the discrepancies between the numbers reported in the two systems.

83. Given the information provided from FE7, FE3 was manually modifying various accounting entries in SAP to maintain or create an appearance of profitability on certain projects. The costs and expenses manipulated by FE3 in SAP involved adjusting cost provisions at the direction of senior management.

84. FE4, a former Inabensa employee in charge of resolving critical accounting-related problems, also confirmed the existence of a double accounting system. According to FE4, Inabensa

maintained official accounting records for the majority of its projects in SAP. These SAP records were the official accounting records for those projects incorporated in Abengoa accounts. During 2013 and 2014, FE4 discovered projects that contained inaccurate cost provisions information used by Inabensa's Administration Department to calculate project profits on a monthly basis and therefore inaccurate income data. Based on his twenty-plus year tenure at Abengoa, FE4 assumed the SAP records were later used for external purposes, such as audits and investor information.

85. Separate and apart from the SAP records, project managers used unofficial Excel files to control the project and have their own figures on cost forecast, expected margin, and other data, according to FE4. This was so because at least Inabensa did not have appropriate software to allow project managers to control the project progress and forecast.

86. FE4 confirmed that, in some cases, project manager forecasts differed from SAP, especially in the expected final profit margin of the project. This was because Inabensa opened each project in SAP with a specified profit margin. It was difficult to obtain authority to lower the preset project margins during the execution of the project. If approval did not come, then pending costs had to be adjusted and delayed. The official project margin in SAP was only reduced at the end of the project, if the costs could not be transferred to new projects. As a result, all profits and revenues taken previously had to be reduced and adjusted to the new SAP profit margin. This created an accounting control problem because it required project follow up.

87. This problem was known by Inabensa's management, who in 2014 authorized software development based in Earned Value Management (EVM) to be implemented at project level in order to make a proper project follow up. Later on, in 2015, Simosa IT (Abengoa's IT subsidiary) purchased Hard Dollar, a commercial software, to oversee project follow-up for Abeinsa.

88. FE4 also confirmed that in 2013 and 2014, Inabensa routinely recognized expenses prematurely in new projects in order to record inflated project revenues. FE4 stated that, based on his familiarity with Abengoa's management's way of working, he had no doubts that directives to

recognize expenses prematurely were coming from Abengoa's senior management and being disseminated throughout Abengoa's subsidiaries, at least the ones within Abeinsa.

89. According to FE4, Abeinsa was able to recognize revenues prematurely through accounting notes in SAP on account of purchasing material cost provisions. The resulting revenues calculated by adding the corresponding profit to these cost provisions were included in Abeinsa's profit and loss statements. In some cases, as soon as a project was awarded, and specially if the end of the financial year was near, those cost provisions were entered immediately. In those same projects, the purchase orders were not issued and in some cases the suppliers were not even identified and of course the materials were not available at the project sites. These cost provisions were then entered before the end of the financial year (December 31). Abeinsa would attempt to obtain letters from possible suppliers stating that certain materials were available and at its disposal. Therefore, as described by FE7, these costs were not recorded in accordance with appropriate accounting rules (*i.e.*, IAS 11).

90. FE4 recalled the same substantial cost provisions that FE7 detailed in the "whistleblower" letter. He recalled that in 2013 two Transmission Lines projects, one in Ukraine and another one in Kenya, were assigned total cost provisions amounting around €20 million. These provisions were accounted in the last quarter of the year and were kept with some variations through all 2014. FE4 also recalled two other projects with false cost provisions, specifically one in Kuwait with more than €10 million. Cost provisions also continued in 2015 but FE4 did not know what happened after pre-bankruptcy was declared in November 2015.

91. These cost provisions that were used to improperly increase revenues were controlled by Inabensa through its Projects Control Department, according to FE4. FE4 believed that these accounting manipulations were done intentionally and one of the reasons was to achieve executive bonuses. FE4 believed this because the accounting manipulation was not eliminated and the losses were not declared. Instead, the losses were hidden and ultimately created even larger problems. FE4 was convinced this was a pattern of behavior not only at Inabensa but throughout

Abeinsa and was most probably pervasive throughout all Abengoa, based namely on the fact that it was directed and authorized from the most senior levels of corporate management.

92. FE5, the project control engineer from the Controller Department assigned to the AVE Mecca Medina project, also corroborated FE7's report of widespread accounting fraud. During the course of his work on the AVE Mecca Medina project, which required him to effectively audit the project's financial records dating back to the project's inception in 2012, he discovered that unrelated expenses had been charged to the AVE Mecca Medina project in 2012, 2013, and 2014 totaling approximately €22,265,328.

93. FE5 explained that transferring unrelated expenses to new projects was a widespread practice at Abengoa because it was necessary for the purpose of hiding undeclared losses from prior projects, increasing the percentage-of-completion of new projects and recognizing higher revenues for Abengoa. If a new project was assigned costs from a previous project upon commencement (which are actually prior project losses), the new project was ultimately unable to allocate its true expenses. Thus, in order to continue executing the project, the costs incurred in a new project have to be attributed to another newer project and, therefore, future projects are likewise affected and will also have false costs (similar to how a "Ponzi" scheme requires new investors to pay profits to earlier investors). FE5 explained that the repercussions of this practice materialized once Abengoa stopped winning new projects and, consequently, did not have the option of passing along its losses from old projects. This precipitated Abengoa's collapse and led it to bankruptcy, according to FE5.

94. FE5 also confirmed that the accounting fraud described above was directed by senior management for financial gain. As FE5 explained, executives within Abengoa received bonuses as part of their compensation. These bonuses were based on the percentage-of-completion of contracts and project margins which is, in part, why Abengoa and senior-level employees were actively falsifying them ensuring that they would receive inflated bonuses that year. FE5 claimed to know that director-level employees were involved because only employees with that level of seniority were able to generate invoices from different Abengoa group companies. In addition, the

timing of the invoices also indicated that they were issued for bonus-related purposes, as the invoices were often issued towards the end of the year and, in the cases described below, on the last days of the calendar year and therefore done in order to maximize the bonuses for that year.

95. FE6, who worked for Cebro in connection with Abengoa's joint venture between Befesa and Riogersa for the Cunene Water Pipeline project in Angola, also confirmed the conduct described by FE7 in the "whistleblower" letter. According to the contract terms, Cebro was hired by Abengoa to build and supply more than 100km of high-density polyethylene pipeline and related fittings for the construction of a water treatment plant. Cebro was supposed to construct the pipeline below ground in trenches that had been excavated by Abengoa. When Cebro arrived at the worksite to commence construction, the trenches had not yet been dug. Notwithstanding, Abengoa ordered Cebro to begin welding the pipe above ground without trenches. The directive was given by Abengoa even though both Cebro and Abengoa knew that the pipe would be damaged due to high temperature and need to be constructed again once trenches were dug. In total, Cebro constructed 30km of the pipeline by November 27, 2012.

96. According to FE6, throughout the course of the project, Cebro received requests from project managers from Abengoa subsidiary Befesa asking for letters confirming the purchase of materials and supplies for use in building the water pipeline even though those materials and supplies were not yet or ever needed.

97. Abengoa did not pay Cebro for the work it performed and, as a result, Cebro filed civil and criminal lawsuits against Abengoa seeking payment in the amount of €1,034,915.16. Abengoa, therefore, recorded at least this amount in project expenses improperly for the purpose of prematurely recognizing revenue under IAS 11. Abengoa recorded these expenses between December 2011, when Cebro negotiated the project's contract terms with Abengoa, and November 27, 2012, when Cebro's work on the project ended.

* * *

98. FE7 provided a detailed "whistleblower" account to the Office of the Prosecutor of the National Court in Spain describing widespread, systemic accounting fraud at Abengoa. This

accounting fraud entailed maintaining a dual set of accounting records, one that was used for external purposes to portray a falsely inflated financial position and a second that recorded the actual costs and margins for ongoing projects. FE7 further described how Inabensa, in particular, inflated its revenues by recognizing revenue prematurely through falsely recording inflated expenses in violation of applicable accounting standards, and that this was done for corporate and personal financial gain. FE1, FE2, FE3, FE4, FE5, and FE6 corroborate FE7's account, demonstrating that Abengoa was in fact engaged in accounting fraud during the Class Period.

**Benjumea Artificially Inflates Abengoa's 2012 Revenues**

99. In the wake of Abengoa's bankruptcy, Abengoa's new and current president, Gonzalo Urquijo, commissioned KPMG to conduct a forensic analysis for the years 2012 through 2016. Mr. Urquijo commissioned the report after one of the investigating judges in the ongoing criminal proceedings demanded that Abengoa provide information in response to the indictments. The criminal proceedings KPMG concluded that accounting fraud had occurred at Abengoa and, significantly, at the direction of Abengoa's most senior management, including its former Executive Chairman Benjumea. To conduct its investigation, KPMG reviewed Abengoa's internal emails and other internal documents.

100. The KPMG report identified internal emails exchanged by and between Benjumea and other executives evidencing that Benjumea played a key role in a widespread corporate scheme to artificially inflate the percentages of completion of projects and project margins worldwide. This allowed Abengoa to artificially inflate revenue in its financial statements, falsely portraying a sound financial situation and misleading both investors and banking institutions.

101. In pertinent part, KPMG found that Abengoa manipulated the revenue recognized in its financial statements by altering project margins. KPMG reported that Abeinsa fraudulently recorded an aggregated net amount of €15 million by artificially inflating project margins from 21% to 35% and by advancing the percentages of completion on projects in a fictitious manner between 2012 and 2013.

102. KPMG also identified "intra-group invoices without economic substance [charged against] the [AVE Mecca Medina] project worth 6.1 million euros." KPMG found "digital evidence" of intragroup operations among Abengoa's subsidiaries with the objective of improving Abengoa's cash flows. Inabensa issued the fake invoices in relation to two contracts awarded for the AVE Mecca Medina project for an amount of €153 million to assemble the catenary and to build technical buildings. Abengoa used the services of Banco Sabadell to develop this operation, as stated in the emails of Abengoa's employees analyzed by KPMG.

103. In addition, KPMG determined that Abengoa engaged in "invoice triangulation operations through Inabensa Turkey to anticipate and control the execution of the work[s]." According to the emails analyzed by KPMG, ***Abengoa used this "invoice triangulation" scheme to inflate Inabensa's earnings for 2012 to €50 million***, double what Abengoa had initially forecasted.

104. On August 10, 2012, **Julio Artillo**, Inabensa's former Administration Department Director, suggested in an email that Abengoa use Inabensa Turkey to record the purchase of supplies that were accounted for that year, even though the physical shipment of the supplies would occur the following year, in 2013. He also suggested the use of several additional projects to record fake costs, including the AVE Mecca Medina project, power line projects in Peru and Brazil, a solar thermal power plant project in the U.S., and two other solar thermal power plant projects in Spain. Artillo further said that he would speak with the various people in charge of the projects to determine what, if any, costs could be booked to their respective projects.

105. On August 11, 2012, Benjumea replied to Artillo's email, directing him to also book costs against the power line project in Peru. Specifically, Benjumea wrote that "The [purchase] order of Peru from Hyunsung is going to [be] triangulate[d], it is too big to [not use it], urgently [start] to negotiate." Hyunsung was a Korean supplier of capital goods that was going to acquire supplies for approximately €15 million.

106. On September 20, 2012, Artillo circulated a final list of projects to be used in the triangulation scheme, and stated that the proposed expenses would allow Inabensa to raise its

margin for 2012 to €53 million and accomplish their objective. The list includes AVE Mecca Medina, Inabensa Turkey, the supply of solar mirrors for a plant in South Africa, four purchases planned for the Zapotillo aqueduct macro project (Mexico), two others in the desalination plants of Tenes (Algeria) and Ghana, and the purchase of wind turbine blades at a Gamesa wind farm in Brazil. The subject line of Artillo's email is titled "Triangulation Turkey." Artillo sent the email to, among others, Benjumea and senior managers of Abeinsa and Teyma, Abengoa's Uruguayan subsidiary.

107. On September 21, 2012, Benjumea replied to Artillo's email giving his authorization to proceed with the scheme. In pertinent part, Benjumea stated, "It is ok to do everything you say on a timely basis, including invoices to EPC from South Africa." In addition, Benjumea emphasized the importance of the proposed triangulations, stating that "Everyone that is copied here must comply with my instructions." Lastly, Benjumea addressed **José Domínguez Abascal**, then Abengoa's general secretary, stating as follows: "for triangulation with India, I need Solar Frame to solve this urgently." Solar Frame was the Indian engineering firm that was finalizing its proposal for the Khi plant in South Africa and that, according to the KPMG report, Abascal was attempting to incorporate into the scheme. A screenshot from KPMG's report featuring Benjumea's September 21 email is below:


CONFIDENCIAL – NO DI[…]
JUZGADO DE INSTRUCCIÓN

4.3 Detalle Incidencia 3: Operaciones Triangulares | Evidencia Digital relevante

[Correo 2]: Instrucciones para realizar las Operaciones Triangulares con Turquía

Asunto: Triangulaciones Turquía
De: FBL Para: JAG, GGG, AGO (…)
Fecha: 21 de septiembre de 2012

Felipe Benjumea Llorente

Asunto: Re: Triangulación Turquía

Gracias

Es ok hacer en plazo todo lo que dices , incluidas facturaciones a EPC de sudafrica

Todo el que este copiado debe cumplir mis instrucciones

Pepon para la triangulacion con la India necesito que Solar Frame resuelva esto urgente

Gracias

[Nota: Correo electrónico relevante a fin dotar de contexto y facilitar el entendimiento de las Operaciones Triangulares]

KPMG

* * *

108. The above emails by and between Benjumea illustrate the accounting fraud described in FE7's letter. They were obtained by KPMG in the course of its forensic audit. They demonstrate that Abengoa and its senior leadership instituted, facilitated, and even required systemic accounting fraud throughout the organization prior to, during, and after 2012 and that this accounting fraud was used to artificially inflate Abengoa's revenue and profit margins by material amounts.

**Abengoa Falsifies Project Expenses and Financial Statements prior to the Offering**

109. FE5 began working for Inabensa in 2007. In April 2015, he was assigned to the "Controller Department" as a project control engineer for the AVE Mecca Medina project, a high-speed railway installation between Mecca and Medina in Saudi Arabia valued at approximately €7 billion. FE5's task was to oversee the project's budget, which included comparing the initial budget to subsequent costs in order to evaluate project margins. Consequently, FE5 was required to effectively audit the project's financial statements dating back to its inception in 2012.

110. Upon starting work on the project, FE5 attempted to obtain the initial budget (referred to internally as "Presupuesto cero" or "Zero Budget"), but was unsuccessful. FE5 was also denied access to Inabensa's accounting records in SAP. Without the initial budget and not knowing all subsequent project costs, FE5 was unable to calculate the true project margin for this project. FE5 was instead instructed by two project managers, **Juan Angel Sierra Figueroa** and **Hakan Gok**, to use a project margin of 21% and to modify costs in order to arrive at that calculation.

111. The accounting records provided to FE5 for the AVE Mecca Medina project (*i.e.*, various versions of project budgets) uniformly contained this project margin of 21% since the project's inception. According to FE5, this was impossible because the project involved varying prices over the course of several years into the future. For example, the budget for the AVE Mecca Medina project required estimates for copper, gasoline, and foreign currency, which all fluctuate depending on the market. It would require someone to correctly anticipate the fluctuations for several years into the future in order to maintain a project margin of 21% for such an extended period of time. Despite the fluctuating costs, FE5 was instructed to manipulate costs in order to calculate a margin of 21% throughout the duration of the project. According to FE5, Abengoa's directors inflated the project margin to overstate the project's viability and to improve the project's percentage-of-completion which, in turn, represented higher revenues for Abengoa and its directors (through bonuses).

112. In the course of his work on the AVE Mecca Medina project, FE5 discovered expenses on the project that appeared to be costs from previous, unrelated projects. For example, on December 31, 2012, an amount of €ll,465,328 was charged against the AVE Mecca Medina project. ***Although this amount represented approximately 10% of the contract price and was nowhere in the budget, it appeared as incurred on the same day that the project commenced***. FE5 explained that, because the project did not incur those expenses on the first day of commencement and did not have any outstanding orders or invoices, the expense was falsified and simply being charged against the AVE Mecca Medina project even though it was incurred during

a previous unrelated project, and thus had not been properly recorded. FE5 determined after further investigation that these costs were in fact losses from unrelated projects involving Huawei, Vodafone, Nokia and others, all of which were completely unrelated to the AVE Mecca Medina project.

113. In addition to the AVE Mecca Medina project, Abengoa also artificially inflated its costs and, in turn, revenue on the Cunene Water Pipeline project in Angola. As recounted by FE6, between December 2011 and November 27, 2012, Abengoa requested Cebro to order supplies and build pipeline that was not necessary and would, in fact, need to be reordered or rebuilt at a later date. Abengoa recorded expenses in connection with these supplies and services in an amount of at least €1,034,915.16, given Cebro's claims for unpaid invoices.

114. FE1 confirms that Abengoa also inflated project values in the U.S. FE1, the Director of Human Resources at Abeinsa EPC, described accounting fraud within Abengoa prior to the Offering. According to FE1, shortly before the Offering, Abeinsa's internal auditor tendered his letter of resignation to FE1. FE1 subsequently participated in an exit interview with the internal auditor, during which he told FE1 that he was resigning from Abeinsa because he had been directed to sign off on financial reports that falsely inflated the value of certain projects. The internal auditor explained to FE1 that the reports showed false percentages of completion on some projects, and also failed to show that some projects were over-budget. The internal auditor conveyed to FE1 during the exit interview that those financial reports had been prepared to present to banks for the purpose of obtaining larger lines of credit.

115. During the exit interview, the internal auditor further told FE1 that he had expressed his concerns directly to the CFO of Abeinsa, **Santiago Duran**, but was instructed by Duran to "shut the f--k up and just sign" the reports. The internal auditor told FE1 that he believed it would be illegal for him to sign off on the reports knowing that they would be used to obtain lines of credit. Therefore, the internal auditor refused to sign off on the reports and instead resigned from Abeinsa.

116. Following the exit interview with the internal auditor, FE1 approached Duran to discuss what the internal auditor had reported, but was told by Duran that he was too busy to discuss the issue. FE1 then memorialized what the internal auditor had reported in an email to Duran and copied Abeinsa's Legal Director. After receiving the email, Duran approached FE1 and expressed his view that the internal auditor could not report his concerns to anyone outside of Abeinsa because he had signed a non-disclosure agreement.

117. Notwithstanding the internal auditor's refusal to sign off on the financial reports, FE1 learned, during leadership meetings FE1 attended, that prior to the internal auditor's resignation, those reports were presented to various lenders who subsequently provided Abengoa with large lines of credit.

118. Abengoa hid additional losses from other areas of its operations, specifically €840 million in losses from its solar plant operations that should have been accrued in 2013 in response to changes in Spain's clean energy reform laws. Abengoa attempted to recover these losses through a private arbitration against the Kingdom of Spain, yet never disclosed them to the public.

119. In June 2013, Abengoa, on behalf of its subsidiary, CSP Equity Investment S.a.r.l., filed a demand for arbitration against the Kingdom of Spain in the Stockholm Chamber of Commerce Institute of Arbitration, Arbitration No. SCC2013/094. Abengoa claimed that the Kingdom of Spain had caused it to lose €840 million in connection with the Government's energy reform (*i.e.*, Royal Decree 9/2013). These losses, according to Abengoa, were attributable to the loss in value of six solar plants located in Spain: Helioenergy 1 and 2, Solaben 2 and 3, and Solacor 1 and 2.

120. In the arbitration, the Attorney General for Spain submitted two expert reports co-authored by Altran Group and MaC Group, two firms specializing in financial consulting within the renewable energy industry, dated October 15, 2014 and June 7, 2017. The reports demonstrated the existence of "clear contradictions between the information published by Abengoa itself and that provided in its report" submitted in support of its arbitration claim. Further, the reports

highlighted a clear divergence between the damages claimed and Abengoa's publicly stated financial reports.

121. Upon information and belief, the public financial statements referred to by Altran Group and MaC Group included the prospectuses disseminated by Abengoa in connection with the Offering as well as the initial public offering for the spin-off of Abengoa Yield on June 12, 2014 and Abengoa's annual reports on Form 20-F for the 2013 and 2014 fiscal years. The prospectus and reports discussed the solar plants in detail, but they did not record the losses claimed by Abengoa in its arbitration against the Kingdom of Spain.

* * *

122. During 2012 prior to the Offering, Abengoa recorded expenses on the AVE Mecca Medina and Cunene Water Pipeline projects that were either unrelated to the projects or were incurred prematurely. This was done for the purpose of inflating expenses to, in turn, prematurely recognize revenue on these projects in violation of the accounting standards governing the percentage of completion revenue recognition method under IAS 11. FE1, FE4, FE5, and FE7 described this practice as widespread and systemic within Abengoa, and not just limited to the two projects mentioned above. Consequently, upon information and belief, Abengoa was falsely inflating expenses and margins within multiple projects, as well as concealing substantial losses attributable to its solar plant operations, during 2013 prior to and during the Offering.

**Investors Purchase Abengoa ADSs on False Information**

123. On October 4, 2013 and October 7, 2013, respectively, Abengoa filed with the SEC the Form F-1 and the Form F-6. On October 16, 2013, after the close of the markets, the SEC declared both the Form F-1 and the Form F-6 effective.

124. On October 17, 2013, Abengoa filed the Prospectus with the SEC. According to the Prospectus, Abengoa was offering to the public 250,000,000 Class B shares at $12.18 per ADS (or €1.80 per Class B share).

125. The Form F-1 and Prospectus registered and described the Class B shares and the ADSs offered to investors; the Form F-6 registered the issuance of the ADSs representing those shares.

126. Because the ADSs could not be offered or sold unless both the ADSs and the underlying Class B shares were registered, the Form F-1, Prospectus, and Form F-6 worked in conjunction to register the ADSs offered to U.S. investors and collectively constituted the Registration Statement.

127. On October 17, 2013, Abengoa's ADSs began trading on the NASDAQ under the ticker symbol "ABGB."

128. Pursuant to the Registration Statement, Abengoa offered to the public in the United States 250,000,000 Class B shares in the form of ADSs at $12.18 per ADS (€1.80 per Class B share), with each ADS representing five Class B shares.

129. After the Underwriter Defendants exercised their over-allotment rights to purchase an additional 37,500,000 Class B shares, Abengoa realized gross proceeds from the Offering of €517.5 million, which at the time was the equivalent of $703.8 million.

130. According to the Registration Statement, Abengoa intended to use the proceeds from the Offering to repay €347 million worth of corporate debt maturities due in 2013 and 2014 (approximately one-third of the debt maturities due in those years), as well as to "reinforce [Abengoa's] liquidity position and strengthen [its] balance sheet."

131. Furthermore, the Prospectus that Abengoa used to sell its ADSs to the public contained statements about its internal financial controls and accounting practices. These statements were materially misleading because they led investors to believe that Abengoa was adhering to international accounting standards and accurately disclosing its financial information.

132. For example, Abengoa stated in pertinent part that:

> We have successfully grown our business while seeking to enforce ***strict financial discipline*** to maintain our strong liquidity position. As of June 30, 2013, we had cash and cash equivalents and short-term financial investments of €3,222 million,

> which we believe are sufficient to satisfy our short-term liquidity needs. ***This strong cash position also assists in bidding for large projects***. . . .
>
> . . .
>
> Revenue recognition using the percentage-of-completion method involves the use of estimates of certain key elements of the construction contracts, such as total estimated contract costs, allowances or provisions related to the contract, period of execution of the contract and recoverability of the claims. ***We have established, over the years, a robust project management and control system, with periodic monitoring of each project. This system is based on the long-track experience of the Group in constructing complex infrastructures and installations. As far as practicable, we apply past experience in estimating the main elements of construction contracts and rely on objective data such as physical inspections or third parties confirmations***. Nevertheless, given the highly tailored characteristics of the construction contracts, most of the estimates are unique to the specific facts and circumstances of each contract.

Emphasis added.

**Abengoa Manipulates Project Costs and Hides Losses after the Offering**

133. Abengoa continued to falsify project expenses and financial statements following the Offering and throughout 2014. Upon information and belief, the following examples represent only a fraction of the financial fraud that occurred at Abengoa during this timeframe.

134. FE5, while auditing the AVE Mecca Medina project, discovered that Abengoa had improperly registered costs on the AVE Mecca Medina project through its subsidiaries Inabensa Saudi and Inabensa Turkey. In November 2013, Inabensa Turkey invoiced approximately €3.8 million of copper wire supplies to Inabensa Saudi, even though Inabensa Turkey was not involved in the project and the copper wire was not needed until 2014. When Inabensa Saudi finally needed the copper wire, it cancelled the invoice received by Inabensa Turkey in December 2014. Accordingly, although Inabensa Saudi did not effectively purchase the copper wire until 2014, Abengoa had recorded the expense as incurred for two years by that point in time, and in turn had benefitted from increased revenues of Inabensa Saudi and sales of Inabensa Turkey.

135. FE5 also discovered falsified invoices charged to the AVE Mecca Medina project on December 30 and 31, 2013. These invoices were from Nicsa, an Abengoa subsidiary, for consulting, engineering and supply services. The invoices (three in total) were dated December 30

and 31, 2013, and totaled approximately €7 million (€1.8 million, €1.2 million, and €4.128 million). Nicsa, however, had not done any of the work or provided any of the supplies indicated in the invoices. In fact, according to FE5, Nicsa had nothing to do with the AVE Mecca Medina project; the engineering for the project was instead performed by another state-owned company named Ineco. Importantly, the entering of these Nicsa invoices required approval by Abengoa's senior management, as they were transactions between two subsidiaries of the Abengoa group. Inabensa's directors lacked the authority to do this.

136. According to FE5, many employees within Abengoa were aware of the fraudulent Nicsa invoices and, when discussing cash flows for the AVE Mecca Medina project, commonly referred to two sets of figures identified as "cash flow with Nicsa and without Nicsa." Often emails were sent to calculate Inabensa's cash-flow in which the difference of the calculation with Nicsa invoices and without them was made in order to internally report the real cash flow.

137. FE5 also identified invoices that had been accepted in 2014, but had been altered in order to extend the deadlines for payment by years, so much so that invoices from 2014 were still payable in 2016 but not yet outstanding or overdue. Abengoa also manipulated its cash flow by entering invoices for amounts much lower than the actual amounts owed to suppliers, or by simply not entering at all certain invoices into the system. As a result of this practice, FE5 started an investigation and discovered an invoice for approximately nine-to-ten million Saudi Riyals owed to supplier Mansour that had been entered for only one-to-two million Saudi Riyals. As a result of the investigation, FE5 found a total of approximately 10 million Saudi Riyas of outstanding invoices that had not been recorded in SAP. According to FE5, Abengoa used this practice either to report an improved cash flow or to prevent a negative cash flow.

138. FE1 provides further evidence that Abengoa systematically delayed and/or avoided payment of invoices as a means of inflating its financial position. FE1 confirmed that cash flow was a critical financial metric for Abengoa, and described various underhanded tactics that it engaged in to artificially increase the amount of cash on its books. For example, Abengoa held a training class during which managers were taught to reject supplier invoices for the purpose of

intentionally delaying payment, and thereby increasing its reported cash position. According to FE1, because Abeinsa's contracts with suppliers provided that rejected invoices could not be resubmitted for 30 days, the practice of rejecting invoices helped to preserve Abeinsa's cash on hand and thereby increase its reported cash flow. FE1 stated that it was so commonplace for employees at the U.S. subsidiary of Abeinsa to reject supplier invoices, that one employee responsible for invoices was nicknamed "The Rejecter."

139. FE3 confirmed that Abengoa artificially inflated its reported cash and thereby preserved its cash flow by maintaining a slow and cumbersome process for invoice approval, which often stretched on for months. According to FE3, Abengoa required an approval process of up to six steps before an invoice could be forwarded to the department responsible for approval, where it was then subject to additional layers of approval. If an invoice was rejected at any point, it was sent back to the vendor for resubmission and the approval process then started over. Once an invoice was finally approved, Abengoa held onto it until a certain point in the month when all approved invoices were forwarded to banks in a single package, thus further delaying payment by up to an additional 30 days.

140. Another tactic described by FE1 to preserve cash was Abengoa's routine refusal to pay contractors on its projects. Abengoa instead forced the contractors to file liens against Abengoa and to ultimately settle their claims in arbitration for "pennies on the dollar," and in some instances, to file for bankruptcy.

141. FE6, who worked on the Cunene Water Pipeline, recalled similar tactics with respect to the nonpayment of Cebro's invoices. FE6 processed work orders and invoices from Abengoa's joint venture between Befesa and Riogersa in relation to the water pipeline project. When Cebro submitted invoices for approval, Abengoa rejected the invoices and sent them back for minor corrections. Once Cebro resubmitted the invoices with revisions, Abengoa would reject them again without clear explanations, so Cebro had to resubmit the invoices again. The approval process by Abengoa took between two to nine months until the final invoices were approved,

which caused similar delays in payments. In total, Abengoa refused to pay Cebro at least €1,034,915.16 for materials and services performed.

142. Abengoa also accrued significant losses during the course of 2014, but did not reveal them at the time. These losses stemmed from two subsidiaries in particular, Abengoa Solar, S.A. and Abengoa Bioenergia, S.A. According to an audit conducted by Silva & Asociados, Abengoa engaged in systematic concealment of substantial losses that led to the misrepresentation of Abengoa's financial condition. The report stated, in pertinent part, that:

> Those portfolio losses accounted for in 2015 and 2016 should have been recorded (recognized), in amounts of material significance, ***at least since 2014*** and on the contrary, they were ***deliberately kept hidden*** to give a misrepresentation of the financial status of the company, all to the detriment of numerous investors who invested their savings, while trusting in the truthfulness of the financial information transmitted by ABENGOA.
>
> The consolidated and also the individual annual accounts of ABENGOA S.A. and subsidiaries … ***for financial years 2014 and 2015, do not reflect the reality of their financial situation***, as well as the result of their operations.
>
> In light of the foregoing, ***the reason for the collapse of ABENGOA expressed by the defendants in their statement***, which consisted in the [company's] need for liquidity of €650 million that could not be obtained through capital increase due to the failure of the banks that did not secure it, ***is unfounded and unreasonable***.

Emphasis added.

143. The recurring losses from these assets amounted to €1,246,000. Given that these assets had no value, Abengoa should not have granted equity loans to the entities, which in 2015 totaled €951,000,000 (Abengoa Bioenergia received €695,000,000 and Abengoa Solar received €256,000,000). This was done, however, to avoid legal dissolution and having to liquidate them. Likewise, the impairment of the value of Abengoa Solar and Abengoa Bioenergia to zero Euros in 2015 meant conclusively that the subsidiaries of those companies which were developing the projects were also worthless and therefore should have been fully impaired as well to zero. Instead, in 2015, Abengoa's financial statements reflected a value for these assets of €2,806,000,000, and loans granted by the companies to the subsidiaries totaling €2,501,800,000. These loans, of course,

could not be fully repaid and therefore should have been impaired accordingly. This did not occur, however, because Abengoa concealed these losses from the market.

144. In addition, Abengoa falsified its financial statements for 2014 by artificially increasing its profit margin for the A3T project, a cogeneration plant in Mexico, by 14.7%. This resulted in artificially inflating Abengoa's operating profit in the 2014 annual statements by €218 million, causing Abengoa to report a year-end profit of €125,300,000, when in reality it should have reported a loss in the amount of €92,700,000.

145. Abengoa at the same time, fraudulently concealed its debt. In total, Abengoa intentionally hid from its net financial debt €500 million in bonds issued by Abengoa Greenfield on September 30, 2014, and €700 million from a syndicated loan issued on the same day. Abengoa did this in order to avoid breaching a covenant with its lenders that required it to remain below a certain leverage ratio. If breached, Abengoa's lenders had the right to demand immediately repayment, which would have thrown Abengoa into bankruptcy immediately, given its existing liquidity deficiencies at the time.

146. Abengoa manipulated its balance sheet in additional ways to reflect less debt than it actually had. Abengoa cancelled a €500 million syndicated loan on December 31, 2014, only to renew it two days later on January 2, 2015. This maneuver was fraudulent and designed to portray an image of financial health and strength to the public that, in reality, did not exist.

* * *

147. Abengoa continued inflating its profits and concealing its losses after the Offering. Just before year-end, it fraudulently billed at least €10.8 million in expenses to the AVE Mecca Medina project to prematurely recognize revenue for 2013. Abengoa continued this practice in 2014 by artificially inflating its operating profit margin by €218 million, while at the same time refusing to pay supplier invoices and failing to recognize hundreds of millions of euros in additional losses stemming from Abengoa Bioenergia and Abengoa Solar. On top of all of this, Abengoa also hid billions of euros in debt from the public without any legitimate explanation.

**The Need for Capital Increases as Project Losses Accumulate**

148. Abengoa's fraudulent accounting practices concealed a deepening liquidity crisis. By transferring expenses from old projects to newer projects, Abengoa was able to conceal losses. However, like any "Ponzi" scheme, maintaining the fraud required additional projects and fresh capital. Accordingly, Abengoa engaged in a number of financing transactions in mid- to late-2015 in an attempt to find desperately-needed new money.

149. On September 3 and 4, 2014, during "strategy update" presentations held in London and New York, Abengoa announced that it would be transitioning to an "asset-light" business model referred to as "Abengoa 3.0," as part of an effort to address investors' concerns about Abengoa's balance sheet. The new business model was aimed at generating cash throughout the lifecycle of construction projects and fast-tracking the early stages of such projects before long term, project-level financing was secured. This was to be achieved, in part, through the creation of a subsidiary called Abengoa Greenfield, S.A. ("Abengoa Greenfield"), which was designed to secure short-term "bridge" financing from Abengoa's external partners for the beginning stages of new projects.

150. According to Abengoa, the new Abengoa 3.0 business model would enable it to control the entire value chain of its construction projects. Completed projects would ultimately be sold to Abengoa Yield, thereby generating cash for Abengoa. Abengoa, in turn, would reinvest a portion of those proceeds in new projects via Abengoa Greenfield, in a process Abengoa referred to as "equity recycling." Analysts and investors expressed optimism concerning the new business model, with a September 12, 2014 Santander analyst report declaring that Abengoa was "moving in the right direction" by "focus[ing] on cash flow generation to improve [its] rating . . . and [on] slimming down the company."

151. In connection with the launch of Abengoa 3.0, on September 22, 2014, Abengoa announced a €500 million private placement of "green bonds" issued by Abengoa Greenfield (the "Greenfield Bonds"). The proceeds from the offering would be used to finance certain environmentally sustainable energy projects "until the long-term funds associated with those

projects are obtained," while "optimizing financial costs" for Abengoa. The Greenfield Bonds were offered in two tranches (one in euros and one in U.S. dollars), both maturing in 2019. The Greenfield Bond offering closed on September 30, 2014 – the last day of the third quarter.

152. On May 8, 2015, Abengoa borrowed 95 million Class B shares from its majority shareholder, Inversión Corporativa IC, S.A. ("Inversión"), equal to ***10%*** of its total outstanding stock and worth approximately ***€275 million***.

153. On the ***very same day*** that Abengoa borrowed the Class B shares from Inversión, Abengoa agreed to subscribe to 51% of a $670 million capital increase announced by Abengoa Yield, designed to fund the acquisition of four solar power assets owned by Abengoa.

154. Analysts questioned the timing of these two contemporaneous transactions. For example, in a July 2015 research note, Berenberg's fixed income sales and trading desk stated that, "while there is no confirmation that the shares were indeed used to get access to funding," if that were the case, "it would be very surprising and worrying at the same time." Berenberg also noted that the share borrow raised "questions [about Abengoa's] excess liquidity."

155. On June 29, 2015, Abengoa entered into yet another transaction for the reason that – unbeknownst to investors – Abengoa needed to raise money immediately. That day, Abengoa filed a Schedule 13D with the SEC stating its subsidiary, Abengoa Concessions Investment Limited ("ACIL"), had entered into a margin loan facility agreement with a financial institution pursuant to which ACIL was permitted to borrow up to ***$200 million***.

156. As collateral for the loan, Abengoa posted a 14% stake in Abengoa Yield which, according to reports, was worth approximately ***$450 million*** at the time.

157. Through this transaction, Abengoa created for itself another makeshift alternative source of liquidity.

158. This transaction was part of a plan to obtain badly needed working capital in an effort to conceal its impending liquidity crisis and stave off bankruptcy. Indeed, Abengoa later admitted in bankruptcy filings that, as of "[e]arly in the second half of 2015, [Abengoa] . . . initiated a plan to optimize its financial structure in order to strengthen its financial position and business."

159. On July 16, 2015, Abengoa made yet another move indicative that it badly needed cash, when it filed a Form 6-K announcing that it had raised €97.6 million from the sale of ***all*** of its Class B shares in treasury stock at a price of €2.80 per share.

160. Abengoa's sale of its treasury stock raised suspicions among analysts and investors. For example, a July 17, 2015 *Reuters* article entitled "Abengoa's Liquidity Questioned After Treasury Shares Sale" quoted an investor as stating that the transaction "suggests that they really need hard cash."

161. Similarly, a July 17, 2015 BPI analyst report expressed confusion regarding the transaction in light of Abengoa's purportedly adequate liquidity, stating that the "rationale behind" the transaction was "not clear," since "***[a]lthough*** . . . ***this should allow a slight reduction of*** . . . ***net debt*** . . . ***and a reinforcement of liquidity, we don't see the need to do it now*** . . . ."

162. Approximately two weeks later, on Monday, August 3, 2015, Abengoa issued a press release and filed a Form 6-K filed with the SEC announcing that it would hold an extraordinary shareholders meeting to seek approval of: (1) a massive capital increase with pre-emptive rights of ***€650 million*** ($713 million); and (2) asset divestitures totaling €500 million – €100 million more than announced on July 31 – plus "additional divestitures of bioenergy assets."

163. According to a Sabadell analyst report dated August 3, 2015, the planned €650 million capital increase represented ***34%*** of Abengoa's market capitalization at the time it was announced. Analysts and investors were stunned by the announcement, and interpreted Abengoa's need to raise capital as an indication that its liquidity position was in jeopardy.

**Abengoa's Liquidity Crisis Results in Bankruptcy**

164. On November 8, 2015, Abengoa announced that Spanish investment firm Gonvarri Corporación Financiera ("Gonvarri") had agreed to invest approximately €350 million in connection with Abengoa's planned €650 million capital increase, and would thereafter become the majority shareholder of Abengoa, in an agreement that was contingent upon "the signing of a substantial package of financial support . . . by a group of financial institutions."

165. However, on November 25, 2015, Abengoa announced that Gonvarri had cancelled the agreement and as a result, Abengoa was filing for preliminary creditor protection under the Spanish Insolvency Law, which provided a four month window (until March 28, 2016) for Abengoa to seek to avoid bankruptcy by reaching an agreement with its creditors. Upon information and belief, Gonvarri cancelled the agreement after discovering Abengoa's accounting fraud while performing due diligence.

166. At the time of the filing, Abengoa reported gross financial debt of €8.9 billion. In addition, analysts estimated that Abengoa had approximately €2.1 billion in "confirming lines" (*i.e.*, funds owed to suppliers) and €5.9 billion of debt held by subsidiaries, bringing its total debt to €16.9 billion.

167. Shortly thereafter, on November 27, 2015, Seage resigned from Abengoa.

168. On March 1, 2016, Abengoa disclosed that it had lost €1.2 billion in 2015 and its gross financial debt had risen to €9.4 billion. The majority of Abengoa's losses, €900 million, were attributable to its construction and engineering division under Abeinsa, and dated back several years.

169. On March 10, 2016, Abengoa announced that it had reached a preliminary debt-restructuring agreement, pending approval by creditors holding at least 75% of its debt. Under the restructuring plan, Abengoa's creditors would take control of at least 90%, while existing shareholders would be left with only a 5% stake. The plan provided that Abengoa would shed non-core assets and emerge as a smaller company focused on engineering and construction with €4.9 billion in debt.

170. On March 28, 2016, Abengoa filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware under Chapter 15 of the U.S. Bankruptcy Code.

171. On April 6, 2016, the Mercantile Court of Seville nº 2 (the "Spanish Bankruptcy Court") approved a "standstill" agreement between Abengoa and its creditors granting it an additional seven months (until October 28, 2016) to restructure. The same day, Abengoa filed a

Form 6-K announcing that it would "immediately" commence proceedings to delist its ADSs from the NASDAQ and deregister its Class B shares with the SEC.

172. The Delaware Bankruptcy Court granted recognition of the Spanish bankruptcy action as a "foreign main" (*i.e.*, controlling) proceeding, pursuant to 11 U.S.C. §1517, on April 27, 2016. The Delaware Bankruptcy Court's decision gave effect in the U.S. to the seven-month standstill agreement, and meant that Abengoa would receive the protections of the automatic stay under Chapter 11 of the U.S. Bankruptcy Code. The next day, Abengoa's ADSs and Class B shares were delisted from the NASDAQ.

173. In addition, between February 24, 2016 and April 7, 2016, dozens of Abengoa's U.S.-based affiliates filed for Chapter 11 bankruptcy protection in Missouri, Kansas and Delaware.

174. Abengoa's Spanish and United States bankruptcy proceedings ultimately concluded on or around August 22, 2019. Abengoa now operates in accordance with its court-approved plan of reorganization.

**Criminal Charges against Senior Leadership**

175. Following Abengoa's filing for bankruptcy, investors filed civil and criminal charges in Spain against Abengoa and certain of its officers, directors, and key subsidiaries. Two complaints, in particular, focus on the accounting fraud alleged herein and demonstrate the veracity and strength of Plaintiffs' allegations. A brief overview of the Spanish court system and procedural history of these cases is required to appreciate the significance of the current status of these Spanish proceedings.

176. Spain's criminal system is governed by the principle of public prosecution, by virtue of which the initiation, promotion and development of the criminal procedure depends on a public office, the Public Prosecutor's Office, or a private prosecutor. When it appears that a well-founded suspicion of criminal conduct exists, a public interest arises to prosecute. The Public Prosecutor's Office or private prosecutor proceeds with the criminal action and the judge assigned to matter will investigate the alleged crimes in its discretion in order to obtain all the necessary facts. If, once carried out, the judge believes that the facts constitute a crime and its perpetration is

sufficiently justified by the corresponding offender, the judge will approve or advance the claims for indictment.

177. The process described in the preceding paragraph is governed by the Criminal Procedure Act (LECr) and in most of procedures (called "abbreviated criminal proceeding") is divided into three (3) phases: (i) first stage of investigation (articles 299-325 from LECr), (ii) the so-called intermediate stage (articles 780-784 LECr); and (iii) the trial stage (articles 785- 789 LECr).

178. The "investigatory stage" is the initial stage where an investigation takes place. In the investigatory stage each and every one of the investigation measures take place, both incriminating and exonerating evidence, such as the testimonies of those being investigated, the witness statements, the expert witness testimony, site inspections, police reports, face-offs, etc. In short, each and every one of the proceedings necessary to find out the reality of the events that led to the initiation of the proceedings. (Articles. 777 and following LECr). This stage of investigation is carried out before the Investigating Judge. Once the Investigating Judge has all the necessary information to make a decision regarding the existence or not of probable cause that a crime has been committed in order to prosecute the investigated facts, he must issue one of the following resolutions (articles. 779 LECr): dismissal without prejudice due to a lack of evidence; or, order to prosecute. In the event that the decision of the Investigating Judge consists of the first option, that is, to issue a dismissal without prejudice, the procedure would be terminated at that time, either for all those investigated, or for some of them only (article 634 LECr). In the second case, that is, in the case in which the Investigating Judge decides that there is enough cause as to continue with the procedure he would issue an order advancing the case to the "intermediate stage." (articles 780 and following LECr).

179. The **"**intermediate stage**"** is mainly a written stage that takes place before the Investigating Court. It necessarily entails subpoenas to the accused parties—the Public Prosecutor's Office and private and popular accusations, as the case may be. (Article. 781 LECr). The accusing party may then (i) either make a formal indictment and qualification of the crime as

described in the Penal Code (ii) or request additional proceedings. If additional proceedings are requested, and the Investigating Judge admits them, said proceedings will be carried out and once completed, they will be re-summoned for indictment. Indictment should include (i) the facts attributed to each of the investigated parties, (ii) the crimes for which they are accused, (iii) the punishments that are petitioned, including civil damages and (iv) the evidence to be examined at the Trial. Once the indictments are ready the so-called Order to Commence Trial will take place (article 783 LECr).

180. The "trial stage" comes next, which will take place in its entirety before the prosecuting body (articles 785 and following LECr). Once the order has been received by the prosecuting body, it must examine it paying special attention to the accusation and defense briefs to issue two (2) resolutions: an order admitting evidence which is not subject to appeal (article 785.1 LECr); and setting date for trial (article 785.2 LECr). Finally, the trial will be held in as many sessions as detailed, where all the evidence proposed by the parties and admitted by the prosecutorial body will be examined. The prosecutorial judge must render a final judgment (articles 788 and 789 LECr). This judgment is subject to appeal before the Appeals Division of the National Court (article 846 ter LEC.) and may be subject to further appeal before the Criminal Division of the Supreme Court in extraordinary cases.

181. Finally, similar to civil courts in the U.S., Spain's criminal courts have jurisdiction over different cases depending on the claims alleged. In Spain, the jurisdiction belonging to a Criminal Investigation Court versus a Central Criminal Investigation Court (or the National Court) depends on the type of offense and the seriousness of the sentence it carries, with the latter being reserved for investigating and ruling on crimes that are particularly severe such as "fraud . . . that causes or can cause serious repercussion in the confidence of mercantile transactions in the national economy or damage to the patrimony of a number of people in territories from more than one *Audiencia*." Article 65.1.c) of the Ley Orgánica 6/1985, de 1 de julio, del Poder Judicial.

182. On March 22, 2016, investors filed a criminal complaint in Spain against Ortega and Benjumea for corporate crime, as defined in article 290 of the Penal Code, and the crime of

misrepresentation in capital investment or misrepresentation in investment in stock markets, as defined in art 282 bis of the Penal Code. The Public Prosecutor's Office is currently an active party and supporting the prosecution, which is in the "investigatory stage" pending in the National Court in Madrid, which is a Central Criminal Investigation Court with jurisdiction over particularly severe crimes.

183. On February 2, 2017, following an evaluation of the proof in support of the indictments by a three-judge panel before the appellate branch of the National Court ("*Sala de lo Penal de la Audiencia Nacional*"), the investigating judge admitted (*i.e.*, accepted) the complaint. In pertinent part, the judge held that evidence was sufficient to investigate whether the financial statements disseminated by Abengoa and the idyllic financial situation disclosed by its managers, prior to its financial collapse in November 2015, were or were not contrary to its financial and economic reality.

184. After two years of extensive discovery in the "investigatory stage" phase, on December 26, 2019, investors of Abengoa filed a motion with the National Court requesting that the criminal complaint against Ortega and Benjumea be "extended" to include as additional defendants: Abengoa; two members of Abengoa's Audit Committee, **Mercedes Gracia Diez** and **Alicia Velarde Valiente**; Abengoa's auditor, Deloitte S.L.; and the audit partner responsible for the audit, **Don Manuel Arranz Alonso**.

185. On January 13, 2020, in response to the motion, attorneys for Benjumea and attorneys for Ortega submitted separate briefs opposing the expansion of the complaint.

186. On January 23, 2020, the Public Prosecutor's Office responded to the motion, stating that it did not oppose the request to add the new defendants. In pertinent part, the Public Prosecutor's Office responded as follows:

> As a matter of fact, throughout the processing of this case, enough evidence has been gathered to establish at this stage of the trial, and without prejudice to the court ruling otherwise, a possible accounting misrepresentation of the accounts corresponding to, at least, the 2014 to 2016 yearly financial statements of Abengoa, S.A. and certain subsidiaries … to the detriment of its partners, shareholders and /

or third parties. ***To this end, and despite the difficulties and obstacles in gathering the documentation that seems to point to the aforementioned facts, there is evidentiary information in the expert report provided by the complainant, which uncovers the systematic concealment of substantial losses (portfolio losses) of assets, as well as the inclusion of work certifications not sufficiently accredited, that point out a clear misrepresentation of the actual economic-financial situation of the entity***.

The suspicions that loomed in this regard, have apparently materialized to such an extent, both in specific accounting operations of concealment and emergence of non-existing assets of such depth, that they require the pertinent clarifications by way of documentary evidence. To that effect, it serves to read the resolution by the "Institute of Accounting and Auditing of Accounts" (ICAC) dated 02/20/2018 … together with the rest of the procedural steps and, particularly, ***the statements provided by the sole defendants to date [Ortega and Benjumea], whose explanations about the underlying cause of the bankruptcy of the entity they were managing, are significantly questionable***.

. . .

The facts, in this stage of the proceedings, could include crimes of misrepresentation of the accounts that reflect the economic situation of the company to the detriment of itself, its partners or third parties; and the crime of investment fraud defined under articles 290 and 282 bis, respectively, of the Penal Code.

In fact, with respect to the type of crime provided for in article 290 of the Penal Code, a gross (in the sense of significant) misrepresentation of the accounts is required to such an extent that it alters, in commercial terms, the actual image of the entity to the point that it is suitable to cause the economic damage required in the classification.

The existence of misrepresentation is established by comparison with what should have been stated in the misrepresented documents, therefore, it is necessary to state what should have been the correct information reflected therein. To that effect, ***the expert evidence provided by the party and its exhaustive analysis are of special significance, in the absence of any other explanation and / or documentation that could fill in the gaps and banish any doubt in this regard.***

. . .

For all these reasons and based on both the foregoing and the exhaustive arguments prepared by the private prosecution, ***the Prosecutor understands that it is appropriate to admit the expansion of the complaint in the terms requested***.

Emphasis added.

187. On February 2, 2020, the National Court granted the motion and expanded the criminal complaint to include Abengoa, Deloitte S.L., and the above-named individuals as defendants. In reaching its decision, the National Court concluded that the evidence submitted against these additional parties was sufficient to show that "***some type of criminal offense***" had been committed. This evidence included, in pertinent part, (1) an expert report prepared by an auditing firm, Silva & Asociados; (2) the ICAC's resolution (discussed below); and (3) a forensic report completed jointly by Altran Group and MaC Group, two firms specializing in financial consulting within the renewable energy industry, submitted by Spain's Attorney General in a separate arbitration proceeding filed by Abengoa against the Kingdom of Spain.

188. In pertinent part, the National Court held that:

> THIRD. As a matter of fact, and in accordance with the Prosecutor's Office, throughout the processing of this case, enough evidence has been gathered to establish at this stage of the trial, and without prejudice to the court ruling otherwise, a possible accounting alteration of the accounts corresponding, at least, to the 2014 to 2016 yearly financial statements of Abengoa, S.A. and certain subsidiaries (ABENGOA SOLAR, S.A. and ABENGOA BIOENERGIA, S.A.), to the detriment of its partners, shareholders and / or third parties.
>
> ***The state of the case, and particularly the report provided by the complainant, shows that there is evidence that can be inferred from the systematic concealment of substantial losses of its assets, as well as the inclusion of insufficiently accredited certifications that indicate a visible misrepresentation of the reality of the entity's economic and financial situation***.
>
> ICAC's resolution of 02/20/2018, taken into consideration along with the rest of the procedural measures and, specifically, the statements made by the only individuals investigated to date, whose explanations of the leading cause for the bankruptcy of the entity they managed are ***questionable***, show that there have been ***specific accounting operations of concealment and the emergence of non-existent assets*** of such depth that they require the pertinent clarifications, predominantly by way of documentary evidence. The matter herein supports the peremptory need to demand from the entities involved, the appropriate answers to the questions that arise regarding the gaps found in the audit of ABENGOA's accounts by DELOITTE, S.L., during financial year 2014.
>
> These facts, at this stage of the trial, could include crimes of misrepresentation of the accounts that reflect the economic situation of the company to the detriment of

the company itself, its partners or third parties; and the crime of fraud against investors as defined in articles 290 and 282 bis, respectively, of the Penal Code.

. . .

Prima facie, the facts reported in the complaint, supported by the accompanying report, demonstrate the existence of serious infractions in the audit of ABENGOA's accounts for the 2014 financial year, as a result of failure to obtain sufficient and accurate evidence of the financial situation published therein, with respect to the revenue from the engineering and construction activities and external financing, all of a highly serious nature, as we will see in detail. ***This report highlights the existence of losses accounted for in 2015 and 2016 that should have been recorded, in significant amounts, at least since 2014, and would have been deliberately hidden to give a misrepresented appearance of the company's equity and financial situation***; ***a situation that would result in obvious damage to those who invested, trusting in the truthfulness of the financial information provided by ABENGOA.***

. . .

In this case, companies ABENGOA S.A. and DELOITTE S.L., in accordance with the foregoing, are not mere instruments of the crime, as they are actual entities endowed with rights and obligations, and therefore must be deemed as entities under investigation for legal procedural purposes, with the rights and guarantees inherent thereto, for their alleged participation in the actions described in this resolution, as if they would constitute a crime as defined in art. 282 bis PC.

As for the company ABENGOA S.A., the events described in the expansion of the complaint were allegedly perpetrated by the Directors and members of their audit committee, Mercedes Gracia Diez and Alicia Velarde Valiente, while carrying out business activities and on behalf of the company, and to the direct or indirect benefit of the same.

. . .

FIFTH: In view of all the above, it is still necessary to determine whether the actions by the Directors and members of the Audit Committee of Abengoa S.A, Mercedes GRACIA DIEZ and Alicia VELARDE VALIENTE, as well as that of the partner of Deloitte S.L., in charge of the audit, Manuel ARRANZ ALONSO, meet the criteria of the crimes that led to these charges, crimes of accounting misrepresentation under art. 290 PC and investment fraud under art. 282 bis PC; the extension of the complaint against individuals, Mercedes GRACIA DIEZ, Alicia VELARDE VALIENTE and Manuel ARRANZ ALONSO, is admissible, as these actions, according to the previous reasoning, could rationally evidence participation in the relevant criminal conduct under investigation.

> SIXTH: Regarding the legal entities against which the expansion of the complaint is filed, said expansion is granted against companies ABENGOA S.A. and DELOITTE S.L. as alleged perpetrators of the actions related therein, insofar as these could constitute a crime of investment fraud under art. 282 bis PC (art. 288 PC).

Emphasis added.

189. A copy of the complete of the National Court's Order dated February 3, 2020, followed by a certified English translation, is attached hereto as Exhibit B.

190. Separate and apart from the National Court action filed against Ortega and Benjumea (which now includes Abengoa as a defendant, as previously discussed), investors filed a second criminal action in or around June 2018 against Abeinsa and Inabensa in Seville (as well as various senior officers of Abengoa), where Abengoa was based. The complaint alleged crimes of accounting fraud and misrepresentation.

191. Seville's Criminal Investigation Court was overseeing the case when the investigating judge decided to admit (or accept) the claims. The judge then thoroughly investigated the claims over the course of the following year. In the course of its investigation, the investigating judge relied upon FE7's letter as well as testimony from FE4 and FE5 detailing the same fraudulent transactions alleged herein. The investigating judge also reviewed and received internal emails and testimony from additional witnesses and a forensic report from KPMG, all of which confirmed that Abeinsa and Inabensa systematically falsified their business results for years to convey to the market a portrait of solvency that in fact did not exist.

192. On June 9, 2020, the investigating judge in Seville decided to elevate the criminal action against Abeinsa and Inabensa to the National Court, which is the same Central Criminal Investigation Court in Madrid currently overseeing the criminal claims against Ortega, Benjumea, and Abengoa. The judge issued the ruling over the objection and opposition from three of the individuals being investigated, including **Alfonso González**, the head of Abeinsa, and **José Fernando Giráldez**, the director of Abengoa's Consolidation and Management Control Department. Relying on the KPMG report discussed previously, the judge agreed that the alleged

financial accounting fraud was not limited to solely the AVE Mecca Medina project, but instead ***pervaded Abengoa in its entirety*** and, therefore, fell under the jurisdiction of the National Court in Madrid. This action remains ongoing as of the date of this filing.

* * *

193. The current criminal proceedings against Abengoa, Ortega, Benjumea, and others, are the product of years-long investigations, significant evidentiary discovery, and expert analysis. The Public Prosecutor's Office, the State Attorney's Office, and Spain's criminal courts have accepted the indictments against these defendants, and have even referred to their "explanations" in defense as "questionable."

**Sanctions against Abengoa's Independent Auditor**

194. On February 20, 2018, in the midst of the above criminal proceedings, Spain's top corporate financial accounting regulator, the ICAC, sanctioned Abengoa's independent auditor, **Deloitte S.L.**, and its lead audit partner, **Don Manuel Arranz Alonso**, in connection with its audit of Abengoa's 2014 financial statements. They were fined €1.48 million and €8,700, respectively.

195. The full text of the ICAC's resolution remains confidential. However, the National Court had access to it in connection with the February 3, 2020 order, when deciding whether to include Deloitte as an additional defendant and, accordingly, incorporated and summarized pertinent portions of it. According to the National Court, the ICAC's resolution:

> . . . highlight[ed] that DELOITTE and its audit partner, Mr. ARRANZ, did not obtain sufficient and adequate evidence in the verification of income from ABENGOA's engineering and construction activity (ICI) for an amount of ***€ 4,514.49 million***, which represents ***63.14% of the group's [revenue]***, despite the fact that (obviously, given the magnitude) they assessed the risk in this recognition of revenue as a ***significant risk of fraud***.
>
> In short, the auditors did not verify the accuracy and reliability of income recorded in the ABENGOA accounts for the 2014 financial year, from the engineering and construction activity, which represent 63.14% of its [revenue], through by obtaining, as is mandatory, adequate and sufficient evidence to verify that they were free of inaccuracies due to fraud.

Emphasis added.

196. In addition, the ICAC found that that Deloitte: (1) did not verify the accuracy or reliability of Abengoa's project margin estimates or costs; (2) certified Abengoa's 2014 financial statements even though it knew that they contained materially inaccuracies arising from the fact that Abengoa inflated its operating profit by €218 million which, in turn, led Abengoa to represent that its profit for year was €125,300,000 when it should have been a loss of €92,700,000; and (3) acted in a "***reprehensible***" manner in approving Abengoa's decision to classify ***€1.2 billion of debt*** as non-recourse debt without "sufficient and adequate evidence" in support. Indeed, as the National Court held in its February 3, 2020 order, the ICAC emphasized "[t]he absolute lack of justification obtained by the auditors to support the reasonability of the profit margin attributed by ABENGOA to its projects and costs recorded in them, by figures of material scope also significant: a sample of projects of 2,215,000,000 euros equivalent to another 30% of its turnover (although selected in a biased way, based on September data and not on the closing of the exercise)."

* * *

197. The ICAC's resolution cements the notion that Abengoa was rife with fraud. Senior management acted with impunity, falsifying Abengoa's financial statements without fear of any repercussion due to the fact that their independent auditor, Deloitte, was performing effectively zero oversight. Deloitte's liability aside, the critical fact here is that Spain's top financial accounting regulator was provided first-hand access to Abengoa's financial records and found clear and convincing evidence of fraud.

## SECURITIES ACT ALLEGATIONS

### The Registration Statement Contained Material Misrepresentations and Omissions

198. The Registration Statement issued in connection with the Offering was negligently prepared and, as a result, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

199. In particular, the Registration Statement represented that Abengoa "enforce[d] strict financial discipline" which, in turn, benefited its ongoing bidding operations, and developed

"a robust project management and control system" to ensure proper compliance with revenue recognition accounting standards, namely the "percentage of completion" method under IAS 11. In pertinent part, the Registration Statement stated as follows:

> ***We have successfully grown our business while seeking to enforce strict financial discipline to maintain our strong liquidity position***. As of June 30, 2013, we had cash and cash equivalents and short-term financial investments of €3,222 million, which we believe are sufficient to satisfy our short-term liquidity needs. ***This strong cash position also assists in bidding for large projects***. . . .
>
> . . .
>
> ***Revenue from construction contracts is recognized using the percentage-of-completion method for contracts whose outcome can be reliably estimated and it is probable that they will be profitable***. When the outcome of a construction contract cannot be reliably estimated, revenue is recognized only to the extent it is probable that contract costs incurred will be recoverable.
>
> As described in Note 2.26.b) to our Annual Consolidated Financial Statements and our Interim Consolidated Financial Statements, ***the percentage of completion is determined at the date of every consolidated statement of financial position based on the actual costs incurred as a percentage of total estimated costs for the entire contract***.
>
> Revenue recognition using the percentage-of-completion method involves the use of estimates of certain key elements of the construction contracts, such as total estimated contract costs, allowances or provisions related to the contract, period of execution of the contract and recoverability of the claims. ***We have established, over the years, a robust project management and control system, with periodic monitoring of each project. This system is based on the long-track experience of the Group in constructing complex infrastructures and installations. As far as practicable, we apply past experience in estimating the main elements of construction contracts and rely on objective data such as physical inspections or third parties confirmations***. Nevertheless, given the highly tailored characteristics of the construction contracts, most of the estimates are unique to the specific facts and circumstances of each contract.
>
> When the outcome of a construction contract can be reliably estimated and it is probable that it will be profitable, revenue from the contract is recognized over the term of the contract. When it is probable that the costs of the project will be greater than its revenue, expected loss is recognized immediately as an expense. To determine the appropriate amount of revenue to be recognized in any period, the percentage of completion method is applied. The percentage of completion method considers, at the date of the Statement of Financial Position, the actual costs incurred as a percentage of total estimated costs for the entire contract. ***Costs***

> ***incurred in the period which relate to future project activities are not included when determining the percentage of completion.*** Prepayments and certain other assets are recognized as inventories, depending upon their specific nature.

Emphasis added.

200. The statements identified in emphasis above in ¶199 were each inaccurate statements of material fact because Abengoa did not "enforce strict financial discipline" or adhere to the "percentage of completion" method for revenue recognition. To the contrary, Abengoa prior to, during, and after the Offering systemically inflated its profit margins and concealed its losses in violation of international accounting standards.

201. As alleged above in ¶¶99-108, between August 2012 and September 2012, Benjumea directed Abengoa's senior management to transfer expenses between unrelated projects in order to artificially inflate Inabensa's profit margin to €53 million in 2012, an amount equal to 10% of Abengoa's consolidated operating profit for the year.

202. Additionally, as alleged above in ¶¶109-22, prior to the Offering Abengoa recorded expenses on the AVE Mecca Medina and Cunene Water Pipeline projects that were either unrelated to the projects or incurred prematurely and, in either scenario, were in violation of the percentage of completion revenue recognition method under IAS 11. FE1, FE4, FE5, and FE7 described this practice as widespread and systemic within Abengoa, meaning that profits and losses for multiple additional projects had been fraudulently manipulated at the time of the Offering.

203. Abengoa also concealed project losses by *inter alia* the use of dual accounting records, as alleged above in ¶¶59-74. Abengoa's SAP records maintained positive project margins which differed materially from the true project margins kept in Excel spreadsheets by project managers. Thus, Abengoa falsely showed profitability on projects to auditors and investors that did not actually exist.

204. In addition to all of this, Abengoa also concealed massive losses attributable to its solar operations in Spain. This includes the €840 million loss related to the solar plants in Spain

that Abengoa had been pursuing in arbitration on behalf of CSP Equity Investment S.a.r.l. since June 2013, as alleged above in ¶¶109-22.

205. These allegations demonstrate widespread, systemic accounting fraud within Abengoa. This materially contradicts the representations in the Registration Statement concerning Abengoa's "strict financial discipline" and compliance with revenue recognition accounting standards. Accordingly, Abengoa's Registration Statement was untrue and materially inaccurate.

**Claim Pursuant to Section 11 of the Securities Act Against the Securities Act Defendants**

206. Plaintiffs incorporate herein ¶¶1-205 by reference.

207. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, against the Securities Act Defendants.

208. This count is asserted by Plaintiffs against the Securities Act Defendants by, and on behalf of, persons who acquired Abengoa's ADS traceable to the Registration Statement issued in connection with Abengoa's Offering on or about October 17, 2013.

209. The Registration Statement for the Offering was defective and inaccurate, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

210. The defendants named in this Count were responsible for the contents and dissemination of the Registration Statement.

211. The Securities Act Defendants each caused the issuance of the Registration Statement and/or signed the Registration Statement, either personally or through an Attorney-in-Fact. The Securities Act Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading. None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, were without omission of any material facts, and/or were not misleading.

212. The Underwriter Defendants were each Underwriters, as that term is used in Section 11(a)(5) of the Securities Act, with respect to the Offering and Abengoa's ADS sold through the Registration Statement. The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts. None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, were without omission of any material facts, and/or were not misleading.

213. Plaintiffs purchased Abengoa's ADSs in the Offering, or traceable thereto, and without knowledge of the untruths and/or omissions in the defective Registration Statement as alleged herein and have been damaged thereby.

214. By reasons of the conduct herein alleged, each defendant named in this Count violated, and/or controlled a person who violated, the Securities Act and is, therefore, liable under Section 11 of the Securities Act to Plaintiffs and the Class.

215. This claim is brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and within three years of the effective date of the Registration Statement.

**Claim Pursuant to Section 15 of the Securities Act Against the Individual Defendants**

216. Plaintiffs incorporate herein ¶¶1-215 by reference.

217. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against the Individual Defendants.

218. Each of the Individual Defendants was a control person of Abengoa by virtue of his or her position as a director, senior officer, and/or authorized representative of Abengoa. By reason of their role(s) at Abengoa, as alleged above, the Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Abengoa to engage in the conduct complained of herein. In addition, the Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or

officers and/or major shareholders of Abengoa. By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

219. Each of the Individual Defendants was a culpable participant in the violations of the Securities Act alleged in Count I above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the Offering to be successfully completed.

## EXCHANGE ACT ALLEGATIONS

### Materially False and Misleading Statements Made During the Class Period

*The Offering*

220. The Class Period begins on October 17, 2013, when Abengoa's ADSs began trading on the NASDAQ following the Offering.

221. The Registration Statement issued in connection with the Offering contained false and/or materially misleading statements. The Individual Defendants signed the Registration Statement. Benjumea also signed the Registration Statement.

222. In particular, the Registration Statement represented that Abengoa "enforce[d] strict financial discipline" which, in turn, benefited its ongoing bidding operations, and developed "a robust project management and control system" to ensure proper compliance with revenue recognition accounting standards, namely the "percentage of completion" method under IAS 11. In pertinent part, the Registration Statement stated, in pertinent part, as follows:

> ***We have successfully grown our business while seeking to enforce strict financial discipline to maintain our strong liquidity position***. As of June 30, 2013, we had cash and cash equivalents and short-term financial investments of €3,222 million, which we believe are sufficient to satisfy our short-term liquidity needs. ***This strong cash position also assists in bidding for large projects***. . . .
>
> . . .
>
> ***Revenue from construction contracts is recognized using the percentage-of-completion method for contracts whose outcome can be reliably estimated and it is probable that they will be profitable***. When the outcome of a construction contract cannot be reliably estimated, revenue is recognized only to the extent it is probable that contract costs incurred will be recoverable.

> As described in Note 2.26.b) to our Annual Consolidated Financial Statements and our Interim Consolidated Financial Statements, ***the percentage of completion is determined at the date of every consolidated statement of financial position based on the actual costs incurred as a percentage of total estimated costs for the entire contract***.
>
> Revenue recognition using the percentage-of-completion method involves the use of estimates of certain key elements of the construction contracts, such as total estimated contract costs, allowances or provisions related to the contract, period of execution of the contract and recoverability of the claims. ***We have established, over the years, a robust project management and control system, with periodic monitoring of each project. This system is based on the long-track experience of the Group in constructing complex infrastructures and installations. As far as practicable, we apply past experience in estimating the main elements of construction contracts and rely on objective data such as physical inspections or third parties confirmations***. Nevertheless, given the highly tailored characteristics of the construction contracts, most of the estimates are unique to the specific facts and circumstances of each contract.
>
> When the outcome of a construction contract can be reliably estimated and it is probable that it will be profitable, revenue from the contract is recognized over the term of the contract. When it is probable that the costs of the project will be greater than its revenue, expected loss is recognized immediately as an expense. To determine the appropriate amount of revenue to be recognized in any period, the percentage of completion method is applied. The percentage of completion method considers, at the date of the Statement of Financial Position, the actual costs incurred as a percentage of total estimated costs for the entire contract. ***Costs incurred in the period which relate to future project activities are not included when determining the percentage of completion.*** Prepayments and certain other assets are recognized as inventories, depending upon their specific nature.

Emphasis added.

223. The statements identified in emphasis above in ¶222 were each inaccurate statements of material fact because Abengoa did not "enforce strict financial discipline" or adhere to the "percentage of completion" method for revenue recognition. To the contrary, Abengoa prior to, during, and after the Offering systemically inflated its profit margins and concealed its losses in violation of international accounting standards.

224. As alleged above in ¶¶99-108, between August 2012 and September 2012, Benjumea directed Abengoa's senior management to transfer expenses between unrelated projects

in order to artificially inflate Inabensa's profit margin to €53 million in 2012, an amount equal to 10% of Abengoa's consolidated operating profit for the year.

225. Additionally, as alleged above in ¶¶109-22, prior to the Offering Abengoa recorded expenses on the AVE Mecca Medina and Cunene Water Pipeline projects that were either unrelated to the projects or incurred prematurely and, in either scenario, in violation of the percentage of completion revenue recognition method under IAS 11. FE1, FE4, FE5, and FE7 described this practice as widespread and systemic within Abengoa, meaning that profits and losses for multiple additional projects had been fraudulently manipulated at the time of the Offering.

226. Abengoa also concealed project losses by *inter alia* the use of dual accounting records, as alleged above in ¶¶59-74. Abengoa's SAP records maintained positive project margins which differed materially from the true project margins kept in Excel spreadsheets by project managers. Thus, Abengoa falsely showed profitability on projects to auditors and investors that did not actually exist.

227. In addition to all of this, Abengoa also concealed massive losses attributable to its solar operations in Spain. This includes the €840 million loss related to the solar plants in Spain that Abengoa had been pursuing in arbitration on behalf of CSP Equity Investment S.a.r.l. since June 2013, as alleged above in ¶¶109-22.

228. These allegations demonstrate widespread, systemic accounting fraud within Abengoa. This materially contradicts the representations in the Registration Statement concerning Abengoa's "strict financial discipline" and compliance with revenue recognition accounting standards, which Abengoa used to conceal its true liquidity risk from investors and prevented the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt. Accordingly, Abengoa's Registration Statement was untrue and materially inaccurate.

*First Nine Months of 2013 Financial Results*

229. On November 11, 2013, Abengoa issued a press release announcing its financial results for the nine months ended September 30, 2013. It reported that EBITDA had risen 29% year-over-year, to €860 million, and reported a pro-forma corporate leverage ratio of 2.5x. In addition, Abengoa confirmed its guidance of EBITDA between €1,180 million and €1,230 million for 2013, Corporate EBITDA between €800 and €825 million for 2013, and "positive free cash flow at the corporate level" beginning in 2014. The press release further stated that Abengoa was "accelerating its deleverage targets," and now intended "to achieve a corporate debt to EBITDA ratio of 2.5x in 2013 and 2.0x in 2014 onwards," as opposed to its "previous targets of 3.0x in 2013 and 2.5x in 2014 onwards."

230. Later that day, Abengoa held a conference call with analysts and investors to discuss its financial results. The corresponding presentation slides were filed with the SEC on Form 6-K the following day, on November 12, 2013. During the call, Ortega commented on Abengoa's leverage ratios, in pertinent part, as follows:

> First of all, the business momentum for Abengoa continues to be impressive . . . . [W]e are delivering on the work we have given to the markets through 2013 . . . . ***[W]e have deleveraged the company to the levels we wanted it to be by year end, with a ratio of 2.5 times the corporate EBITDA***.

Emphasis added.

231. The statements referenced above in ¶¶229-30 concerning Abengoa's financial results and guidance, including its leverage, cash flow, and EBITDA, were materially false and misleading at the time they were made because they conveyed to investors that Abengoa was operating profitably and, in turn, had sufficient cash flows to service its debt. In reality, the profitability and liquidity described by Abengoa was due in material part to its ongoing accounting fraud.

232. Throughout 2013, Abengoa was engaged in widespread and systemic accounting fraud, as detailed above in ¶¶59-74. This included Inabensa's use of at least €25 million of "cost provisions" to artificially inflate its earnings for the year.

233. During 2013, as alleged above in ¶¶109-22, Abengoa concealed a loss of €840 million attributable to six of its solar power plants in Spain. Reports provided by Spain's Attorney General in the course of the arbitration proceedings before the Stockholm Chamber of Commerce Institute of Arbitration demonstrated the divergence between the damages claimed and Abengoa's publicly stated financial reports, including those in the Form 20-F for 2013. These reports were co-authored by Altran Group and MaC Group.

234. Additionally, as alleged above in ¶¶133-47, Abengoa used the AVE Mecca Medina project once again to inflate Inabensa's profit margins, fraudulently billing at least €10.8 million in expenses to the project in order to prematurely recognize revenue for the year in violation of the percentage of completion method.

235. Collectively, the false and/or materially misleading statements referenced above concealed Abengoa's true liquidity risk from investors and prevented the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt.

*Full Year 2013 Financial Results*

236. On February 20, 2014, Abengoa issued a press release announcing its financial results for the full year ended December 31, 2013. It reported that EBITDA had grown 44% year-over-year, to €1,365 million. With respect to leverage, the press release stated that Abengoa's "corporate net debt ratio stood at 2.2x, representing a reduction of 1.5x compared to 3.7x in December of 2012, hence ***delivering on the commitment to reduce corporate leverage***," and further represented that "[t]he ratio of total net debt (including debt associated to [Abengoa's] concessions business) stood at 5.8x, a reduction of 1.3x year-over-year." In addition, Abengoa initiated 2014 guidance of EBITDA between €1,350 million and €1,400 million, and Corporate EBITDA between €860 million and €885 million. The press release further stated that Abengoa was "reiterat[ing] its financial targets for 2014" of "a corporate net debt to EBITDA ratio of 2.0x in 2014 onwards," and "positive free cash flow at the corporate level from 2014 onwards." In the

press release, Ortega commented that Abengoa had "***ended 2013 reinforced financially and with a clear business plan to deliver***." (Emphasis added.)

237. Later that day, Abengoa held a conference call with analysts and investors, during which Zubiría commented on Abengoa's EBITDA, leverage reduction, and corporate leverage ratio, in pertinent part, as follows:

> ***Delivery on our deleverage plan has been the focus of the management team during each of the 365 days of 2013***. And that is why I am so glad to share with you that ***we have reduced our corporate leverage from 3.7 times corporate EBITDA at the end of 2012 to 2.2 times at the end of 2013, a 1.5 times reduction.***
>
> * * *
>
> Secondly, I would outline our delivery on all of the key commitments that we have shared with the market, reducing by 15% our corporate net debt to EUR2.124 billion, beating guidance of corporate EBITDA, which has reached EUR978 million for the year December 2013, up 48% compared to 2012, and ***thereby achieving a corporate leverage ratio of 2.2 times, well below the 2.5 times that we set as the target for the year and 1.5 times below the levels at the beginning of the year***.
>
> * * *
>
> . . . . ***[T]hanks to our proactive and successful financial policy***, we are entering 2014 with little if no maturities in the short-term, ***an improved capital profile, and more deleverage to come***. . . . As anticipated to you, ***we have achieved significant deleverage at the corporate level during this year – during 2013, overtaking our initial guidance for December of 2.5 times corporate EBITDA, and placing the Company at 2.2 times at the corporate level***. Compared to 2012, leverage has gone down by 1.5 times, from 3.7, a significant progress towards achieving our 2014 target of 2 times, a sound leverage for our corporate activities . . . .

Emphasis added.

238. During the call, Defendant Sánchez Ortega discussed Abengoa's leverage and cash flow targets for 2014, in pertinent part, as follows:

> . . . . I would like to share with you our guidance for 2014, a year in which ***we expect the business to continue on the positive path begun in 2013 with growth, further deleverage, and generation of free cash flow at corporate level, which is probably the most remarkable of the targets that we are confirming today***. And regarding the key financial targets, I can confirm that ***we remain committed to the following: net corporate leverage is expected to be additionally reduced to below***

> ***2 times . . . . And finally, 2014 is expected to be the first year in many for the Company to generate positive free cash flow at a corporate level, excluding the proceeds from any disposals.***

Emphasis added.

239. Abengoa's and Ortega's statements referenced above in ¶¶236-38 were false and/or materially misleading because they concealed the rampant accounting fraud occurring within Abengoa. Indeed, throughout 2013, Abengoa was engaged in widespread and systemic accounting fraud, as detailed above in ¶¶59-74. This included Inabensa's use of at least €25 million of "cost provisions" to artificially inflate its earnings for the year.

240. During 2013, as alleged above in ¶¶109-22, Abengoa concealed a loss of €840 million attributable to six of its solar power plants in Spain. Reports provided by Spain's Attorney General in the course of the arbitration proceedings before the Stockholm Chamber of Commerce Institute of Arbitration demonstrated the divergence between the damages claimed and Abengoa's publicly stated financial reports, including those in the Form 20-F for 2013. These reports were co-authored by Altran Group and MaC Group.

241. Additionally, as alleged above in ¶¶133-47, Abengoa used the AVE Mecca Medina project once again to inflate Inabensa's profit margins, fraudulently billing at least €10.8 million in expenses to the project in order to prematurely recognize revenue for the year in violation of the percentage of completion method.

242. Contrary to how Abengoa was fraudulently manipulating its financial statements, Abengoa claimed an EBITDA for the year of €1,365 million and Ortega represented that it ended the year "reinforced financially." Collectively, the false and/or materially misleading statements referenced above concealed Abengoa's true liquidity risk from investors and prevented the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt.

<u>*The 2013 20-F*</u>

243. On March 19, 2014, Abengoa filed its annual report for the year ended December 31, 2013 with the SEC on Form 20-F (the "2013 20-F"). The 2013 20-F was signed and certified

as to its veracity, as required by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), by Ortega. Ortega stated in his certification that:

> I, Manuel Sánchez Ortega, Chief Executive Officer of Abengoa S.A. (the "Company"), certify that:
>
> 1. I have reviewed this annual report on Form 20-F of the Company;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;
>
> 4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (c) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and
>
> 5. The Company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of Company's board of directors (or persons performing the equivalent function):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to

adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

244. Ortega's Sarbanes-Oxley certification referenced above in ¶243 was false and/or materially misleading because it concealed the rampant accounting fraud occurring within Abengoa. The certification represented that the Form 20-F did not contain any material misrepresentations or omission concerning the period ended December 31, 2013. However, prior to and during that period, Abengoa engaged in widespread and systemic accounting fraud, as detailed above in ¶¶59-74. This included Inabensa's use of at least €25 million of "cost provisions" to artificially inflate its earnings for the year.

245. Further, as alleged above in ¶¶109-22, in 2013 alone, Abengoa concealed a loss of €840 million attributable to six of its solar power plants in Spain. Reports provided by Spain's Attorney General in the course of the arbitration proceedings before the Stockholm Chamber of Commerce Institute of Arbitration demonstrated the divergence between the damages claimed and Abengoa's publicly stated financial reports, including those in the Form 20-F for 2013. These reports were co-authored by Altran Group and MaC Group.

246. Additionally, as alleged above in ¶¶133-47, Abengoa used the AVE Mecca Medina project once again to inflate Inabensa's profit margins, fraudulently billing at least €10.8 million in expenses to the project in order to prematurely recognize revenue for the year in violation of the percentage of completion method.

247. Contrary to how Abengoa was fraudulently manipulating its financial statements, Ortega's certification claimed that the financial statements "fairly present[ed] in all material respects the financial condition, results of operations and cash flows" of Abengoa. Accordingly, Ortega's statements in the Sarbanes-Oxley certification were false and/or materially misleading.

248. The 2013 20-F discussed Abengoa's liquidity position and cash flow, in pertinent part, as follows:

> ***Based on our current level of operations, we believe our cash flow from operations, available cash and available borrowings under our credit facilities will be adequate to meet our future liquidity needs for at least twelve months*.**
>
> * * *
>
> ***We believe that our existing liquidity and cash flow will be sufficient to meet our requirements and commitments for the foreseeable future*.**
>
> * * *
>
> Our operations are capital intensive and we operate with a significant amount of indebtedness, which, as of December 31, 2013, totaled €11,975.4 million, of which €5,654.4 million was Gross Corporate Debt and €6,320.9 million was non-recourse financing. Additionally, we have additional corporate borrowing capacity of €581.0 million which we may incur without triggering a breach of our financial covenants.
>
> * * *
>
> ***We believe that we have sufficient corporate debt in place, together with non-recourse debt and cash flows, to fund and adequately support our existing operations and finance our expansion.***

Emphasis added.

249. The statements referenced above in ¶248 were false and/or materially misleading because they concealed Abengoa's true liquidity risk from investors and prevented the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt.

<u>*Eighth Annual Analyst and Investor Day*</u>

250. On April 3, 2014, Abengoa held its Eighth Annual Analyst and Investor Day in New York. During the Analyst and Investor Day, Ortega gave a presentation on Abengoa's "strategic priorities." The corresponding slides stated that Abengoa was "delivering everything that we committed to," including, a "***strong liquidity position***" and "***reinforced financial discipline***." (Emphasis added.)

251. Ortega's statements referenced above in ¶250 were false and/or materially misleading because they concealed the rampant accounting fraud occurring within Abengoa. As of the date of the Analyst and Investor Day, Abengoa was engaged in widespread and systemic

accounting fraud, as detailed above in ¶¶59-74. Additionally, as alleged above in ¶¶109-22, 133-47, Abengoa was actively concealing a loss of €840 million attributable to six of its solar power plants in Spain and had just used the AVE Mecca Medina project to inflate Inabensa's profit margins for 2013, fraudulently billing at least €10.8 million in expenses to the project in order to prematurely recognize revenue for the year in violation of the percentage of completion method.

252. Ortega's statements during the Analyst and Investor Day concealed this fraud and, instead, falsely assured investors of Abengoa's "reinforced financial discipline" and "strong liquidity position." In light of Abengoa's widespread accounting fraud, Ortega's statements collectively concealed Abengoa's true liquidity risk from investors and prevented the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt. For this reason, the above-referenced statements were false and/or materially misleading.

*First Quarter of 2014 Financial Results*

253. On May 14, 2014, Abengoa issued a press release announcing its financial results for the quarter ended March 31, 2014. It reported that EBITDA had increased 24% year-over-year, to €302 million, and "[c]orporate leverage stood at 2.5x." In addition, Abengoa confirmed its guidance of EBITDA between €1,350 million and €1,400 million for 2014, Corporate EBITDA between €860 million and €885 million for 2014, "a corporate net debt to EBITDA ratio of 2.0x in 2014 onwards," and "positive free cash flow at the corporate level from 2014 onwards."

254. Later that day, Abengoa held a conference call with analysts and investors, during which Ortega discussed free cash flow generation and corporate leverage ratio, in pertinent part, as follows:

> ***We will see during 2014 additional improvements in the cash flows day after day, with excellent availability level already in Q1 2014, thanks to a successful management of our portfolio.***
>
> * * *
>
> I would like to highlight once again that Q1 has confirmed a positive trend in the main key performance indicators for the business, confirming that the ability on the

> rest of the year in terms of growth and, more importantly, ***the ability of the business to generate cash, going forward***. So, this, together with a ***sound and confirmed disciplined investment policy*** and improvement in the credit profile of the business, ***make us more and more confident to achieve our financial commitments*** and guidance that we shared with you in the last call and that we reiterate in this call of the Q1 numbers.

Emphasis added.

255. Zubiría also commented on Abengoa's corporate leverage ratio and free cash flow generation, in pertinent part, as follows:

> Given the seasonality in the E&C business, which has impacted our working capital for the period, corporate net debt increased by 14% quarter on quarter, reaching EUR2,421 million. ***As a result, the corporate leverage has increased to 2.5 times, from the 2.2 times achieved at the end of 2013, but improved significantly, by 0.8 times, from the levels at the end of March 2013***. This is not atypical, as Q1 has been historically weaker in cash flow generation, and the level of backlog and pipeline make us feel ***confident that we will improve as the year goes by, and expect to reach our corporate leverage and corporate free cash flow targets at year end***.

Emphasis added.

256. The statements referenced above in ¶¶253-55 concerning Abengoa's financial results and guidance, including its leverage, cash flow, and EBITDA, were materially false and misleading at the time they were made because they conveyed to investors that Abengoa was operating profitably and, in turn, had sufficient cash flows to service its debt. In reality, the profitability and liquidity described by Abengoa was due in material part to its ongoing accounting fraud. Indeed, throughout 2014, Abengoa was engaged in widespread and systemic accounting fraud, as detailed above in ¶¶59-74.

257. This included artificially increasing project margins in 2014 to recognize substantial amounts of revenue prematurely for the purposes of inflating Abengoa's financial results, such as how Inabensa increased the margin of the "DGEN" project in India to 86% in order to record the full profit from the project, even though it had hardly even started. Similarly, Abengoa had also recorded €58 million in "cost provisions," the majority of which occurred in the final months. This was also done for the purpose of artificially inflating Abengoa's earnings.

Additionally, as alleged above in ¶¶109-22, Abengoa was actively concealing a loss of €840 million attributable to six of its solar power plants in Spain.

258. In addition, as alleged above in ¶¶133-47, Abengoa was hiding additional significant losses attributable to its operations in Abengoa Solar and Abengoa Bioenergia. These losses, according to forensic analyst reports, amounted hundreds of millions of euros that Abengoa fraudulently refused to record and deliberately kept hidden.

259. Collectively, the false and/or materially misleading statements referenced above concealed Abengoa's true liquidity risk from investors and prevented the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt.

*First Half of 2014 Financial Results*

260. On August 12, 2014, Abengoa issued a press release announcing its financial results for the six months ended June 30, 2014, which was filed with the SEC on Form 6-K. It reported that EBITDA had increased 31% year-over-year, to €695 million, which Ortega attributed to "an improvement in the margins of all our activities." With respect to Abengoa's leverage, the press release stated that "corporate net debt to corporate EBITDA ratio (Corporate Leverage Ratio) as of June 30, 2014 was 2.5x, in line with the previous quarter, and 0.7x lower than twelve months ago." In addition, Abengoa "reiterated its guidance for the fiscal year 2014."

261. Also on August 12, 2014, Abengoa held a conference call with analysts and investors, during which Zubiría discussed free cash flow generation, in pertinent part, as follows:

> ***From a cash flow standpoint, I can say that we have all the right levers to continue on the path of increasing free cash flow delivery. First, we have a strong and growing corporate EBITDA generation***. . . .

Emphasis added.

262. During the call, Ortega commented on Abengoa's corporate leverage, stating in pertinent part, as follows:

> . . . .***[O]ur corporate leverage is improving*** up to 2.5 times of corporate EBITDA, down from the results of June of last year by 0.7 times.

Emphasis added.

263. The statements referenced above in ¶¶260-62 concerning Abengoa's financial results and guidance, including its leverage, cash flow, and EBITDA, were materially false and misleading at the time they were made because they conveyed to investors that Abengoa was operating profitably and, in turn, had sufficient cash flows to service its debt. In reality, the profitability and liquidity described by Abengoa was due in material part to its ongoing accounting fraud. Indeed, throughout 2014, Abengoa was engaged in widespread and systemic accounting fraud, as detailed above in ¶¶59-74.

264. This included artificially increasing project margins in 2014 to recognize substantial amounts of revenue prematurely for the purposes of inflating Abengoa's financial results, such as how Inabensa increased the margin of the "DGEN" project in India to 86% in order to record the full profit from the project, even though it had hardly even started. Similarly, Abengoa had also recorded €58 million in "cost provisions," the majority of which occurred in the final months. This was also done for the purpose of artificially inflating Abengoa's earnings. Additionally, as alleged above in ¶¶109-22, Abengoa was actively concealing a loss of €840 million attributable to six of its solar power plants in Spain.

265. In addition, as alleged above in ¶¶133-47, Abengoa was hiding additional significant losses attributable to its operations in Abengoa Solar and Abengoa Bioenergia. These losses, according to forensic analyst reports, amounted hundreds of millions of euros that Abengoa fraudulently refused to record and deliberately kept hidden.

266. Collectively, the false and/or materially misleading statements referenced above concealed Abengoa's true liquidity risk from investors and prevented the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt.

*Strategy Update Breakfasts*

267. On September 3, 2014, Abengoa filed with the SEC a Form 6-K containing a slide presentation to be given at its "strategy update" breakfasts held in London and New York on

September 3 and 4, 2014, respectively. In the presentation, Abengoa highlighted that it had achieved a "***Strong liquidity position***" and "***Reinforced financial discipline***" and represented that Abengoa's "***Key Strategic Priorities***" included "Reduction of Corporate leverage," "positive [free cash flow] in 2014," "Reduc[ing] Levels of Gross Debt," "Significant Reduction of Financial Costs," and "Improving [Abengoa's] Credit Rating." The presentation further stated that Abengoa maintained a "***Strong focus on financial discipline*** . . . ."

268. Speaking during the September 3, 2014 update breakfast in London, Ortega commented on Abengoa's purported "strong liquidity position" in pertinent part, as follows:

> . . . And ***we told you we were planning to reinforce the financial discipline*** with certain targets that we told you. And I am happy to tell you that ***all those targets that we told you are either achieved or on track*** and, therefore, ***we have been strict on the financial discipline managing [Abengoa]*** as one of the priorities of the management team.
>
> * * *
>
> And the whole picture, I mean the global picture . . . is that ***we are finishing at the Company what we call the period of balance sheet optimization*** and we recognized that our balance sheet was not optimal.
>
> I mean we have suffered even 2011, 2012, I mean this crisis that we have gone through, it was – it was really tough. And ***we believe that we have done a lot of homework trying to improve the balance sheet of the Company and the financial discipline in the Company and we believe we are about to complete that balance sheet optimization***.
>
> So ***the main*** . . . ***focus point of that is to continue with a reduction of the corporate leverage***, to reduce the corporate CapEx, ***to achieve the corporate free cash flow or the operating free cash flow in 2014 positive*** and to set this record and vehicle of equity results.
>
> I mean in the next period we call [it] . . . financial expense reduction, we can call it EPS expansion, if you want, . . . on the other side.
>
> Because ***basically what we're trying to do is to reduce the levels of gross debt and cash, enhance the liquidity that we have in the Company***, to reduce the negative working capital and related costs that it has, to reduce the financial cost of the Company and materially improve the EPS of the Company therefore and hopefully ***leading*** all of them ***to an improvement of the credit rating*** [which] as you know has been one of our main targets.

Emphasis added.

269. Abengoa's and Ortega's statements referenced above in ¶¶267-68 were false and/or materially misleading because they concealed the rampant accounting fraud occurring within Abengoa. As of the date of the Strategy Update Breakfast, Abengoa was engaged in widespread and systemic accounting fraud, as detailed above in ¶¶59-74. This included artificially increasing project margins in 2014 to recognize substantial amounts of revenue prematurely for the purposes of inflating Abengoa's financial results, such as how Inabensa increased the margin of the "DGEN" project in India to 86% in order to record the full profit from the project, even though it had hardly even started. Similarly, Abengoa had also recorded €58 million in "cost provisions," the majority of which occurred in the final months. This was also done for the purpose of artificially inflating Abengoa's earnings. Additionally, as alleged above in ¶¶109-22, Abengoa was actively concealing a loss of €840 million attributable to six of its solar power plants in Spain.

270. In addition, as alleged above in ¶¶133-47, Abengoa was hiding additional significant losses attributable to its operations in Abengoa Solar and Abengoa Bioenergia. These losses, according to forensic analyst reports, amounted hundreds of millions of euros that Abengoa fraudulently refused to record and deliberately kept hidden.

271. In light of the above, Abengoa's and Ortega's statements during the Strategy Update Breakfast misrepresented its "financial discipline" and "strong liquidity position." Collectively, the false and/or materially misleading statements referenced above concealed Abengoa's true liquidity risk from investors and prevented the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt.

*First Nine Months of 2014 Financial Results*

272. On November 12, 2014, Abengoa issued a press release announcing its financial results for the nine months ended September 30, 2014, which was filed with the SEC on Form 6-K. Abengoa reported that EBITDA had risen 24% year-over-year, to €1,071 million, which Defendant Sánchez Ortega attributed to "an improvement in our activities." With respect to

Abengoa's leverage, the press release stated that Abengoa's "***pro-forma corporate net debt to corporate EBITDA ratio (Corporate Leverage Ratio) as of September 30, 2014 was 2.1x***, [a] 0.4x reduction versus the previous quarter, [and] ***on track for full year 2014 target of 2.0x***." In addition, Abengoa raised its 2014 Corporate EBITDA guidance from a range of €860 million to €885 million, to a range of €885 million to €900 million, and reaffirmed its 2014 EBITDA guidance of a range of €1,350 million to €1,400 million.

273. Later that day, Defendants held a conference call with analysts and investors to discuss Abengoa's financial results. The corresponding presentation slides were filed with the SEC on Form 6-K the same day. During the call, Zubiría discussed Abengoa's EBITDA, free cash flow generation, as well as debt and cash flow targets, in pertinent part, as follows:

> . . . What's also very important is ***that our corporate EBITDA target has been increased*** despite the lower volumes. . . . From a balance sheet and cash flow perspective, ***the Company has been able to continue delivering on its financial commitments and has been preparing itself for delivery of its leverage and cash flow targets***. . . . ***We have generated EUR164 million of free cash flow in the quarter***. And most importantly, we have started to see the positive trend that we had anticipated from working capital, which has recovered over EUR250 million of the cash consumed in the first part of the year. ***We feel, therefore, confident to reconfirm the debt and cash flow targets for the year***.
>
> * * *
>
> . . . [W]e are ***expecting to see a strong, a very strong fourth quarter in terms of cash flow generation from working capital***.

Emphasis added.

274. Ortega also commented on Abengoa's leverage ratio, stating in pertinent part, as follows:

> . . . . ***Last but not least important, the management has been diligent in maintaining a keen eye on our financial commitments, continuing executing on our deleveraged plans. As of September, our pro forma corporate net debt leverage stood at 2.1 times our corporate EBITDA, one step closer to our end-of-the-year target of 2 times***. . . .

Emphasis added.

275. Additionally, in the earnings presentation slides, Defendants reported that Abengoa was "on track to achieve our positive [free cash flow] target for FY 2014E."

276. This was the first quarterly conference call held with analysts following Abengoa's issuance of the Greenfield Bonds. The Greenfield Bonds were offered in two tranches (one in euros and one in U.S. dollars), both maturing in 2019. The Greenfield Bond offering closed on September 30, 2014 – the last day of the third quarter. Importantly, according to Abengoa's press release announcing the offering, the Greenfield Bonds would "be ***guaranteed by the company*** and several of the company's subsidiaries." (Emphasis added.) Likewise, the Greenfield Bonds' offering memorandum represented that the bonds were "irrevocably guaranteed on a senior unsecured basis" by Abengoa. The offering memorandum further represented that Abengoa "intend[ed] to classify" the Greenfield Bonds as corporate recourse debt "upon issuance."

277. Notwithstanding Abengoa's representations about its guarantee of the Greenfield Bonds, its financial statements for the first nine months of 2014 did not include them as recourse debt. Accordingly, during the November 12, 2014 conference call, HSBC analyst Sean McLoughlin sought clarification about the fact that "the green bond . . . [did not] seem to be" included in Abengoa's reported corporate leverage ratio of 2.1x. In response, Zubiría revealed that Abengoa had reclassified the Greenfield Bond as non-recourse debt, thereby excluding it from Abengoa's debt and leverage ratios. Zubiría stated, in pertinent part: "So, it is included in the September 30th numbers. It is, however, . . . categorized under nonrecourse financing [in process]."

278. Likewise, Barclays analyst Tom Southton questioned why the Greenfield Bonds had not been included in Abengoa's reported corporate leverage ratio of 2.1x, stating in pertinent part: "[S]o obviously the greenfield bonds . . . are the same as the other debts guaranteed by Abengoa. And yet, you're not including it in the corporate debt. I just wanted to understand why." Zubiría similarly responded that, "It is, for accounting purposes, classified in a different bucket. . . . It is preoperational nonrecourse debt. And that is accounted for as what we call nonrecourse debt . . . ."

279. In response to the revelation that Abengoa had reclassified the Greenfield Bonds in order to report a more favorable corporate leverage ratio and concerns that its lack of credibility could harm its borrowing ability, the price of Abengoa ADSs fell nearly ***50%*** over the next three trading days, on heavy trading volume, as the market digested the adverse announcements – falling from a closing price of $17.59 per ADS on November 11, 2014, to close at $8.83 per ADS on November 14, 2014.

280. The fallout from the November 12, 2014 revelation of the Greenfield Bonds' reclassification forced Defendants to make additional disclosures about Abengoa's debt and leverage during a conference call held on Monday, November 17, 2014, in an effort to repair their credibility.

281. During the call and in an accompanying presentation filed with the SEC on Form 6-K, Defendants revealed that Abengoa accounted for a total of ***€1.595 billion*** (including the €500 million Greenfield Bonds) as so-called "non-recourse debt in process" – thereby excluding such debt from Abengoa's corporate leverage ratio – even though the debt was guaranteed by Abengoa.

282. Abengoa further revealed that after including "non-recourse debt in process," Abengoa's corporate leverage ratio was 3.9x, its "total net debt" was over €9 billion, and its "total net leverage" ratio was 5.6x. Finally, Zubiría disclosed that Abengoa did not characterize as debt "approximately €1 billion of cash linked to supplier payment[s] that is [set aside] on collateral accounts."

283. Notwithstanding these disclosures, during the call, Ortega continued to highlight Abengoa's purportedly adequate liquidity position, stating, in pertinent part, as follows:

> . . . ***[W]e have a sound financial health, which is underpinned by the strong liquidity that we have in the Company, which will allow us to continue [to] manage the Company***. ***It's business as usual***.
>
> <u>Zubiría</u>:
>
> . . . I think that's the most important thing, which was the point – ***the message at the end is that we are in a sound financial position, underpinned by our strong liquidity position***. I think our liquidity protection policy, that, as we have always

> explained, and some of you have not like because it's not the most cost efficient, I think, today is extremely valuable because ***we have the liquidity to be able to undertake our short-term obligations***.

Emphasis added.

284. The November 12 and 17, 2014 statements referenced above in ¶¶272-75 and ¶283 concerning Abengoa's financial condition and liquidity were materially false and misleading at the time they were made because they concealed the rampant accounting fraud occurring within Abengoa. As of the date of this conference call, Abengoa was engaged in widespread and systemic accounting fraud, as detailed above in ¶¶59-74. This included artificially increasing project margins in 2014 to recognize substantial amounts of revenue prematurely for the purposes of inflating Abengoa's financial results, such as how Inabensa increased the margin of the "DGEN" project in India to 86% in order to record the full profit from the project, even though it had hardly even started. Similarly, Abengoa had also recorded €58 million in "cost provisions," the majority of which occurred in the final months. This was also done for the purpose of artificially inflating Abengoa's earnings. Additionally, as alleged above in ¶¶109-22, Abengoa was actively concealing a loss of €840 million attributable to six of its solar power plants in Spain.

285. In addition, as alleged above in ¶¶131-47, Abengoa was hiding additional significant losses attributable to its operations in Abengoa Solar and Abengoa Bioenergia. These losses, according to forensic analyst reports, amounted hundreds of millions of euros that Abengoa fraudulently refused to record and deliberately kept hidden.

286. In light of the above, Abengoa's and Ortega's statements during the conference call misrepresented its "financial health" and "strong liquidity." Collectively, the false and/or materially misleading statements referenced above concealed Abengoa's true liquidity risk from investors and prevented the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt.

<u>*February 9, 2015 Announcements*</u>

287. On February 9, 2015, Abengoa issued a press release concerning its "preliminary results for 2014," its "targets for 2015" and "the progress of its strategic plan[.]" It reported that

consolidated EBITDA for 2014 was "expected" to be "slightly more than" €1,400 million – in line with 2014 guidance – and "[c]orporate free cash flow after asset rotations in 2014 [was] expected to be around €135 [million]."

288. With respect to Abengoa's debt and leverage, the press release stated that "[c]orporate net debt [was] expected to be around €2,350 [million] as [of] December 31, 2014, with a corporate leverage ratio of 2.4x" – missing its guidance of 2.0x. The press release emphasized, however, that "[t]aking into account the €390 [million] in cash proceeds from the corporate transactions carried out during the first few weeks of 2015 (the sale of 13% of Abengoa Yield, and the sale of assets to Abengoa Yield . . . ) adjusted corporate net debt as at December 31, 2014 would be approximately €1,960 [million], equivalent to a corporate leverage ratio of 2.0x." The press release further stated that "[n]onrecourse debt in process (NRDP) as at December 31, 2014 [was] estimated at €1,940 [million], resulting in a corporate leverage ratio including NRDP of 4.5x or an adjusted ratio of 4.1x" and "consolidated net debt [was] approximately €7,290 [million], which implies a consolidated leverage ratio of 5.2x or an adjusted ratio of 4.9x."

289. Later that day, Ortega held a conference call with analysts and investors to discuss Abengoa's progress and outlook for 2015. The corresponding presentation slides were filed with the SEC on Form 6-K the same day. During the call, Ortega and Zubiría's successor as CFO at the time, Garcia Alvear, discussed Abengoa's liquidity position and free cash flow generation, in pertinent part, as follows:

Garcia Alvear:

> . . . ***[W]e never stress enough the importance of maintaining a solid liquidity buffer to guarantee the flexibility of the business***. [As a consequence of our] strategic actions . . . , ***we are significantly enhancing our liquidity position, leaving us with a comfortable outlook for the future***.
>
> * * *
>
> All in all, ***this represents a very strong liquidity position for the Company and makes us look to the remainder of the year with a very positive visibility***.

Ortega:

> ***[In] 2015, we'll definitely see significant cash generation*** on top of the operating activity, ***and that will be prompted by the strong execution of our financial plan, optimizing our business model***.
>
> * * *
>
> And we of course ***maintain our commitment to keep*** a ***healthy level of liquidity*** . . . . ***[T]he business model of Abengoa now is set for a strong positive cash flow generation***.

Emphasis added.

290. In addition, the presentation slides accompanying the conference call stated that Abengoa was "***maintaining a healthy level of liquidity***" and that its new business model, Abengoa 3.0, was "***poised to generate positive free-cash flow***."

291. The statements referenced above in ¶¶287-90 concerning Abengoa's EBITDA and liquidity were materially false and misleading at the time they were made. Throughout 2014, Abengoa was engaged in widespread and systemic accounting fraud, as detailed above in ¶¶59-74. This included artificially increasing project margins in 2014 to recognize substantial amounts of revenue prematurely for the purposes of inflating Abengoa's financial results, such as how Inabensa increased the margin of the "DGEN" project in India to 86% in order to record the full profit from the project, even though it had hardly even started. Similarly, Abengoa had also recorded €58 million in "cost provisions," the majority of which occurred in the final months. This was also done for the purpose of artificially inflating Abengoa's earnings.

292. Additionally, as alleged above in ¶¶133-47, Abengoa was actively hiding additional significant losses attributable to its operations in Abengoa Solar and Abengoa Bioenergia. These losses, according to forensic analyst reports, amounted hundreds of millions of euros that Abengoa fraudulently refused to record and deliberately kept hidden.

293. Abengoa also ended 2014 by significantly inflating profits and committing blatant acts of fraud to conceal substantial amounts of debt. As alleged above in ¶¶133-47, Abengoa inflated its year-end operating profit by €218 million, causing Abengoa to report a year-end profit of €125,300,000 when in reality it should have reported a loss in the amount of €92,700,000. At

the same time, Abengoa fraudulently concealed its debt by falsely excluding €1.2 billion of debt from its net financial debt to avoid breaching a covenant with its lenders. And, shockingly, Abengoa cancelled a €500 million syndicated loan on December 31, 2014 only to renew it two days later on January 2, 2015 for the purpose of making it seem less leveraged than it truly was.

294. Abengoa and Ortega materially misrepresented its earnings and liquidity, given that they concealed the above information. Collectively, the false and/or materially misleading statements referenced above concealed Abengoa's true liquidity risk from investors and prevented the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt.

*Full Year 2014 Financial Results and 2014 20-F*

295. On February 23, 2015, Abengoa issued a press release announcing its financial results for the full year ended December 31, 2014, which was filed with the SEC on Form 6-K. The press release stated that "[a]ll the figures presented [on] February 9, 2015, as part of the market update held by the company, have been confirmed" and reiterated Abengoa's 2015 guidance and leverage targets.

296. The same day, Abengoa filed its annual report for the year ended December 31, 2014 with the SEC on Form 20-F ("2014 20-F"), which was signed and certified pursuant to Sarbanes-Oxley by Ortega. Ortega stated in his certification that:

> I, Manuel Sánchez Ortega, Chief Executive Officer of Abengoa S.A. (the "Company"), certify that:
>
> 1. I have reviewed this annual report on Form 20-F of the Company;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

> 4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (c) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and
>
> 5. The Company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of Company's board of directors (or persons performing the equivalent function):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

297. Ortega's Sarbanes-Oxley certification referenced above in ¶¶295-96 was false and/or materially misleading because it concealed the rampant accounting fraud occurring within Abengoa. The certification represented that the Form 20-F did not contain any material misrepresentations or omission concerning the period ended December 31, 2014. However, prior to and during that period, Abengoa engaged in widespread and systemic accounting fraud, as detailed above in ¶¶59-74. This included artificially increasing project margins in 2014 to recognize substantial amounts of revenue prematurely for the purposes of inflating Abengoa's

year-end results, such as how Inabensa increased the margin of the "DGEN" project in India to 86% in order to record the full profit from the project, even though it had hardly even started. Similarly, Abengoa had also recorded €58 million in "cost provisions," the majority of which occurred in the final months. This was also done for the purpose of artificially inflating Abengoa's earnings.

298. Additionally, as alleged above in ¶¶133-47, Abengoa was actively hiding additional significant losses attributable to its operations in Abengoa Solar and Abengoa Bioenergia. These losses, according to forensic analyst reports, amounted hundreds of millions of euros that Abengoa fraudulently refused to record and deliberately kept hidden.

299. Abengoa also ended the 2014 year by significantly inflating profits and committing blatant acts of fraud to conceal substantial amounts of debt. As alleged above in ¶¶133-47, Abengoa inflated its year-end operating profit by €218 million, causing Abengoa to report a year-end profit of €125,300,000 when in reality it should have reported a loss in the amount of €92,700,000. At the same time, Abengoa fraudulently concealed its debt by erroneously excluding €1.2 billion of debt from its net financial debt to avoid breaching a covenant with its lenders. And, shockingly, Abengoa cancelled a €500 million syndicated loan on December 31, 2014, only to renew it two days later, on January 2, 2015, for the purpose of making it seem less leveraged than it truly was.

300. Contrary to how Abengoa was fraudulently manipulating its financial statements, Ortega's certification claimed that the financial statements "fairly present[ed] in all material respects the financial condition, results of operations and cash flows" of Abengoa. Accordingly, Ortega's statements in the Sarbanes-Oxley certification were false and/or materially misleading.

301. The 2014 20-F also discussed Abengoa's liquidity position and cash flow, stating, in pertinent part, as follows:

> ***Based on our current level of operations, we believe our cash flow from operations, available cash and available borrowings under our credit facilities will be adequate to meet our future liquidity needs for at least twelve months***.

* * *

> ***We are committed to maintaining a sound capital structure and a strong liquidity position***.

* * *

> ***We believe that our existing liquidity and cash flow will be sufficient to meet our requirements and commitments for the foreseeable future***.

Emphasis added.

302. Also on February 23, 2015, Abengoa held a conference call with analysts and investors to discuss its full year 2014 financial results. The corresponding presentation slides were filed with the SEC on Form 6-K the same day. During the call, Garcia Alvear discussed the Abengoa's approach to managing its liquidity, in pertinent part, as follows:

> ***As liquidity is a cornerstone to our financial management***, ***we are taking all the necessary steps to enhance it through 2015*** and improve the flexibility of our business. . . . To replenish the liquidity buffer is important; after having supported the credit through liquidity, we plan to monetize our investments for a further EUR1.6 billion, based on a plan already shared with the market . . . . Altogether this will leave [us] with a total corporate cash source of plus EUR4.4 billion. ***That leaves us in an excellent position to face our operational and financial needs***.

Emphasis added.

303. Additionally, Ortega commented on Abengoa's business model, stating, in pertinent part, as follows:

> After the completion of the strategic milestones that we announced in Q1, ***we think that our business model is all set to enhance our free cash flow generation*** and activate our eventual cycle.

* * *

> . . . ***Abengoa will be less capital-intensive*** and increase the returns per euro spent ***and improving the overall financial strength of the Company through a sustainable free cash flow generative model***.

Emphasis added.

304. In the presentation slides, Abengoa reiterated that it was "***maintaining a healthy level of liquidity***" and noted that it had "***substantial liquidity sources to face [its] corporate***

***commitments***." Abengoa also assured investors that "strong cash generation [was] expected for 2015" and that it had a "business model poised to generate positive free-cash flow."

305. The statements referenced above in ¶¶301-304 were false and/or materially misleading because they concealed Abengoa's true liquidity risk from investors and prevented the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt.

*First Quarter of 2015 Preliminary Financial Results and Ninth Annual Analyst and Investor Day*

306. On April 7, 2015, Abengoa issued a press release announcing its preliminary financial results for the quarter ended March 31, 2015, which was filed with the SEC on Form 6-K. It reported that consolidated EBITDA was expected to be between €265 million and €285 million. The press release also stated that during the quarter, Abengoa had "[a]nnounced transactions with expected cash proceeds of approximately [€1.1 billion]," and highlighted that "together with the corporate transactions announced during this first quarter, Abengoa's corporate liquidity at the end of March is approximately [€3.0 billion], a 5% increase compared to the [€2.8 billion] available by the end of 2014."

307. Also on April 7, 2015, Abengoa held its 9th Annual Analyst and Investor Day in New York. A financial review presentation given by Garcia Alvear, and filed with the SEC on Form 6-K, stated that Abengoa had taken "***[s]ignificant liquidity enhancement actions during Q1 to protect [its] credit profile***," had achieved its "***liquidity reinforcement plan***," expected "***significant corporate cash generation***" for 2015, and had "***[r]einforced and de-risked [its] free cash flow generation profile***." In addition, Abengoa reaffirmed its corporate free cash flow target of €1.4 billion for FY 2015.

308. Significantly, Abengoa highlighted the Abengoa 3.0 model, which was referred to in the presentation slides as a "positive game changer" that "***de-risk[ed] [the Company's] business model***."

309. The statements referenced above in ¶¶306-08 concerning Abengoa's EBITDA and liquidity were materially false and misleading at the time they were made. Throughout 2014 and

into 2015, Abengoa was engaged in widespread and systemic accounting fraud, as detailed above in ¶¶59-74. This included artificially increasing project margins in 2014 to recognize substantial amounts of revenue prematurely for the purposes of inflating Abengoa's financial results, such as how Inabensa increased the margin of the "DGEN" project in India to 86% in order to record the full profit from the project, even though it had hardly even started. Similarly, Abengoa had also recorded €58 million in "cost provisions," the majority of which occurred in the final months. This was also done for the purpose of artificially inflating Abengoa's earnings.

310. Additionally, as alleged above in ¶¶133-47, Abengoa was actively hiding additional significant losses attributable to its operations in Abengoa Solar and Abengoa Bioenergia. These losses, according to forensic analyst reports, amounted hundreds of millions of euros that Abengoa fraudulently refused to record and deliberately kept hidden.

311. Abengoa and Ortega materially misrepresented its earnings and liquidity, given that they concealed the above information. Collectively, the false and/or materially misleading statements referenced above concealed Abengoa's true liquidity risk from investors and prevented the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt.

*First Quarter of 2015 Financial Results*

312. On May 14, 2015, Abengoa issued a press release announcing its financial results for the quarter ended March 31, 2015, which was filed with the SEC on Form 6-K. Abengoa reported that EBITDA had risen 22% year-over-year, to €321 million. With respect to Abengoa's leverage, the press release stated that its "adjusted corporate net debt to corporate EBITDA ratio (Adjusted Corporate Leverage Ratio) as of March 31, 2015 was 1.5x, a 1.0x reduction versus March 31, 2014, on track for full year 2015 target of 1.2x." In addition, Abengoa reduced its 2015 consolidated EBITDA guidance to a range of €1,330 million to €1,380 million, in light of its agreement "to sell a third asset package" to Abengoa Yield, while reaffirming its 2015 guidance of: (1) a corporate net debt to corporate EBITDA ratio of 1.2x; (2) a corporate net debt ratio of

3.2x; (3) a consolidated net leverage ratio of 3.9x; and (4) corporate free cash flow after asset rotations of approximately €1,400 million.

313. The same day, Abengoa filed with the SEC a separate Form 6-K reporting its financial results for the Quarter ended March 31, 2015 (the "1Q15 Form 6-K"). The 1Q15 Form 6-K included Abengoa's Consolidated Condensed Interim Financial Statements for the First Quarter of 2015, filed with the CNMV on May 14, 2015, which discussed its liquidity position, in pertinent part, as follows:

> ***Abengoa's financing and liquidity objectives are to ensure that the company has sufficient funds available on an ongoing basis to honor all upcoming financial commitments and obligations***.

Emphasis added.

314. The 1Q15 Form 6-K also reported Abengoa's Corporate Net Finance Debt to Consolidated EBITDA ratio, in pertinent part, as follows:

> To ensure that the Company has sufficient funds to repay the debt with respect to its capacity to generate cash flow, Abengoa has to comply with a financial ratio (Net Financial Debt/Corporate EBITDA) with the financial institutions.
>
> According to the financing agreements the maximum limit of this ratio is 2.5 starting December 31, 2014. ***As of March 31, 2015, Corporate Net Debt/EBITDA financial ratio is 2***. . . .

Emphasis added.

315. Also on May 14, 2015, Abengoa held a conference call with analysts and investors, during which Garcia Alvear provided reassurances about its liquidity position, stating in pertinent part, as follows:

> . . . ***[C]orporate liquidity*** . . . ***stands at EUR3.022 billion as at March 31, 2015***. . . . ***Thus the Company can access quite readily to accompany the needs of the business***.
>
> * * *
>
> ***During 2015, management has decided to put a strong focus on the enhancement of our liquidity position, and to keep on reinforcing our balance sheet***.
>
> * * *

> Let me remind you that we have the ability of another EUR400 million of undrawn working capital line facilities, an extra cushion that leaves us ***in a very comfortable position to face the needs of the operation of our business and our strategic commitments.*** Given the current corporate liquidity available of EUR3 billion on the total estimated liquidity sources of EUR4.3 billion, ***we feel we're in a very comfortable position to face and fulfill our commitments for the future***. . . .

Emphasis added.

316. Additionally, Ortega commented on Abengoa's capital structure, in pertinent part, as follows:

> . . . ***And we believe that now we have the adequate structure to be able to grow without penalizing the balance sheet of the Company, on the contrary, with contribution on the cash flow generation of the Company, every time we continue growing***. . . .

Emphasis added.

317. The statements referenced above in ¶¶312-16 concerning Abengoa's EBITDA and liquidity were materially false and misleading at the time they were made. Throughout 2014 and into 2015, Abengoa was engaged in widespread and systemic accounting fraud, as detailed above in ¶¶59-74. This included artificially increasing project margins in 2014 to recognize substantial amounts of revenue prematurely for the purposes of inflating its quarterly results, such as how Inabensa increased the margin of the "DGEN" project in India to 86% in order to record the full profit from the project, even though it had hardly even started. Similarly, Abengoa had also recorded €58 million in "cost provisions," the majority of which occurred in the final months. This was also done for the purpose of artificially inflating Abengoa's earnings.

318. Additionally, as alleged above in ¶¶133-47, Abengoa was actively hiding additional significant losses attributable to its operations in Abengoa Solar and Abengoa Bioenergia. These losses, according to forensic analyst reports, amounted hundreds of millions of euros that Abengoa fraudulently refused to record and deliberately kept hidden.

319. Abengoa and Ortega materially misrepresented its earnings and liquidity, given that they concealed the above information. Collectively, the false and/or materially misleading statements referenced above concealed Abengoa's true liquidity risk from investors and prevented

the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt.

*First Half of 2015 Financial Results*

320. On Friday, July 31, 2015, Abengoa issued a press release announcing its financial results for the six months ended June 30, 2015, which was filed with the SEC on Form 6-K. It reported purportedly "***[s]trong business performance***," driven by "healthy growth in EBITDA" of 9% year-over-year, or €650 million. With respect to Abengoa's leverage, the press release stated that its "corporate net debt to corporate EBITDA ratio (Corporate Leverage Ratio) as of June 30, 2015 was 2.5x, a 0.1x reduction versus March 31, 2015."

321. Abengoa also held a conference call with analysts and investors to discuss its results for the first half of 2015. During call, Abengoa again misrepresented its liquidity, claiming that it had no plans to access the capital markets for additional financing.

322. In particular, Garcia Alvear gave a detailed presentation on Abegoa's liquidity position during the call, which included a "potential downside scenario," stating, in pertinent part, as follows:

> Taking into the account the liquidity that we went through before and including the monetized of the treasury stock, we will end with an expect liquidity of EUR1,865 million. In the right side, ***we have run a potential downside scenario***, arriving to the same conclusions. With this estimation for the second semester, we meet our guidance for operating cash flow generation, reaching between EUR480 million and EUR530 million for the full year – sorry, for this, in 2016, there is no significant debt maturities other than remaining EUR125 million of the high yield of 2016 and with a cash flow generation that we're expecting, ***even under conservative scenario*** . . . ***we expect to maintain even higher level of liquidity***.
>
> * * *
>
> ***Given the current liquidity position and the options we have reviewed with you to access additional liquidity, we believe we are in a comfortable position to face the future maturities of our corporate debt***. . . .

Emphasis added.

323. Also during the call, analysts asked directly whether Abengoa was adequately funded, or whether any additional capital was necessary to support the business. Seage responded, in pertinent part, as follows:

> Pinaki Das – BofA Merrill Lynch – Analyst:
>
> . . . So, can you tell us, for H2, what are your funding needs? ***The one thing that the market has been worried about when you have recently issued some of the loans or even sold your treasury shares that you need to fund the business.***
>
> ***So, can you tell us, for H2, will you come back to the market?*** Is there – what are your funding needs? Is it zero, or do you need – I don't know – EUR500 million to invest in new CapEx? I don't have a problem with investing in CapEx. I think it's fine. But, if you have a need, is it possible for you to make it clear to the market that, on a consolidated level, this is the amount of CapEx we need to spend, and this is how we'll fund it. We might come back to the market for an -- I don't know – bond issuance or – I don't know – we'll sell more assets or maybe go for bank funding. So, that's for H2, H2 2015. Is there any funding? Do you need to come back for anything else?
>
> Seage:
>
> So, in H2, ***there is no need to fund anything***. . . . Ignacio [Garcia Alvear] showed you on a scenario, a liquidity analysis, as he called it, where you can see that ***we not – don't need to access the market for anything***. The way we finance our consolidated CapEx, as you know, mostly is through nonrecourse debt and, in second place, with partners. . . . [W]e have taken into account the equity we need to invest ourselves. As you can see here, ***there's no need to access the market for any reason***.
>
> * * *
>
> John Quealy – Cannacord Genuity – Analyst:
>
> Given the concerns in the equity and debt markets, ***even though you said there's nothing planned on corporate market injections in the Company in 2015, is it worthwhile putting an equity injection or something into this to just give a margin of safety to the marketplace***, given your end market seems fairly demand – fairly strong, and your position in it is strong as well. It's just a scrutiny around this business model. I can't see you guys slowing down project development, quite frankly. So, would you care to comment on that comment? Thank you.
>
> Seage:

> . . . Going to your second part of the question, ***at this point in time, the Company has no plan to do what you were suggesting, to tap the capital markets in any manner***.

Emphasis added.

324. The statements referenced above in ¶¶320-23 concerning Abengoa's EBITDA and liquidity were materially false and misleading at the time they were made. Throughout 2014 and into 2015, Abengoa was engaged in widespread and systemic accounting fraud, as detailed above in ¶¶59-74. This included artificially increasing project margins in 2014 to recognize substantial amounts of revenue prematurely for the purposes of inflating its financial results, such as how Inabensa increased the margin of the "DGEN" project in India to 86% in order to record the full profit from the project, even though it had hardly even started. Similarly, Abengoa had also recorded €58 million in "cost provisions," the majority of which occurred in the final months. This was also done for the purpose of artificially inflating Abengoa's earnings.

325. Additionally, as alleged above in ¶¶133-47, Abengoa was actively hiding additional significant losses attributable to its operations in Abengoa Solar and Abengoa Bioenergia. These losses, according to forensic analyst reports, amounted hundreds of millions of euros that Abengoa fraudulently refused to record and deliberately kept hidden.

326. Abengoa and Ortega materially misrepresented its earnings and liquidity, given that they concealed the above information. Collectively, the false and/or materially misleading statements referenced above concealed Abengoa's true liquidity risk from investors and prevented the market from accurately determining whether and to what extent Abengoa would be able to make sufficient profits and cash flows to service its debt.

327. This was especially true with regard to Seage's statements that Abengoa did not "need" or have any "plan[s]" to raise additional money from the capital markets. As revealed the very next business day on August 3, 2015, Abengoa in fact did need additional capital and very much had plans to raise it as of the time of the above statements. Indeed, on Monday, August 3, 2015, Abengoa announced a massive capital increase with pre-emptive rights of ***€650 million*** ($713 million) and asset divestitures totaling €500 million.

## Additional Scienter Allegations

*Corporate Scienter*

328. The accounting fraud within Abengoa was widespread and pervasive. The former employees describe a stunningly deficient environment of internal controls over financial reporting. Significantly, the fraud was facilitated and even required by Abengoa's senior leadership.

329. First and foremost, Benjumea, Abengoa's former Executive Chairman, was directly involved in and responsible for artificially inflating project expenses for the purpose of prematurely recognizing revenue in violation of IAS 11 (*i.e.*, the percentage of completion method). Benjumea directed his subordinates, including **Julio Artillo**, Inabensa's former Administration Department Director, and **José Domínguez Abascal**, then Abengoa's general secretary, to carry out his instructions "urgently."

330. Second, in connection with Benjumea's invoice "triangulation" scheme, he and Ortega continue to face criminal charges in Spain's National Court. The claims against them have been vetted by investigating judges and approved after receiving competing testimony and expert analysis. The crimes alleged consist of misrepresenting Abengoa's financial statements to the public and concealing a liquidity crisis that ultimately led it to bankruptcy, similar to the claims here.

331. Third, as of February 2020, Abengoa's Audit Committee members, **Mercedes Gracia Diez** and **Alicia Velarde Valiente**, as well as Abengoa's independent auditor, **Deloitte S.L.**, and lead audit partner, **Don Manuel Arranz Alonso**, also face criminal charges for misrepresenting Abengoa's financial statements. Like the claims against Ortega and Benjumea, a judge has independently evaluated the evidence against them showing that they knowingly certified false financial information to the public.

332. Fourth, as described by FE4, FE5, and FE7, Abeinsa's and Inabensa's various department heads and directors participated in and/or were complicit in the fraud, given the fact that it required their approval to transfer expenses among the various subsidiaries. This included

employees ranging from project managers, such as **Juan Angel Sierra Figueroa** and **Hakan Gok** who instructed FE5 to falsify project margins, to the CFO of Abeinsa, **Santiago Duran** who told FE1 to "shut the f--k up and just sign" reports known to contain false financial information.

333. Fifth, Abengoa utilized a control system that effectively prevented project managers from lowering project margins, even when the costs for the project required. This control system, referred to as Mandatory Compliance Standards (MCSs or, in Spanish, NOCs), required a chain of approvals reaching upper levels of Abengoa management. Consequently, the NOCs allowed senior management to maintain inflated margins in projects throughout Abengoa, as described above in ¶¶59-74. Proof of this is evident in the fact that Abengoa developed and maintained two sets of accounting records: the SAP records for external purposes and Excel spreadsheets used for internal discussion only. These records differed materially, namely because the project margins in the SAP records did not reflect the true finances of many of Abengoa's projects. These MCSs, or NOCs, were corporate policy and therefore designed and implemented with the knowledge and permission of Abengoa's senior leadership.

334. Sixth, Abengoa also tied corporate bonuses to project profitability, motivating all levels of management to perpetuate the fraud at all costs. FE4, FE5, and FE7 describe how Abengoa's management, ranging from project managers all the way up through department heads and subsidiary directors, benefitted financially from meeting bonus objective. By increasing project margins and, in turn, project earnings, these employees received substantial bonuses in addition to their annual compensation. Proof of this is evident in the fact that cost provisions regularly increased close in time to the end of the fiscal year, as demonstrated by the internal accounting files provided by FE7.

335. The intent of these employees is imputed to Abengoa under the doctrine of *respondeat superior* and common law principles of agency. Thus, given the widespread knowledge of the fraud by and among the organization's senior leadership, their scienter is imputed to Abengoa for the purposes of this lawsuit.

*Ortega's Resignation Bolsters the Inference of Scienter*

336. Ortega resigned abruptly in May 2015 following an embarrassing and highly damaging revelation concerning Abengoa's leverage ratios and amidst a tightening of internal controls while Abengoa was on the eve of financial collapse. The following chronology demonstrates that his resignation further supports an inference of scienter.

337. On September 22, 2014, Abengoa announced a €500 million private placement of "green bonds" issued by Abengoa Greenfield (*i.e.*, the "Greenfield Bonds"). The proceeds from the offering would supposedly be used to finance certain environmentally sustainable energy projects "until the long-term funds associated with those projects are obtained," while "optimizing financial costs" for Abengoa, and would "be ***guaranteed by the company*** and several of the company's subsidiaries." The offering memorandum further represented that Abengoa "***intend[ed] to classify***" the Greenfield Bonds as corporate recourse debt "upon issuance." Thus, Abengoa's investors and purchasers of the Greenfield Bonds alike expected the bonds to be recorded as corporate recourse debt on Abengoa's balance sheet.

338. Notwithstanding the foregoing, Abengoa did not classify the bonds as corporate recourse debt on its balance sheet. When analysts raised questions about this, Abengoa ultimately disclosed that it had excluded the bond and other debt totaling nearly €1.6 billion, plus approximately €1 billion owed to suppliers, from its leverage ratios, in order to report more favorable ratios and avoid breaching various covenants with lenders. Abengoa had no basis for doing this; in fact, as the ICAC would later declare, Abengoa's auditors failed to provide "sufficient and adequate evidence that would allow them to justify their conclusion or the reason for classifying the debt as without recourse" and, therefore, their decision to do so was "reprehensible." The fallout from this episode was highly damaging to Abengoa's reputation and share price.

339. In May 2015, Abengoa created a "Controller Department" for the purpose of auditing past projects to determine why margins stayed relatively consistent throughout the life of projects before dropping drastically upon completion. The reason was, of course, because Abengoa

was artificially inflating its project margins in SAP. Furthermore, it was also at this time that Abengoa's IT subsidiary, Simosa IT, purchased a new project management system to address Abeinsa's "cost provision" practices. Thus, as alleged above in ¶¶59-74, Ortega's resignation coincided with two poignant control programs that presented an acute risk to Ortega that his fraudulent style of management would be exposed.

340. On May 8, 2015, Abengoa borrowed 95 million Class B shares from its majority shareholder, Inversión Corporativa IC, S.A. ("Inversión"), equal to ***10%*** of its total outstanding stock and worth approximately ***€275 million***. On the ***very same day*** that Abengoa borrowed the Class B shares from Inversión, Abengoa agreed to subscribe to 51% of a $670 million capital increase announced by Abengoa Yield, designed to fund the acquisition of four solar power assets owned by Abengoa.

341. On May 19, 2015, Ortega resigns from his position as CEO.

342. On June 29, 2015, Abengoa entered into a margin loan facility agreement with a financial institution pursuant to which an Abengoa subsidiary would be permitted to borrow up to ***$200 million***. As collateral for the loan, Abengoa posted a 14% stake in Abengoa Yield which, according to reports, was worth approximately ***$450 million*** at the time.

343. On July 16, 2015, Abengoa made yet another move indicative that it badly needed cash, when it filed a Form 6-K announcing that it had raised €97.6 million from the sale of ***all*** of its Class B shares in treasury stock at a price of €2.80 per share.

344. On August 3, 2015, Abengoa announced its abrupt massive capital increase with pre-emptive rights of ***€650 million*** ($713 million); and asset divestitures totaling €500 million – €100 million more than announced on July 31 – plus "additional divestitures of bioenergy assets."

345. On November 8, 2015, Abengoa announced that Gonvarri had agreed to invest approximately €350 million in connection with Abengoa's planned €650 million capital increase. But then, just two-and-a-half weeks later on November 25, 2015, reveals that Gonvarri cancelled the agreement and as a result, Abengoa was filing for preliminary creditor protection under the Spanish Insolvency Law.

346. The above timeline shows that Ortega's resignation occurred on the eve of Abengoa's complete financial collapse, a collapse that had been concealed and delayed by the fraud that occurred under his watch while CEO. When internal auditors and controllers began uncovering evidence of fraud, Ortega resigned with only months to spare before the scheme was exposed.

347. The criminal charges against Ortega in Spain make clear that he was involved in the alleged fraud. They are based on evidence that has been independently obtained and vetted by investigating judges. In fact, the evidence to date has been so compelling that Spain's National Court expanded the claims to several additional parties, as discussed above in ¶¶175-93.

348. Ortega's certification of Abengoa's internal controls and disclosures over financial reporting under Sarbanes-Oxley places him at the center of the alleged fraud and, therefore, his resignation is indicative of scienter. Collectively, Ortega's resignation, given its timing relative to Abengoa's internal control efforts, capital raises, and the criminal proceedings, give rise to a strong inference of scienter.

* * *

349. As alleged herein, the Exchange Act Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of Abengoa or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. The Exchange Act Defendants, by virtue of their receipt of information reflecting the true facts regarding Abengoa, their control over, and/or receipt and/or modification of Abengoa's allegedly materially misleading misstatements and/or their associations with Abengoa which made them privy to confidential proprietary information, were active and culpable participants in the fraudulent scheme alleged herein.

350. The Exchange Act Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of Abengoa, including each of the Exchange Act Defendants.

351. The Exchange Act Defendants, because of their positions with Abengoa, controlled the contents of its public statements during the Class Period. They were provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Exchange Act Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading. As a result, each of the Exchange Act Defendants is responsible for the accuracy of Abengoa's corporate statements and is therefore responsible and liable for the misrepresentations contained therein.

**Loss Causation/Economic Loss**

352. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Abengoa ADSs and operated as a fraud or deceit on Class Period purchasers of Abengoa ADSs by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Abengoa ADSs fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of Abengoa ADSs during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

353. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Abengoa's business and prospects, specifically the liquidity risk it faced from its inability to timely meet its financial obligations and fund its operations.

Defendants' false and misleading statements and omissions had the intended effect and caused Abengoa ADSs to trade at artificially inflated levels throughout the Class Period, reaching as high as $29.14 per share on September 4, 2014, before falling to $6.00 per share on August 4, 2015 – a decline of 79%.

354. Under questioning from analysts during Abengoa's November 12 and 17, 2014 conference call, Ortega and Zubiria were forced to reveal that Abengoa had excluded the Greenfield Bonds from its leverage ratios, in order to report more favorable ratios. In response to this revelation and concerns that Abengoa's lack of credibility could harm its borrowing ability, the price of Abengoa ADSs fell nearly 50% over the next three trading days, on heavy trading volume, as the market digested the adverse announcements – falling from a closing price of $17.59 per ADS on November 11, 2014, to close at $8.83 per ADS on November 14, 2014.

355. Analysts and investors criticized Abengoa following the November 12 and 17, 2014 conference calls. For example, a Lucror Analytics report issued on November 13, 2014 "caution[ed] that Abengoa's calculation of corporate leverage should be taken with a grain of salt, ***as the real corporate leverage is higher, in our view***. . . . [A]s long as the debt issued by Abengoa Greenfield is recourse debt, we do not believe that it is appropriate to exclude it from the corporate leverage calculation." The report concluded that: "With its weak and constantly changing disclosure, Abengoa is creating the impression that it is trying to hide something from analysts . . . ."

356. Similarly, on November 14, 2014, Fitch Ratings issued a report noting that under Fitch's calculations of Abengoa's leverage – which included the Greenfield Bonds – "our adjusted FY14 net recourse leverage estimate (4x) is ***nearly twice the company's most recent figure of 2.1x*** . . . ." A BPI analyst report issued the same day noted that the "***credibility and uncertainty issues***" raised by the reclassification of the Greenfield Bonds "pose[d] relevant risks in funding access and related cost" – of particular concern since "access to credit markets is critical for [Abengoa]."

357. According to a November 18, 2014 *Reuters* article, the reclassification of the Greenfield Bonds as non-recourse debt "***flies in the face of the traditional definition of non-recourse debt***, which usually has no claim on the parent company." The article reported that during the conference call, Abengoa "faced myriad further questions about how various liabilities are treated on its balance sheet" – including its failure to categorize the €1 billion linked to supplier payments as debt – and quoted a hedge fund analyst as stating: "***The more they open the door on their financials, the more questions there are***." (Emphasis added.)

358. Although Defendants had been forced to "open the door on [Abengoa's] financials" just a crack, investors remained unaware that Defendants were inflating Abengoa's earnings and falsifying financial information. By doing so, Defendants continued to conceal Abengoa's true financial condition and its ability to generate sufficient cash to service its debt, and thereby misled the market about Abengoa's liquidity and the likelihood of, and need for, of future capital raises.

359. Ultimately, the alleged fraud was not enough to prop up Abengoa, and on July 31, 2015, Abengoa was forced to slash its free cash flow guidance and announce plans to divest €400 million worth of assets. Although Abengoa had finally begun to reveal signs that its financial condition was worse than previously disclosed, it continued to misrepresent both the severity of its liquidity problems and plans going forward. In response to questions from analysts about whether Abengoa would need to "come back to the market" to raise capital, Abengoa steadfastly denied that possibility, stating that "at this point in time, the Company has no plan . . . to tap the capital markets in any manner" and "there's no need to access the market for any reason."

360. Despite Abengoa's adamant reassurances during the July 31 conference call that its liquidity was sufficient and that it had "***no plan . . . to tap the capital markets in any manner***," on ***the very next business day***, Abengoa stunned the market when it announced that it would do just that.

361. Before the markets opened on Monday, August 3, 2015, Abengoa issued a press release and filed a Form 6-K filed with the SEC announcing that it would hold an extraordinary shareholders meeting to seek approval of: (1) a massive capital increase with pre-emptive rights

of ***€650 million*** ($713 million); and (2) asset divestitures totaling €500 million – €100 million more than announced on July 31 – plus "additional divestitures of bioenergy assets." According to Abengoa, these admittedly "significant actions" were necessary to "reduce corporate debt" and "reinforce [Abengoa's] balance sheet."

362. According to a Sabadell analyst report dated August 3, 2015, the planned €650 million capital increase represented ***34%*** of Abengoa's market capitalization at the time it was announced.

363. Analysts and investors were stunned by Abengoa's announcement, and interpreted the sudden reversal regarding its need to raise capital as an indication that its liquidity position was in jeopardy.

364. For example, an August 3, 2015, Cannacord Genuity analyst report stated that "Monday's . . . announcements ***caught the market by surprise, triggering renewed fears over liquidity***."

365. A Citi analyst report issued on August 4, 2015 noted that Defendants "***expressly stated on the call*** that the company would not need to come back to the markets (equity and credit) this year, and ***that liquidity was 'comfortable'***. . . [but] ***then announced a material rights issue . . . on the next trading day***. . . ." The Citi report concluded that the reversal "***inevitably raises the question as to why the rights issue should be necessary if there is not a liquidity situation***."

366. An August 3, 2015 *Bloomberg* article similarly noted that Abengoa's announcements that day, following on the heels of the July 31, 2015 announcement lowering Abengoa's 2015 free cash flow guidance, had "***eroded trust in Abengoa's accounting methods and ability to generate sufficient cash to service its debt***."

367. Abengoa's about-face signaled to investors that its previous statements about its "strong liquidity position" and "strict financial discipline," for example, were untrue. In fact, Abengoa was and had been on the brink of a liquidity crisis, a reality that had been successfully concealed since the Offering thanks to Defendants' false and materially misleading statements and accounting fraud scheme to inflate earnings and hide losses. The announcement on August 3, 2015

was proof positive of Abengoa's precarious liquidity position, poor financial condition, and its dire need for additional capital. In response to the revelation, the price of Abengoa's ADS plummeted nearly 30%, from a closing price of $11.06 per share on July 31, 2015, to close at $7.75 per share on August 3, 2015. The price of Abengoa's ADSs fell an additional $1.75 per share on the following trading day, as the market digested the announcements, closing at $6.00 per share on August 4, 2015 – a total decline of more than 45%. In total, Abengoa lost ***$8.1 billion*** in market capitalization and approximately ***$837 million*** in ADS market share over the course of two trading days.

368. Investors' fears about Abengoa's liquidity position were confirmed on November 25, 2015, when Defendants announced that Abengoa was filing for preliminary creditor protection under the Spanish Insolvency Law.

369. The precipitous decline in the price of Abengoa ADSs was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the price of Abengoa ADSs negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e*., damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Abengoa ADSs and the subsequent significant decline in the value of Abengoa ADSs when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance: Fraud on the Market Doctrine and *Affiliated Ute* Doctrine**

370. Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. Abengoa's ADSs traded in an efficient market;

d. the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Abengoa's ADSs; and

e. Plaintiffs and the other members of the Class purchased Abengoa ADSs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

371. At all relevant times, the market for Abengoa ADSs was an efficient market for the following reasons, among others:

a. Abengoa ADSs met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. as a regulated issuer, Abengoa filed periodic public reports with the SEC and the NASDAQ;

c. Abengoa regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Abengoa was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

372. As a result of the foregoing, the market for Abengoa ADSs promptly digested current information regarding Abengoa from all publicly available sources and reflected such information in the prices of Abengoa's ADSs. Under these circumstances, all purchasers of

Abengoa ADSs during the Class Period suffered similar injury through their purchase of Abengoa ADSs at artificially inflated prices and a presumption of reliance applies.

373. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Abengoa's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

374. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

**No Safe Harbor**

375. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein. Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Abengoa who knew that those statements were false when made.

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

**Against the Exchange Act Defendants**

376. Plaintiffs incorporate herein ¶¶1-197 and ¶¶220-375 by reference.

377. During the Class Period, the Exchange Act Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

378. The Exchange Act Defendants violated §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Abengoa's ADSs during the Class Period.

379. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Abengoa ADSs. Plaintiffs and the Class would not have purchased Abengoa ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements and/or omissions.

380. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Abengoa ADSs during the Class Period.

**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**[4]

381. Plaintiffs incorporate herein ¶¶1-197 and ¶¶220-380 by reference.

382. The Individual Defendants acted as controlling persons of Abengoa within the meaning of §20(a) of the Exchange Act, as alleged herein. By reason of their high-level positions

---

[4] Plaintiffs acknowledge that the Court denied leave to amend with respect to the Section 20(a) claim against Ortega and accordingly except him from this Count. However, Plaintiffs reserve all rights to renew the claim and/or appeal the Court's denial of leave to amend if an underlying primary violation of Section 10(b) is adequately pleaded against Abengoa.

with Abengoa, their ownership of Abengoa ADSs, their participation in and/or awareness of the its operations and/or intimate knowledge of the false and materially misleading statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control (and did influence and control), directly or indirectly, the decision-making of Abengoa, and caused it to engage in the wrongful conduct complained of herein, including the dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had access to: reports, press releases, public filings and other information and statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Abengoa and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

383. As set forth above, the Individual Defendants violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. Moreover, by virtue of their positions as controlling persons, the Individual Defendants had the power and authority to, and did, cause Abengoa to engage in the wrongful conduct alleged. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Abengoa's ADSs during the Class Period. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a. Determining this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class representatives, and designating Lead Counsel as Class Counsel;

b. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

c. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: September 22, 2026

Respectfully submitted,

LEVI & KORSINSKY, LLP

s/ Adam M. Apton
Nicholas I. Porritt
Adam M. Apton
Max E. Weiss
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

*Counsel for Lead Plaintiffs Jesse Sherman and Arlette Sherman and Lead Counsel for Class*

Robert M. Rothman
Erin W. Boardman
Robert D. Gerson
ROBBINS GELLER RUDMAN & DOWD LLP
58 South Service Road, Suite 200
Melville, New York 11747
Tel: (631) 367-7100
Fax: (631) 367-1173

*Counsel for Plaintiff PAMCAH-UA Local 675 Pension Fund and Additional Counsel for Class*